G66AAOLIC                    Conference

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        15 CR 861-1(JMF)

5    ROBERT OLINS,

6                   Defendant.

7    ------------------------------x

8                                        New York, N.Y.
                                         June 6, 2016
9                                        3:45 p.m.

10
     Before:
11
                      HON. JESSE M. FURMAN,
12
                                         District Judge
13

14                        APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     ANDREA GRISWOLD
17   CHRISTINE MAGDO
          Assistant United States Attorney
18
     JAMES R. DEVITA
19        Attorney for Defendant Olins

20   ANTHONY CECUTTI
          Attorney for Defendant Olins
21

22

23

24

25

1          (Case called)

2          THE COURT:  You may be seated.

3          MS. MAGDO:  Good afternoon, your Honor.

4          Christine Magdo, on behalf of the government.  With me

5   at counsel table is AUSA Andrea Griswold, paralegal specialist

6   Holly Meister and joining us from Yale Law School for the

7   summer, Matthew Chan.

8          THE COURT:  Good afternoon, to you'll of you.

9          MR. DEVITA:  James DeVita, for Mr. Olins.

10         With me is Anthony Cecutti who has recently joined to

11  assist me on the case and Mr. Olins is here.

12         THE COURT:  Good afternoon, to all of you.

13         All right.  So we're mainly here to talk about

14  scheduling just because there are a couple wrinkles in my

15  schedule that I wanted to go over.

16         But am I correct, Ms. Magdo, that the government

17  obtained a superseding indictment against the defendants?  As

18  long as we're here I would think I should arraign the defendant

19  on that as well.

20         MS. MAGDO:  That would be great from our perspective.

21         THE COURT:  Can you tell me what the main differences

22  are between the original indictment and the S1 indictment.

23         MS. MAGDO:  Certainly.  There are no new charges.

24  There are no new counts.  It's basically a matter of

25  clarification.  With respect to the dragon candelabra

1    transaction, in the original indictment we had CC1 as a

2    co-conspirator with Mr. Olins on that transaction.  The

3    superseding indictment removes him based on facts we've learned

4    since the original indictment.  And we also more specifically

5    describe what happened to the money that went to the Isle of

6    Man.  In paragraph 15 we clarify that it went through two

7    accounts before being wired back to the United States.

8                So those are the two changes that we made.

9                THE COURT:  All right.  Mr. DeVita, I should have

10   asked if you are prepared to proceed with arraignment.

11               MR. DEVITA:  Yes, we are, your Honor.

12               THE COURT:  All right.  Great.  So, Mr. Olins, if I

13   can you to please rise.

14               Have you seen a copy of the superseding indictment S1

15   15 CR 86?

16               THE DEFENDANT:  Yes.

17               THE COURT:  Have you read it?

18               THE DEFENDANT:  Yes, I have.

19               THE COURT:  Have you discussed it with Mr. DeVita?

20               THE DEFENDANT:  Yes, I have, your Honor.

21               THE COURT:  Would you like me to read it out loud or

22   do you waive its public reading?

23               THE DEFENDANT:  Waive the reading, sir.

24               THE COURT:  How do you plead at this time, guilty or

25   not guilty?

1          THE DEFENDANT:  Not guilty.

2          THE COURT:  Thank you.  You may be seated.

3          All right.  So trial in this matter is scheduled to

4     begin on June 27.  The issues -- and I think these may have

5     been flagged for you by my deputy -- the main issue for my

6     purposes is that I will be out of the district on July 8th,

7     11th and 12th.  So if the case were to go longer than eight

8     trial days we would run into that period of time.

9          Now, one option is that we just live with that.  And

10    if the case gets that far, we take a three-day break and resume

11    at whatever point we're at on the 13th.  Not ideal but it is

12    certainly doable.  Another option is, it may be that this is

13    not a big risk and you think that we will be done by the 8th in

14    which case it certainly wouldn't be an issue and then there are

15    some other options that I thought were at least worth

16    exploring.  The other would be the week of June 20th if that's

17    doable on your parts so that we could start promptly on the

18    27th or even sooner for that matter with openings and the like.

19         Although, given that you were not told about the

20    possibility of openings sooner than that, I wouldn't demand

21    that you do that unless you were prepared to do it so.  I

22    wanted to just get together so we could explore these options

23    and figure out where things stood.

24         It also sounded to me from my deputy that Mr. DeVita's

25    views of how long the case may last may have been different

1    than counsel's views at the conference when the trial was set.

2    So I figured better to have a conversation than proceed in

3    ignorance.

4              MR. DEVITA:  Your Honor, want to hear from me first?

5              THE COURT:  Sure.

6              MR. DEVITA:  Your Honor, I would find it very

7    difficult for us to open, to pick a jury and lose a day of

8    trial preparation.  I'm still playing catch up ball on this

9    case because of the volume of the discovery.  We just got

10   additional discovery on June and 1 and it's all electronic.

11   There was a period between the time that Dave -- it was clear

12   they weren't going to be continuing before I was able to enter

13   the case and I think that that makes losing a day of trial

14   preparation would be very difficult.  So I don't think that's a

15   good option.

16             THE COURT:  Meaning you would oppose even picking a

17   jury the week before on the 27th?

18             MR. DEVITA:  I think that -- yeah, I think it would

19   cut my time to prepare for trial.

20             THE COURT:  All right.  To be clear, you should

21   anticipate that you are going to need to open on the 27th any

22   way.

23             MR. DEVITA:  I understand that, your Honor.  I will be

24   prepared to do that but I am talking about just getting -- we

25   have an agreement with the government that they're going to

1    provide us 3500 material two weeks ahead of time.  My

2    impression is that there's going to be a fair amount of that.

3    We have exhibits ahead of time.  We are still working our way

4    through reviewing, there's an SEC case and other litigation

5    that has to have a substantial record that we need to

6    familiarize ourselves with.  So I think that the jury selection

7    will take a good part of the day.  And I would be prepared to

8    open on the 27th any way but just bites into that time.

9         I also don't think it's realistic even if we open and

10   pick a jury.  I just don't think it's realistic to see that

11   this case would reach the jury and the jury would reach a

12   verdict in the timeframe that you have because, as you know, as

13   you pointed out, the 4th of July weekend takes one day and at

14   the beginning of the week your Honor's schedule takes a day at

15   the end of the week.  I am just not that confident that that

16   case would even get to the jury in that time.

17        THE COURT:  All right.  Ms. Magdo, Ms. Griswold, let

18   me back up and at least at the time of the last pretrial

19   conference you must estimated that the case would last a week

20   or a little more than a week.  I assume you have a better sense

21   of timing at this point.  What is your current sense of an

22   estimate.

23        MS. MAGDO:  I think that currently we approximate

24   about six days.  We had planned it out with the jury being

25   picked the week of the 20th.  As your deputy has indicated, it

1   might be a possibility.  And in that case we would plan to be

2   wrapping up on July 5th.  We only have a total of about seven

3   or eight witnesses.  And again, some of it depends on how long

4   the cross-examination is but that would be our estimate.  Our

5   preference would be to pick the jury the prior week just for

6   the sake of efficiency and moving things along so that we have

7   the greatest chance of finishing before the three days that are

8   off.  And then I guess as your Honor said, it's not ideal but

9   we would be willing to live with continuing the trial on the

10  13th, if necessary.

11          THE COURT:  All right.

12          MS. MAGDO:  Just with respect to the amount of 3500

13  and discovery, if I could just briefly address that.  The vast,

14  vast majority of the discovery was produced in January.  And I

15  understand that the defense counsel is relatively new to the

16  case but that's one of the reasons we're producing our exhibits

17  two weeks in advance of trial, as well as our 3500 which is not

18  at all voluminous in this case.  The case agent has probably

19  between a hundred and 200 e-mails that we're still reviewing.

20  And for the other witnesses it's mainly their reports that were

21  written of their prior meetings with the government.  So I

22  would not really characterize that as voluminous.

23          THE COURT:  All right.  Does either side anticipate

24  motions being filed by the June 17th deadline?

25          MS. MAGDO:  We do, your Honor.

1          THE COURT:  Can you give me a sense of what the nature

2    of the motions might be.

3          MS. MAGDO:  I believe they're almost entirely

4    evidentiary just to bring up issues, things as simple as

5    whether something counts as a business record, whether

6    something is 404(B) or should be considered as evidence, direct

7    evidence of the conspiracy.  Nothing crazy or unusual.  Sort of

8    routine pretrial motions.

9          All right.  Mr. DeVita.

10          MR. DEVITA:  Your Honor, it's hard for me to

11   anticipate the motion in limine without knowing what the 404(b)

12   evidence the government intends to offer is and that would to

13   me be the most likely area of controversy.  I think that we've

14   spoken to -- I spoke to the government last week about getting

15   a preview of what their 404(b) evidence would be and we have an

16   agreement that I would get a higher level preview this week.

17   And then that was not until the motions in limine are due, the

18   details of the 404(b) evidence that is kind of difficult.  So

19   it's hard for me to make a motion in limine to exclude 404(b)

20   evidence but I don't really get the details until the day the

21   motions are due.

22          That's really, I don't see a lot of other motions.

23   We're also talking about possible stipulations and business

24   record stipulations and that sort of thing and that may avoid

25   pretrial motion practice.

1          THE COURT:  All right.  Obviously, I would encourage

2     you to discuss those with one another.  So my inclination is to

3     proceed as follows.  My inclination, I think there's a certain

4     degree of risks that we are going to run into in my absence

5     regardless but I am inclined to minimize that risk by

6     proceeding with jury selection the week of the 20th.  I really

7     don't understand how the defense could remotely be prejudiced

8     by that given that you would need to be prepared to open on the

9     27th any way.  So this would just provide you with the

10    certainty that you'll open on the 27th as opposed to the risk

11    and possibility that you would need to open on the 27th.  So I

12    don't think that there's any prejudice, whatsoever, that would

13    flow from doing it this way and it just minimizes the risk of

14    leading into my absence.

15         Having said that, I would prefer to -- well, it

16    doesn't matter so much to me but one option is to do it on the

17    22nd when we have the final pretrial conference scheduled

18    basically it to proceed with jury selection and then go into

19    the final pretrial conference after we've selected a jury.  The

20    other option would be to move into the 21st if counsel is

21    available on that date.  I don't have a strong feeling between

22    the two.  For my purposes the 21st might be marginally more

23    convenient but it doesn't really matter strongly.

24         So anyone have a thought?

25         MS. MAGDO:  Either of those work for the government.

 1        MR. DEVITA:  Your Honor, if we have to lose a day I'd

 2   rather lose one than have it happen twice.

 3        THE COURT:  Just to be clear, you would only lose one

 4   regardless.  I would either move the pretrial conference to the

 5   1st.  We'd have jury selection, followed by the final pretrial

 6   conference or we'd do the same on --

 7        MR. DEVITA:  I didn't understand that, your Honor.

 8   The 21st is fine.

 9        THE COURT:  All right.  So let's change that to the

10   21st.  Why don't we start at 9:30 in the morning and in all

11   likelihood we'll actually start with the final pretrial

12   conference because we wouldn't actually have a jury panel at

13   that time.  Although, given that it's Tuesday and not Monday,

14   we won't get one not long thereafter.  And whenever we get a

15   jury panel, we'll take a break from the final pretrial

16   conference, begin with jury selection and go from there.

17        That does mean that I don't have a whole lot of time

18   to ponder any motions and responses to those motions since

19   responses are due on the 20th.  I'll certainly do my best.  I

20   may or may not have rulings for you at the final pretrial

21   conference but I'll give them to you, if not there, soon

22   thereafter.  It does mean though that I won't have a whole lot

23   of time to ponder your preposed voir dire for purposes of jury

24   selection.

25        So to the extent you are able to file those by the

1   June 17 deadline, I would encourage you to do that just so I

2   have a little bit more time to prepare my voir dire script for

3   the 21st.  But we'll start on the 21st at 9:30 in the morning.

4   Any questions?

5            MS. MAGDO:  Not from the government, your Honor.

6            MR. DEVITA:  Your Honor, in my e-mail to the Court I

7   referenced an issue related to the documents that were produced

8   as, I'm not sure whether they were produced in response to a

9   grand jury subpoena or the SEC but Mallet, which is a key

10  player and former company of Mr. Neville who is not

11  cooperating, produced documents in this kind of fashion, your

12  Honor, with the redactions outweighing the actual documents.

13  And I would ask that we -- I was planning to make a submission

14  for 17(C) subpoena requiring them to produce un-redacted

15  versions of the documents.  And I would ask that your Honor if

16  we submit that tomorrow, grant that and we could get those

17  prior to the trial rather than serving trial subpoena.

18           THE COURT:  All right.  I didn't actually review your

19  e-mail with, certainly, not with any care because it wasn't a

20  formal submission.  That's part of what prompted me to just

21  make a conference was so that if there were any issues to be

22  discussed they could be discussed on the record since that was

23  just a communication with my deputy.  But can you back up and

24  fill me in on what you are talking about.

25           MR. DEVITA:  The company for which Mr. Neville worked

1   which was the company that sold a very substantial number of

2   the pieces from the receivership estate is called Mallet.  It

3   has a New York and a UK presence and Mr. Neville was in their

4   New York office.  There, Mr. Neville's alleged co-conspirator

5   with respect to the, at least now with respect to the vases,

6   they were involved in a number of transactions that also I

7   think are relevant to this.  When they produced the documents

8   in response either to the grand jury or to the SEC subpoena

9   which then was turned over in discovery redacted, among other

10  things, the people who purchased these items that are allegedly

11  underpriced and which were the subject of this case.  And it is

12  I think going to be highly relevant to both to the merits what

13  was told to the people who purchased this who would have never

14  known that until -- and they still don't know who it was that

15  Mallet sold them to.

16          And secondly, there are other transactions that are

17  similar in nature to the ones involved here that we would like

18  to get documents demonstrating what the sales price was.  And

19  Mallet, as I said, has redacted virtually all of the documents

20  it produced and we don't have information that we need.

21          THE COURT:  So these redactions were made by Mallet

22  itself, not by the government?

23          MR. DEVITA:  That's right.

24          THE COURT:  OK.  All right.  And can you just flesh

25  out for me what the relevance would be of, number one, any

1  communications made by Mallet to the purchasers?

2            MR. DEVITA:  Yes.  Any discussion of Mr. Olins or any

3  representations relating to Mr. Olins or his role in the

4  transaction, also what representations about the value of the

5  items made to the purchasers, the communications of the

6  purchasers to Mallet, I think are also the offer and when it

7  took place, how long.  It's part of the government's case that

8  Mr. Henry Neville had a purchaser early in 2012 and that my

9  client was aware of that.  The absence of any communication

10 between the purchasers and Mr. Neville, I mean Mr. Olins would

11 be relevant.  And also the absence of the person's awareness of

12 Mr. Olins would be relevant to the government's theory that he

13 was a co-conspirator and familiar with the transaction that

14 Mr. Neville was negotiating on the other side.

15           The timing of the offers from the seller, the

16 purchaser to Mallet is also relevant to when he could have

17 known what the price was going to be or what the prospective

18 price was going to be.  Without being able to test that we're

19 left only with the word of Mr. Neville about who he had

20 conversations with, when and what they would be willing to pay.

21           THE COURT:  OK.  I mean, I thought the gravamen of the

22 government's theory here is that Mr. Olins with others sold

23 these items for "X" and reported to the Court that they were

24 sold for some fraction of "X" and therefore pocketed the

25 difference.  I guess, I'm not --

1          MR. DEVITA:  That's actually slightly the reverse

2    because as far as the evidence is concerned, representations

3    were made to the Court regarding what the sale price would be

4    or what the value was and the allegation is that it was already

5    known prior to that and also known by my client that the offer

6    was, that the purchaser was willing to pay a higher price and

7    was being represented to the Court.  But if, in fact, that is

8    not the case or my client was not aware of that until after the

9    fact makes a big difference.

10          THE COURT:  OK.  What was the second category of --

11          MR. DEVITA:  Well, there were other transactions, your

12   Honor, where without going into too much detail about the

13   defense.  We're of the view that Mr. Olins is ignorant of the

14   misrepresentations that Mr. Neville was making and I think that

15   there are other transactions that we think that there are where

16   similar misrepresentations were made but I don't think the

17   government was intending Mr. Olins was aware or that Mr. Olins

18   shared in that.  We think that's highly relevant.

19          THE COURT:  All right.  Ms. Magdo, just to be clear,

20   there's no application on the table.

21          I guess, one question, Mr. DeVita, is that whatever

22   you plan to submit today or tomorrow is there any reason it

23   can't be done with notice to the government?

24          MR. DEVITA:  Well, it pretty -- it is customary, your

25   Honor, for the defense's strategy to be defense's and

1    applications of this nature in my experience were made ex

2    parte.  But I am prepared and I think I've outlined the

3    relevance of what I am going to be seeking.  I think if your

4    Honor has more questions about the relevance, I can go into

5    that.  But it's highly material to the defense and also to the

6    cross-examination of the key government witnesses and alleged

7    co-conspirator.

8            So I think -- I mean, if your Honor wants more than

9    that I was hoping that this could be considered an oral

10   application could just submit the proposed scene.

11           THE COURT:  In my experience whether it's done ex

12   parte or not depends on whether and to what extent --

13           Ms. Magdo, based on what you've heard you guys know

14   both sides know more about this case at the moment than I do.

15   What are your thoughts?

16           MS. MAGDO:  With respect to what has been redacted,

17   our understanding from speaking with counsel for Mallet is that

18   these documents were produced in response to the SEC and that

19   there were certain documents, physically, located abroad and

20   not located in the U.S. or on U.S. servers and that Mallet was

21   not obligated, in their opinion, to produce those documents.

22   And if they did so as a courtesy or because they wanted to

23   cooperate but that they have to comply with certain European

24   privacy laws before they're able to do so because that is

25   the -- of this action, the redactions that we see now.  Again,

1   I haven't seen the un-redacted documents is that these deal

2   mainly with the identity of the purchaser or not with the price

3   or with the dates of relevance.  And we could clarify that with

4   Mallet if that would be helpful.

5       But we also and we mentioned this to Mr. DeVita right

6   before the conference, to the extent the government has become

7   aware of the names of parties through independent means, means

8   independent of what Mallet has produced, we're willing to share

9   that with defense attorney.  And whatever we know with respect

10  to that we, of course, are willing to share.  But I think the

11  broader point is it doesn't really matter whether the purchaser

12  of the vases was someone who living in English or someone who

13  living in Japan or South Africa or in the U.S. it doesn't go to

14  what's at issue in this case.

15      There are e-mails evidencing Mr. Olins' knowledge and

16  his communication and there's witness testimony on that point,

17  and as far as I know and I am happy to doublecheck, there have

18  been no communications between Mr. Olins and Mr. Neville that

19  have been withheld.  Those would be a U.S. Attorney server.

20  Server.  So honestly we don't feel strongly if defense would

21  like a subpoena for this purpose.  But we are willing to help

22  out as much as we can to expedite this.

23      THE COURT:  All right.  Well, why don't you do that in

24  any event.  Given that there's no opposition and given that

25  Mr. DeVita has a better sense of potential relevance here than

1    I do at the moment I am prepared to sign the subpoena and grant

2    the application understanding that Mallet may well have some

3    views on the matter.  And if these are not held in the United

4    States and they implicate European data private privacy laws

5    they may not be willing to be able to comply in which case,

6    obviously, I'll give them an opportunity to be heard at the

7    appropriate time.

8            So, Mr. DeVita, do you have the subpoena with you?

9            MR. DEVITA:  No.  I'll submit it tomorrow, your Honor.

10            THE COURT:  If you do that I'll get a signed copy and

11    we can go from there.

12            Anything else?

13            MS. MAGDO:  Not from the government, your Honor.

14            MR. DEVITA:  Not from the defendant.

15            THE COURT:  All right.  In that case I will see you on

16    the 21st.  Thank you very much.

17                        (Adjourned)

18

19

20

21

22

23

24

25