UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA, New York, N.Y.

v. 15 Cr. 861(JMF)

ROBERT OLINS,

Defendant.

------------------------------x

December 20, 2016
9:10 a.m.

Before:

HON. JESSE M. FURMAN,

District Judge

APPEARANCES

PREET BHARARA
United States Attorney for the
Southern District of New York
BY: CHRISTINE I. MAGDO
ANDREA M. GRISWOLD
Assistant United States Attorneys

DOAR, RIECK, KALEY & MACK
Attorney for Defendant
BY: JAMES R. DeVITA

LAW OFFICE OF ANTHONY CECUTTI
Attorney for Defendant
BY: ANTHONY CECUTTI

ALSO PRESENT:

HOLLY MEISTER, U.S. Attorney's Office
VIRGINIA FAUGHNAN, U.S. Postal Service
MATTHEW BITTERMAN, FBI

(Case called)

MS. MAGDO: Good morning, your Honor. Assistant U.S. Attorney Christine Magdo for the government. With me at counsel table is Assistant U.S. Attorney Andrea Griswold, Paralegal Specialist Holly Meister, and Postal Inspector Virginia Faughnan. Good morning.

THE COURT: Good morning.

MR. DeVITA: Good morning, your Honor. James DeVita, Doar, Rieck, Kaley & Mack, for Mr. Olins. With me is Anthony Cecutti, and Mr. Olins is here.

THE COURT: Good morning to you, as well. Mr. DeVita, I hope you are doing well.

MR. DeVITA: Yes, your Honor. Something of a false alarm. It turned out to be something less serious than it could have been, but it kept me in the emergency room from 8:00 in the morning until 10:00 at night to find that out.

THE COURT: All right. Well, I'm sorry to hear about that but certainly pleased to hear that it appears to have been less serious than you feared. Good to see you.

We are here for the *Fatico* hearing and, assuming that time allows, sentencing. I am happy to cut right to the hearing, but do you want to give me a sense of what I can expect? Not in terms of the particulars, but just in terms of witnesses and the like.

MS. MAGDO: Yes, your Honor. I would appreciate the

opportunity to just frame the issues before the court before we call our first witness.

THE COURT: Sure.

I will stress that I have read all of the submissions, and I think those do helpfully frame the issues; but to the extent you think that there is additional framing that I would benefit from, go ahead.

MS. MAGDO: Okay. Well, it will just take a couple of minutes. I know there have been a number of submissions and a lot of back and forth.

I just want to clarify what's at issue and what the government believes is not in dispute.

So what is not in dispute is that the parties entered into a plea agreement that has a stipulated guidelines range of 33 to 41 months. As the court is well aware, the parties are bound by the plea agreement, not to seek a sentence outside of this guidelines range. And so, at first blush, it may seem a little bit unusual that we are having a *Fatico* hearing, that the government requested a *Fatico* hearing, where the parties are constrained to a relatively narrow range of eight months in terms of sentencing.

But, as your Honor is aware, Mr. Olins has submitted two sentencing submissions, and the government believes that the lengths that he goes to to deny, to excuse, and to downplay his criminal conduct and to shift blame on to others is worth

putting to rest, so to speak, or attempting to put to rest, because it doesn't present an accurate version, in the government's opinion, of what actually happened.

So Mr. Olins, in his submissions, spends a lot of time making accusations against Mr. Neville. He depicts him as the mastermind and himself as a victim of Mr. Neville.

As the government's witnesses today will testify, there is a lot of fraudulent --

THE COURT: Hold on for a second. I don't know who is in the back. I assume none of them is someone likely to be called as a witness?

MS. MAGDO: That's correct, your Honor.

THE COURT: Okay. Thank you. Go ahead. Sorry to interrupt.

MS. MAGDO: No problem.

We have some witnesses today, your Honor, who will speak about instances of fraudulent or disruptive conduct that Mr. Olins engaged in which had nothing to do with Mr. Neville or involved Mr. Neville only tangentially.

Basically what Mr. Olins wants the court to believe is that, aside from the narrow sliver of criminal activity to which he allocuted at his plea hearing, the remainder of the allegations in the indictment are false. For example, the indictment alleges that, in November 2012, before Mr. Jacob purchased the dragon candelabra from the receiver, Mr. Olins

made an agreement with Mr. Jaeger whereby Mr. Olins would receive share of proceeds, and Mr. Jaeger could resell the dragons at a significant markup. When that markup was not achieved, Mr. Olins took a cut from the proceeds anyway, and then falsely stated to Mr. Jaeger that he had not done so.

So what Mr. Olins is doing is, rather than admitting his wrongdoing or even remaining silent about it, he has presented in his sentencing submission a completely alternative version of what happened between Mr. Jaeger and Mr. Rusco -- I mean between Mr. Jaeger and Mr. Olins. So this is conduct that is set forth in the indictment, and we think it is worth the time to set the record straight, as the government sees it.

The indictment also described Mr. Olins' purchase on credit of a pair of wall brackets worth about $700,000; and, here, what I would just like to point out for the court is that, although the government believes evidence shows the wall brackets were purchased in early 2011, Mr. Olins maintains that they were purchased in 2010 and spends a lot of time in his submissions writing about that.

But, just to clarify, whether they were purchased in 2010 or 2011 is ultimately not material. What is material is that in 2012 and 2013, Mr. Olins diverted about a half million dollars of money that should have gone to the receiver and he put it towards paying for those wall brackets.

And finally, the indictment also alleges wrongdoing by

Mr. Olins with respect to a set of three vases. Now, Mr. Olins admits that he should not have wired $160,000 that he received from the sale of those vases to an account in the Isle of Man and that he did so in an effort to hide the money from the receiver and the SEC. But Mr. Olins denies that he and Mr. Neville had prearranged a split of the proceeds. He again blames Mr. Neville for defrauding the receiver, and this time tries to pass himself off as a lucky latecomer who happened to stumble upon the spoils of Mr. Neville's criminal activity and managed to convince Mr. Neville to share those proceeds with him.

Finally, Mr. Olins seeks to mitigate his wrongdoing by claiming that he was motivated by dire financial desperation; but, again, as the government will show, this self-serving version of the events is simply not supported by the evidence and is yet another attempt to distract the court from the conduct at issue.

So, to conclude, the efforts that I have just described by Mr. Olins, this classic smoke and mirrors technique, Mr. Olins undoubtedly hopes will prevent the court from focusing on the evidence of his guilt.

If, during today's proceeding, the government believes that the defendant has failed clearly to demonstrate acceptance of responsibility, the government will seek denial of the three-point adjustment that is currently in the plea agreement

for acceptance of responsibility.

Just briefly, the witnesses we plan to call today are Mr. Rusco, who works for AB&T Bank, which was appointed receiver over Mr. Olins' art and antiques collection; Mr. Jaeger, who was an acquaintance --

(Pause)

MS. MAGDO: -- who appeared on cue at the door, which was not intended, Mr. Jaeger, who was an acquaintance of Mr. Olins and who purchased the dragon candelabra; Mr. Neville, with whom the court is familiar, who worked for Mallett; and then our paralegal, Holly Meister, to put in some financial records and summary charts.

We had originally intended to call Ms. Silverstone as a short witness -- she is an interior decorator who did work for Mr. Olins during the relevant time period -- but she was scheduled to have surgery this morning, so we excused her appearance.

So we have four witnesses.

THE COURT: All right. Thank you.

MR. DeVITA: Your Honor, let me start by reassuring the court, Mr. Olins accepts responsibility for his crime. He has pled guilty to it. We don't deny that he committed the crimes to which he has pled guilty -- obstruction, conspiracy to obstruct justice, and money laundering.

The details, I think, are -- and, secondly, it is

clear from the -- and I think will be clear from this hearing, that Mr. Olins' financial circumstances, after the SEC disgorgement order, became extremely dire; and that is not an excuse for his crime, but it is context for which your Honor to take into account. It is not denial of his guilt or any shirking of acceptance of responsibility. It is simply to put into context motivation.

There have been references to high living, apartments in Spain, none of which materialized. And your Honor will hear that there are many instances, there is substantial evidence of Mr. Olins' difficulties, financial difficulties throughout this entire period. As I say, it is not offered for an excuse, merely to put the entire crime in context.

I think that there may be a difference of memories as to who agreed to what at what time. I think that Mr. Neville's memory is incorrect. I think that the key point that the government -- that the defense has made with respect to the dragon candelabra is that, when they were sold, they were sold free and clear of any claim by the bank. They were sold to Mr. Jaeger with the full knowledge that he was going to try and sell them for profit.

The bank forewent -- could have kept the dragon candelabra and continued trying to sell it, as it had been for two years. It chose to shift the risk of loss or the hope of gain to someone else. And the fact that ultimately Mr. Olins

shared in that may not be admirable, but I don't think it constitutes a fraud against the bank, because there were no misrepresentations in connection with that. All of that was very transparent.

So that is basically our position.

Where we differ --

THE COURT: All right. I think I have a pretty good sense from the papers, which, as I said, I have read very carefully. You will have an opportunity to be heard, if not at the conclusion of the hearing, then at sentencing.

So why don't we, I would propose, get started and have the government call its first witness?

MS. MAGDO: Thank you, your Honor.

The government will call Mr. Rusco.

GREGORY WESTFALL RUSCO,

called as a witness by the government,

having been duly sworn, testified as follows:

THE COURT: You may proceed.

MS. MAGDO: Thank you.

DIRECT EXAMINATION

BY MS. MAGDO:

Q. Mr. Rusco, where are you currently employed?

A. Currently employed with American Bank & Trust Company in Tulsa, Oklahoma.

Q. How long have you been employed at -- is it referred to as

AB&T?
A. Generally, yes, AB&T.
Q. How long have you been employed at AB&T?
A. 32 years.
Q. What is your current position there?
A. I am executive vice president in commercial lending.
Q. Back in 2003, were you also involved in commercial lending?
A. Yes.
Q. In May 2003, did AB&T make a loan to Mr. Olins?
A. Yes, we made a loan, actually, to Argyle Capital Management Corporation, and Robert Olins was a guarantor of that loan.
Q. What did you understand the relationship between Argyle Capital Management and Mr. Olins to be?
A. He was 100 percent owner of Argyle Capital, Mr. Olins was.
Q. And was the loan originally in the amount of $3 million?
A. Approximately that amount, yes.
Q. And what was the original collateral for the loan?
A. Originally we had an assignment of promissory notes from Spatia Light, as well as Spatia Light stock, and then a negative pledge on a portion of Robert's art and antique collection.
Q. What is a negative pledge?
A. That's an agreement where the assets listed in the agreement, the pledgor agrees not to encumber them or sell them without any consent on our part.

Q. After AB&T made the original loan in 2003, were modifications made to the loan?
A. Yes, they were.
Q. When did the last of those modifications occur?
A. The last modification occurred in April of 2009.
Q. What was the amount of the loan at that time -- of the principal?
A. The principal amount of that loan was $5,100,000.
Q. And at that time, in April 2009, what were the assets serving as collateral for the loan?
A. There was a pledge of Mr. Olins' art and antique portfolio, the entire portfolio.
Q. And did you have a sense of the value of that portfolio in 2009?
A. Yes.
Q. Approximately how much did you understand it to be worth?
A. It was in the 10 to $12 million range.
Q. What was that based on?
A. That was based on auction estimates, original purchase price of assets, and insured values.
Q. And prior to 2011, had payments on the loan been made in a timely fashion?
A. Yes, they had.
Q. And what was the source of the principal payment, the payments toward the principal amount of the loan?

A. It was the sale of the art and antique assets.
Q. So, in other words, it was the sale of the same assets that were serves as collateral?
A. Correct.
Q. And why was the loan structured or why was the payment of the principal structured in this way?
A. We were at a point where we needed to pay down the loan, and that was the only source of income that we knew that Robert had was to sell those assets.
Q. And how were those assets sold to make payments?
A. There were two ways we did it.

One was to place them in an auction house and have them sold through the auction company or through a retail dealer. We would consign them to the dealer and have a certain price that we would accept for payment of those -- the sale of those assets.
Q. Was Mr. Olins permitted to sell items from the art and antique collection without your knowledge?
A. No, he was not.
Q. And what was to happen to the proceeds from those sales?
A. The proceeds were to have been paid to the bank in order for us to apply them on the principal of the loan.
Q. And do those proceeds include 100 percent of the proceeds net of commissions?
A. That's correct.

Q. Did there come a time when your ability to sell the items, as you just have described, was restricted?

A. Yes, there was a time.

Q. When was that?

A. That was in August of 2011.

Q. And what was that restriction?

A. The SEC had invoked a restraining notice on those assets, saying that they could not be sold without any consent or acknowledgment by them.

MS. MAGDO: If we could please display Government Exhibit 102.

BY MS. MAGDO:

Q. Mr. Rusco, that should appear on your screen as well as it should be in the binder that you have in front of you so you can look at it whichever way you prefer.

THE COURT: Why don't we go with the binder for now.

THE WITNESS: The screen is not coming up mine is not.

BY MS. MAGDO:

Q. So is this the restraining order from 2011, August 2011 that you just described?

A. Yes, it is.

Q. And turning to page 2 of the restraining order itself --

MR. DeVITA: Your Honor, I am going to object to calling it an order. It's a restraining notice.

MS. MAGDO: Sorry, restraining notice. That's right.

BY MS. MAGDO:

Q. I am just going to read from the bottom of the notice, I am sorry, from the bottom of page 2 continuing on to page 3 of the notice.

First of all -- let me back up for a second -- this is addressed to Mallett, Inc., correct?

A. That's correct.

Q. Do you have an understanding of why it was addressed to Mallett, Inc.?

A. They had possession of a number of the assets that were on consignment with them.

Q. And what is Mallett, Inc.?

A. Mallett, Inc., is a prominent art and antique dealer in New York and in London.

Q. Okay. So let's look at the bottom of page 2, where it says, "You are hereby forbidden to make or suffer any sale, assignment, transfer, or interference with any property in which the Defendants/Judgment Debtors Olins and Argyle Capital Management Corp. has an interest, except on direction of the United States Marshal or pursuant to an order of the court, until the judgment is satisfied or vacated."

Did you understand this restraining order -- restraining notice to apply to your ability or to restrict your ability, as AB&T, to sell items from the art and antique collection?

A. Yes, we did.
Q. So in August 2011, did you halt sales of the items in the arts and antique collection?
A. Yes, we did.
Q. Did there come a time that Argyle defaulted on the loan?
A. Yes, December 15, 2011.
Q. What was the outstanding principal of the loan at that time?
A. It was in the range of 2.5 to 2.7 million dollars.
Q. But you couldn't sell the collateral for the remaining principal because it was restrained pursuant to the SEC notice, right?
A. That is correct.
Q. Did the SEC take any other actions with respect to the arts and antique collection?
A. They initiated an effort to have a receivership appointed.
Q. Was that in this federal court here in the Southern District of New York?
A. Yes, it was.
Q. In connection with the SEC's application for a receiver, did AB&T take a position?
A. Yes, we did.
Q. And what was AB&T's position?
A. We felt at the time it was not an appropriate action to take, and we wanted to not signal to the market that there was

any kind of distress in the sale of these assets.
Q. And did you feel that you had been successful in selling those items prior to the restraining notice?
A. Yes, we had.
Q. Ultimately did the court here in the Southern District of New York grant the SEC's application to appoint a receive?
A. Yes, they did grant that order.
Q. And did the court issue an order to that effect?
A. Yes, they did.
Q. So directing your attention to Government Exhibit 3, is this a letter that you -- the first page, is this a letter that you wrote to Mallett attaching the order?
A. Yes, it is.
Q. And what follows? Is that the order that Judge Denise Cote, here in New York, signed?
A. Yes, it is.
Q. And who was appointed receiver of the art and antique collection?
A. American Bank & Trust Company.
Q. And when was American Bank & Trust Company appointed receiver?
A. It was May 11, 2012.
Q. What assets were covered by this order?
A. They were the entire collection of Robert Olins' art and antiques.

Q. Are those items specified anywhere in the order?
A. Yes. They are specified in Exhibit A of the order.
Q. And were these the same assets that had secured the AB&T loan as of April 2009?
A. Yes, they are.
Q. Was AB&T appointed receiver for both its own outstanding loan and for the SEC debt?
A. Yes, we were.
Q. And according to the order, which of those parties had first priority?
A. According to the order, appointing receiver.
Q. Well, what was your understanding of which party had priority to the payments?
A. Our understanding was that American Bank, as secured lender, had the first priority on the proceeds of those assets.
Q. And what does that mean in practical terms?
A. Well, it means that any time the assets were sold, the proceeds of those sales would be used to pay down our loan.
Q. And after the principal of your loan was paid, what would happen to the proceeds?
A. Then those proceeds would be paid to the SEC.
Q. So the receiver order gives AB&T certain duties and powers, correct?
A. That's correct.
Q. And it also imposed certain duties on anyone who possessed

or controlled any of the receivership assets, right?
A. That's correct.
Q. So let's just look at page 7 of the receivership order in paragraph 11. I am just going to read this briefly, a portion of this.

So, "This applies to all institutions and other persons or entities which have possession, custody, or control of any receivership property." Correct?
A. Yes, is that correct.
Q. And by "receivership property," we mean all the assets listed in Exhibit A, is that your understanding?
A. That's correct.

MR. DeVITA: I'm sorry, what page are we referring to?

MS. MAGDO: Sure. This is page 5.

THE COURT: It says page 5 of 12.

MS. MAGDO: I misspoke. I may have said page 7, but it is paragraph 11.

MR. DeVITA: Yup, thanks.

BY MS. MAGDO:
Q. Does this order direct any such parties to "not liquidate, transfer, sell, convey, or otherwise transfer any receivership property" -- I am skipping ahead -- "except upon instructions from the receiver"?
A. Yes, that's what the order states, correct.
Q. And does it also state that "such parties shall not

exercise any form of setoff, alleged setoff, or any form of self-help whatsoever without the permission of this court"?

A. That is correct.

Q. And looking ahead to paragraph 17, which is on page 7, does the order also require the "defendants," namely, Mr. Olins, "to cooperate with and assist the receiver in the performance of its duties"?

A. Yes, it does.

Q. And was one of your responsibilities -- so I am going to use you and AB&T interchangeably as "the receiver." Is that because you carried out the duties of AB&T as receiver?

A. Yes, correct.

Q. Or primarily you?

A. Primarily me, that's correct.

Q. Okay.

Was one of the responsibilities of the receiver to come up with a liquidation plan within 90 days?

A. Yes, that was one of the duties of the receiver.

Q. And were you to submit that to the court for approval?

A. Yes, we were.

MS. MAGDO: And just to make sure the record is clear, the government would like to formally offer these exhibits if the court requires.

MR. DeVITA: No objection.

THE COURT: I'm not sure it is required but, in any

event, admitted.

(Government's Exhibits 3 and 102 received in evidence)

BY MS. MAGDO:

Q. Mr. Rusco, are you familiar with a Sevres Garniture set of three vases that was a receivership asset?

A. Yes, I am.

MS. MAGDO: I would like to pull up Government Exhibit 502, please.

THE COURT: You might need to spell some of those words.

MS. MAGDO: We provided a glossary to the court reporter in advance, anticipating that some of the spellings might be unfamiliar.

BY MS. MAGDO:

Q. Are these the vases?

A. Yes, they are.

Q. We are just going to refer to them as "the vases," if that's okay with you.

A. Okay.

Q. Did there come a time that you learned that there was a buyer interested in purchasing the vases?

A. Yes, there was a time that I was contacted about that.

Q. And do you remember when that was?

A. It was, I think, the first part of May or so. Robert had contacted me and let me know that Mallett or Henry Neville may

have had an opportunity to sell the piece or had a prospective buyer who was interested in the pieces.

Q. Are there any documents that would help you remember more precise dates?

A. Yes. I kept a log of my phone calls and transactions that I had done on those -- for those various things.

Q. I would like to show you Government Exhibit 200. Do you recognize this?

A. Yes. That is the -- I actually kept two logs. This is the first one I started in 2010. It is actually a printout of an Outlook task that I used to log what I did with various things related to the Argyle credit.

Q. Please take a look at Government Exhibit 201 now. Do you recognize this?

A. Yes. That is another log that I kept when the receivership began. It was based in an Excel spreadsheet instead of an Outlook task document.

Q. You will notice that certain portions of this document are blacked out.

A. Correct.

Q. Do you know who blacked those out?

A. No.

Q. Do you know whether they were produced to the government with these blackouts?

MR. DeVITA: Your Honor, I will stipulate that they

are designated as privileged.

MS. MAGDO: Okay.

THE COURT: All right. Thank you.

BY MS. MAGDO:

Q. So just to go back to the substance of Government Exhibit 201, what did you memorialize in this document?

A. In 201, various activities, phone calls, letters that were issued.

Q. So let's take a look at the entry for -- actually there are numerous entries from May 17. Did you make any notes of that call that you just described with Mr. Olins?

A. Yes, I did. As you can see, there is a note that I made for May 17. I had a telephone call from Robert. He indicated that Henry had a prospective buyer for the Sevres garniture set and wanted to know how we could proceed with the sale. The receivership was fairly new, so I was unsure how we could proceed prior to getting the plan filed that we were working on, but we would look into it and see what we could do.

Q. So there is a reference in your notes to Henry Neville. Who is Henry Neville?

A. Henry Neville was the president or director of the Mallett New York office and the primary contact we had with Mallett.

Q. Did you subsequently have discussions with Mr. Neville about the prospective buyer that Mr. Olins had told you about?

A. Yes, I did.

Q. Based on your discussions with Mr. Neville, did you seek court approval to sell the vases to Mallett so that Mallett could, in turn, sell them to their prospective buyer?
A. Yes, we did.
Q. Please take a look at Government Exhibit 4. Do you recognize this?
A. Yes. That's the receiver's application to sell certain receivership assets.
Q. And you make certain representations about the transaction to the court --
A. Yeah.
Q. -- right, in this application?

What was your understanding of how much the receiver would get for the vases in this transaction?
A. We were to receive $540,000.
Q. And that was based on -- how did you learn that?
A. Well, Henry told me that he had a prospective buyer, and he looked liked like the price was going to be in the $600,000 range; and, with the roughly 10 or so percent commission on that, he would net to us 540.
Q. So your understanding was that Mallett would make a commission on this sale?
A. Correct.
Q. So what did you understand the total amount of the sale to be approximately?

A. Well, initially we thought it was going to be about $600,000, and then it kind of developed into he was taking a trade instead of all cash, so that the value of -- the total value we thought was going to be in the range of 600 to 675 for the total consideration on the purchase.
Q. With 675 as the upper limit?
A. Yes, 675 was the upper end.
Q. Did it matter to you how much Mallett was making on this transaction?
A. Yes. I mean, we wanted to clearly communicate to the court what the commissions were, and it was important for us to be able to do that accurately, to the best -- so that's what -- why it was important to know what the value of the transaction was and what they were going to make as a commission.
Q. Would it have mattered to the receiver if you had known that Mallett had already sold vases for approximately twice as much as they were telling you they would receive?
A. Yes, it would definitely matter.
Q. Would you have asked the court to approve the sale of the vases to Mallett for $540,000 if you had known that Mallett had already sold them for over a million dollars?
A. No, I would not have asked the court to do that.
Q. Would it have mattered to you if you had known that Olins was getting some portion of the sale proceeds?
A. Yes, it would have mattered.

Q. Why?
A. Because he -- at this point he was not entitled to those proceeds. The proceeds were to be used to pay down the bank debt first and then ultimately the SEC debt.
Q. Did Mr. Olins ever disclose to you that he was to receive a portion of the proceeds of the sale of the vases?
A. No, he did not.
Q. Would you have recommended the sale to the court if you had known that Mr. Olins was getting some portion?
A. No, I would have not.
Q. What if he were getting a portion of the proceeds but not in cash, say, a credit toward another antique? Would you have recommended the sale?
A. No.
Q. Would it have made a difference to you whether he was receiving the proceeds in cash, credit, or some combination?
A. No. The form of that payment was irrelevant.
Q. Okay. Are you familiar with a receivership asset which is a set of gilt dragon candelabra?
A. Yes, I am.
Q. Can you take a look at Government Exhibit 500, please.

THE COURT: Counsel, can we just agree there is no need to formally offer any exhibits? If it is shown, it will be deemed to be in evidence.

MR. DeVITA: Yes, your Honor. Since the rules of

hearsay don't apply in a *Fatico* hearing, I have no objection, for example, to Mr. Rusco's logs being accepted in evidence.

THE COURT: I will treat anything shown during the hearing as in evidence unless there is an objection; which is to say that the default is that it is in unless there is an objection, in which case I will address it.

MR. DeVITA: That's fine, Judge.

THE COURT: You may proceed.

MS. MAGDO: Thank you.

BY MS. MAGDO:

Q. Is Government Exhibit 500 the dragon candelabra with which you are familiar?

A. Yes, it is.

Q. Focusing your attention on the fall of 2012, did there come a time that you learned of someone who might be interested in purchasing the dragon candelabra?

A. Yes. Again, Robert Olins contacted me and said that he had someone who might be interested in purchasing the item.

Q. By that time, had you already filed the receiver's liquidation form with the court?

A. Yes, we had.

Q. And had the court approved the liquidation plan?

A. Yes, it had been approved.

Q. 0did the liquidation plan include a minimum price for each item in the receivership?

A. Yes, it did.
Q. And were you allowed to sell an item at or above that minimum price without seeking further court approval?
A. Yes, we were.
Q. And what was, to the best of your knowledge, the minimum price based on?
A. It was based on generally the low estimate, low auction estimate that we had for the items.
Q. And what was the minimum price for the dragon candelabra in the liquidation plan?
A. $200,000.
Q. Do you know whether that price was known to Mr. Olins?
A. Yes, it was.
Q. What was the name of the buyer to whom Mr. Olins introduced you?
A. Bruce Jaeger.
Q. What was your understanding of the relationship between Mr. Olins and Mr. Jaeger?
A. He was a longtime friend of Robert's.
Q. Did Mr. Jaeger make an offer to buy the dragon candelabra from the receiver?
A. Yes, he did.
Q. Did you eventually agree upon a price?
A. We did agree.
Q. What was that?

A. It was $235,000.
Q. Did Mr. Jaeger tell you whether he was planning to keep the dragon candelabra on consignment after he purchased them?
A. He did indicate that he was going to keep it on consignment with Mallett.
Q. In an effort to resell it.
A. Correct.
Q. So did you consider this to be an investment item for him rather than an item that he was going to keep at home, for example?
A. Correct.
Q. Prior to Mr. Jaeger's purchase of the dragon candelabra, did Mr. Olins tell you that he was going to receive a share of the proceeds from any resale?
A. No, he did not.
Q. And at any time, not just prior to the purchase, but at any time, did Mr. Olins tell you that he was going to receive or had received a share of the resale price?
A. No.
Q. If you had known that Mr. Olins was planning to take a portion of the resale proceeds, would you have agreed to sell the dragon candelabra to Bruce Jaeger for $235,000?
A. No, I would have not.
Q. If you known that Mr. Olins was planning to use his portion of the proceeds as a credit toward the purchase of another

piece of artwork, would you have agreed to sell the dragon candelabra?

A. I would have not.

Q. I would like to direct your attention to May 2012, to the time when AB&T was appointed receiver. You testified that Exhibit A lists all the assets subject to the receivership. How was this list compiled?

A. That was compiled from the security documents that we had for the assets that were pledged to our loan.

Q. Is that because the assets that had secured the loan were identical to the assets in the receivership?

A. Yes, that's correct.

Q. And was Mr. Olins given the opportunity to review the list in Exhibit A as far as you know?

A. As far as I know, yes, he was.

Q. Did you do anything to notify those individuals or entities who were holding the assets that were subject to the receivership?

A. Yes. After being appointed receiver, we prepared letters to each of those parties that had possession of the assets and asked them to confirm their possession of them and then to await our instructions.

Q. Okay. So let's take a look at Exhibit A.

MR. DeVITA: I'm sorry. What exhibit number is this?

MS. MAGDO: This is still the receivership order,

Government Exhibit 3.

MR. DeVITA: 3.

MS. MAGDO: So Government Exhibit 3, page -- it is the 15th page. It is Exhibit A.

MR. DeVITA: Got it.

BY MS. MAGDO:

Q. So the very first item listed is a French -- a Louis XV armchair that's listed as being in the possession of Will Iselin in Paris.

A. Correct.

Q. Did you send a letter to this person?

A. Yes, I did.

Q. And did you hear back?

A. We did hear back from him.

Q. What did you here back?

A. We heard back that he did not have possession of the item and learned that it had been returned to the original dealer that Robert bought it from because they had determined it had been a forgery.

Q. From that letter, did you understand that that is something that had happened since the receiver had been appointed in May?

A. No. It happened much earlier than the receivership.

Q. Was the armchair part of the bank's collateral for its loan as of April 2009?

A. Yes, it was.

Q. If Mr. Olins had received a refund for the chair that turned out to be fake, what should he have done with the money?
A. Those proceeds should have been paid to the bank in order to pay down his loan.
Q. Had Mr. Olins -- so prior to your receiving this letter from Mr. Iselin, had Mr. Olins ever disclosed to you that he had received a refund for that armchair because it was fake?
A. No, he had not.
Q. And did Mr. Olins tell you at the time that this list was compiled in May 2012, that he know longer owned that very first item, the armchair?
A. He did not.
Q. Let's go to the next page, which is the second page of Exhibit A. About a third of the way down, do you see the entry for the Louis XV Savonnerie carpet purportedly located at Sotheby's Paris?
A. Yes, I do.

MR. DeVITA: I'm sorry, which?

MS. MAGDO: So this is the second page of Exhibit A, this is the eighth item, the Louis XV Savonnerie carpet.

MR. DeVITA: Got it.

BY MS. MAGDO:
Q. Just to read the rest of that entry, it says, "Per defendants, this item is currently located in Versailles, France, and is subject to the French government's claim of

repatriation."

What did you understand that to mean?

A. Well, that's a shorthand for saying that the item had been placed in auction in Paris and that the French government had claimed a national treasure right on it. And it was purportedly sold, but there was some issue about sales value and who -- how much was to be paid, and that had not been resolved at the time, at least our understanding, it had not been resolved at the time of the receivership.

Q. So you mentioned that it had been put up for auction.

A. Correct.

Q. Do you remember when that was?

A. That was in October of 2008.

Q. And were you aware that it was put up for auction?

A. Yes, we were aware.

Q. And do you recall what the auction estimates were?

A. The low estimate was $3 million and the high estimate was $5 million.

Q. And at the time that the carpet was put up for auction in October 2008, was it collateral for AB&T's loan?

A. Yes, it was.

Q. So when the item was sold, what was to happen to the proceeds pursuant to the loan agreement?

A. Pursuant to the loan agreement, the proceeds should have been sent to American Bank & Trust to pay down the loan with

Robert.
Q. And did you ever ask Mr. Olins, after October 2008, what happened to the proceeds?
A. Yes, a number of times.
Q. And did you come to understand from him that the proceeds were being held up somewhere in France?
A. That was my understanding. And he was concerned that the price was not exactly what it should have been and the reserve amount was not correct, and so he told me that there was some dispute about that that he was trying to resolve and possibly get a higher price for.
Q. And prior to May 2012, did Mr. Olins ever tell you that the proceeds had in fact been freed up and distributed?
A. No, he had not.
Q. And you had repeated conversations with him about this topic?
A. Yes, we did.
Q. So did you send, upon being appointed receiver, did you send a letter to Sotheby's in Paris regarding their possession of the carpet?
A. Yes, we did.
Q. And did you receive any reply?
A. Yes, we did.
Q. And what did you learn from the reply that you received from Sotheby's?

A. We learned that they didn't have possession of the item and the proceeds from the auction, net commission, had been disbursed, a portion of it had been used to pay down an outstanding debt that Robert had at Sotheby's, and then a portion was sent to him at, I believe, his bank account at Citibank.
Q. So let's just break that down. What was your understanding from Sotheby's about the net proceeds? And by "net proceeds," I mean net of any commission, what the net proceeds of the sale of that carpet were.
A. Approximately $2.8 million.
Q. And you said that some portion of it was used to pay down Mr. Olins' debt, some debt at Sotheby's in Paris, correct?
A. That's correct.
Q. And approximately what amount was used toward that?
A. $2.3 million.
Q. Do you know whether that was a secured lien that Sotheby's had or not?
A. I do not know.
Q. Did Mr. Olins ever disclose to you that there was a lien on the carpet, secured lien on the carpet?
A. No.
Q. So you also said that Mr. Olins received some portion of the sale proceeds. Approximately how much was that?
A. Approximately $500,000.

Q. Had Mr. Olins, had he ever disclosed to you that he had received $500,000 in proceeds?
A. No, he had not.
Q. And from the letter, did you understand that this had happened since the receivership order had issued?
A. Since the -- no, it happened much prior to the receivership order being issued.
Q. Do you have any understanding of what Mr. Olins did with the $500,000 that Sotheby's told you he received?
A. It's my understanding he used that money then to purchase a lamp or actually a chandelier from Christie's, a portion of it. I think it was, like, a little over $600,000 that he had paid for a lamp -- or a chandelier, not a lamp, and he put that 500 toward that purchase.

THE COURT: Can you tell me how you know that?

THE WITNESS: I think that came from communication from his legal counsel in the receivership.

BY MS. MAGDO:
Q. Did that item that he purchased become a receivership asset?
A. Yes, it did. It became a pledged asset to the bank and then a receivership asset.

MS. MAGDO: Did the court have any other questions at this point?

THE COURT: No.

BY MS. MAGDO:

Q. And what should Mr. Olins have done with the $2.8 million in proceeds from the sale of the carpet in your opinion?

MR. DeVITA: Your Honor, I am going to object to what Mr. Olins should have done. The testimony is that what cash he got, he put into an asset that became pledged to the bank. The question of whether Mr. Rusco has an opinion as to who had a superior right, Sotheby's or AB&T, is irrelevant in terms of the --

MS. MAGDO: Let me --

THE COURT: Why don't you rephrase the question.

BY MS. MAGDO:

Q. So if Sotheby's had a superior interest in the proceeds of the carpet, is that something that Mr. Olins should have disclosed to you when he pledged the carpet as collateral?

A. Yes.

Q. And if Sotheby's in Paris did not have a superior interest in those proceeds, what should have happened with the $2.3 million?

A. That should have been paid to American Bank & Trust. $2.8 million should have been paid to the bank.

Q. And, to be clear, Mr. Olins did not pay $2.8 million to the bank, correct?

A. He did not.

Q. And he did not disclose that Sotheby's Paris had a superior

interest in the carpet, correct?
A. He did not.
Q. After you learned -- after you heard back from Mr. Iselin and Sotheby's in Paris, did you discuss -- did you have any discussions with Mr. Olins about what you had learned?
A. Yes, I did.
Q. Tell me about that conversation or conversations.
A. We spoke by phone, and Robert was apologetic and embarrassed about what had happened, and that was basically the extent to which that conversation went.
Q. In connection with AB&T's opposition to the receivership, did you file a declaration with the court in the Southern District of New York.
A. Yes, I did.
Q. Let's take a look at Government Exhibit 2, at page 3, please. Actually, just looking at Government Exhibit 2 as a whole, is this your declaration?
A. Yes, it is.
Q. So directing your attention to paragraph 7 on page 3, so, to be clear, in this document, when you refer to "loan customers," I believe that's defined in paragraph 2 as "Argyle Capital and Robert Olins," right?
A. Yes, that's correct.
Q. Essentially that's just Mr. Olins because you testified earlier that he was the sole owner of Argyle Capital

Management, is that correct?

A. Yes, that's correct.

Q. So looking at paragraph 7, you wrote, "During the past few years, the bank has worked with the loan customers to effect sales of the art collateral to reduce their indebtedness to the bank under the loan. During this time, all sales of the art collateral have been made with the bank's prior knowledge and consent. In my dealings with the loan customers, I have not found any reason to believe that their actions with respect to our banking relationship and, in particular, the art collateral and these sales, were fraudulent in any way."

When you submitted this declaration, were you aware of what had happened to the armchair and to the carpet?

A. I was not aware.

Q. And based on what you now know, what you learned in 2012, would you still characterize Mr. Olins' actions as "not fraudulent in any way"?

A. I would not characterize them that way.

MS. MAGDO: No further questions.

THE COURT: Cross-examination.

MR. DeVITA: Thank you, your Honor.

CROSS EXAMINATION

BY MR. DeVITA:

Q. Good morning, Mr. Rusco. My name is James DeVita, and I represent Mr. Olins. How are you today?

A. I am doing fine.
Q. You mentioned in your direct testimony that the original collateral for the loan was consisted primarily of stock in a company called Spatia Light?
A. Excuse me. It was promissory notes from Spatia Light to Argyle Capital and stock in Spatia Light.
Q. Okay. So both promissory notes from Spatia Light and Spatia Light stock?
A. Stock and the negative pledge.
Q. Sorry?
A. Negative pledge.
Q. Negative pledge with respect to the art and antique collection?
A. Right.
Q. What happened to Spatia Light?
A. Well, it is just, in a nutshell, it struggled along for a while and eventually filed bankruptcy.
Q. So the stock that had been pledged became worthless?
A. No. The stock had at some point been liquidated, so we paid down the loan.
Q. I see. So before the Spatia Light went bankrupt, you were able to sell some of the stock and apply it against that?
A. Right. Robert did that.
Q. Robert did that.

And he paid the loan down with the proceeds from those

sales?
A. Correct.
Q. And of course the promissory note became worthless.
A. Right.
Q. The government has said, by the way, in its submission in this proceeding, that Mr. Olins resisted the sale of his antiques collection. Is that an accurate statement?
A. Well, in some respects, yes, he did resist. He wouldn't allow us in some cases in auctions to take a lower reserve than the low estimate, which in one particular incident caused that piece not to sell.
Q. So, in other words, when he was -- to the extent that he resisted, it was because he thought too low a price was being asked.
A. Right.
Q. Right.

Because he was asking that more be realized from the sale in order to make you whole and to reduce his debt, right?
A. Correct.
Q. Okay.

So it's also true, though, that he introduced many individuals and dealers to purchase antiques from his collection to you, right?
A. He did.
Q. For example you mentioned Mr. Iselin, Will Iselin. He

introduced you to Mr. Iselin?
A. He did.
Q. And Mr. Iselin made purchases of antiques from the collection, correct?
A. Correct.
Q. And that resulted in a reduction of the outstanding debt?
A. That's correct.
Q. And Mr. Iselin made such purchases both before and after the receivership, right?
A. I don't recall any before. It was only after the receivership.
Q. Well, do you have your log? Maybe we can have Government Exhibit 200, and look at the entry for -- and if you have it in front of you, if you need to refer to it, do you see your entry for February 26, 2010, if we can highlight that?

Now, this may not have resulted in a transaction, but he was introduced, Mr. Olins introduced -- or was introducing to you Mr. Iselin as somebody who -- as potential buyer for the garniture and wall lights?
A. Correct.
Q. And then if we could turn to March 7, 2014, unfortunately the pages are not numbered on your log, but it is chronological. So March 7.

(Counsel confer)

MR. DeVITA: 14793.

Q. There was a pending offer in March of 2014 for Mr. Iselin for a schedule of items, correct? Do you see that on the entry for March 7?
A. I haven't found that yet. I'm sorry.
Q. Maybe we can display it. If you look at the display, I think it may be up there.

If you look at the bottom right corner, there are numbers that are stamped on your log, and if you look at the 14793, they are sequentially numbered. So if you look at 147 -- can I approach, your Honor?

THE COURT: Yes, why don't you do that.
Q. If you look down here?

THE COURT: Why don't you just get him to the page?

MR. DeVITA: I will show with my marked copy, if that's all right, your Honor.

THE COURT: Sure.

BY MR. DeVITA:
Q. Got it?
A. Right.
Q. That discussed offers for Mr. Iselin, right?
A. Yes, we did.
Q. And that was something Mr. Olins was instrumental in bringing about, correct?
A. That is correct.
Q. Also there is a reference on that same day to someone named

Steven Gelles.
A. Correct.
Q. That's another purchaser that Mr. Olins introduced to you, correct?
A. That is correct.
Q. And this is after the receivership.
A. Right.
Q. And Mr. Gelles ultimately did make purchases, didn't he?
A. He did.
Q. Substantial purchases.
A. Yes, in a number of items, yes.
Q. A number of items, over hundreds of thousands of dollars?
A. I don't know that it was hundreds of thousands of dollars.
Q. Well, it was over a hundred thousand dollars.
A. Yes.
Q. Did Mr. Olins also introduce you to someone named Dean Krechevsky?
A. Yes, he did.
Q. And Mr. Krechevsky made purchases from the estate, correct?
A. Yes, he did.
Q. And that was after the receivership?
A. Correct.
Q. And he introduced you to an individual named Barry Terhune?
A. Correct.
Q. And Mr. Terhune made purchases from the estate?

A. Yes, he did.
Q. And that was after the receivership?
A. Correct.
Q. Mr. Olins introduced you to someone named Bhavin Shah, isn't that right?
A. Yes.
Q. And Mr. Shah never made -- ultimately did make purchases but was negotiating for a very large set of purchases from the estate, isn't that right?
A. Yes.
Q. And isn't it a fact that Mr. Jaeger -- I'm sorry, Mr. Olins was instrumental in seeking to bring that about?
A. Yes. He introduced me to the individual.
Q. Didn't he also agree to save you some money by traveling to New York? He agreed to take Mr. Shah to the place where the items were stored and show them, so that didn't you have to do that yourself?
A. I made arrangements with the art storage facility for him to inspect the property.
Q. And Mr. Olins took him there, is that right?
A. That I don't recall.
Q. Could you take a look at the entry for September 13, 2013. Do you see that? Have you found that? It is -- the bottom number is 14783. Do you have that?
A. Yes.

Q. If you look at the entry for September 16, Robert offered to meet Bob in New York City to show him the items in order to save the receivership estate any travel expense?
A. Okay, yes.
Q. Does that refresh your recollection?
A. Yes, it does.
Q. Speaking of expenses, the receivership, in addition to recovering -- I'm sorry, AB&T, in addition to recovering the principal -- has recovered the principal on its loan, hasn't it?
A. It has recovered its principal, yes.
Q. And it has recovered all of the interest that was due at least prior to the order of priority that was set by Judge Cote, isn't that right?
A. Correct.
Q. Including some default interest?
A. That's correct.
Q. And the default interest was 26 percent?
A. 26 1/2.
Q. 26 1/2 percent, okay.

And, in addition, the interest on the loan for a large period of time was 5 percent, isn't that right?
A. It would have been in the 6 1/2 percent range.
Q. Oh, I'm sorry, 6 1/2 percent. And those are pretty substantial interest rates for the time period we are talking

about, aren't they?
A. Correct.
Q. And AB&T has recovered that?
A. We recovered it up through the May 11, 2012.
Q. Correct. Okay.
And expenses, as well, isn't that right, your travel?
A. Yes.
Q. Your attorney's fees?
A. Attorney's fees, yes.
Q. Is your travel here today being paid by the estate?
A. No.
Q. Okay. Is the government paying it?
A. Yes.
Q. Okay.
Lenora Lorenzo is another person that Mr. Olins introduced you to, isn't it?
A. Yes.
Q. Isn't she?
A. Yes.
Q. And she also made a purchase --
A. Correct.
Q. -- from the estate.
So even after the receivership, Mr. Olins was actively attempting to bring buyers to look at the collection, isn't that right?

A. Correct.

Q. And those efforts paid off, right?

A. They did. We closed those sales, yes.

Q. The experience prior to the receivership in terms of the prices that were realized, am I correct in saying that the performance was quite favorable in terms of the prices that were realized? Prior to the receivership?

A. Prior to the receivership?

Q. Right.

A. By "favorable," you mean in what respect?

Q. At or above the minimum estimate.

A. At or above. Probably more like at the low estimates that we had.

Q. Let me show you...

(Pause)

MR. DeVITA: Your Honor, I would like to show Mr. Rusco Exhibit I to my letter of I believe it is November 29.

THE COURT: All right. That's fine. Go ahead.

MR. DeVITA: Since I am using this copy, may I stand next to him and question?

THE COURT: Meaning you only have one copy?

MR. DeVITA: Well, I have another copy buried in another file, but I am take it a little out of order.

THE COURT: As long as it is okay with the court

reporter, it is okay with me.

BY MR. DeVITA:

Q. Exhibit I, it is dated April 4, 2011. All right. Let me show you --

THE COURT: I think it is Exhibit I to the reply submission.

MR. DeVITA: Correct, your Honor.

MS. MAGDO: Okay.

BY MR. DeVITA:

Q. And this is a report that you prepared, isn't it? Do you recognize that report, Mr. Rusco? It is a loan review?

A. It is a loan review, but it is not something that I prepared.

Q. Who prepares it?

A. Our loan review officer at the bank.

Q. So this summary and recommendation is not prepared by you but by another person at the bank.

A. That's correct.

Q. But it is something that you reviewed at some point?

A. Yes. It would be part of the credit file for the bank.

Q. And if it is something you disagreed with, you would let your superiors know that you disagreed with that conclusion.

A. Correct.

Q. And you see that in the summary and recommendation, there is a section which says, "If we chose to, American Bank could

repossess the collateral, sell it at auction, and repay this loan in full in less than six months. However, performance on the credit has been good, Mr. Olins has been cooperative, sales prices have been strong, and there appears to be no reason to impose such requirement on the borrower. His sales plan, which, to his benefit, provides maximum realized prices for the items sold, has been providing adequate performance on this loan."

That's a statement that you agreed with at that time?

A. Correct.

Q. So that the sales performance in the period leading up to prior to the receivership was strong and the prices were strong, is that fair?

A. They were reasonable, yes.

Q. What was the experience after the receivership in terms of the prices realized on the assets that -- for example, the assets that had to be sold at auction?

A. The auction estimates changed from the original amounts that we had started out with with the receivership, and we saw a decline in the market value.

Q. A decline in the realized sales price, isn't that right?

A. Well, at first initially a decline in the auction estimates themselves and then a decline in the realized prices --

Q. And you don't know yourself how much of that was a result of the receivership itself, do you?

A. It's hard to say. I do not know.
Q. But you believe it had an impact?
A. Well, that, and just the general timing of when we were selling things, the indication I had gotten from Christie's was that the values and the type of assets that he had in his portfolio were suffering some decline.
Q. But to your -- in your view, there is no question in your mind, is there, that the receivership and the publicity or the public awareness of that had an impact, isn't that right?
A. That was our view in the beginning, yes. I wouldn't say that's the case now.
Q. I want to draw your attention to June 2010, Mr. Rusco, and ask you if you could take a look at that period of time in your log, starting at 14760.

Have you been able to find that?
A. Yes.
Q. Drawing your attention to June 1, there is a reference there, is there not, to a transaction involving some wall lights?
A. That's correct.
Q. And just if you could take a moment to refresh -- to read to yourself the entries from June 1 through June 8.

(Pause)
Q. While you are doing that, I am also going to hand -- actually, I don't have the exhibit tags.

MR. DeVITA: Your Honor, I don't have exhibit tags. I had them in my desk drawer. I forgot to bring them with me, as one always does, so I am going to ask that we mark a document as Defense Exhibit A for today's hearing and I will just write on and Mr. Cecutti will keep track.

THE COURT: All right. Do you have copies for me?

MR. DeVITA: I do, your Honor. That's my point. I noticed that I did not have exhibit numbers or tags to put on them. I have a copy for the court. I am going to hand a copy to Mr. Rusco, a copy to Mr. Cecutti, so he can help me keep track of my offerings here.

Q. I don't want to interrupt you, Mr. Rusco, if you are still reading those entries.

A. Give me a minute.

Q. Go ahead. Let me know when you are finished.

(Pause)

A. Okay.

Q. Okay. Let me ask you to look at what I have marked as Exhibit A. Actually maybe I can write on your copy. I am going to put "delta" for "defense" and "X" for "exhibit" "A," so we know what we are talking about.

That's a signed agreement covering some of the assets that were part of the estate, is that right? This is prior to the receivership obviously.

A. Yes it was.

Q. At the bottom, it refers to American Bank & Trust Company and an account number.
A. Correct.
Q. That was the account for Argyle's repayment, is that correct?
A. Yes, that was their checking account.
Q. Are you familiar with this document? Did you see this consignment agreement at the time?
A. Yes, I did.
Q. And it shows, if you would, the second item, Louis XV Ormolu three branch wall lights attributed to Jacques Caffieri. I think I am saying that right. Do you recognize that?
A. Yes, I do.
Q. Are those the same wall lights that are referenced in your notes on June -- in June of 2010?
A. Yes, they are.
Q. And the consignment price on these is $1,750,000, right?
A. That's correct.
Q. And according to the notes that you made at the time, these are contemporaneous, right?
A. Well, the notes were in 2010.
Q. I meant contemporaneous to when the events occurred.
A. Yes.
Q. So there was an offer that would have resulted in a net price to Robert, Mr. Olins, of $1,400,000?

A. Correct.
Q. There came a time when Mr. Olins expressed some concern to you about that offer, is that correct?
A. Yes.
Q. Let me ask that we mark as Defense Exhibit B, an e-mail dated June 5, 2010.

THE COURT: Just careful of the wires when you walk back and forth, please.

MR. DeVITA: I will, your Honor.

Q. Mr. Rusco do you recall receiving that e-mail from Mr. Olins, Mr. Rusco?
A. Yes, I recall.
Q. Mr. Olins is expressing to you concern that someone on the selling side -- whether it is Mr. -- who is Glenn Randall, by the way?
A. Glenn Randall was a consultant. He is also an art dealer Robert had used from time to time to help him with various transactions.
Q. And he was working with Mallett on this transaction?
A. I believe so, yes.
Q. And Mr. Olins was saying to you he was suspicious about the price at which the chandelier -- I'm sorry, the wall lights were being sold, right?
A. Correct.
Q. Having refreshed your recollection by looking at your

notes, do you recall what your reaction was?
A. Well, at the time, we didn't know for sure what Mallett was going to be selling them for, but we felt like the million four was a reasonable price and he should proceed with accepting that proposal.
Q. So basically you pressured him into taking that price.
A. Well, we thought it was something that he needed to do because it was --
Q. You wanted to close the deal?
A. We wanted to close the deal.
Q. Correct.

And you say that you talked to Frank about Robert's perspective. Who is Frank?
A. Frank Henke is the owner of American Bank & Trust.
Q. And Frank told you that the transaction needs to close, right?
A. Right.
Q. And he is your boss?
A. He is my boss.
Q. And you told Robert Olins the transaction needs to close, right?
A. Correct.
Q. Notwithstanding his suspicions.
A. I didn't have anything to say one way or the other that there was anything about what Mallett was selling the items

for, so I didn't see that there was any reason to question the transaction.

Q. You didn't think there was any reason to question Mallett?

A. No.

Q. Even though Mr. Olins told you there might be some reasons to question.

A. Right.

Q. The entry for June 8 says you also talked to someone named -- or initials CGM. Who is that?

A. That was Charles Meckfessel, Chuck Meckfessel, the president of the bank.

Q. All right. So the president and the owner of the bank said that you should not do anything to jeopardize the transaction?

A. Right.

Q. Can you look at your entry for June 16, actually June 15. Do you have that now? It refers to, about three quarters of the way down on that entry, "Talked to Glenn Randall re: sales confirmation. He will discuss with Henry Neville and get back to me. Talked to Robert, told him that Glenn will be discussing the request for sales price confirmation with Henry."

Do you recall that?

A. Yes.

Q. So at Mr. Olins' request, you were asking Mallett and Glenn

Randall to confirm what they sold those wall lights for, right?
A. No. We were wanting to just get confirmation that the money had been sent to us.
Q. Well, hadn't you requested Glenn to confirm what the sales price was?
A. You are talking about the June 15, 2010, entry?
Q. Yeah. This is after you received the money, right?
A. No.
Q. Well, if you look just before it, it says on June 15, it says, "Wire transfer for the $1,400,000 was received" then it says, "Talked to Glenn Randall re" sales confirmation. He will discuss with Henry Neville and get back to me."
A. Okay. I guess I am not seeing that. Just a second.
THE COURT: If you look at the screen, it is on there, Mr. Rusco.
THE WITNESS: Okay. Yes, I see that, correct.
Q. So you were asking Glenn Randall to confirm what they sold this item for, right? And then after that you talked to Robert, "I told him that Glenn will be discussing the request for sales price and confirmation with Henry."
A. Right.
THE COURT: Mr. DeVita, you need to let him answer the questions.
Is it correct that you are confirming the sale?
THE WITNESS: Yes, we had asked him if we could

confirm the sale price.

BY MS. MAGDO:

Q. And the sale price they had told you was $1,600,000, right?

A. That's correct.

Q. And then I ask you to look at your entry for June 17, I'm sorry, June 16. It says, "Glenn Randall called at about 12 p.m. He indicated that Mallett's and his position is that they cannot provide documentation of the $1,600,000 sales price. Due to sensitivity concerns with the buyer, they both felt that the client might decide to rescind the transaction if he were to find out that a third party was in possession of such documentation."

Do you see that?

A. I do.

Q. That's what he told you.

A. Right.

Q. Then he says, "On future deals, they will try to obtain, if such is stipulated as part of the acceptance of a variance for the price, in the Randall consignment," correct?

A. Correct.

Q. And then you told Robert about that conversation, right?

A. Correct.

Q. And then you told him that you didn't want to do anything to jeopardize any future sales through Mallett, right?

A. Correct.

Q. Now, would it surprise you to learn that Mallett in fact sold those wall lights for $1,750,000?
A. Yes, it would surprise me.
Q. Let me show you -- let me ask that we mark as Defendant's Exhibit -- what are we up to? D?
MR. CECUTTI: C.
MR. DeVITA: C.
(Pause)
Q. Is that a form that you recognize, Mallett's invoices?
A. Yes, it is on their letterhead and has their address and so forth.
Q. And the description, the date of this is June 2. It is prior to your conversation with Mr. Randall, right?
A. Right.
Q. And the description of the property is the same three branch wall lights that we have been talking about, correct?
A. Yes, that's correct.
Q. And the amount reflected as the purchase -- or the sale price, of course, the purchaser is redacted. You see that.
A. Right.
Q. So you were never told who the purchaser was.
A. No, I was never told.
Q. And we don't know because it has been redacted.
But it does indicate that they were sold for $1,750,000, is that right?

A. Yes.
Q. And you were not aware of that.
A. I was not aware of that.
Q. And you would urge Mr. Olins not to press the issue because you didn't want to jeopardize the relationship with Mallett, right?
A. Well, we had several things on consignment there. We wanted to continue selling things through them.
Q. So you had urged Mr. Olins not to press the issue because you didn't want to jeopardize the relationship with Mallett.
A. Correct.
Q. Now, do you recall a time when Mr. Olins asked you to allow him to take money from proceeds of sales for legal fees?
A. Yes, I recall that.
Q. And do you also remember him requesting you to advance funds to help pay an SEC judgment?
A. Correct.
Q. And that occurred, did it not, also in June of 2010, right?
A. Correct.
Q. And if we turn to your log for June 11 -- I'm sorry, June 14. No. I'm sorry. I beg your pardon. June 10. Actually, let's go first to June 2, 2010, bottom of the page, reads 146760. That refers to the proceeds from the sale of these wall lights, does it not, $1,400,000?
A. Yes, that's correct.

Q. And Robert needs $1240,000 of that for legal fees?
A. Correct.
Q. And this was in connection with the SEC action, right?
A. I believe so.
Q. And so you knew about the SEC action as early as June of 2010.
A. Correct.
Q. And it says, "Talked to FXH, and he agreed to providing $140,000 to Robert as requested." FXH, I think you testified, is the owner of the bank?
A. Yes, correct, Frank Henke.
Q. Henke?
A. Henke.
Q. And then if you go over to June 10, at the very last sentence on that, it says, "Part of the $140,000 from the wall lights proceeds will pay the first $45,000 installment due under the order, changed due to" -- I'm sorry. This refers to a judgment that came down, money judgment, on that date, June 10, right?
A. Correct.
Q. And Mr. Olins told you about it right away.
A. I don't recall exactly when the money judgment -- I guess it was entered that day, and he needed to pay some portion of that on the date that it was entered. So, yes, that's correct. He told me that.

Q. It was due on June 11, according to your note.
A. Yeah.
Q. And it says, "Robert" -- "talked to Robert about my conversation with Glenn Randall and about the SEC monetary judgment that was entered today."
So the judgment was entered on June 10?
A. Correct.
Q. And you and Robert agreed that part of the $140,000 that he thought was going to be available to pay his legal fees would be used to pay the first installment under that judgment, is that right?
A. That's correct.
Q. Did there come a time when you advanced more funds to help him pay the SEC -- that SEC judgment from June of 2010? And maybe I can help you. If you look at your entry for June 21.
A. Right. There were -- the requests, we had sold the zodiac figure, and he had requested $90,000 of that to pay two additional installments on the SEC --
Q. So that's a total of $135,000 that Mr. Olins is adding to his debt to you so that he can pay the SEC, right?
A. Effectively, yes. I mean, he is not paying it down, so . . .
Q. Do you still have Exhibit A, Mr. Rusco, the consignment agreement? Is that still up there with you?
A. Yes, it is.

Q. Okay.

If you would look at the first item on the consignment, a Louis XIV boule chandelier. Do you see that?
A. Correct.
Q. And the consignment price is $1,600,000, correct?
A. Correct.
Q. Now, did there come a time when that was sold?
A. Yes. That item was sold.
Q. By Mallett, right?
A. Correct.
Q. I draw your attention to your entry, the entry in your log for December 15, 2010. Do you see that there is a reference actually on the 14th and the 15th to that particular transaction. Do you see that? The 14th, it says, "Various e-mails of phone calls throughout the day regarding proposal on the chandelier at Mallett," and then it says, "After some e-mail correspondence, Robert called to say that Henry was agreeable to the net amount of $1,350,000 with a $50,000 store credit for Robert."

Do you see that?
A. Yes, I do.
Q. So that's considerably less than the consignment price, right?
A. Yes, that's less than the consignment price.
Q. And the consignment price, the $1,600,000 is what is

supposed to be net to the consignee, right? Consignor.
A. Correct.
Q. So even with the $50,000 store credit, it is $200,000 less, right?
A. Correct.
Q. Do you know -- and that was something that was the subject of some back and forth as reflected in your notes, right? Robert, Mr. Olins was resisting going down on that?
A. I don't recall specifically, but yes.
Q. Well, do you recall that he wanted more for that?
A. Well, I believe so, yes.
Q. Would it surprise you to learn that Mallett sold that chandelier for $2,700,000?
A. Yes.
Q. I have marked Defendant's Exhibit D. You are familiar with the name Henry Neville, is that correct?
A. Yes, I am.
Q. The first page is an e-mail reflecting a stock sold by Henry Neville, invoice gross $,2,700,000. Do you see that?
A. I do.
Q. If you turn over to the second page of the exhibit, and you look at the description, is that the same chandelier we have been talking about?
A. I believe it is.
Q. So you were not aware that Mallett sold this for

$2,700,000?

A. No, I was not.

Q. This was still prior to the receivership, is that right?

A. That's correct.

Q. Did you get the SEC's agreement to that transaction? It was after the restraining notice -- I'm sorry this is 2010. I'm sorry. My fault. Sorry.

Did there come a time when Mr. Olins asked you to advance funds so that -- let me strike that.

Did there come a time when you learned that a court in California had rendered a judgment requiring Mr. Olins to disgorge over $3 million?

A. Yes, there came a time when I learned of that.

Q. And that was in 2011, correct?

A. Yes.

Q. Drawing your attention, if you could look at your log, for March 11, 2011, and then March 23, 2011, you had conversations with Mr. Olins and Frank -- that's the owner of the bank -- about the SEC matter, right?

A. Yes, we did, March 10 and March 11, 2011.

Q. And you had a conversation with the attorney for the SEC, a Mr. Silverman, is that right? If you look at your entry for June -- I'm sorry, I am ahead of myself. We are still talking about the earlier period.

Did there come a time when Mr. Olins requested

funds -- requested the bank to advance funds in order to provide money for him to appeal that SEC decision -- the court decision on the SEC case?

A. As far as an appeal, no, I don't recall that he had ever requested that we advance funds to appeal the case.

Q. Let me show you what we previously marked as Exhibit G on my --

MR. DeVITA: Actually rather than confuse it, I will make it Exhibit E. It will be easier, your Honor. This was a previously submitted exhibit from the -- my November 29 submission.

BY MR. DeVITA:

Q. Let me show you what's been marked Exhibit E, Mr. Rusco. This is an e-mail from Mr. Olins to you.

Do you recall that?

A. Yes, it is, correct.

Q. This is his e-mail to you discussing the timing for the appeal from the decision in the SEC case, right? Take your time to read it.

A. I am.

(Pause)

A. Yes, the topic was about his plans to pursue some kind of appeal.

Q. Right. And he mentioned that he had discussions with lawyers from a firm called Proskauer?

A. Yes.
Q. Is that a firm that you had heard of?
A. Only at that time.
Q. So you didn't have any prior familiarity.
A. No.
Q. You also mentioned that he had been represented by a firm called Ropes & Gray?
A. Correct.
Q. Is that a firm that you were familiar with?
A. No.
Q. But you understood from this e-mail that their legal fees were pretty high?
A. Yes, it was pretty clear.
Q. With respect to both of those firms.
A. Well, one greater than the other.
Q. Right.

And there came a time, did there not, when Mr. Olins specifically requested that you advance $100,000 to help fund that appeal, is that right?
A. Yes. He had contacted us in May regarding the $100,000 advance.
Q. If you looked at your log for March 11 -- I'm sorry, March -- I'm sorry, April, April 21.
A. Right.
Q. It says you sent Robert an e-mail regarding the $100,000

readavance request. Do you know if that relates to the legal fees?

A. It doesn't reference in my notes, but...

Q. Let me show you what is marked as Defendant's Exhibit F, what I will mark as Defendant's Exhibit F. That is an April 19 e-mail -- I'm sorry, April 19 e-mail, not the top one, but there is an e-mail from you to Mr. Olins asking some details about the $100,000 readvance to prepay Ropes & Gray, is that right?

A. That's correct.

Q. So if you would turn over to the second page of that exhibit, there is a reference -- there is an e-mail from Mr. Olins going into some detail, starting out by saying, "I need you to be my advocate again," essentially asking you to help him get the $100,000, right?

A. Right.

Q. And he refers to the $500,000 estimated by Proskauer, right?

A. Yes.

Q. And then a lesser amount from a small California firm. Then it says "if Critchley, Kinum & Vasquez stayed in the case." Do you know who that is? Are you familiar with that firm?

A. I knew they were involved in some way, but I don't recall in specific how they were.

Q. Was his attorney someone named John Vasquez?
A. I believe so, that's correct.
Q. Did you have any conversations with John Vasquez?
A. I think we did at some point, but I don't recall any particulars of them.
Q. Do you know if he is a federal judge now?
A. I don't know.
Q. There is a further discussion about your making -- oh, it says, "As always, please feel free to speak with Rick Marshall directly." Do you see that?
A. Correct.
Q. Rick Marshall was the attorney at Ropes & Gray who had represented Mr. Olins?
A. Right.
Q. Did you in fact speak to Mr. Marshall?
A. I don't recall specifically if I did or not.
Q. You don't know one way or the other?
A. No.
Q. But certainly Mr. Olins invited you to?
A. Yeah, correct.
Q. Then I think we saw earlier --

MR. DeVITA: Did we mark this as an exhibit? We never marked the loan review document from April of 2011 as an exhibit. Should I mark it? We referred to it, your Honor, but didn't mark it separately. Should I make it Exhibit G?

THE COURT: Sure.

MR. DeVITA: Okay.

THE COURT: Just to be clear, this is I think Exhibit I to your reply letter, is that right?

MR. DeVITA: I think that's correct, your Honor.

THE COURT: Okay.

MR. DeVITA: Your Honor, just to confuse the record more, it is also Exhibit B to our original submission, so it now has B, G, and I.

THE COURT: All right. I think we can leave it there. I had already noticed that was the same document.

BY MR. DeVITA:

Q. I would ask you to look at the last page of that exhibit, and does that reflect that the proposed readvance of $100,000 was approved?

A. Yes, it does.

Q. Are you one of the people -- I see a number of different signatures at the bottom, or initials -- are you among the initialers?

A. Yes, I am.

Q. And which one would be you?

A. GWR.

Q. Okay. So you initialed it twice, once for approval and once for ABT loan policy compliance?

A. Correct.

Q. Okay.

Now, to your knowledge, did that appeal ever go forward?

A. I don't recall.

Q. Let me show you what's been marked -- what I will mark as Defense Exhibit H.

MR. DeVITA: Which, for the sake of completeness, that was Exhibit J to my November 29 letter, your Honor. It is hearing Exhibit H.

BY MR. DeVITA:

Q. Mr. Rusco, is that an e-mail you received from Mr. Olins? Do you recall that?

A. Yes, that's an e-mail that's addressed to me.

Q. Take a moment to read it.

A. Okay.

(Pause)

A. Okay. I have read it.

Q. Okay. So it indicates problems coming up with respect to Ropes & Gray and the $100,000, right?

A. Right.

Q. Do you recall that in fact the $100,000 was never advanced to Ropes & Gray?

A. I don't recall one way or the other on that.

Q. At the bottom of the e-mail, you see it says, "Would you mind speaking with Rick sometime today?"

That refers to Rick Marshall again?
A. Correct.
Q. "I will ask him to call you."
Do you recall whether you did speak to Mr. Marshall?
A. The only thing that would help me with that recollection would be looking at my log.
Q. Well, I could, if you don't mind my shortcutting, there is no reflection in your log of any conversation in April of 2011 with Mr. Marshall?
A. So I don't recall that I did.
Q. If you did, would you have put it in your log?
A. Yes.
Q. Okay. So the fact that it is not there suggests that it didn't take place.
A. Right.
Q. Now, do you recall, as part of the issue of an appeal, any conversation regarding trying to settle the case, the SEC's judgment? Do you recall any discussion about that?
A. Yes, we had conversation with Robert about that possibility.
Q. And in connection with that, were you also discussing a mediation that had taken place?
A. I don't recall that specifically.
Q. Well, let's take a look at your entry for April 27, 2011. Do you see that?

A. Yes, I do.
Q. And it says that you -- TT stands for "talked to," correct?
A. Yes he.
Q. "Talked to Robert regarding the SEC case. Court mediator thinks a settlement in the high 6 or low 7 range would be reasonable."
Do you recall that? Does that refresh your recollection?
A. Yes, it does.
Q. And did Mr. -- do you recall that Mr. Olins told you that the mediator was the chief magistrate judge for the Northern District of California?
A. I don't recall that specifically, no.
Q. But you do recall discussion about the mediator recommended?
A. Right.
Q. Did there come a time when AB&T became involved in trying to encourage the settlement?
A. Yes.
Q. I started to draw your attention, if you look to June 16, 2011, there is a reference in your log to a conversation with John Silverman of the SEC. Do you see that?
A. Yes, I do.
Q. Do you recall what that conversation was?
A. Essentially John was saying that he wanted to proceed with

getting the assets sold and was at that point considering receivership.
Q. Did you discuss settlement at all?
A. Not at that time.
Q. Not at that time.
Take a look at your entry for August 31, 2011.
A. Okay.
Q. There is a reference there, "Talked to Robert Olins, our legal counsel, about the possibility of settling the SEC matter. Robert will contact John Vasquez."
Was that one of Robert's lawyers?
A. I believe that's the one you mentioned earlier.
Q. Right. We saw he was the third name in that firm name, right?
A. Right.
Q. And at this time also, if you look at August 26, 2011, the SEC had served its restraining order, right?
A. Right.
Q. Restraining notice?
A. Yes. That's often been confused that way, but . . .
Q. Yes.
And I notice that on September 6, 2011, you received a copy of Mallett's response to the SEC subpoena and restraining order, is that right?
A. That's correct.

Q. And then you sent a copy to Robert of that.
A. Correct.
Q. So you knew in September of 2011 that Mallett had been -- had received the restraining notice and, in fact, had provided information about what it had in its possession?
A. Correct.
Q. But getting back to the settlement issue, do you recall what settlement offers were made at the time that these conversations were taking place?
A. I do not recall specifically. I know we had talked about it various . . .
Q. Do you remember that AB&T offered to loan Mr. Olins a million dollars to try and settle?
A. Yes. I remember that we were considering a loan to --
Q. In fact, that was subsequently raised to a million and a half, right?
A. Yes.
Q. And Mr. Olins was open to that idea, right?
A. Yes, he was.
Q. But the SEC was not.
A. No, they were not.
Q. And the million -- whatever money was advanced to settle the SEC case would have been added to Mr. Olins' debt to the bank --
A. Correct.

Q. -- to be paid out of the collateral.
A. That's correct.

THE COURT: Mr. DeVita, any estimate on how much longer you expect to be on cross?

MR. DeVITA: I would say, your Honor, another half hour.

THE COURT: Okay. I want to take some pity on the court reporter, so is this a good time to take a break?

MR. DeVITA: This is a good time.

THE COURT: Why don't we break for five or ten minutes and then we will be ready to go. Thanks.

(Recess)

MR. DeVITA: May I continue, your Honor?

THE COURT: You may.

Mr. Rusco, you are still under oath.

You may proceed.

MR. DeVITA: Thank you, your Honor.

BY MR. DeVITA:

Q. Mr. Rusco, just to follow up with something you had testified on direct examination, you mentioned that there was an outstanding loan that Mr. Rusco had with Sotheby's that related to the sale of the carpet, is that correct?

THE COURT: I think you misspoke.

THE WITNESS: Yes.

A. You said Mr. Rusco had a loan with Sotheby's.

Q. I'm sorry, Mr. Olins had a debt to Sotheby's.
A. Yes, that's correct.
Q. That debt was reflected on his balance sheet that he provided to the bank, wasn't it?
A. I would have to look at the balance sheet at the time for that record, but I believe so.
Q. Okay.
Now, I want to bring your attention to June of 2012. Was there an item in the estate, two items, Swedish -- some Swedish globes? Do you recall that?
A. Yes.
Q. And did there come a time when Mr. Neville told you that he had a buyer for the Swedish globes?
A. Yes.
Q. Do you recall when that was?
A. Not specifically.
Q. Do you have your Government Exhibit 201 in front of you? That's the other log, the receivership log.
A. Right.
Q. Do you see that?
A. Yes.
Q. I draw your attention to the entry for June 18, 2012. It is on page 5. It refers to a telephone call from Henry Neville, "Called to let me know" -- "called to confirm that we received the wire transfer for the garniture set." That's the

vases we were talking about earlier?
A. Correct.
Q. And then it says "and to let me know about the items Mallett would like to show next week at The Masterpiece."
A. Correct.
Q. What was Masterpiece?
A. It was an art and antiques show that occurred annually I believe in London.
Q. And it was in June of -- it was June of the year or the spring of the year?
A. Well, in the June time frame.
Q. Okay. And Mr. Olin -- Mr. Neville was discussing some items he wanted to bring -- he said he wanted to bring to show at that fair?
A. Correct.
Q. Were the Swedish globes among those items?
A. I believe they were.
Q. So, to the best of your recollection, on June 18, is this the first suggestion of an effort by him to sell those globes?
A. Yes.
Q. And then if you could turn to June 27 -- I'm sorry, let's start with June 29. It says, "Reported that he had an interested buyer in the globes and that a client had asked to see the dragon candelabra."

On June 29 he was telling you that he had someone who

was interested in buying the globes.
A. Correct.
Q. So obviously that would mean that he had not sold them before then, right?
A. Right.
Q. Right.

And I draw your attention back to the entry on June 27. It says, "He indicated that he would not be able to disclose names of buyers, but the prices and commissions were workable for him. I indicated to him that we understood the issue with the disclosure of the names of the buyers and can work around that issue."

Now, was that related to any specific sale or is that in general?
A. Well, it certainly related to the items he was taking to the Masterpiece.
Q. Did it also have any connection to the vases?
A. Not to my recollection. We had already sold the vases by that time.
Q. But without knowing the identity of the purchaser, you are kind of stuck with the representations that Mallett gives you as to what it sold the items for, aren't you?
A. Well, we were wanting to get from him some documentation, if possible, on that.
Q. Did you?

A. I don't recall.

Q. Now, drawing your attention to --

MR. DeVITA: Let me ask that we mark as Defendant's Exhibit I a series of e-mails on June 26.

(Pause)

Q. I ask you to look first at the attachment, and that's a letter from you addressed to Mr. Neville, correct?

A. Yes, that's correct.

Q. And dated June 26, and it says, "Thank you for your phone call on Monday and the request to place four items from the receivership estate of Olins/Argyle Capital Management Corp. in The Masterpiece 2012 Art and Antiques Fair to be held in London, June 28, 2012 through July 4, 2012, correct?

A. Correct.

(Continued on next page)

Q. And the first item that is mentioned is the Swedish globes, right?
A. That's correct.
Q. And the sale price to be -- that is reflected is $250,000?
A. Right.
Q. And the commission rate, that's the rate of profit to Mallett is scheduled is to be 20 percent?
A. Correct.
Q. And the next sentence after that lists, as we will require that Mallett provide documentation disclosing names of purchaser, the purchase price and commission amount deducted from each item sold. So we know you didn't get the names of the purchasers, right?
A. Right.
Q. And any representation you got about the purchase price was what Mallett told you?
A. Right.
Q. And did there come a time that Mallett told you the globes were sold?
A. Yes.
Q. Could you look at your log for July 5, 2012. -- I am sorry.

Before we go there, you had to apply to the court for permission for him to sell these items, right?
A. That's correct.
Q. Because this is before the liquidation plan had been filed?

A. Right.
Q. So that you informed him, your e-mail of June 26 says perhaps I should have delayed my response to you by a few minutes. We just received the court order approving your request, correct?
A. Correct.
Q. And the request was based on his representation that he would be selling the items for the prices listed in your letter, right?
A. Correct.
Q. And then going to your log for July 5, 2012 confirming the sale of the Swedish globes. Do you see that?
You have a telephone call from Henry Neville, he asked about the Dragon candelabra and confirmed about the sale of the Swedish globes. Do you see that?
A. Yes.
Q. And then over on July 12, there is an entry that says you received $209,968.00 net proceeds from the sale of the Swedish globes?
A. Correct.
Q. That is net from their commission, which according to this, is $40,000?
A. Well, actually, it would have been -- the price would have been a little bit more than that because they would have if they collected 20 percent commission.

Q. 20 percent commission?
A. Right.
Q. Let me show you -- I ask that we mark as Defendant's Exhibit J -- this is a July 5, 2012 letter from Mr. Neville to you, correct?
Do you see that?
A. Yes.
Q. It says in it that the sum owing to the bank will be $210,000 net of the 20 percent commission and that's representing $10,000.00 more than the agreed return that you had discussed. Is that right?
A. Correct.
Q. So he negotiated with you for a lower return, and he said, in other words -- well, let me put it this way:
You had agreed to a return of $200,000, and he's telling you in this letter that he got you even better, right?
A. Correct.
Q. So Mr. Neville never told you that he actually sold those globes in April of 2012, correct?
A. No. I thought they were sold at the Masterpiece Fair?
Q. He didn't tell you they were actually sold at Maastricht?
A. No.
Q. You know what Maastricht is, right?
A. Yes.
Q. What is Maastricht?

A. It is a European art and antique show, I think, I can't recall which country it is in, but it is not in the U.K.
Q. He didn't tell you that he had sold, that Mallett had sold those globes for 310,000 euros, did he?
A. No.
Q. (Pause) I am showing you what has been marked as Defense Exhibit K. I wrote on there "Government Exhibit," and I apologize for that.
THE COURT: Old habits die hard.
MR. DeVITA: It is 30 years ago, Judge, it should have been long dead by now.
BY MR. DeVITA:
Q. But the invoice that is reflected on the second page of that exhibit is the same or the same Swedish globes that we're talking about?
A. I believe so.
Q. And it indicates a sale price of 310 euros -- 310,000 euros?
A. 310,000 euros, correct.
Q. And that would be, if you know -- you're a banker, maybe you should know, roughly $408,000?
A. At that time perhaps. I am not into foreign exchange that much. Only when I need to be.
Q. But you know it is a lot more than the $250,000 that the court approved and that Mr. Neville told you they sold it for?

A. Correct.
Q. And you never received any part of the difference, right?
A. No.
Q. "You" being the bank --
A. The bank, no.
THE COURT: Mr. Rusco, just wait till counsel finishes the question. If you speak at the same time, it makes the Court Reporter's job a little too difficult.
THE WITNESS: Sorry about that.
MR. DeVITA: I'll try to do the same, your Honor.
THE COURT: Thank you.
BY MR. DeVITA:
Q. So there is no question in your mind that Mr. Neville told you he was taking the globes to the masterpiece festival or whatever it is called?
A. Art show, I believe, yes, there is no question in my mind that's where they were to be displayed.
Q. Now, I want to bring your attention back to the vases that we talked about earlier, we talked about on direct examination.
Did you ever agree in March, in or about March of 2012 with Mr. Neville that he could sell those vases?
A. Well, they were in his possession. They were still under a consignment agreement at the time. We didn't have anything, you know --
Q. They were also -- sorry?

A. There was no new agreement in place.
Q. Did you agree and authorize him to either buy or sell them for $520,000?
A. Once we got the court approval.
Q. That was when?
A. That was in June.
Q. So you didn't have that, a conversation of that type in March?
A. (Pause)
Q. Take a look at your log. Specifically let's take a look at March 28th, 2012. I think that would be on your first log.
A. The first log?
Q. Yes.

THE COURT: It says Government Exhibit 200.

MR. DeVITA: 200, yes, your Honor.

A. March 28th?

BY MR. DeVITA:

Q. March 28th, 2012, if you had a conversation on that date in which you authorized Mr. Neville to sell those vases with a return price of $540,000, would you have recorded it in that log for March 28th, 2012?
A. Yes, I would have.
Q. It is not there?
A. It is not there.
Q. Okay. This is at the time when the litigation over the

receivership is taking place, isn't it?
A. Correct.
Q. Now, I ask you to take a look at your receiver log. This is Government Exhibit 201. You have the entry of May 17, 2012 reflecting a conversation with Mr. Olins, right, may 17th?
A. I am trying to find it.
Q. This is now the receiver log, Government Exhibit 201.
A. Right. There is a telephone conversation with Robert Olins.
Q. I am not sure you're looking at the same one.
A. I am.
Q. You have it in the book. Okay. Now --
A. Just to explain, my bifocals don't work so well with the computer screen.
Q. That is fine. That is fine. You notice I am using the paper, too. I'm an old fashioned fella.
So the conversation with Mr. Olins does not reflect any conversation or discussion of the price for the sale, does it?
A. No.
Q. I'd like you to look carefully in the period between May 17, 2012 and the time at which the vases were sold and see if there are any further conversations between you and Mr. Olins related to those vases?
THE COURT: Mr. Rusco, can you remind me when the

vases were sold?

THE WITNESS: They were sold in June of 2012.

BY MR. DeVITA:

Q. I think there is an entry --

A. It is like June 15th or 12th, something in that range.

Q. There is an entry on June 15 that reflects a telephone call from Henry Neville, and it says told about court order on the garniture set, and follow-up says send a copy of the order and wire transfer instructions. That is when you got the 15th is when you received the court approval --

A. Right.

Q. -- for the sale. So let's take the period between June -- May 17 and June 15th. Are there any conversations between you and Mr. Olins?

A. (Pause) None recorded in my log.

Q. If you had had them, they would be recorded, right?

A. Yes.

Q. But there are numerous conversations with Mr. Neville about the vases, right?

A. Yes.

Q. And on, for example, on June -- May 18th, this is the day after you spoke to Mr. Neville, to Mr. Olins, you got a call from Mr. Neville and says we discussed the garniture set. He has a "potential buyer." He thinks he would sell them for $600,000 with a net of 540. Do you see that?

A. Yes, I do.
Q. Do you recall any conversation with Mr. Neville prior to that date, at which you discussed with him and consented to a net of $540,000?
A. No.
Q. He certainly didn't tell you in that conversation that he'd already sold the vases, did he?
A. As I said there, he told me he had a potential buyer.
Q. And then on May 18, you asked Mr. Olins for a letter to --
A. Not Mr. Olins.
Q. Mr. Neville. You didn't speak to Mr. Olins, right --
A. Right.
Q. -- in that period of time?

You asked Mr. Neville for a letter addressed to the bank outlining the potential sale, correct?
A. That's correct.
Q. And the purpose for that letter was to submit to the court to get approval?
A. That's correct.
Q. And you told Mr. Neville that?
A. Yes.
Q. So he knew that the representations that he was making were going to be presented to the court?
A. Correct.
Q. I ask you to turn to your entry for May 24, 2012. Have you

found it?

A. Yes.

Q. There is a conversation with Mr. Neville -- I am sorry. The 3:00 pm conversation I am talking about. There are several conversations with Mr. Neville.

It says we also discussed the garniture set. Mallett London is trying to connect contact the potential buyer. He explained that the potential transaction may involve the exchange of pieces from the potential buyer, a common practice, still willing to provide a letter regarding the garniture set once -- wanted to clarify the transaction. Do you see that?

A. Correct.

Q. So clearly if he had already or Mallett had already sold the vases, he was -- it was a misrepresentation to you that London was trying to contact a potential buyer, right?

A. If that's the case, yes, you're correct.

Q. I ask you to look at the entry for June 7, 2012, 10:15 am, there is a telephone call from Henry Neville.

Do you see that?

A. Yes.

Q. And he told you that there is a degree of urgency as the client is planning to come to London. No dates at this point, but Henry will advise as soon as he can. So he is representing to you there is a potential buyer who is coming to London, so you have to act fast. That is the reason for that

representation, right?
A. Well, there was going to be some pressure, yes, to deal with that buyer.
Q. And then at the end of the day you were told that the vases were sold with a 20 percent commission and it meant a net to you of -- actually, it wasn't $210,000. He charged you for the wire fee, right, that was deducted?
A. That was from the globes, the 210,000. You are talking about the vases?
Q. Yes.
A. With the vases, I received 540,000.
Q. Going back to the globes, though, he, in fact, made you pay the cost of the wire transfer, right?
A. Right.
Q. All right. Mr. Rusco, I'd like to talk to you about the Dragon candelabra you were discussing on direct examination.
There was a proposed sale of those in June of 2012. Isn't that right?
A. That's correct.
Q. If you look at your log, at Page 7, on June 29, 2012, do you see that?
A. Yes, telephone call from Henry Neville, and there is a client who'd asked to see the Dragon candelabra.
Q. Did you discuss pricing with Mr. Olins -- Mr. Neville at that time?

A. We discussed pricing with him after we talked to Robert Olins about it as well as we spoke with Robert Olins about the price.
Q. Ultimately, that proposed sale by Mallett didn't take place?
A. It never materialized.
Q. There had been a number of discussions about these Dragon candelabra throughout the time of the -- not just the receivership, but even before. Isn't that right?
A. That's correct.
Q. They had been on consignment for a long time?
A. I believe since October of 2009.
Q. And they had not sold?
A. Not sold.
Q. There had a been number of inquiries, but they hadn't sold?
A. Right.
Q. It was your belief it was in the best interest of the bank to get them sold, right?
A. Yes.
Q. So that when Mr. Jaeger came to you, you dealt directly with Mr. Jaeger? You had conversations with Mr. Olins, but you negotiated with Mr. Jaeger. Isn't that right?
A. That's correct.
Q. You knew Mr. Jaeger was planning to consign those dragons to Mallett?

A. Correct.
Q. In fact, you informed Mallett of that desire on his part, didn't you?
A. Yes, I did.
Q. Did you have a conversation about what the consignment price would be?
A. No.
Q. What was the consignment price that the bank had with Neville -- with Mallett?
A. I'm thinking it was in the $900,000 range.
Q. Did you have any reason to believe that Mr. Jaeger was going to consign it for less?
A. Well, given how we hadn't had any sales of it and a lower price, I assume he probably -- if he was trying to sell it quickly, he might sell it for less, yes.
Q. But you didn't have a conversation with him about that?
A. No, I didn't talk with him about what he was planning on consigning it for.
Q. Once you sold them to Mr. Neville, to Mr. Jaeger, the bank's interest ended, right?
A. That's correct.
Q. The bank had no interest in those Dragon candelabra once they were sold, right?
A. Correct.
Q. In fact, you had a bill of sale that was entered into,

right?

A. That's correct.

(Off-the-record discussion)

MR. DeVITA: I seem to have made one too few copies of this, your Honor -- no, no, I am sorry. Here it is. I didn't want to leave the court without a copy.

BY MR. DeVITA:

Q. Is that your signature on that bill of sale, Mr. --

A. Yes, it is.

Q. -- mr. Rusco.

THE COURT: This is Defense Exhibit L?

MR. DeVITA: Yes, your Honor.

BY MR. DeVITA:

Q. Where it says witness, it says grantor, that's the bank, right, for the sum of $235,000 paid to it by grantee on the 6th day of December, the receipt of which is hereby acknowledged, has granted bargain quitclaim, sold, conveyed, assigned, transfer, set-over and delivered by these presents and by these presents does hereby grant, bargain, sell, convey, assign, transfer, set-over and deliver unto grantee and to grantee's successors and assigns forever all of the following described property subject to grantor's control and possession as receiver in the lawsuit.

Then it talks, describes the Dragon candelabra, right?

A. Correct.

Q. As has been authorized and approved by the United States District Court in that certain order entered on the docket number, correct?
A. Correct.
Q. And then it says at the next to the last paragraph, it says to have and to hold the Dragon candelabra hereby sold, assigned, transferred and delivered unto the grantee, its successors and assigns forever free and clear of any rights, titles, interests or liens, right?
A. Correct.
Q. So that means that once he resold this, however long it took, Mr. Jaeger was entitled to whatever money he received?
A. He was the owner of the Dragon candelabra.
Q. And he was entitled to do whatever he wanted with the proceeds of that sale, right?
A. Correct.
Q. No question in your mind about that?
A. No.
Q. You had given to him the risk that you had, as part of this transaction, given to Mr. Jaeger whatever risk there was on the resale?
A. Yes.
Q. And whatever ability to profit there was on the resale?
A. Correct.
Q. And to divide the profit however he so chose?

A. Yes.

MR. DeVITA: Your Honor, I have no further questions. May I have just one moment to make sure I'm right on that?

THE COURT: Yes.

(Off-the-record discussion)

MR. DeVITA: No further questions.

THE COURT: All right. Redirect.

MS. MAGDO: Just very briefly, your Honor.

REDIRECT EXAMINATION

BY MS. MAGDO:

Q. Mr. Rusco, you testified earlier that there was a minimum price of $200,000 for the sale from the receiver to a third party of the Dragon candelabra. Is that correct?

A. Yes, that's correct.

Q. And that for any amount of $200,000 or above, you did not need to seek court approval because it was part of the liquidation plan, correct?

A. That's correct.

Q. Did you at any time assign a value of $432,000 to the Dragon candelabra as the minimum amount that the receiver needed to get on a for sale?

A. Yes, we did.

Q. What was the context of that?

A. That was the context of the item being shown to the prospective buyer that Mallett had.

Q. That was in mid-2012?
A. Mid-2012, July, August time-frame.
Q. That sale didn't end up going through, correct?
A. That's correct.
Q. Did you tell Mr. Olins that if a sale was consummated for less than $432,000, he would owe a deficit to the bank of whatever the number was below $432,000?
A. No.
Q. So he didn't have an additional amount that he needed to make up to the bank if it was sold for less than $432,000?
A. Right.
Q. So he did not have such a debt? So if he told anyone that he had such a debt to the bank, that would be incorrect?
A. Yes, that would be incorrect.

MS. MAGDO: Nothing further.

RECROSS EXAMINATION

BY MR. DeVITA:

Q. Let me explore that a little further if I can, Mr. Rusco.

If the item sold with a net to the bank of $432,000, that would have reduced Mr. Olins' debt by $432,000, right?
A. Correct.
Q. When it sold for $235,000, there was a gap between what the reduction of his debt was, right?
A. Correct.
Q. So Mr. Olins -- and if that gap is $197,000, right?

A. Yes.
Q. Right?
A. Yes.
Q. So as a result of the Dragon candelabra selling for $235,000 instead of $432,000, Mr. Olins was still on the hook to the bank for 197 more, 197 more thousand more than he would have been had the Dragon candelabra sold in June for $432,000?
A. That's correct.
MR. DeVITA: Okay.
REDIRECT EXAMINATION
BY MS. MAGDO:
Q. One quick follow-up.
At that time the amount of the collateral, the value of the collateral exceeded the debt to AB&T. Is that correct?
A. Yes, that's correct.
MS. MAGDO: Nothing further.
THE COURT: You may step down, Mr. Rusco.
(Witness excused).
THE COURT: Ms. Magdo, next witness.
MS. MAGDO: The government calls Bruce Jaeger. Do you want to retrieve the exhibits from the witness stand?
MR. DeVITA: Maybe we can take a minute to clean up, your Honor, because I have exhibits up there, too.
THE COURT: Sure.
(Pause)

MS. MAGDO: The government calls Bruce Jaeger.

BRUCE W. JAEGER,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MAGDO:

Q. Mr. Jaeger, what do you do professionally?

A. I am in investment banking.

Q. How long have you known Robert Olins?

A. Since the mid-'90s.

Q. Mr. Jaeger, if I could ask you to approach the microphone and speak into the microphone so everyone can hear you. Thank you.

Describe the nature of your 20 year or so relationship with Mr. Olins.

A. I first met Mr. Olins when he was -- had trading authority on behalf of a client at Bear Stearns, Isadore Becker. He had approached the desk for some trades on behalf of Mr. Becker, and that is how I got to know Mr. Olins.

Q. Are you aware Mr. Olins collected artworks and antiques?

A. Yes, I am.

Q. We'll refer generally to his collection of arts and antiques as the art and antique collection, okay?

A. All right.

Q. Did there come a time you became interested in purchasing

an item from the art and antique collection?
A. Yes, I did.
Q. Approximately when was that?
A. In the fall of 2012, I believe.
Q. How did that come up.
A. Mr. Olins and I had discussed that the SEC had imposed a fine, I think about $3 million, plus he had defaulted on a loan, and they were in the process of liquidating his assets to satisfy those obligations.
Q. Did he approach you about the purchase or did you approach him?
A. He approached me.
Q. Did he give a reason for approaching you about this?
A. Yeah, he thought it was a way I could help him pay down his debt and a way I could buy some assets at a reasonable valuation.
Q. Were you looking to buy an item as an investment or as something to keep and display?
A. Trade, for the investment.
Q. Did you and Mr. Olins discuss a specific piece?
A. Yes, we discussed the Dragon candelabra.
Q. Did there eventually come a time you made an offer to buy the Dragon candelabra from the receiver?
A. After doing a bunch of due diligence, yes.
Q. Approximately when did you make your offer to buy the

Dragon candelabra?
A. In December, beginning of December, I believe it was.
Q. 2012?
A. Yes.
Q. Now I'd like to focus your attention specifically on the time-frame prior to your making an offer to the receiver, okay?
A. Yes.
Q. Did you have any discussions with Mr. Olins about the potential resale value of the Dragon candelabra?
A. Yes, I did.
Q. Tell me about those conversations.
A. The conversations were that there were three potential buyers out in the market, and one one was in Latin America, one was in Asia, another in the south of France, a German client.

Those three potential clients were out there and Mr. Olins felt that if I purchased it as a reasonable valuation, that I could sell it at a nice profit over time.
Q. Did you discuss what price Mr. Olins thought you might be able to resell it for over time?
A. I think it was a combination of Mr. Olins and Mr. Neville, but, yes, the answer is yes.
Q. What was that price?
A. $950,000.
Q. Would that have been the net?
A. Yes.

Q. To you?
A. Yes, that would have been the net to me.
Q. After any commissions to --
A. That's correct. As I understood, it was 1.2 million was the gross price, if you will, net of a commission to Mallett, and net to me would be 950.
Q. Again focusing your attention ton the time period prior to your making an offer to the receiver, did you have any discussions with Mr. Olins about the price point at which you should make an offer to the receiver?
A. Yes.
Q. What were those conversations?
A. The conversations were in the context of looking at the Christie's estimates and discussing it, looking at the insurance, looking at where Mr. Olins had purchased it prior and, you know, what exactly the range was within the Christie's estimates.
Q. Did a specific number -- did you discuss a specific number with Mr. Olins?
A. I would say we came up something in the low 2's, yes.
Q. And by "low 2's," you mean at or above -- slightly above $200,000, right?
A. That's correct, yes, that's correct.
Q. Did Mr. Olins advise you to make a bid in that range?
A. Yes, he guided me, yes, accordingly.

Q. Again still talking about the period prior to your offer to the receiver while the Dragon candelabra was still owned by the receiver, okay, did you have any conversations with Mr. Olins regarding the division of the proceeds of an eventual resale?
A. Yes.
Q. Tell me about those conversations.
A. Mr. Olins said to me that there's a value that's been assigned to this Dragon candelabra by the receiver, and that valuation was assigned at the $432,000 number, and that would be a deficiency if I were able to buy it at anything less than that.

So in the case where I did purchase it at $235,000, and the valuation in terms of the collateral was carried at 432, Mr. Olins would have a deficiency of 197, which is the difference between the collateral value were to purchase it and where -- and he felt if I was consigning 950, at two and a half times my money, then it wouldn't be fair for him to have to make up a deficiency based on that transaction.
Q. So when you said you would help him make up a deficiency, what do you mean?
A. I said if I were to buy it at 235 and eventually sell it at 950, that he could receive from Mallett the deficiency, the collateral, deficiency of 197, which in my mind was due back to the bank.
Q. What was your understanding of what Mr. Olins would do with

any such proceeds?
A. He would remit it back to the bank. That was the whole premise of the deficiency.
Q. What was your first offer or what was your initial offer?
A. My initial offer was 225.
Q. $225,000?
A. To Mr. Rusco, that's correct.
Q. The final purchase price was?
A. He rejected that, and I came back at 235.
Q. Okay. Again prior to the time of your making an offer, did you make any notes about this potential transaction?
A. Yes, I did.
Q. What was the purpose of your making notes --
A. So I could look and see, based on the profitability, if it was worth doing the transaction.
Q. All right. Please take a look at Government Exhibit 303. You can look at it either on the screen where it should appear momentarily or in your binder, whichever is easier for you.
THE COURT: Mr. Jaeger, make sure before you speak, you let counsel finish her question just so that you're not talking at the same time, please.
THE WITNESS: Yes, your Honor.
BY MS. MAGDO:
Q. Do you recognize Government Exhibit 303?
A. Yes.

Q. What is it?
A. Those are my handwritten notes.
Q. Starting at the top of the page where it says T No. 1, what is T No. 1?
A. Transaction No. 1 candelabra.
Q. Can you tell us what the first line under candelabra reads.
A. Yes. "RAO, which is Robert Olins, paid 660,000 and it says to be verified/bank/insurance.
Q. Were you including that as just a data --
A. A data point, right.
Q. Moving on to the second line, what does that say?
A. Mallett selling price of $1.2 million.
Q. You testified earlier that that was the number that both Mr. Olins and Mr. Neville said you could hope to achieve in the long run?
A. That's correct.
Q. The next line, please.
A. Mallett commission. I was told about 20 percent was the right number to estimate.
Q. And is that about $250,000?
A. That's correct.
Q. The net proceeds, what does that mean, 950,000?
A. That is deducting the Mallett commission from the Mallett selling price, leaving with net proceeds.
Q. The next line.

A. The next line is Robert A. Olins, collateral net of $182,000.

Q. Can you explain that, please.

A. Sure. As I mentioned before, Robert had, Mr. Olins had explained to me that the candelabra had a collateral value at the bank of $432,000, and any purchase price below that would be a deficiency.

That deficiency would need to be made up to the bank, so anything, if you add that 182 to whatever I estimated my purchase price, that should add up to the 432. If you wanted to go down --

Q. What did you estimate your purchase price would be?

A. Yeah, it says a couple of lines down.

Q. So tell -- walk --

A. I estimated the cost to the bank which has a question mark as 250, $250,000, which is also the most I would be willing to pay.

Q. Why is there a question mark there?

A. Because I had no idea what the bank would accept.

Q. Is that because you had not even made an offer yet?

A. Yes.

Q. Are you arriving at the $182,000 by subtracting 250 from 432?

A. That's correct.

Q. Again Mr. Olins told you that 432 was the value the bank

had assigned?
A. That's correct.
Q. And he would be on the hook for any difference?
A. That's correct.
Q. Again what did you understand would happen to the -- what you estimate to be $182,000?

MR. DeVITA: Objection to what he understood, if there is a conversation.

THE COURT: I think we have covered it. Go ahead.

BY MS. MAGDO:
Q. What did Mr. Olins tell you would happen to the estimated $182,000?
A. I believe that that was going back to the bank to cover his deficiency.

MR. DeVITA: Objection to what he believes, your Honor.

THE COURT: Again I think we have covered it. Why don't you ask your next question.

BY MS. MAGDO:
Q. Did you intend the approximately $182,000 payment to Mr. Olins to be in any sense a commission to him for helping to resell the Dragon candelabra?
A. No.
Q. Who was going to actually give the money? Who did you intend to have give the money to Mr. Olins?

A. I asked Mr. Olins to work it out with Mr. Neville.
Q. Did you discuss with Mr. Olins what would happen if you were to accept an offer at less than the $950,000 net proceeds price?
A. No.
Q. So --

THE COURT: Can I just clarify. If I can call it a deal, to the extent that the understanding or your understanding or intent was to provide the delta, the difference between the 432,000 and whatever price you ultimately paid for the item, was that conditional upon your getting $950,000?

Was it explicit between you and Mr. Olins that that would only occur if you got $950,000?

THE WITNESS: Yes.

THE COURT: Okay.

BY MS. MAGDO:
Q. So there doesn't appear to be a date on these notes, correct?
A. Correct.
Q. Are you able to place the timing of when you made these notes as before or after you purchased the Dragon candelabra?
A. Definitely before.
Q. How do you know that?
A. Because the numbers, both the RAO collateral number and the

cost to the bank are just estimates because if this was done after that RAO collateral, it would have been 197, and the cost to the bank would have been 235.
Q. So just at the bottom line, 9 months put back at 500,000, what does that refer to?
A. I was trying to hedge my bet. If I wasn't able to sell it in 9 months, I could try to put it back to Mallett.
Q. Did that eventually end up being part of the deal?
A. No.
Q. Is that another way to know before you purchased it?
A. Yes.

THE COURT: Mr. Jaeger, just a reminder, even if you know what the question is likely to be, and you can see it coming, just wait for Ms. Magdo to finish before you answer.

BY MS. MAGDO:
Q. So when did you close on the purchase of the Dragon candelabra?
A. I believe it was in December 6th in 2012.
Q. What happened to the, physically what happened to the Dragon candelabra after you purchased them?
A. The Dragon candelabra were housed in, as I understood it, in London, in Mallett's office in London, and it was being shown around in various galleries throughout Europe on displays to market the piece. This is what I was told by Neville.
Q. Did you enter into a consignment agreement shortly after

you purchased them?
A. I did. I think five days after I purchased the piece, I entered into a six-month consignment agreement for 950 with Mallett.
Q. During the period of the consignment with Mallett, did you have any conversations with Mr. Neville about how his efforts to sell the piece were going?
A. Yes.
Q. In those discussions, did you discuss those three potential purchasers that Mr. Olins had mentioned to you with Mr. Neville?
A. Yes.
Q. What did Mr. Neville tell you about those purchasers?
A. One of the three, I can't recall which one it was, whether it was the Latin American or the Asian buyer pretty quickly stepped out of the picture, so there were only two potential buyers left, which made me somewhat nervous, but we decided to just go ahead and continue to market the candelabra.
Q. Did Mr. Neville take the Dragon candelabra anywhere to show them to anyone?
A. Yes, he did.
Q. Where was that?
A. In Maastricht, a big show, I don't know exactly where it is in Europe, but it is -- I don't know if it is in France or where it is.

THE COURT: I am going to take judicial notice Maastricht is in the Netherlands. Go ahead.

BY MS. MAGDO:

Q. Did he take them to France, as far as you know?

A. I believe he did.

Q. What was the purpose of that?

A. As I understood it, he was bringing it down to the chateau of the potential German buyer to put it on his mantle-place to show them how it would look on their mantle-place.

Q. To the best of your knowledge, during the consignment period was Mr. Olins making any efforts or any trips or any efforts to sell the Dragon candelabra?

A. Not that I was aware of, no.

Q. During the period that you had the Dragon candelabra consigned to Mallett which started in November -- sorry -- December 2012 -- correct -- did you ever tell Mr. Olins that you would give him a sales commission if he helped to get the Dragon candelabra sold?

A. I don't believe I ever said that, no.

THE COURT: I am sorry. Can you say that again?

THE WITNESS: I don't believe I ever said that.

BY MS. MAGDO:

Q. Again any money that you had agreed to give him was to pay back to the bank, correct?

A. Right.

Q. It was not for him to keep as a sales commission, though?
A. (Pause)
Q. At any time did you receive an offer to purchase the Dragon candelabra?
A. Yes.
Q. Who informed you of that offer?
A. I was in California, and I got a call on my cell phone from Mr. Olins.
Q. What did Mr. Olins tell you?
A. Mr. Olins said that there was a buyer, I think it was the German buyer, for 603 net, and that I had it for a long time, I should really consider selling it.
Q. What was your initial response to that offer?
A. I was rushing out and it was so far below the 950, I said absolutely not, and hung up and went on my way.
Q. As far as you know, was the potential buyer the same person, the same German client I think you called him, that who dad expressed interest even before November 2012?
A. Yes.
Q. After you rejected the initial offer of $603,000 net to you, what happened next?
A. Mr. Olins called me a few hours later and said he was able to speak I believe with Mr. Neville, and they were willing to throw in a $50,000 store credit. Again I was running out. I said okay, and that was the extent of our conversation.

Q. Did Mr. Olins have an opinion on whether you should accept the offer?
A. Yes.
Q. What was his opinion?
A. That I should take it since I had been holding the candelabra for 11 months.
Q. That day when you were in California and speaking to Mr. Olins by phone, did you discuss whether he would receive a share of the proceeds?
A. I don't recall ever saying that, no.
Q. Had you discussed with Mr. Olins what would happen if you accepted a price of less than 950,000?
A. Yeah. The fact that I was receiving so much less than I originally anticipated, I would have absolutely prorated any number that he thought he would be entitled to.
Q. Your understanding of the 603 offer, did you believe that Olins was getting a portion of those proceeds?
A. You know, I didn't know what to believe. To be honest with you, there was a decorator involved on the buying side, there was barter being taken back per Neville, and so there were a lot of moving parts, so I didn't know who was getting what. It was hard for me to assess who, in fact, was getting something, if anybody was.
Q. Did Mr. Olins tell you that he was taking a portion of the sale proceeds?

A. I don't recall him ever saying that, no.
Q. Did you get an invoice from Mallett regarding that transaction?
A. Yeah, when I arrived back in New York a couple of days later, I did receive an invoice for $800,000 from Mallett.
Q. What did you do after you received that invoice?
A. I got right on the phone with Mr. Olins and said:
A. I have a tax problem here; and
B. Someone is lying to me about what it was sold for.
Q. What did Mr. Olins say?
A. Mr. Olins said take it up with Henry, which I wound up doing.
Q. Tell me about that.
A. I called Henry's office, and Henry was traveling, and I spoke to a woman, I think her name was Anna Gutierrez, and she said she would get in touch with Mr. Neville and get back to me.
The next day I got an e-mail from Mallett saying that the invoice was sent in error, they made a mistake, discard, and they're going to re-send the invoice of 603 including the $50,000 store credit.
Q. Did you have any further conversations about this transaction with Mr. Olins?
A. Yeah. I then after the dust settled, I did call him back and said I feel like someone was lying to me because it seems

like someone got paid $800,000, whether it be Mr. Olins, Mr. Neville or the decorator, and Mr. Olins told me under no uncertain terms that that was not the case.

Q. Did he specifically say that he did not get any money from the transaction?

A. Yes.

Q. What was the tenor of that conversation?

A. The length or the tone?

Q. The tone?

A. The tone was hostile.

Q. Did you continue to follow up on what you suspected was a discrepancy?

A. A couple of weeks later I went with a family member to visit Mallett to cash-in, for lack of a better word, my store credit, and I confronted Mr. Neville and basically asked Mr. Neville -- I told Mr. Neville that I thought somebody had made money, I thought he had made money or the decorator, somebody had made money and someone was lying to me, and he got very agitated and said that no one -- he didn't make money and his firm didn't make money and all this was was a relationship trade from Mallett's perspective.

Q. Did he mention that he took back certain items in connection with the transaction?

A. He did, he said it was a relationship trade. I don't remember the kind of furniture, it be armchairs or some kind of

furniture, I recall.

Q. Did you follow up with Mr. Olins to try to get to the bottom of what happened?

A. Not really. At that point I had a loan maturing a month a way. I was out an illiquid piece of art. I realized no matter how much digging I was going to do, it would just not prove fruitful, so I was done.

Q. You mentioned a loan. What loan is that?

A. Back in December I issued a loan to --

Q. Sorry? December of 2012?

A. I had issued a one-year loan for $340,000 to Spirit Bear.

Q. What is Spirit Bear?

A. Spirit Bear is an investment entity in which Mr. Olins consults for and Jay Palmer, the president.

Q. And how did the idea of your making a loan to Spirit Bear originate?

A. I was approached originally to look at a company called HPEV, and Mr. Olins actually brought in the management team so a bunch of potential investors could hear their story.

After I heard their story, I was not impressed with the management team, but I did like the technology, so I said I was out in terms of making an equity investment.

Subsequently, Mr. Olins came back to me and said would you make a loan to Spirit Bear since Spirit Bear had already invested or committed to investing a half a million dollars

into the company of which they put in 180,000. So I said I'd listen.
Q. What was the loan? What did Mr. Olins tell you the loan would be used for?
A. To invest in the technology and into the infrastructure of HPEV Company.
Q. What was the initial amount of the loan Mr. Olins asked you to make to Spirit Bear?
A. I think it was 350 was the initial amount. It wounded up being 340.
Q. Did you make any notes regarding the potential loan?
A. Yeah, on Transaction No. 2 is the highlight summary of the loan I was considering.
Q. Just to be clear, this is Government Exhibit 303, about halfway down where it says T No. 2. Are those your notes about the loan efforts?
A. Yes, they are.
Q. When in relation to making the loan did you make these notes, before or after?
A. Oh, definitely before.
Q. How do you know that?
A. Well, there are inconsistencies. These again are estimates. The $350,000 was in there wound up being 340,000. The 12 percent quarterly interest payments was correct. The UCC filing was correct, but the whole premise on No. 3 about

the shares is not correct.

What I agreed to take in consideration for making the loan was a 12 percent interest rate plus preferred shares. In this case, there were preferred shares of 15 preferred shares, which translates here into 350,000 shares of common stock.

What I actually wound up taking was 25 preferred shares, which translates into 500,000 shares of common stock.

Q. Did there come a time you actually entered into this loan agreement?

A. Sorry. Can you repeat that?

Q. Did there come a time you entered into this loan agreement?

A. Yes.

Q. Directing your attention to Government Exhibit 302, was this pledge and security agreement part of the agreement that you had with Spirit Bear?

A. It looks as it, yes.

Q. This was entered into on December 13, 2012, correct?

A. That's correct.

Q. The notes at Government Exhibit 303, were those made before or after December 13, 2012?

A. Before.

Q. So you mentioned that the collateral pool changed. What ended up being the collateral pool for --

A. Sure. Well, originally Mr. Olins provided me with a document that showed a $695,000 value on the wall brackets

which he was going to post as collateral for my loan, so I would get the 12 percent interest rate, I would get the shares and the collateral, if you will, instead of the oil interests was the wall brackets.

Q. Just to be clear and make sure I understand, when you were initially negotiating this loan with Mr. Olins, he offered some wall brackets as collateral for the loan. Is that correct?

A. That's correct.

Q. And what did he tell you the value of the wall brackets was?

A. I had the invoice, and the invoice showed me the wall brackets were worth $695,000.

Q. So did you ask him to put in writing that Spirit Bear owned -- this was an asset belonging to Spirit Bear?

A. Yes. I eventually did ask that of him and his associate, Jay Palmer, and I got what I termed a net asset letter which shows me the assets between the combined entities.

Q. Looking at Government Exhibit 300, is that the letter that you received in response to your request?

A. Yes.

Q. Taking a look at -- let's read the letter.

Dear Bruce: This letter shall serve to confirm that Spirit Bear Limited's assets include -- and let's skip to Point No. 2 -- is this a description, more formal description of the wall brackets that Mr. Olins had told you about earlier?

A. Yes.
Q. Based on this letter, did you understand that the wall brackets were owned by Spirit Bear, Limited?
A. It is on Spirit Bear letterhead, yes.
Q. Did you have any reason to think they were not owned free and clear?
A. No.
Q. Did you have any reason to think or did Mr. Olins tell you they were encumbered in any way?
A. No.
Q. After you received the letter, did Mr. Olins confirm to you that it was Spirit Bear, the U.S. entity that owned the brackets?
A. Well, I went back to Jay Palmer first and asked him who, in fact, owned these assets because I wasn't sure if it was the Isle of Man or the U.S.
Q. What did Mr. Olins tell you?
A. Again, I don't know if it was Mr. Olins or Mr. Palmer, but I found out that the interest in the oil wells was owned by Spirit Bear Isle of Man and that the wall brackets were owned by Spirit Bear U.S.
Q. Originally you said the wall brackets were pledged as collateral for the loan?
A. They were intended to, yes.
Q. Did that change at some point?

A. Yes. When I notified Mr. Olins that we were going to do a UCC filing or lien against the collateral, then the next day I got a call saying why don't you take the oil interest instead of the brackets.

Q. You mentioned a UCC filing. What does that involve?

A. It is a mortgage or a lien you have to go in and you have to figure out who, in fact, owns the asset being pledged.

Q. Did it involve certain due diligence?

A. Of course.

Q. Would such due diligence, would you expect it would disclose any prior liens on the collateral?

A. Yes.

Q. When Mr. Olins proposed that you not take the wall brackets as collateral, did he give you any explanation for why?

A. He just said he thought that the oil brackets -- oil wells were better and they were cash-flowing assets, no real explanation.

Q. When a negative pledge is put on an item, is a UCC filing done as well?

A. Not necessarily, no.

Q. So you mentioned you saw an invoice for the wall brackets. Let's take a look at Government Exhibit 101. Is that the invoice that you saw?

A. Yes.

Q. Based on this invoice, did you believe that they were owned

free and clear?
A. Yes.
Q. Did you notice that the invoice was issued to Mr. Olins?
A. Yes.
Q. Did you ask any questions about that?
A. I don't recall if I asked any questions. I just assumed that it was transferred over to Spirit Bear, considering that this didn't show up in his schedule of assets owned individually.
Q. Did you rely on that letter that we just looked at in understanding these belonged to Spirit Bear?
A. I relied on the net asset letter that was provided to me to make the loan.
Q. In deciding whether to make the loan to Spirit Bear, did you rely upon the representation that Spirit Bear owned the wall brackets?
A. Yes.
Q. Based on the total collateral pool, including the negative pledge on the wall brackets, did you decide to enter into a loan agreement?
A. Yes.
Q. So let's look at Government Exhibit 302. In the second paragraph, what is the amount of the loan, the principal amount of the loan?
A. $340,000.

Q. Is that different from the notes that you had made earlier?
A. Yes.
Q. Why is that?
A. I don't recall. It was an estimated of 350, and maybe they didn't use much for legal fees. I don't recall the reason it was different.
Q. At some point it changed?
A. It did.
Q. Let's take a look at Exhibit D to this agreement which is on Page 19 of this document. Under the "material assets," do you see the wall brackets listed?
A. Yes.
Q. That's again because there was a negative pledge on those?
A. That's correct.
Q. Did there come a time that forbearance of the loan was requested?
A. Yes, about two -- sorry.
Q. Who requested the forbearance?
A. Mr. Olins requested it. He called me two days before the loan was due and told me they didn't have sufficient funds and would I grant them forbearance.
Q. Did you agree to a forbearance?
A. Initially, no, but when I spoke to Mr. Olins numerous times, I then granted forbearance.
Q. At the end of the forbearance period, did Spirit Bear

ultimately default on the loan?
A. Yes.
Q. At that time did you try to enforce the negative pledge on the wall brackets?
A. First we foreclosed on the collateral and then we then sent letters out to Mallett and to the public company that on the HPEV shares notifying that these assets are subject to our pledge agreement and to reinforce those assets, so the answer is yes.
Q. With respect to the wall brackets, why did you send a letter to Mallett?
A. Because that's where they were being housed. I didn't want them to disappear or go overseas.
Q. Did you receive a response from Mallett?
A. Yes, we did.
Q. Was it from Mallett or their counsel, if you recall?
A. Mallett's counsel.
Q. Let's take a look at Government Exhibit 301. Is this the letter that you received from Mallett's counsel in response to your attempt to enforce the negative pledge?
A. Yes.
Q. Upon reading this letter, how would you describe your reaction?
A. Surprised.
Q. What was the reason for your surprise generally?

A. I mean the first bullet, when -- actually, the first and second bullet, when they talk about a private client, we knew who the private client was because we had cross-referenced the invoice numbers and who exactly who the private client was. In the first bullet point it looks like Mr. Olins had agreed to purchase the wall brackets for 695,000.

MR. DeVITA: Your Honor, at this point I will object because he is now interpreting someone's hearsay letter.

THE COURT: I'll allow him to testify as to his understanding in reaction to the letter, but take it with a grain of salt given he didn't write the letter. Go ahead.

BY MS. MAGDO:

Q. So the first bullet point, was that different from what you had previously understood?

A. Yes.

Q. How so?

A. How so? I received a net asset letter from the company Spirit Bear that said that they owned outright the brackets.

Q. Looking down the letter, was there anything else that was different from what you had previously understood?

A. Well, on November 19th, 2013, it seems that a $197,000 credit was issued to the same or the account of the private client, which we know is Neville -- sorry -- which we know is Olins, which is the same day I sold the candelabra.

Q. What else is different from what you had previously

understood?
A. That all of a sudden the private client who owned the brackets transferred those to Spirit Bear and thereby violated my loan again by incurring debt.
Q. So you had previously understood that Spirit Bear owned the wall brackets, correct?
A. That's correct.
Q. After reading this letter, who did you believe owned the wall brackets?
A. After reading the letter, it sounded to me like Mallett owns the brackets, and neither Olins or Spirit Bear ever owned the brackets.
Q. So was the negative pledge that was made on the wall brackets, was that a valid consideration?
A. For me making the loan?
Q. Did you rely on that in making the loan?
A. Yes, yes, of course.
Q. Who had made the representation about the wall brackets upon which you relied?
A. Spirit Bear in their letter, their net asset letter.
Q. Did Mr. Olins make any representations about the wall brackets?
A. Initially when he offered it to me, yes.
Q. Did you rely on those representations?
A. Yes.

Q. If you had known that there was a $400,000 encumbrance or amount owing on the wall brackets, would you have changed your decision to accept the wall brackets as part of the collateral pool?
A. Yes.
Q. Did you pursue any legal remedy with respect to the defaulted loan?
A. Yes.
Q. What amount of damages did you seek?
A. The loan and the legal fees, the principal loan and the legal fees and the interest rate.
Q. Do you remember how much the total was?
A. At one point it was $430,000, I believe, and that is after deducting the $55,000 credit bid I had to make to acquire the oil wells.
Q. Did you file a lawsuit against Spirit Bear?
A. I did.
Q. Was that settled?
A. We won summary judgment, and eventually it was settled.
Q. How much were you able to sell them for?
A. 282,000 and change.

MS. MAGDO: Just one moment.

(Off-the-record discussion)

MS. MAGDO: No further questions.

THE COURT: Cross-examination. Just so everyone knows

in about 7 or 8 minutes, we are going to break for lunch.

MR. DeVITA: Do you want to break now, Judge?

THE COURT: No, because I am meeting someone in about 14 minutes.

CROSS-EXAMINATION

BY MR. DeVITA:

Q. Good afternoon, Mr. Jaeger. My name is James DeVita. We have never met before, have we?

A. No.

Q. Mr. Jaeger, you bought the Dragon candelabra for $235,000, right?

A. Correct.

Q. You sold them for a net of $650,000, including the store credit?

A. Correct.

Q. So that's a profit of $418,000?

A. Pretax, yes.

Q. So 653 -- sorry -- the 603,000 you received in cash?

A. Yep.

Q. And that was net of whatever may have been before that, right?

A. (No answer)

Q. And you held that for approximately one year?

A. 11 months.

Q. 11 months? So you made a $418,000 profit in 11 months?

A. The math doesn't work for me, sir.
Q. Well, $418,000, you bought it for 235, you realized 653 --
A. No. I sold it for 603 in cash. I bought it for 235 in cash. The net is that difference.
Q. Well, you got a store credit of 50,000?
A. Correct.
Q. So you include that in the compensation you received?
A. Okay.
Q. 418,000, right?
A. If you use the 50,000 store credit.
Q. You did use the 50,000 store credit?
A. I did a year later, sir.
Q. So you used it?
A. Yes.
Q. If you had not, if it hadn't been for Robert Olins, you would not have made any of that money, right?
A. Probably.
Q. In fact, there was a time when you were considering pulling the Dragon candelabra from Mallett because you weren't happy with how they were marketing it, right?
A. That's correct.
Q. And there was a period of time when you were not getting along with Henry Neville, right?
A. I don't know about not getting along. We had words, but that is the course of the business.

Q. You had severe words, right?
A. I don't know what "severe words" are, but, yes.
Q. Did you yell at him?
A. I might have.
Q. You did, didn't you?
A. I might have.
Q. I am asking you if you did?
A. I don't recall I yelled at him.
Q. But, in any event, it became necessary for Mr. Olins to be the intermediary between you and Mr. Neville, right?
A. I think it helped.
Q. At one time you were going to put the candelabra in an auction? You were considering that, right?
A. I considered it, yeah.
Q. And Mr. Olins talked you out of it?
A. Ah-huh.
Q. He told you that that would result in a much lower price than you would have realized in a private sale?
A. I believe so.
Q. At one time you asked him to go back to the original seller, and he told you the original seller wasn't interested?
A. Yes. I think it was a Kugel, K U G E L, and I don't know if he ever spoke to them. He did say they weren't interested.
Q. Let me ask you to look again at the Government Exhibit 303, the handwritten notes. You said that the $182,000 was the

difference between the 250 you were thinking of or you were prepared to offer and the 432,000 that he told you that was a valuation that the bank considered?
A. Ah-huh.
Q. On this asset, right?
A. That's correct.
Q. Did Mr. Neville tell you that there had been a plan -- you discussed these candelabra with Mr. Neville before he bought them, right?
A. Yes.
Q. Did he tell you there had been a proposed sale earlier in 2012?
A. No.
Q. Did you ever talk to Mr. Rusco about an earlier proposed sale?
A. No.
Q. You talked to him many times with Mr. Rusco, though?
A. Yes.
Q. Did you ever ask Mr. Rusco where this 432 figure came from?
A. No.
Q. But if you understood that Mr. Neville would still be obligated to the bank for that under this calculation, the $182,000, if that was the difference between the earlier price, the 432 and the 250, right?
MS. MAGDO: Objection. I don't think Mr. Neville was

obligated to the bank.
Q. I am sorry. Mr. Olins. Let me rephrase the question.
THE COURT: I think that is a good idea.
BY MR. DeVITA:
Q. You knew that this Dragon candelabra was an asset that the bank held as collateral?
A. That's correct.
Q. And you knew that if the bank sold it for $432,000, that would reduce Mr. Olins' obligation to the bank in that amount?
A. That's correct.
Q. If it sold for $250,000, you knew that there would be a $182,000 difference between the reduction in his debt on that second lower sale, right?
A. That's correct.
Q. You also know -- you can sit here and calculate today -- that the difference between 432,000 and 800,000 is 197,000, right?
A. Say again.
Q. The difference between 432,000 and 800,000 is 197, right?
THE COURT: I think you are going to have to try your math again, Mr. DeVita.
(Pause).
BY MR. DeVITA:
Q. I am confusing the two different numbers.
The difference between what you actually paid and the

432 is the 197,000?
A. That's correct.
Q. So in terms of -- let me ask you to look at the bill of sale for the Dragon candelabra. Do we have Exhibit L. (Pause)
This is Defense Exhibit L. That is the bill of sale --
(off-the-record discussion)
BY MR. DeVITA:
Q. That is the bill of sale that you received in connection with this sale?
A. I am not so sure that the last two pages were attached to it, but the bill of sale --
Q. The court order?
A. Yeah.
Q. The bill of sale, the one on the first page you recognize?
A. Yes.
Q. You were specifically asked to receive the dragon candelabra free and clear of any rights, titles, interest or liens. Isn't that right?
A. Yes.
Q. That was in your letter to the bank that a condition of your purchasing was to receive it free and clear of any liens, right?
A. As I understood then, it would go through the process.
Q. Right. So you understood whatever profit was made from the

sale of the candelabra, you had complete discretion about its allocation, right?
A. Yes.
Q. You didn't owe anything to the bank, right?
A. I didn't owe anything to the bank, that's correct.
Q. Mr. Olins was still on the hook for the difference between the 432 -- I mean he only received debt reduction to the extent of $235,000, right?
A. That's correct.

MS. MAGDO: I am not sure he has a foundation for saying what Mr. Olins debt would then be --

THE COURT: I think he is inquiring what the witness's understanding was of the transaction. Is that correct?

MR. DeVITA: Correct.

THE COURT: Is that your understanding, Mr. Jaeger?

From this transaction, to the extent that Mr. Olins received any debt reduction from the bank, that it would have been the purchase price, the $235,000. Is that your understanding?

THE WITNESS: Yes.

MR. DeVITA: Your Honor, this would be a convenient time.

THE COURT: All right. Let's break and we will start up again at 2:00 o'clock. I assume I should instruct Mr. Jaeger that he should not communicate with the government since

he is on cross?

MR. DeVITA: That's correct.

THE COURT: Is that okay with everybody?

MR. DeVITA: Yes.

THE COURT: Mr. Jaeger, you should not communicate with any representatives of the government because you're on cross-examination. Please be back here a minute or two before 2:00 o'clock so we can resume at 2:00 o'clock.

MS. MAGDO: For planning purposes, does the court have any idea how late the court is willing to sit today?

THE COURT: Why don't we let Mr. Jaeger step down and chat about where this is going.

(The witness left the courtroom).

THE COURT: I am sort of sensing that we may not finish in one day, but perhaps I'm being unduly pessimistic.

Mr. DeVita, do you have any sense of how much longer you have on cross of Mr. Jaeger?

MR. DeVITA: I would guess at most a half hour.

THE COURT: All right. So you tell me. I assume Mr. Neville will perhaps be the longest witness. In that regard, we may not finish today. Again maybe that is not correct?

MS. MAGDO: We estimate the direct examination of Mr. Neville will take between 60 and 75 minutes, and then the direct examination of Ms. Meister will take 10 to 15 minutes.

THE COURT: All right. I guess the short answer to your question is I am prepared to stay until the end of the day, which is 5:00 o'clock. That is not the end of my day, but the end of the court day.

Why don't we just see where we are at that point and we can figure out what to do. I am also available tomorrow morning. So I will tell you that now and we can resume then. I think that might be ideal if we are not done because these matters will be fresh in my mind. We can take that up later and you guys can talk about it at the break.

(Luncheon recess)

(Continued on next page)

A F T E R N O O N S E S S I O N

2:00 p.m.

THE COURT: You may be seated.

Mr. Jaeger, if you come back on up to the stand, we will resume.

MR. DeVITA: May I proceed, your Honor?

THE COURT: You may.

Mr. Jaeger, you are still under oath, and we will pick up from where we left off.

You may proceed.

MR. DeVITA: Thank you, your Honor.

BY MR. DeVITA:

Q. Mr. Jaeger, you testified on direct examination that you saw a copy of an invoice for the wall brackets that was made out to Mr. Olins, right?

A. Yes.

Q. Was it Henry Neville that showed you that?

A. I don't recall.

Q. You, at the same time that you were considering the wall brackets as part of this -- the negative pledge of the wall brackets as part of this loan, that's the same time you were dealing with Mr. Neville in consigning the -- about whether you would consign --

THE COURT: Why don't you start that one over?

MR. DeVITA: I just noticed I'm not standing next to

the microphone.

THE COURT: I think that was the least of your problems, but go ahead.

MR. DeVITA: No, you are right.

BY MR. DeVITA:

Q. This was the same time frame when you were meeting with Mr. Neville about consigning the dragon candelabra for Mallett, right?

A. I don't remember the date that is we are talking about here, so, I would --

Q. It was December of 2012, November, December --

A. November, December 2012, correct.

Q. And you were doing due diligence both with respect to the wall brackets and with respect to the dragon candelabra?

A. Well, I had already done the due diligence on the dragon candelabras, and I was also doing the diligence on the wall brackets, that is correct.

Q. And you knew that the wall brackets were with Mallett, right?

A. I wasn't 100 percent sure, but, yes, the answer is yes.

Q. Now, am I correct that there was a period of time, about ten years, when you were estranged from Mr. Olin?

A. That is correct.

Q. And you told the government, I think, that that was related to an investment in Spatia Light, right?

A. That's correct.
Q. You -- Mr. Jaeger, you were instrumental in making introduction for Spatia Light to some folks who invested, isn't that right?
A. That's correct.
Q. And that was someone called The Alabama Group?
A. That's correct.
Q. And the individual who put together The Alabama Group was Mr. Twifer?
A. That's correct.
Q. That was someone that you knew?
A. That's right.
Q. As a consequence of that, did you receive warrants from Spatia Light?
A. I did not.
Q. Did your brother receive warrants from Spatia Light?
A. I believe he did, yes.
Q. So you made the introduction. Your brother got the warrants?
A. That's not exactly how it happened.
Q. Exactly how did it happen?
A. I introduced Mr. Olins to The Alabama Group. The Alabama Group decided to make an investment into Spatia Light, and Mr. Olins then came back and asked me if I knew of anybody who would be interested in investing in the warrants. And I then

spoke to my brother, and he was interested in investing in those warrants.

Q. So he purchased warrants?

A. Yes.

Q. And the warrants were for restricted stock, correct?

A. I believe so, yes.

Q. And when it came time for your brother -- there came a time when your brother -- by the way, you at the time were employed at Bear Stearns?

A. That's correct.

Q. So you couldn't invest directly yourself, right?

A. That's correct.

THE COURT: What time are we talking about here.

MR. DeVITA: 1998.

THE COURT: You have to give the answers.

What time are we talking about?

THE WITNESS: Yes, I would say 1988, '99, something like that.

Q. '98.

A. Yes.

THE COURT: Mr. Jaeger, there is a sort of comfort zone for the microphone of a couple of inches away is kind of ideal distance. It's a little tricky in this courtroom. But if you could aim for that, that would be great.

THE WITNESS: You got it.

BY MR. DeVITA:

Q. So did your brother -- how much did your brother pay for the warrants, do you recall?

A. I don't recall.

Q. But he did pay for them?

A. Yes, I believe so.

Q. You believe so?

A. I believe he did, yes.

Q. You are not sure.

A. He paid for the warrants.

Q. And the warrants, as I said, were -- the exercise of the warrants would give rise to the issuing of restricted shares?

A. Yes, converted to restricted shares.

Q. The warrant is an option. So it's an option to purchase restricted shares. Correct?

A. Correct.

Q. You have to answer yes or no.

A. Correct, yes.

Q. Nodding your head, the court reporter can't get.

And the warrants required payment of money to exercise them. There was a strike price?

A. Yes.

Q. And if you purchased restricted shares, then you couldn't sell those shares to cover what you paid to exercise the warrants, right?

A. Say it again? I'm sorry.

Q. If you can't sell the shares, you have to pay the exercise price out of your pocket, right?

A. Yes.

Q. But if you can turn around and sell the shares, you could cover the cost of purchasing, right?

A. Yes.

Q. And so you came to Mr. Olins and asked him if he would find someone that would trade the restricted shares that were exercisable for unrestricted shares, isn't that right?

A. No.

Q. Do you know someone named Derek Brierly.

A. The name does not ring a bell.

Q. Isn't it a fact that you or your brother, whoever was exercising the shares was able to get unrestricted shares and sell them?

A. I think Mr. Olins arranged that, yes.

Q. He arranged an exchange of the restricted shares for unrestricted shares.

A. That's my understanding, yes, or part of them, yes.

Q. As a consequence of that transaction, there was a profit made of about a million dollars?

A. I would say that's about right.

Q. And, in fact, you used the money to buy a house in the Hamptons?

A. No, that's not correct.
Q. Did your brother buy a house in the Hamptons?
A. No, he didn't.
Q. But, in any event, there was a profit of about a million dollars?
A. There was a profit which he paid full taxes on, yes.
Q. But it was a profit of a million dollars?
A. Yes.
Q. What happened to the restricted shares that he traded to get the unrestricted shares?
A. Don't know.
Q. You know that Spatia Light went bankrupt, right?
A. Yes, I do.
Q. So that the restricted shares that your brother got under the warrants became worthless?
A. I'm not so sure I understand.
Q. Okay. The restrictions on the restricted shares did not lapse before bankruptcy, did they?
A. Were all the restricted shares traded out for common or unrestricted shares?
Q. No. I'm talking about the transaction involving you or your brother. Isn't it a fact that the shares your brother traded to get the unrestricted shares became worthless?
A. I don't know.
Q. So if Mr. Olins had not arranged the transaction, instead

of getting a million dollars profit, your brother would have --
A. I don't know when the warrants -- I don't know when the restrictions lapsed.
Q. You don't remember.
A. I don't remember.
Q. But you held it against Mr. Olins that there was a discount in the trade for the restricted shares to the unrestricted shares, is that right?
A. No.
Q. That's not right.
A. That's not right.
Q. You didn't hold it against him that your brother received 460 instead of 600,000 shares?
A. That's correct.
Q. That is correct?
A. Yes.
Q. So he got 460,000 unrestricted shares in exchange for the 600,000 restricted --
A. He bought 600,000 shares originally of which all were restricted and --
Q. I thought you said warrants.
A. Warrants, sorry.
Q. So he bought warrants?
A. Bought warrants.
Q. For 600,000 shares?

A. Yes.

Q. That were restricted.

A. That were restricted. And Mr. Olins, I understand Mr. Olins exchanged 460,000 of those into free trading shares. The other 160 disappeared, so we don't know what happened to those.

THE COURT: By 160, you mean 140?

THE WITNESS: 140, sorry.

Q. 30 percent discount, right, in the exchange for restricted shares for unrestricted shares?

A. That's not the deal. That's the math, but that wasn't the deal.

Q. You thought that someone would exchange freely traded shares for an equal number of restricted shares?

A. Why not?

Q. Because they are restricted. That's why not. You wouldn't have done that as an investment banker, would you?

A. I might have.

Q. You would make a straight up exchange 600,000?

MS. MAGDO: He has answered the question.

THE COURT: There is a new question being posed. Go ahead.

Q. You are saying that, as an investment banker, you would straight up trade 600,000 unrestricted shares in exchange for 600,000 restricted shares?

A. It depends on the restrictions.
Q. Time restrictions.
A. Are they all different?
Q. Time restrictions?
A. Were they all different, sir? They have different strengths.
Q. You were there, Mr. Jaeger.

THE COURT: Gentlemen --

A. It was 15 years ago.

THE COURT: -- number one, stay two to three inches away from the microphone.

Number two, you each need to wait for the other to finish before you said say anything so that we can all understand what's being said and the court reporter can take it down. All right?

Number three, you answer the questions. You don't pose the questions. So you have to answer the questions that Mr. DeVita asks. If you can't, then you can tell him that, but that's the way this works.

Go ahead.

BY MR. DeVITA:

Q. But the fact of the matter is, Mr. Olins arranged for your brother to receive unrestricted shares that he sold for a million dollars profit, and you held a grudge against him for ten years, right?

A. No.

Q. You didn't hold a grudge against him for ten years?

A. No, but you are not framing the question right.

Q. Well, I am framing the question. You listen to it carefully.

Your brother exchanged 460,000 -- 600,000 restricted shares for 460,000 unrestricted shares, right?

A. That's correct.

Q. He sold the unrestricted shares for a million dollars profit.

A. Correct.

Q. And as far as you know, when Spatia Light went bankrupt, those unrestricted shares became worth zero?

A. Who is to say that the other 140,000 shares were not to be coming over as well as unrestricted? You are making a supposition that because he gave 460 and converted them in clean shares that he had no obligation or said about the other 140, right?

THE COURT: Do you know how the 140,000 figured into this transaction if at all?

THE WITNESS: Well, there was 600,000 purchased. We only received 460 or he only received 460, so he was shortchanged 140.

Q. Shortchanged if he got unrestricted shares?

A. Who is to say that the other 140 weren't converted into

unrestricted shares and given to somebody else?
Q. Did somebody force him to go into that transaction?
A. I'm sorry?
Q. Did someone force that transaction on him?
A. No.
Q. So he willingly exchanged 600 restricted shares for 460 unrestricted shares?
A. No. He willingly exchanged 460,000 shares for 460,000 unrestricted shares.
Q. I thought you said he had 600,000 shares.
A. He did.
Q. And he exchanged the 600,000 for 460 unrestricted, right?
A. That's correct.
Q. And then sold them for a million dollars profit?
A. Yes.
Q. And you held a grudge against my client for ten years as a consequence, correct?
A. Yes.
Q. Now, you mentioned also on your direct examination that, as part of the loan transaction, you received 25 HPEV preferred shares, right?
A. That's correct.
Q. And those preferred shares were convertible into common stock.
A. That's correct.

Q. And you in fact converted some of those?
A. I did.
Q. Now, this was not -- these were shares that you did not pay anything for. They were part of the consideration for making the loan?
A. Considerations, yes, paid for them.
Q. You didn't pay dollars to get the shares?
A. I gave a $340,000 loan.
Q. You gave a $340,000 loan and received, in addition to the repayment of most of the loan, these restricted -- these preferred shares, right?
A. I received a 12 percent interest rate and additional consideration for a risky loan that I gave for $340,000, that's correct, that defaulted twice, that's correct, yes.
Q. And you converted the preferred shares?
A. I converted, yes, I converted some of the shares.
Q. How many?
A. At one point I think -- they are all converted now, but at one point they were different conversion levels.
Q. So you converted to a million shares?
A. 1.25 million shares, that's correct.
Q. And you sold some of those?
A. Some of them.
Q. And you sold some of those in April of 2014, isn't that right?

A. I would have to look.

Q. Let me show you a letter.

MR. DeVITA: Your Honor, I have an exhibit that I am going to mark as Defendant's Exhibit's --

MR. CECUTTI: -- K.

MR. DeVITA: Unfortunately, I don't have any copies. I have shown it to the government and I can show it to your Honor. I just want it to use to refresh Mr. Jaeger's recollection.

THE COURT: Why don't you show it to the government, please.

MR. DeVITA: I have shown it to them. I showed it to them on the break.

THE COURT: So you can give it to the witness.

BY MR. DeVITA:

Q. Does that refresh your recollection about the timing of at least 400,000 shares that you sold?

(Pause)

A. This gives me the right --

THE COURT: The question is, does it refresh your memory about whether you sold shares in April of 2014? Yes or no.

THE WITNESS: No.

THE COURT: All right. You can give it back to Mr. DeVita.

BY MR. DeVITA:
Q. In order to sell the shares, you needed -- they weren't registered shares, were they? They weren't registered under section 5 of the --
A. That's correct.
Q. -- the Securities Act?
So you had to rely on an exemption to Rule -- under Rule 144, correct?
A. Correct.
Q. And you had to provide a statement that you didn't have any inside information relating to the company, among other things?
A. Correct.
Q. But the -- how much did you sell those -- your shares for?
A. I don't recall.
Q. Is it in excess of $800,000 all told?
A. It depends when those 400,000 were sold because that just gives me the right to sell, sir.
Q. Did you in fact sell HPEV stock that you got by converting the preferred stock --
A. Yes.
Q. -- that you received in connection with the Spirit Bear loan?
A. Yes.
Q. How much did you sell it for total?
A. I would have to get back to you on that number.

Q. Give me an approximation.
A. I don't remember if the stock was traded 30 cents or a dollar or a dollar fifty at the time of that letter.
Q. It was trading at about $2 in April of 2014, wasn't it?
MS. MAGDO: Objection.
THE COURT: Overruled. "Yes" or "no" or "I don't know."
A. I don't know.
Q. Did you make in excess of $100,000 on your sale of HPEV stock?
A. To date?
Q. Yes.
A. Yes.
Q. Did you make in excess of $500,000?
A. Probably.
Q. Did you make in excess of a million dollars?
A. I don't think so.
Q. So somewhere between 500,000 and a million dollars?
A. Sounds right.
Q. And that was the stock that you received just for making the loan, yes?
A. Yes.
Q. Now, you testified on direct examination that you did not know that Mallett received $800,000 cash in the sale of the dragon candelabra, is that right?

A. Of what?
Q. You testified that you did not know that Mallett, when it sold the dragon candelabra, received $800,000?
A. That's correct.
Q. Let me show you what's been marked for identification, I guess in evidence at the hearing, as Defense Exhibit N as in "Nancy."

Is that an exchange of e-mails between yourself and Henry Neville?
A. Yes.
Q. The first e-mail is from you to Mr. Neville and it says, "Dear Henry, thank you for all your hard work on my behalf. Please wire $600,000 to the following account per the instructions below. Once the wire has been sent, please send me a confirmation number so I can alert my banker."

Of course, you don't say in there please wire "the" $600,000?

THE COURT: It actually says 603,000.

BY MR. DeVITA:

MR. DeVITA: 603,000. I'm sorry.
Q. It doesn't say "the" 603,000, correct?
A. Right.
Q. Then the response to that, from Mr. Neville, is "Dear Bruce, I will send you all of the paperwork tomorrow."

Then you respond, "Henry, per your e-mail below, when

can I expect the wire for $603,000 as well as the paperwork? Thank you."

And then Mr. Neville responds, "The payment will be wired to you so that you can have cleared funds before the end of the week. The money is coming in from Europe, so it can take up to three days to clear, which is why I am being a little conservative as to the exact day ad to when" -- I think that's a typo, but -- "you will receive the funds. The paperwork is coming from London and should be with us on Monday, and I will walk it up to 88th Street as soon as we receive it here in the gallery."

88th Street is where you live?

A. Yes.

Q. So Mr. Neville is saying that he will physically bring the paperwork of the bill of sale to you, correct?

A. That's correct.

Q. And then you say, "Thank you. The bill of sale for the dragon candelabras will be for $603,000 for reporting purposes, correct?" That's what it says.

A. Yeah.

Q. Now, why would it be for anything other than $603,000?

A. As I mentioned before, they sent me an invoice incorrectly for 800,000.

Q. This is before he sent the invoice, isn't it?

A. This is before he sent the invoice?

Q. Because he is saying to you on, Friday, November 8, "I'll walk the papers up on Monday."
A. No. They e-mailed me, I believe, the invoice. I have to look.
Q. Well, but he is saying to you in this e-mail that he would bring them up to you on November 8. On Monday -- on Friday, November 8, he is saying to you, I will bring them to you on Monday, correct?
A. Correct.
Q. So there is no e-mail -- there is no invoice with this e-mail?
A. I'm not sure I understand.
Q. This is talking about what the e-mail says -- what the bill of sale is going to say before it is issued, right? His e-mail says to you, "Paperwork is coming from London. Should be with us on Monday." So this is Friday, November 8. He is telling you the paperwork should be there on Monday. Right?
A. That looks correct.
Q. And you are saying to him, "Thank you. Bill of sale for the dragon candelabras will be for $603,000 for reporting purposes, correct?"
A. Correct.

THE COURT: Can I ask a question, Mr. Jaeger? If I remember correctly, you testified that you initially received an invoice indicating that the sale price was $800,000. Is

that correct.

THE WITNESS: That's correct.

THE COURT: When was that in relation to this exchange of e-mails?

THE WITNESS: It had to be before this.

MR. DeVITA: No, it was after this.

THE WITNESS: I don't believe so.

BY MR. DeVITA:

Q. Why would you be saying that it will be for $603,000 if you have already received one?

A. Because that one was sent in error.

Q. I'm sorry?

A. How would I know it was sent in error if I hadn't received it?

Q. You hadn't received it.

A. No, how would I have known the bill was in error if I had not received it? Obviously I received it.

Q. Well, obviously you are asking him to make a bill of sale out for 603 and not 800,000, correct?

A. No, I didn't ask him. I asked his assistant, while he was traveling, when I got an 800,000 bill that was incorrect, okay, to go back to Henry and ask what had happened. They then came back and said it was a mistake, discard the bill, and they will send me the corrected bill for $603,000, plus a store credit.

Q. But that all took place after this e-mail, correct?

A. No, I don't think so.

(Pause)

MR. DeVITA: Your Honor, I apologize that I only have one copy of it.

(Pause)

MR. DeVITA: Your Honor, these are documents produced to us by the government. I don't have additional copies, and I would like to rely on them. I will show your Honor.

THE COURT: May I see them?

MR. DeVITA: Yes.

(Pause)

MR. DeVITA: We can provide copies.

THE COURT: Is the second page part of Defense Exhibit O?

MR. DeVITA: Yes, your Honor.

THE COURT: All right. Why don't you make sure you make copies later --

MR. DeVITA: Yes. Thank you, your Honor.

THE COURT: -- but you may proceed.

BY MR. DeVITA:

Q. Mr. Jaeger, showing you Defendant Exhibit O, which is a November 14, 2013, letter to you with the name -- from Mallett as well as an attached "credit note" dated November 14, 2013.

Is that the $800,000 invoice you were referring to?

A. It looks like the one I received incorrectly, yes.

Q. And it is dated November 14, right?
A. It is.
Q. And the e-mail we were looking at is November 8.
A. I have to look at the date of sale versus the date of the bill.
Q. It's right there. November 8 is the e-mail, right?
A. November 8 is the e-mail, right.
Q. Okay. And let me show you what's been marked as Defendant's Exhibit P.

Is that the revised invoice that you were talking about for $603,000?
A. You mean the one that has the actual date of sale on it?
Q. Is that the invoice for $603,000 that you were talking about?
A. With the actual date of sale, yes.
Q. And it shows November --
A. These other bills, whatever you have here, don't have the actual date of sale on it. This is the right -- this is the correct date of sale.
Q. Yeah, but the document is dated November 19, right?
A. Um-hmm.
Q. Okay.
A. That's the date of the sale.
Q. Whether it's the date of the sale or not, your e-mail exchange with Mr. Neville in which you say to him, issue a

$603,000 for reporting purposes, is November 8, right?
A. I must have received the incorrect invoice earlier.
Q. It is dated November 14, isn't it?
A. Yeah. I don't remember even seeing that one. I know I have seen November 19. There's 20 different.

THE COURT: Mr. DeVita, can you go back to the podium, please.

MR. DeVITA: Yes.

BY MR. DeVITA:
Q. The e-mail, which is Exhibit N, indicates -- in it Mr. Neville says to you, "The paperwork is coming from London, in from London. Should be with us on Monday. And I will walk it up to 88th Street as soon as we receive it here in the gallery."

So that means that on November 8, 2013, he did not have the paperwork, right?
A. I guess so.
Q. Excuse me?
A. I guess so, yeah.
Q. And then you say, "Thank you. Bill of sale will be" -- future tense -- "will be for $603,000" --
A. The correct number, that's correct.
Q. -- "for reporting purposes, correct?"
A. For sale and reporting purposes.
Q. For reporting purposes, right?

A. For sale and reporting purposes.

THE COURT: The question is what does the e-mail say? The e-mail says for reporting purposes, correct?

THE WITNESS: For reporting purposes, correct.

MR. DeVITA: I have no further questions, your Honor.

THE COURT: Redirect.

REDIRECT EXAMINATION

BY MS. MAGDO:

Q. Mr. Jaeger, the agreement that you reached with Mallett regarding the dragon candelabra was $603,000 in cash to you. That was part of it, correct?

A. That's correct.

Q. And the other part of it was a $50,000 store credit at Mallett, is that correct?

A. That's correct.

Q. When you testified earlier, you said that you considered your profit from the sale of the dragon candelabra to be $603,000, correct?

A. That's correct.

Q. Rather than $653,000, correct?

A. Two separate tax years, correct.

Q. Right, they are different tax treatments. Is that what your position was?

A. That's correct, yes.

Q. So after the deal is consummated, or at least agreed to

orally, but before you get the paperwork, did you have any concern that Mallett would send you an invoice reflecting a $653,000 profit?
A. No.
Q. Did you want to have an invoice that reflected the two amounts lumped together or invoices reflecting the two amounts separately?
A. Separately.
MR. DeVITA: Objection, your Honor, to the compound nature and the leading.
THE COURT: I will overrule the objection, but obviously watch the form of your questions, please.
MS. MAGDO: Okay.
BY MS. MAGDO:
Q. How did you want to receive -- explain how you wanted to receive invoices reflecting the cash and the credit that you received in exchange for the dragon candelabra?
A. I sold the dragon candelabra for $603,000 of cash nine months, okay, or ten months -- maybe it was 11 months actually, it was short term capital gains. So I received $603,000 sale on a bill of sale. That was correct. And I can't attest to all the others. And I paid $235,000. So, on my tax returns, okay, in 2013, I showed a short term capital gain of 603 minus the 235. And then, in the subsequent year, when the actual $50,000 store credit was used, per my accountant's advice, I

declared that as ordinary income in 2014.

Q. So the two forms of compensation that you -- consideration that you received for the dragon candelabra, you treated separately for reporting purposes?

A. Per my accountant's advice, yes.

Q. And you actually -- they were reported in different years?

A. That's correct.

Q. So if Mallett had sent to you an invoice for $653,000, what would you have done? Just lumping it all together.

A. I would have asked them to bifurcate it.

Q. Was there ever -- did you know at the time, in November 2013, that the net commission price on the dragon candelabra was $800,000?

A. No.

MS. MAGDO: Nothing further.

MR. DeVITA: Nothing further, your Honor.

THE COURT: All right, Mr. Jaeger, you may step down.

(Witness excused)

THE COURT: Ms. Magdo, your next witness.

MS. GRISWOLD: The government calls Michael Henry Neville.

MICHAEL HENRY GARTSIDE NEVILLE,

called as a witness by the government,

having been duly sworn, testified as follows:

THE COURT: You may proceed.

MS. GRISWOLD: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. GRISWOLD:

Q. Good afternoon, Mr. Neville.

Do you go by Michael or Henry?

A. Henry.

Q. Are you currently working?

A. No, I am not.

Q. When did you stop working?

A. In 2000 and -- May, end of May, end of May. 20 --

Q. 2015?

A. Yes. When Mallett released me, I think it was -- just one moment, while I recollect, end of May 2000 -- this year, when I was charged, so that would have been this year, 2016, I believe.

THE COURT: Mr. Neville, let me ask you to put the microphone down a little bit and just scoot up a little bit so you are a couple of inches away from the microphone so we can all hear you.

THE WITNESS: Yes, certainly.

THE COURT: Ms. Griswold.

MS. GRISWOLD: Thank you, your Honor.

BY MS. GRISWOLD:

Q. Mr. Neville, you pled guilty in May --

A. Yes.

Q. -- of 2016?
A. Correct.
Q. And you recall that you stopped working at Mallett how long before you pled guilty?
A. I was terminated when I pled guilty.
Q. Okay. Thank you.
Had you been on a leave of absence prior to that?
A. Indeed, I was on a leave of absence prior to then, since the previous July.
Q. July of 2015.
A. Correct.
Q. Approximately when did you initially begin your work at Mallett?
A. In the early 1980s.
Q. And at that time was Mallett physically located in the U.K., the United Kingdom?
A. Yes, it was.
Q. Focusing your attention on the time period between 2010 and 2015, did Mallett have an office or a gallery in the United States during those years?
A. Yes, it did.
Q. And was that in New York City?
A. Yes, it was.
Q. Between 2010 and 2015, were you based at the Mallett location in New York City?

A. Yes, I was.
Q. And what was your title in those years between 2010 and 2015?
A. I was president of Mallett, Inc.
Q. Was there anyone senior to you in the New York gallery of Mallett?
A. No.
Q. Could you briefly describe what your day-to-day duties were at Mallett?
A. I was responsible for the maintenance and running of the gallery and its showrooms. I had five or six members of staff and six or seven showrooms with works of art displayed in them.
Q. How did Mallett obtain the pieces that it displayed and sold in its gallery?
A. We obtained them by purchasing them from private individuals, at auction, from other dealers, and we also had pieces on consignment from collectors to sell on their behalf.
Q. Between 2010 and 2015, what was your approximate annual salary at Mallett?
A. $200,000.
Q. Per year?
A. Per year.
Q. Did you receive any commissions of any kind during those years?
A. I did not receive any commissions, no.

Q. Did you receive any money from Mallett apart from your salary, again, for those years?
A. I received an allowance of $10,000 a year and occasional use of the company car.
Q. And you testified that you stopped working for Mallett in 2015. Were you terminated or did you leave by choice?
A. I was terminated.
Q. In connection with your work for Mallett, did you have a client named Robert Olins?
A. Yes, we did.
Q. Approximately what year did you first meet Mr. Olins?
A. 2009.
Q. And when you met him, did you understand Mr. Olins to have a collection of antiques?
A. Yes, I did.
Q. Did you commit crimes in connection with the sale of one or more items from the defendant's antiques collection?
A. Yes, I did.
Q. In your own words, could you briefly summarize what it is that you did with the defendant?
A. I misled Mr. Rusco, who was a banker working as receiver for the estate, on a piece of Mr. Olins' collection; and, in misleading Mr. Rusco, I caused the court to be misled in his application for the sale to Mallett.
Q. Okay. I will ask a few more questions about your conduct a

little later, but, first, I want to ask you, in the fall of 2015, did you learn that criminal authorities wanted to speak with you about your involvement in the sale of items from Mr. Olins' collection?

A. Yes, I did.

Q. And since that time, have you been cooperating with the government?

A. Yes, I have.

Q. And have you pled guilty to several felonies, including making false statements to the government?

A. Yes, I have.

Q. Before we talk about specific items in Mr. Olins' collection, let me ask you a few questions about the collection as a whole.

In what year did you first learn that Mr. Olins' collection was encumbered in any way?

A. I believe it was shortly after the collection was consigned to us, when I was introduced to Mr. Rusco of American Bank & Trust, so late 2009, early 2010.

Q. And was it American Bank & Trust that held an interest in the collection?

A. I understood it to be American Bank & Trust who held that, yes.

Q. And Mr. Rusco is the individual that you dealt with from American Bank & Trust?

A. Yes.
Q. Did you understand, when you learned about the interest that American Bank & Trust -- I am just going to call them AB&T -- held on Mr. Olins' collection, did you have an understanding how much Mr. Olins owed AB&T?
A. Not at that time, no, but later I came to understand that it was approximately 3 million, I believe.
Q. Approximately when did you come to that understanding?
A. A year or so later, I think, yes.
Q. At the time you learned about the AB&T lien, did you understand that Mr. Olins' collection was encumbered in any other way?
A. Not at that time, but later I came to understand that it was also encumbered to the SEC.
Q. Okay. Let's turn to some specific pieces in the collection.

MS. GRISWOLD: I will ask Ms. Meister to please pull up Government Exhibit 502.

Q. You have a binder in front of you, but it should also come up on your screen, so you should use the screen unless you have difficulty.
A. Thank you.
Q. Are you familiar with the vases depicted in Government Exhibit 502?
A. Yes.

Q. Are these items from Mr. Olins' collection?

A. These items are three Sevres porcelain vases that were part of Mr. Olins' collection.

Q. I am just going to refer to them as "the vases."

A. Yes.

Q. When were the vases first placed on consignment with Mallett?

A. I believe they were part of our original consignment in late 2009.

Q. And you understood the vases to be owned by Mr. Olins at that time?

A. Indeed.

Q. Were the vases placed on consignment with Mallett directly by Mr. Olins or through another antique dealer?

A. They were placed on consignment through Mr. Glenn Randall, another antique dealer.

Q. And when you took on that consignment, what was the consignment price that Mr. Randall was seeking?

A. I believe it was $850,000.

MS. GRISWOLD: I will ask Ms. Meister to please pull up Government Exhibit 111.

BY MS. GRISWOLD:

Q. Do you see that in front of you, Mr. Neville?

A. I do.

Q. Are you familiar with this document?

A. This is a document of incoming consignment from Glenn Randall to Mallett.

Q. And the date on that is October 2009?

A. I see that, yes.

Q. Do you see the vases at the top of this exhibit?

A. Yes, I do, item number 3.

Q. And the consignment price is $850,000?

A. I see that.

Q. Do you notice at the bottom of the document --

MR. DeVITA: Your Honor, just for the record, this is already in evidence Defense Exhibit A.

MS. GRISWOLD: It is a little bit different, Mr. DeVita. It is an unredacted version.

MR. DeVITA: Okay. I see.

BY MS. GRISWOLD:

Q. You see at the bottom, Mr. Neville, a reference to American Bank & Trust Company?

A. I do, yes.

Q. At the time of the item being consigned, these items being consigned through Mr. Randall, what was your understanding of what the impact was, the fact that AB&T had this encumbrance in terms of what it meant for Mr. Olins' ability to sell these items?

A. It meant that Mallett would pay the monies received directly to American Bank & Trust.

Q. Under this consignment agreement, the one dated October of 2009, was Mallett able to sell the vases?
A. No.
MS. GRISWOLD: I ask Ms. Meister to please pull up Government Exhibit 112.
BY MS. GRISWOLD:
Q. Do you see that in front of you?
A. I do.
Q. Do you recognize this consignment agreement dated October 7 of 2010, about a year later?
A. I see it, yes.
Q. Do you see the vases on this consignment agreement?
A. Item number 3.
Q. For $725,000?
A. Yes, indeed.
Q. The consignor here on Government Exhibit 112 is AB&T instead of Mr. Randall. Do you see that?
A. I do.
Q. At the time did you have an understanding of why the consignor, that is, the entity or individual placing the items with Mallett, had changed from Mr. Randall to AB&T?
A. I believe that AB&T did not want to consign through another agent to us who was selling on their behalf.
Q. Were the vases sold under this agreement?
A. They were sold after this agreement expired.

Q. Now, when the vases came to Mallett, did they stay in New York?

A. No, they did not.

Q. They were transferred to London?

A. They were transferred to our London gallery.

Q. Why were they transferred?

A. Because we believed that we would have a greater opportunity of selling them to a European client.

Q. Did you tell Mr. Olins that they had been transferred to London?

A. I believe I would have done, yes.

Q. When you say you believe you would have, do you recall one way or the other whether you did?

A. I discussed it with Mr. Olins, yes.

MS. GRISWOLD: Ms. Meister, can you please pull up Government Exhibit 504.

BY MS. GRISWOLD:

Q. Do you recognize the items depicted in this exhibit?

A. These are four carved giltwood wall brackets, yes.

Q. Were these -- was this an item or items that were also placed on consignment with Mallett?

A. These were placed on consignment with Mallett.

Q. When did Mallett first obtain these wall brackets?

A. We first obtained the wall brackets back in the 1990s, I believe, and sold them to a client who later reconsigned them

to us for resale.

Q. What was the name of that client?

A. Mr. Degardiola.

Q. Approximately when did Mr. Degardiola place them on consignment with Mallett, at which time it was the second time that Mallett had the wall brackets?

A. Early in 2011 would be my best guess, late 2010, early 2011.

Q. Once the items were consigned that second time with Mallett in late 2010 or early 2011, was Mallett able to identify a purchaser for the wallet brackets?

A. Mr. Olins had always expressed a huge interest in these wall brackets as he had tried to acquire them unsuccessfully the first time they were on the market. I offered them to Mr. Olins when they came back to us because he had said these were one of the most important things he had not been able to acquire.

Q. When were those communications with Mr. Olins when you offered them?

A. In early 2011.

Q. And how are you able to place those conversations in time in early 2011?

A. That was when the brackets came to us, and I had said to Mr. Olins that I would like to be able to offer them to him before we put them on public display. Unfortunately he was

unable to come in when I was in the gallery and had to go to an exhibition in Florida during February of 2011, and therefore we had a meeting to view these wall brackets in late February, after my return.

MS. GRISWOLD: Ms. Meister, can you please pull up Government Exhibit 118.

BY MS. GRISWOLD:

Q. Do you see that e-mail in front of you, Mr. Neville?

A. I do see the e-mail.

Q. This is an e-mail chain dated February 7, 2011, between you and Mr. Olins.

Do you recall this e-mail chain?

A. Yes, I do.

Q. In the first e-mail in the chain, on the page with the Bates stamp ending in 3621, do you see that in front of you?

A. I do, yes.

Q. There is reference in your e-mail to Mr. Olins, at 4:36 p.m., that you are stuck in Florida for the Palm Beach Fair.

Is that the Florida show that you were talking about earlier you testified about?

A. Yes, indeed, it is.

Q. Did you offer the wall brackets, to show them to anyone besides Mr. Olins at this time?

A. No.

Q. Did there come a time when you did in fact meet with

Mr. Olins to discuss the wall brackets and have him observe them?
A. On my return from Florida, we did meet to discuss the wall brackets in the Mallett Gallery on Madison Avenue.
Q. Were the brackets there at the time of your meeting?
A. The brackets were hanging in our private showroom, which we were able to close off, so they were.
Q. Was anyone else present for that meeting?
A. Nobody else was present, no.
Q. At that meeting did you reach an agreement with Mr. Olins for the purchase the wall brackets?
A. Yes, we did.
Q. And what was the agreed-upon purchase price?
A. The agreed-upon purchase price was $695,000.
Q. Did you agree on when Mr. Olins would pay?
A. No.
Q. Now, at the time you knew he had a debt with AB&T, correct?
A. Correct.
Q. In light of that, why did you agree to sell these brackets to Mr. Olins?
A. I understood that Mr. Olins' collection was worth well in excess of the debt that he owed to the bank and, therefore, was happy to wait until the debt had been paid before receiving money on the wall brackets.

MS. GRISWOLD: Ms. Meister, can you please pull up

Government Exhibit 101.

BY MS. GRISWOLD:

Q. Do you see that document in front of you, an March 8, 2011, invoice?

A. Yes, I do.

Q. Is this an invoice for the wall brackets that are depicted in Government Exhibit 504 that we just looked at?

A. Yes, it is.

Q. This invoice has a date of March 8, 2011. What prompted the preparation of this invoice?

A. A request from the London office to process the invoice so that it could be counted in the first quarter's figures of that year.

Q. Did you have any communications with Mr. Olins about actually issuing and sending the invoice?

A. No.

Q. So the last time that you had spoken to him about the wall brackets was in February, when you met with him at Mallett?

A. Yes.

MS. GRISWOLD: Ms. Meister, could you please pull up Government Exhibit 102.

Q. If you want to turn to this in your binder, this is a several-page letter with multiple attachments.

MR. DeVITA: I'm sorry. What exhibit are we on?

MS. GRISWOLD: 102, August 9, 2011, letter with four

attachments.

MR. DeVITA: Thank you.

BY MS. GRISWOLD:

Q. Now, this letter is addressed to Mallett at the Madison Avenue gallery. Are you familiar with this document?

A. Yes, I am.

(Continued on next page)

Q. Did you receive this document in or about August of 2011?
A. Yes, indeed.
Q. When you received it, did you read it in its entirety?
A. I read this document, yes.
Q. After reading it, what was your understanding of what it meant for Mallett in terms of the items in Mr. Olins' collection?
A. That we would not be allowed to sell them because they were under lien from the SEC.

MR. DeVITA: Sorry, your Honor, I can't hear the witness.

A. We would not be allowed to sell them because they were under lien from the SEC.

BY MS. GRISWOLD:

Q. At that time, in August of 2011, did you understand that lien to include the vases?
A. I did.
Q. After initially receiving this document, what did you do, if anything, with it?
A. I sent it to our lawyers.
Q. Without telling me what you may have discussed with your attorneys, how, if at all, did your understanding of what this agreement meant change after consulting with them?
A. After that date, our lawyers explained to us that the pieces from the collection of Mr. Olins' that were in London

were not included in this lien.
Q. So items that were physically located in London were not barred by this lien, by the SEC restraining notice?
A. That was the advice we received.
Q. However, the vases were still part of the collection that was secured by the AB&T loan, correct?
A. Correct.
Q. And so you still needed to communicate with Mr. Rusco in order to sell the vases?
A. Correct.
Q. Mr. Neville, did there come a time in 2012 you learned a client of Mallett located in the U.K. had a strong interest in purchasing the vases?
A. Yes.
Q. Who was that Mallett client?
A. The Sheikh of Qatar.
Q. Was the Sheikh of Qatar your personal client or the client of someone else at Mallett?
A. He was not my client. He was someone else's client.
Q. Who was that?
A. Mr. Richard Cave.
Q. Was Mr. Cave based in New York or based in London?
A. He was based in London.
Q. Approximately when in 2012 did you learn the Sheikh was interested in the vases?

A. Early in 2012, January.
Q. How were you able to place that in time?
A. The vases were taken from us and placed with Sotheby's for sale and published in their catalog for a January sale. This sale was canceled by Sotheby's and the vases then returned to us after our request to Mr. Rusco.
Q. So at the time that you learned of the Sheikh's interest, Mallett did not actually have possession of the vases. Is that right?
A. We did not.
Q. Once you learned that the Sheikh was seriously interested in the vases, did you communicate this information to Mr. Olins?
A. Yes, I did.
Q. When?
A. During this time, early January and February, I communicated with Mr. Olins about trying to get the vases back from Sotheby's because we had a client who was asking for them so that he might be able to purchase them.
Q. Did you ask the defendant for his assistance in getting the vases back from Sotheby's?
A. Yes, I did.
Q. How did the defendant respond?
A. That he would contact Mr. Rusco and ask for the vases to be returned to us.

Q. What else, if anything, did you tell the defendant?
A. We had discussions at this time about the possibility of Mallett buying outright from the receiver items from the estate so that we might be able to sell them directly to our clients. Mr. Olins was in agreement with that request.
Q. And that request being that Mallett would buy them outright?
A. Correct.
Q. At this time, January-February of 2012, what was your understanding of how much the Sheikh was willing to pay for the vases?
A. I understood that it would be in the region of somewhere around a million dollars.
Q. And again in January and February 2012, in your communications with Mr. Olins, did you relay that information to Mr. Olins?
A. I relayed the information that the client would be prepared to pay a full price, greatly in excess of the estimate that Sotheby's had printed.
Q. Did you and Mr. Olins discuss what would happen if Mallett was successful in purchasing the vases outright?
A. Yes.
Q. Describe those communications.
A. We had a number of discussions about the possibility of buying the vases outright particularly because this client had

suggested such strong interest.

Mr. Olins was unhappy about the concept of Mallett would take all the additional profit; and, therefore, he proposed that if we were successful in selling them with a high overage, he should participate in that overage.

Q. When you say "overage," what are you talking about?

A. I am talking about the difference and the profit between the sum of money which we were able to acquire them for from the bank and the sum of money we would sell them for to our client.

Q. When you say Mr. Olins said he should participate, what do you mean by that?

A. That a share of the overage would go to Mr. Olins.

Q. Did your discussions discuss whether that share would be in cash or otherwise?

A. His suggestion was that it would become part of the debt that he owed us on the wall brackets and pay down that debt.

Q. After these discussions with Mr. Olins, did you, in fact, speak with Mr. Rusco regarding purchasing the vases?

A. I did.

Q. Approximately when, when did you first talk to him?

A. In February 2012.

Q. What did you tell Mr. Rusco in February of 2012?

A. I told him that we would be interested in purchasing the vases, but that their price had been compromised by the

publication of their value as an estimate at the Sotheby's Auction House and also by the fact that we had discovered a fairly considerable restoration in the vases; and, therefore, I did not believe that they would be able to sell well for much more than between 5 and 600,000, which was the published estimates.

Q. Was that accurate, that you did not believe they would be able to be sold for more than --

A. No, it was not accurate, in that we had a client who had expressed an interest at a greater sum.

MS. GRISWOLD: Ms. Meister, would you please pull up Government Exhibit 115.

Q. Are you familiar with this document in front of you, Mr. Neville?

A. Thank you. Yes, I am.

Q. What is this document?

A. This is a document I dictated following the conversation with Greg Rusco and noting my statements to him about the price of the --

MR. DeVITA: What exhibit?

MS. GRISWOLD: 115.

Q. This says RAO HN conversation with Greg Rusco?

A. Correct.

Q. Your recollection is this is a conversation between you and Mr. Rusco?

A. This is a conversation I had with Mr. Rusco and I believe that Mr. Olins was on a third-party line at that time.

Q. Are you certain about that?

A. I am not certain about that, no.

Q. How long after that conversation were these notes dictated?

A. Immediately after.

Q. Did you type them yourself or have someone else type them?

A. No, I did not type them myself.

Q. In the second bullet, the publication of the vases and further withdrawal from the sale makes them unsalable at their consignment price but rather at a lower sum.

HN, that is you?

A. Yes.

Q. You suggest returning 500 and 550 to the bank?

A. Correct.

Q. So these notes reflect that you told Mr. Rusco that the vases would be unsalable at a sum much above between 500 and 550?

A. I believe so, yes.

THE COURT: Who came up with the estimate that Christie's published or Sotheby's?

THE WITNESS: Their experts. When the auction houses have items on consignment, each department's experts look at the item and then judge the market by that price, or judge the price by the market. I apologize.

THE COURT: All right. And so these items were consigned -- was it Sotheby's or Christie's?

THE WITNESS: Sotheby's, your Honor.

THE COURT: They were consigned by Mallett?

THE WITNESS: No, they were not. They were consigned by Mr. Rusco through Mr. Glen Randal to Sotheby's for sale.

THE COURT: I see. And the consignor; namely, Mr. Rusco or Mr. Randall, wouldn't play any role in coming up with the estimates?

THE WITNESS: No.

THE COURT: Okay. Thank you.

MS. GRISWOLD: May I proceed?

THE COURT: You may.

BY MS. GRISWOLD:

Q. After this conversation with Mr. Rusco, did you speak to Mr. Olins?

A. Yes.

Q. How long after the call with Mr. Rusco?

A. Within the day.

Q. Describe that call.

A. Mr. Olins called me and said that he thought that conversation with Mr. Rusco had gone well and that I would now wait to see if the bank were prepared to sell the vases directly to us.

Q. What did you understand Mr. Olins to mean when he said the

call had gone well?
A. That Mr. Rusco had listened to my arguments about the value of the vases considering their published price and their condition and had understood my argument.
Q. Your argument that you would not be able to sell them for much above the Sotheby's estimate?
A. 500 to 550, correct, yes.
Q. Did Mallett ultimately sell the vases to the Sheikh?
A. Yes.
Q. When did that happen?
A. April 2012.
Q. How much did Mallett sell the vases for?
A. $1.3 million.
Q. Prior to this April sale, did you tell Mr. Rusco or anyone at AB&T that the sale was going to take place?
A. No.
Q. Did you get approval from the SEC?
A. No.
Q. Did you get approval from any court?
A. No.
Q. Did you tell the defendant prior to consummating that sale in April of 2012?
A. No.

MS. GRISWOLD: Ms. Meister, please pull up Government Exhibit 105.

Q. This is a several page e-mail. You may want to turn to it in your binder. Just let me know when you're there.

THE WITNESS: Your Honor, excuse me. I wonder if I might ask my briefcase has my glasses, my reading glasses?

THE COURT: Sure. We'll get that for you.

THE WITNESS: I apologize.

MS. GRISWOLD: May I approach, your Honor?

THE COURT: You may.

MS. GRISWOLD: Thank you.

THE WITNESS: They're in my coat. Sorry.

(Pause)

BY MS. GRISWOLD:

Q. Are you able to see the document?

A. Yes, I do. Thank you.

Q. This is a six page e-mail chain April 7 to April 12, 2012. Are you familiar with this e-mail?

A. I am.

Q. First to identify the individuals on this e-mail, are these individuals in Mallett's London office?

A. Yes.

Q. It is from Khalil Ishaq to Michael Smyth-Osbourne?

A. Indeed.

Q. This e-mail indicates that monies received for the vases are in the amount of 844,994 British pounds. I am looking specifically at the page ending in 2774.

A. I see that.
Q. Who was Party 5?
A. I believe it would have been the Sheikh.
Q. I want to focus your attention on the sentence on the page ending in 2773.
A. Yes.
Q. Where Mr. Smyth-Osbourne instructs you to "go into that" with Olins' bank and Olins about how much we have to pay the bank and how much we keep to pay off Olins' debt on the --
A. Yes.
Q. Are the wall lights reference to wall lights depicted in Government 504 or something else?
A. They are the wall brackets.
Q. When you received this e-mail, what did you understand Mr. Smyth-Osbourne to mean by how much we keep to pay off Olins' debt on the wall lights?
A. I understood this referred to Mr. Degardiola and how much we were able to give to Mr. Degardiola for the wall lights which Mr. Olins had agreed to purchase.
Q. So to pay down Mr. Olins debt on those wall brackets?
A. Correct.
Q. By this time had you spoken to Mr. Olins about applying the money from his portion of the -- any money from the sale of the vases to his wall bracket debt?
A. Yes, I had.

MS. GRISWOLD: Ms. Meister, please pull up Government Exhibit 3.

Q. This is a May 17th, 2012 letter addressed to you from AB&T. Are you familiar with this letter?

A. Yes.

Q. Did you receive it in May 2012?

A. Yes.

Q. Did you read it at the time?

A. Yes.

Q. What was your understanding of what it meant?

A. I understood that it meant that Mr. Rusco, the banker at AB&T, had been appointed receiver for the court in respect of Mr. Olins' estate.

Q. What did that mean for the pieces in Mr. Olins' estate? In terms of Mallett's ability to sell them?

A. That we would need court permission to do so.

Q. I ask you to turn to Exhibit A of this document.

MS. GRISWOLD: Ms. Meister, will you put it up on the screen in front you.

THE WITNESS: Yes.

Q. Are the vases on this list?

A. They are on the list, yes.

MS. GRISWOLD: I ask Ms. Meister to highlight them, please.

Q. So you received this document in May of 2012, and the vases

are on the list, and you've testified that you understood at this point that court approval would be required to sell any items on this list, correct?
A. Yes.
Q. But you had already sold the vases, right?
A. Yes.
Q. So at this point did you call Mr. Rusco and tell him that?
A. No.
Q. Did you notify the court?
A. No.
Q. Did you call the defendant?
A. Yes, I did call the defendant and I asked if we were going to receive the letter that we had been promised giving us permission to buy the vases because I had received this document from the bank.
Q. What happened next?
A. Mr. Rusco telephoned me to say that he needed a letter from me in support of his application for the purchase of the vases by Mallett.
Q. And in that phone conversation, did you tell Mr. Rusco that you already sold the vases?
A. No, I did not.
Q. In that conversation, did you tell Mr. Rusco that you had a buyer willing to pay more than a million dollars for the vases?
A. No, I did not.

Q. What price did you discuss with Mr. Rusco in May of 2012?
A. I don't remember discussing a price with Mr. Rusco at that time. Earlier I had received a telephone call outlining that Mallett would be able to buy the vases for $540,000 but that we would have to wait and receive written permission in order to ratify that purchase.
Q. Fair to say that you had communications with Mr. Rusco about paying $540,000 for the vases?
A. Correct.
Q. Also fair to say that you led Mr. Rusco to believe that Mallett's buyer was willing to pay in the range of $600,000?
A. In the range of between 600 and $700,000, correct.
Q. Was that true?
A. No.

MS. GRISWOLD: Ms. Meister, would you put up Government Exhibit 106, please.

Q. Mr. Neville, did you communicate with Mr. Olins regarding obtaining approving from Mr. Rusco and the court to sell, to get the vases out of receivership for $540,000?
A. Yes.
Q. What did you understand?

Did you understand whether or not Mr. Olins was in support of this request?

A. I believe Mr. Olins was in support of this request.
Q. What, if any, steps did Mr. Olins take to assist in getting

the vases out of the receiver estate for $540,000?

A. I had been asking Mr. Olins on a number of occasions prior to this e-mail of May 21st if we were going to obtain the written permission soon and was always assured that we should obtain it soon.

However, as it was not forthcoming, Mr. Olins telephoned to say, as reported hereby Anna, my assistant, that Mr. Olins' lawyer was discussing with Greg Rusco and the bank the sale of the vases to Mallett.

Q. Just break that down a little bit.

In this e-mail, dated May 21, 2012, Anna Gutierrez, was she your assistant?

A. Yes.

Q. This e-mail indicates Robert called to say his buyer is putting pressure on Greg Rusco and the bank to allow the sale of the vases to go through. He asked we hold off on any letters or further action until tomorrow.

What did you understand the reference to holding off on any letters or further action to mean when you received this e-mail?

A. That I should not communicate directly with Mr. Rusco.

Q. Did you ultimately, however, send one or more letters to Mr. Rusco?

A. I did.

MS. GRISWOLD: Ms. Meister, would you please pull up

Government Exhibit 4 again and turn to Exhibit A of that exhibit. I believe it is Page 7 of 10.

Q. Do you see that in front of you, Mr. Neville?

A. I do.

MR. DeVITA: Where are you?

MS. GRISWOLD: We are on Exhibit 4, and within that exhibit, Exhibit A.

BY MS. GRISWOLD:

Q. This is a letter from you dated, I believe, May 31st of 2012. Is that your signature? Did you send that letter?

A. That is my signature, yes.

Q. When you sent this letter, did you understand that the letter was for the purpose of obtaining approval in order to get the vases out of the receiver, approval from the court?

A. I did.

Q. Was there, in fact, a prior letter in which you described Mallett as acting as a broker on the transaction?

A. Yes.

Q. And was that true?

A. No.

Q. Mr. Neville, at any point in May of 2012 or before, did you tell Mr. Rusco that you had a buyer that either paid or was going to pay more than twice the sum of 540,000 for the vases?

A. No.

Q. How did you learn that the sale of the vases was approved

by the court?

A. Mallett received a letter from the court, agreeing to the sale.

Q. Once you received that information, did you communicate with the defendant?

A. Yes.

Q. Can you describe those communications.

A. I telephoned Mr. Olins to say that we had received written permission and that we would be prepared to extend to him a credit of $460,000 against his purchase of the wall brackets.

Q. How did you arrive at the amount of 460,000? Did you come up with that amount?

A. Yes, I did personally because Mr. Olins had always expressed the idea that the vases were worth around a million dollars. I understood that that was possibly his purchase price; and, therefore, if we were paying the bank $540,000 in order to reach the million, he would be receiving 460.

Q. What was his response when you indicated that you were willing to offset $460,000 of the wall bracket debt?

A. That he was unable to accept the $460,000 entirely as credit, but that he needed some of that as cash in order that he could put down a deposit on an apartment that he was looking to acquire in Madrid, Spain.

Q. Did you agree to pay a portion in cash?

A. Yes, we did.

THE COURT: Can I ask, during this time who had possession of the wall brackets? Did Mallett still or were they in Mr. Olins' possession?

THE WITNESS: Mallett had possession of the wall brackets, your Honor.

THE COURT: Was the understanding or the agreement that you would retain possession of the wall brackets until the amount that he agreed to pay was paid off, at which point he would take possession of them?

THE WITNESS: Indeed, your Honor, yes. The wall brackets did not belong to us. They belonged to Mr. Degardiola. We were acting as guardian or custodian for them and we would not release them until they had been fully paid for.

THE COURT: Did you consider the 600 some-odd thousand dollars, I think there was a document that we saw indicating the sale of --

THE WITNESS: Yes, indeed.

THE COURT: -- the wall brackets for that amount?

THE WITNESS: Yes.

THE COURT: Did you consider that to be a binding agreement that the defendant owed that amount to Mallett?

THE WITNESS: Yes.

THE COURT: And Mallett would pay whatever amount was owed to Mr. --

THE WITNESS: Degardiola.

THE COURT: Thank you.

BY MS. GRISWOLD:

Q. For the cash portion, the $160,000 that you agreed to pay Mr. Olins in cash, did he indicate to what account or entity he wanted that money sent?

A. Yes.

Q. What was that?

A. It was to a bank account in the Isle of Man.

Q. Do you recall the name on that account?

A. Wychwood. I don't recall which wood trust or which wood.

Q. Did you personally receive any money from the vase transaction, Mr. Neville?

A. No.

MS. GRISWOLD: Ms. Meister, can you pull up Government Exhibit 108, please.

Q. Mr. Neville, are you familiar with the letter in front of you, Government Exhibit 108?

A. Yes, indeed.

Q. Who prepared this letter?

A. This letter was prepared at Mallett's in the office.

Q. The letter is dated July 23rd of 2013. Did you have this prepared at your direction?

A. The Accounts & Finance Department in London asked me to prepare this letter in order that the finance department had

written confirmation of Mr. Olins' activities in 2012.

Q. In the letter the defendant indicates that he paid $300,000 toward the purchase of the wall brackets. How did the defendant pay that $300,000?

A. He paid that $300,000 as part of the sum allocated to him from the overage on the sale of the vases.

Q. Did you see the defendant sign this letter?

A. Yes, I did.

Q. Did he sign it on or about July 23, 2013?

A. Yes.

Q. I turn your attention to Government Exhibit 500.

Are you familiar with the item depicted in Government Exhibit 500?

A. Yes.

Q. What is that?

A. It is one of a pair of Olio candelabra.

Q. How many were there total?

A. Two.

Q. Were they the brass part of Mr. Olins' collection?

A. Yes.

MS. GRISWOLD: I ask Ms. Meister to turn back to Exhibit 3, Attachment A, which is the receiver order.

Q. Are the candelabra listed on Exhibit A as part of the receiver estate?

A. Yes.

Q. How far down?

MS. GRISWOLD: I ask Ms. Meister to please highlight them.

A. No. 5.

Q. No. 5? So by May 2012 the brass were governed by the receiver order?

A. Yes.

Q. Were the items, were the candelabra and item on consignment with Mallett in 2012?

A. Yes.

Q. Was Mallett able to successfully sell them in 2012?

A. No.

Q. Had there come a time you were introduced to an individual named Bruce Jaeger?

A. Yes.

Q. Mr. Jaeger was an acquaintance of Mr. Olins?

A. I believe so, yes.

Q. What were the circumstances under which you met Mr. Jaeger first?

A. Mr. Jaeger visited the gallery, and I was told by Mr. Olins on the telephone that he would do so because he was interested in the possibility of acquiring some pieces from the estate.

Q. Approximately when was that meeting?

A. Autumn or fall of 2012.

Q. Did there come a subsequent time you learned Mr. Jaeger had

actually purchased the candelabra from the receiver?
A. Yes.
Q. Approximately when did you learn that?
A. Late in 2012.
Q. How did you learn it?
A. Mr. Rusco called me to say that he had sold the candelabra, but not to be concerned as the purchaser was going to leave them at Mallett for resale.
Q. After that time did Mallett, in fact, obtain the candelabra again on consignment for resale?
A. From Mr. Jaeger, yes.
Q. Was there an agreement with Mr. Jaeger regarding the consignment with Mallett?
A. Yes.
Q. Can you describe that agreement.
A. The agreement was to return Mr. Jaeger $950,000.
Q. Were there other aspects to the agreement?
A. Originally the agreement was to last for six months.
Q. What was Mallett's compensation or commission on the consignment agreement?
A. We would take 20 percent.
Q. Did you negotiate that agreement with Mr. Jaeger?
A. Yes.
Q. In person or over the phone?
A. In person.

Q. Where?
A. In the front showrooms at Mallett.
Q. Was anyone else present when you negotiated that agreement?
A. Mr. Olins was present.
Q. When was the candelabra ultimately sold by Mallett?
A. The year following, late in the year following, October-November.
Q. 2013?
A. 2013.
Q. For how much was it sold?
A. It was sold for cash and goods. I believe the exact sum that was booked was 1.4 million.
Q. How much of that was cash?
A. 800,000.
Q. What did Mallett get out of the transaction?
A. We got the goods.
Q. And the goods making up the difference between 800,000 and the total price?
A. 1.4, correct.

THE COURT: Ms. Griswold, would this be a good time to take a five-minute break?

MS. GRISWOLD: Sure, that would be good. I don't have too much more, maybe 15 minutes.

THE COURT: Thanks for letting me know. We'll take a five-minute break and pick up where we left off. Thank you.

(Recess)

THE COURT: You may be seated.

Mr. Neville, you're still under oath. Direct examination to be continued.

BY MS. GRISWOLD:

Q. Mr. Neville, you had indicated that the Mallett sold the candelabra in 2013 for 800,000 cash and then some goods. Is that correct?

A. Correct.

Q. I believe you said, you testified you thought the total price was 1.4 million. Are you certain about that?

A. No, I am not certain about that. I am certain about the cash, but not the goods.

Q. Did you personally get anything from the sale of the brass?

Did you get any money or any property or anything of any sort?

A. No.

Q. How much was credited to Mr. Olins from the resale of the Dragon candelabra?

A. I believe it was $197,000.

Q. Whose decision was that, that he would get a portion?

A. I believe it was an agreement between Mr. Jaeger and Mr. Olins. The exact amount I wasn't certain of until I was informed of the quantity by Mr. Olins.

Q. Who was it that told you it is 197 to be applied to Mr.

Olins?
A. Mr. Olins.
Q. How was that given to Mr. Olins in cash or in credit?
A. As a credit against the wall brackets.
Q. Was there any discussion about whether that would be received in cash or as a credit?
A. No.
Q. I am going to turn to a few more questions about the wall brackets. You testified earlier about the defendant's purchase of the wall brackets for 695,000. Do you recall that?
A. Yes.
Q. That was the meeting in February of 2011?
A. Correct.

MS. GRISWOLD: I ask Ms. Meister to you pull up Government Exhibit 101 again.

Q. Do you recall this exhibit, the invoice showing the name of Mr. Olins?
A. Yes.
Q. I ask you to look at Government Exhibits 109 and 1010. They are a June 4, 2014 e-mail with attachments and a June 30, 2014 e-mail with attachments?

MR. DeVITA: Sorry. What?

MS. GRISWOLD: Government Exhibit 109 and 110.

Q. They're both e-mails from Anna Gutierrez to you?
A. Yes.

Q. Do you recall these e-mails and attachments?
A. Yes, I do.
Q. Let's start with Government Exhibit 110.
THE COURT: Can I go back to the wall brackets. I am not sure this is relevant, but I am sort of hung up on it because I find it interesting. The transaction involving the wall brackets, you testified the agreement was in or about February and March of 2011. Is that correct?
THE WITNESS: Yes, your Honor.
THE COURT: And when you made that agreement, was there any understanding as to how quickly Mr. Olins would pay down the money, the purchase money, the debt?
THE WITNESS: No, your Honor.
THE COURT: But the understanding was until he did, they would remain in possession of Mallett?
THE WITNESS: Yes, your Honor.
THE COURT: So, in theory, could that have been indefinite?
THE WITNESS: In theory, your Honor, but I am not sure for some long a time, yes.
THE COURT: Is that standard practice in the industry?
THE WITNESS: It can be.
THE COURT: All right. Go ahead.
BY MS. GRISWOLD:
Q. Government Exhibit 110 is the June 4th, 2014 e-mail. Do

you see that?
A. Yes, I do.
Q. Attached to that is an invoice, dated March 8th, 2011, the second page of the attachment.
MS. GRISWOLD: Would you display that, please, Ms. Meister.
Q. This is an invoice for the wall brackets made out to Mr. Robert Olins. Is this the same invoice as the one that we looked at earlier, Government Exhibit 101? I ask you to compare those two.
A. Yes.
Q. Turning to Government Exhibit 109, which is the June 30th e-mail from Ms. Gutierrez to you, the attachments to this e-mail include an invoice ending in Bates No. 3506. Do you see that in front of you?
A. I do, indeed.
Q. And this invoice is also dated March 8th, 2011. It is also for the wall brackets at a price of 695,000 but it is in the name of Spirit Bear Limited as opposed to Mr. Olins. Do you see that?
A. Yes, I do.
Q. Can you explain how between June 4th of 2014 and June 30th of 2014 the invoice for the wall brackets came to go from Mr. Olins' name to Spirit Bear's name?
A. Mr. Olins asked us to reissue the invoice to Spirit Bear

Limited.

Q. When you say "us," who did he ask?

A. He asked myself and Anna.

Q. Did you agree to change the invoice?

A. I confirmed with London and the finance department and agreed to change the invoice.

Q. But keep the date of March 8th, 2011?

A. Correct.

Q. Did Mr. Olins indicate why he wanted you to change the name on the invoice from his name to Spirit Bear's name?

A. He said that if we were able to do this, we would be able to receive the outstanding balance on the monies owed to us for the invoice in the sum of about $25,000 a month.

Q. And the "we" being Mallett, Mallett would be able to receive the outstanding amount?

A. Correct.

Q. Once you made this change, did Mallett, in fact, receive additional funds towards the purchase price of the wall brackets?

A. We received one payment of I believe $25,000.

Q. What was your understanding, if any of what Spirit Bear was --

A. I did not have any understanding exactly what it was.

Q. Did you have any discussions at any time with Mr. Olins about whether he was purchasing the wall brackets for himself

or for some other entity or purpose?

A. It was always my understanding that he was purchasing them for himself because he and I had had a number of discussions over a long period about the possibility of forming a great collection of carved English guild-wood.

MR. DeVITA: I will object because Ms. Griswold asked whether he had a conversation with Mr. Olins, and the witness is testifying what his understanding was, not what the conversation was.

THE COURT: All right. Fair enough.

Did you have any conversations with Mr. Olins about whether he was purchasing the wall brackets for himself or for another entity or purpose?

THE WITNESS: I cannot recall that exact conversation, your Honor, no.

THE COURT: Okay. To the extent that you shared your understanding --

THE WITNESS: Yes.

THE COURT: -- what was your understanding based upon?

THE WITNESS: My understanding was based upon Mr. Olins' desire to form a great collection of English carved guild-wood furniture, of which these wall brackets would have formed an important part.

THE COURT: So you did have conversations about his desire to form such a collection?

THE WITNESS: Yes, indeed, your Honor.

THE COURT: Thank you.

BY MS. GRISWOLD:

Q. On that point, you testified earlier that Mr. Olins told you that part of the reason why he wanted a portion of the 160,000 from the sale of the vases in cash related to a potential apartment in Spain. Is that correct?

A. That is correct, yes.

Q. Did you have any conversations with Mr. Olins regarding furnishing that apartment in Spain or items of antiques that he may want to purchase for that apartment?

A. Yes, I did.

Q. Describe those.

A. Mr. Olins was excited about the potential of the apartment in Spain because it had high ceilings and good walls on which to be able to display his collection and also hang chandeliers.

Q. Did you or Mallett assist Mr. Olins in any way in locating an apartment in Spain or furnishing an apartment in Spain?

A. Not locating, but he did ask if we knew anybody who could help him in setting up an apartment in Spain, and we did have the wife of one dealer with whom we did business, who dealt with properties in Spain and put him in contact with her.

MS. GRISWOLD: Ms. Meister, please pull up Government Exhibit 116.

Q. This is an August 10th, 2012 e-mail chain, approximately

two months after the vase transaction was approved. Are you familiar with this e-mail, Mr. Neville?
A. Yes, indeed.
Q. This is an e-mail that begins from you to Mr. Olins, subject line Plaza del Cordone. What was the purpose of this e-mail?
A. This was, as I explained, our introduction to Rita Frayer, who is the wife of a dealer with whom we did business, and to her partner who could help Mr. Olins with his apartment.
Q. There is a reference in this e-mail in the second sentence, you say she is at present in Belgium; and, therefore, if you need this house installation to be worked on quickly, she has an absolutely perfect partner in Madrid who has done this many times for expats.
What did you mean by a house installation?
A. The words "house installation" would mean fitting out a house with anything and everything. I can't be precise about its meaning, as I wasn't aware of the exact space in Spain.
Q. Mr. Neville, you talked about the fact that you deceived Mr. Rusco with respect to the vases?
A. Yes.
Q. Did you deceive the receiver in connection with other pieces in Mr. Olins' collection?
A. Yes.
Q. Did you mislead Mr. Rusco about a pair of globes?

A. Yes.

MS. GRISWOLD: I ask Ms. Meister to pull up government exhibit -- actually, we don't need the exhibit.

Q. What did you do to deceive Mr. Rusco with respect to the globes?

A. I misstated the time of the sale, the location of the sale and I misstated the price.

Q. What year are we talking about?

A. 2012.

Q. What did you tell Mr. Rusco about when the sale of the globes took place?

A. I told Mr. Rusco the sale took place at a London affair in the summer of 2012, when the sale actually took place at a March exhibition the same year.

Q. In the spring of 2012?

A. In the spring of 2012.

Q. When you lied to Mr. Rusco about the globes, you understand Mr. Rusco was working on behalf of AB&T, the bank?

A. I did.

Q. And you said this is in 2012, so you also understood that he was the receiver at this time?

A. I did.

Q. In addition to lying to him about where they were sold and when they were sold, did you also lie to Mr. Rusco about how much they were sold for?

A. Yes, I misstated the price by over a hundred thousand dollars, I think.
Q. Before you pleaded guilty in May of 2016, you disclosed these lies about the globes to the government. Is that correct?
A. Yes, I did.
Q. I will ask you a few questions about the time period before the SEC restraining notice was sent to you in 2011. I ask you about an item called a bull chandelier. Do I have that correct?
A. You do have that correct.

MS. GRISWOLD: Can you bring back up Government Exhibit 11, please.

Q. Is the bull chandelier on Government Exhibit 11?
A. Yes.
Q. Consigned to Mallett at a price of 1.6 million?
A. Correct.
Q. Did Mallett ultimately find a buyer for the bull chandelier?
A. We did.
Q. You did?
A. Yes.
Q. How much cash did Mallett receive for the sale of the bull chandelier?
A. It was in excess of a million. I cannot remember the exact

figure.

MS. GRISWOLD: Your Honor, may I approach?

THE COURT: You may.

(Pause)

BY MS. GRISWOLD:

Q. I put in front of you, Mr. Neville, a two page screen-shot --

A. Yes.

Q. -- Government Exhibit 119. Do you see those two pages?

A. I do.

Q. Do you recognize what these are, what these depict?

A. Yes.

Q. Can you explain.

A. When we sold the bull chandelier, Mr. Olins was in a hurry to receive the payment as quickly as possible. However, it was over the Christmas period and, unfortunately, the client's Swiss private office was closed.

Therefore, I pushed the client's agent to put some money down as a show of good faith for the purchase, which is why we received 145,000 separate from the balance of 1.305 million at a later date when the client's private office reopened.

(Continued on next page)

Q. So just so we are clear, the second page of Government Exhibit 119, that ends in Bates stamp 60, that is a screen shot dated December 31 of 2010.

Is this from a Mallett internal system?

A. This is from a Mallett accounting system, yes.

Q. And it indicates, "Due to Mallett, 145,000," and that's what you are describing being paid first?

A. Yes.

Q. For the boule chandelier?

A. Correct.

Q. And then the document ending in 61 is dated January 20, 2011, to Mallett, "paid to London directly $1.305 million"?

A. Correct.

Q. And is this the entirety of the cash that was received from Mallett for this boule chandelier transaction?

A. Yes. Yes, I believe so.

Q. I am going to show you what is marked as Defense Exhibit D, it's a $2.7 million invoice for the boule chandelier.

A. Yes.

Q. Did you direct this invoice to be put together?

A. No.

Q. Do you know where the $2.7 million price comes from?

A. I believe so, yes.

Q. Can you explain?

A. We received goods as part of the purchase of the chandelier

as well as the cash. The goods we received were two giltwood chandeliers, which the client had bought from us many years previously. These were valued by our accounts department and by the client's agent at the original purchase price of $1.3 would be about right, $1.3 million. However, when they came in, we wrote them down considerably to a few hundred thousand because, in the present market, giltwood chandeliers didn't sell easily.

Q. When you reported the purchase price for the boule chandelier to AB&T, did you disclose just the cash portion or also the goods --

A. I --

Q. Let me just finish my question just so the court reporter can get us both down.

Did you disclose just the cash portion or also the goods that Mallett had taken back from the purchaser?

A. I disclosed the cash portion, and disclosed the fact that we would take goods as our commission on the sale.

Q. Finally, I want to ask you about a set of wall lights.

Again, Government Exhibit 111, we see the wall lights. Do you recall the wall lights?

A. Yes, I do.

Q. With a consignment price of $1.75 million?

A. I see them.

Q. And again this is 2010, so before the receiver order?

A. Correct.
Q. Were the wall lights consigned directly by Mr. Olins or through Glenn Randall?
A. Through Mr. Randall.
Q. And who did you deal with regarding the consignment of the wall lights to Mallett?
A. With Mr. Randall.
Q. Did you have any discussions with Mr. Rusco regarding the wall lights?
A. I do not remember doing so.
Q. Do you recall if Mallett had a buyer for the wall lights?
A. We did sell the wall lights.
Q. Do you recall how much they were sold for?
A. I don't exactly know.
Q. Did you discuss that sale with Mr. Olins?
A. I don't remember doing so. At this time I was discussing the financial affairs with Mr. Randall, who was the agent.
Q. So your discussions regarding the wall lights, the best of your recollection, took place with Mr. Randall?
A. Yes.
Q. So you are cooperating, you testified earlier, with the government in the hopes of receiving leniency from the judge?
A. I understand that.
Q. And you pled guilty in May of 2016?
A. Yes, I did.

Q. What did you plead guilty to?
A. I pled guilty to five different charges.
Q. What were those charges?
A. They were conspiracy to obstruct justice and obstructing justice; they were conspiracy to bank fraud and bank fraud; and they were issuing false statements to the government.
Q. And what is your understanding of the maximum sentence you could face for these crimes?
A. It is, on the top, 80 years.
Q. And you entered into a cooperation agreement with the government?
A. I did.

MS. GRISWOLD: Very briefly, I am going to ask Ms. Meister to put up 350112 on the screen.

BY MS. GRISWOLD:
Q. Is this your cooperation --

MS. GRISWOLD: And if you could please put up the signature page.

Q. Is this your cooperation agreement with the government, Mr. Neville?
A. Yes.
Q. And what is your understanding of what you have to do under this agreement?
A. I have to tell the government and this court the truth about the affairs about which I am questioned.

Q. Now, you did not tell the truth when you first met with the government in the fall of 2015, is that correct?
A. That is correct.
Q. And you tried to tell the government that you had never had any intention to mislead Mr. Rusco?
A. That is correct.
Q. And you also tried to tell the government that you hadn't really sold the vases in April 2012 because it wasn't really a final sale, is that correct?
A. That is correct, yes.
Q. And as a result of those lies to the government, what happened?
A. I was charged with false representations to the government and admitted to that crime.
Q. And if you lie today, what is your understanding of whether the government could also prosecute you again for perjury?
A. I understand that I could be prosecuted for perjury and that also my agreement outside here is null and void.
Q. Does the outcome of this hearing have any impact on what your sentence will be as far as you understand?
A. As far as I understand, no.

MS. GRISWOLD: May I have one moment, your Honor?

(Counsel confer)

BY MS. GRISWOLD:
Q. Just one more question because Judge Furman seemed

interested.

Under what circumstances would you allow a client to purchase an item entirely on credit with no payment schedule whatsoever?

A. I would be prepared to do that so long as I understood the client had the wherewithal to pay at some time in the future.

MS. GRISWOLD: No further questions, your Honor.

THE COURT: All right. Cross-examination.

MR. DeVITA: It may take a moment, your Honor.

(Pause)

CROSS EXAMINATION

BY MR. DeVITA:

Q. Good afternoon, Mr. Neville. My name is James DeVita, and I represent Mr. Olins.

A. Good afternoon.

Q. Other than passing in the hallway, we have never met, have we?

A. No.

Q. You were discussing just a moment ago a transaction involving wall lights that you sold from Mr. Olins' collection. Do you recall that?

A. Yes.

Q. Those are the -- let me show you Exhibit A. This is the copy, it is somewhat redacted, but a copy of the agreement that -- consignment agreement under which you originally

received these, is that correct?
A. Yes.
Q. And I think you testified that -- what did you testify the cash component of the sale was?
A. I don't think I remember -- this was only a cash sale.
Q. This was only a cash sale?
A. Yes, it was only the boule chandelier that had --
Q. Okay. Do you know what Mr. Neville -- I'm sorry, what Mr. Rusco was told and what Mr. Olins were told regarding how much they were selling for?
A. I don't know.
Q. Is this one where you said you didn't have any conversations with Mr. Rusco?
A. I don't remember having conversations directly on these. I believe I was speaking with Mr. Randall at this time.
Q. Did you have a conversation with Mr. Randall about whether you could be -- you could provide details regarding the sales price and the purchaser of these? Were you asked about that by Mr. Randall?
A. I don't remember precisely. However, it is our normal practice, if requested, to send an invoice, but usually we redact the name of the client.
Q. Let me show you what is marked as Defendant's Exhibit Q and ask you to take a look at that and see if that is another copy of the consignment agreement that we saw earlier, but with some

additional handwriting on it. Do you see that?

A. I do.

Q. I draw your attention, Mr. Neville, to the handwriting that appears in the -- to the right of the two items. One is the Marchault D'Arnuville Segoura.

What does that refer to?

A. That refers to the three aubergine glazed porcelain vases that were made for -- given by the French king to Marchault D'Arnuville, and Mr. Olins I believe purchased them from a dealer in Paris called Segoura.

Q. So those are referring to the glaze, the vases that we saw earlier, is that right?

A. Yes.

Q. Do you recognize the handwriting, the numbers and letters that appear to the right of that?

A. No, I do not.

Q. But the number that's written there is 1.4 million?

A. Yes.

Q. And is that approximately what those actually sold for?

A. They sold for 1.3 million, yes.

Q. Depending on the conversion rate, it could be a little bit more, right?

A. Depending on the conversion rate.

Q. Okay.

Now, do you notice that the wall lights that we have

just been talking about are listed as the second item on this? Do you see that?
A. Yes.
Q. Do you understand the significance of the figure "2.6 million" written next to that item?
A. I do not know exactly what that refers to. I would only be supposing if I did.
Q. There is no need for you to suppose.
But the fact of the matter is, as we have seen with Exhibit C, the wall lights sold for $1,750,000 is that right?
A. The wall lights sold for $1,750,000.
Q. And if there was any misrepresentation to Mr. Rusco about what they were selling for or to Mr. Olins, you didn't make it?
A. I do not remember having a discussion directly with them, no.
Q. Well, those are two different questions. You don't remember or you did not?
A. I do not remember having any discussions at that time with them over this sale. I don't think I did. I believe at that time I was discussing with Mr. Randall.
Q. Let me turn to the question of the vases.
A. Yes.
Q. And let me ask you to look at, if you have in front of you -- if not, I can hand it to you -- Exhibit 201. Do you have a copy? I will hand you a defense copy.

THE COURT: This is Government Exhibit 201?

MR. DeVITA: It is Government Exhibit 201. It's a long exhibit, so he may need to have -- I may ask for enlargement of some of those.

(Counsel confer)

MR. DeVITA: I will hand him this notebook.

A. Thank you. Thank you.

Q. On page 1, see this is a log of conversations and it refers to a conversation that you had on May 18, 2012, with Mr. Rusco. This is a log that is in evidence of Mr. Rusco's phone calls with you.

A. Right.

Q. And it indicates that, in the box in the middle, where it says "summary of activity details" --

A. Yes, I see that.

Q. -- it says, "We discussed garniture set. He has potential buyer he thinks would sell the item for 600,000 with a net of 540,000."

Do you remember telling that to Mr. Rusco at that time?

A. I do not remember this call, but I did mislead Mr. Rusco by suggesting that we could sell the vases for between a 10 and 20 percent commission.

Q. You misled him, meaning you lied to him.

A. Yes.

Q. Okay.

And then, again, there is another call on May 18, and there is another discussion about the sale price of 600,000 with a commission of 10 percent, the net proceeds of 540,000, and you lied to him again on May 18, right?

A. Yes.

Q. And then if you turn the next page, you see a reference on May 24, 2012. The conversation described there it says, "We also discussed the garniture set. Mallett London is trying to contact the potential buyer. He explained that the potential transaction may involve the exchange of pieces from the potential buyer (common practice). Still waiting to provide a letter regarding the garniture set, but wanted to clarify the transaction."

Do you remember telling Mr. Rusco that London was trying to contact the potential buyer?

A. I do not remember that precise wording, no, but I did make clear to Mr. Rusco that the buyer would be coming in to London at that time, yes.

Q. Which was not true.

A. No, it was not true.

Q. You were making that up out of whole cloth.

A. I was making that up.

Q. Whether it's whole cloth or half cloth, you were making it up.

A. Yes.

Q. Okay.

And then if you turn to page 4, June 6 -- June 7, 2012, reflects another conversation between you and Mr. Rusco; and, according to this, you told Mr. Rusco that there was a degree of urgency as the client is planning to come to London. No dates at this point, but Henry will advise as soon as he can."

Do you remember making that representation that there was a degree of urgency because the client was coming to London?

A. Yes, I do.

Q. And you made that up.

A. Yes, I did.

Q. Let me go back earlier in time to when you, Mallett, had the vases in your custody. You mentioned earlier that at some point they came to be sent to Sotheby's?

A. Yes.

Q. Who was it that directed that they be sent to Sotheby's?

A. I was informed that they would be sent to Sotheby's for sale I believe by Mr. Randall, but I will not guarantee that. I believe it was Mr. Randall.

Q. But it is you that put that in motion, that delivery to Sotheby's, correct?

A. I asked for the London office to consign them to Sotheby's,

yes.
Q. I will show you what's been marked as Defendant's Exhibit R.
A. Thank you.
Q. Take a moment to look at that, if you would, Mr. Neville.
A. Yes.
Q. It says -- it is addressed to someone named Giles?
A. Yes.
Q. And who is Giles? Giles Hutchison Smith.
A. He is the CEO in London.
Q. CEO in London of Mallett?
A. The CEO of Mallett.
Q. So he is the CEO overall?
A. Correct.
Q. It says, "Sotheby's London may contact you to collect and photograph the Sevres garniture on behalf of party two." I take it "party two" is Mr. -- is Glenn Randall?
A. I don't know, but that was my memory.
Q. "As I discussed the other day." It says, "I made party two sweat a little bit and said we could not possibly released them before December 10, and he has confirmed to me, although I am sure it is not the whole truth, that the estimate in the catalog will be 600,000 to 900,000, with a reserve of 600,000."

Do you recall that conversation?
A. I don't in detail, but I do, from reading here, recognize

the letter -- the e-mail.
Q. And that's a conversation you had with Mr. Randall.
A. I believe it would have been, yes.
Q. And it says, "They are trying to sell them privately for $750,000 return to" and then it says "party two" "which, although less than us, I do not think is such an embarrassment. Anyway, be assured I have vented a considerable amount of irritation to party two before agreeing to anything."
Can you explain what that was about?
A. We had had interest from our client, the Sheikh of Qatar, for many months prior to this e-mail, on the possibility of purchasing the Sevres garniture. It was a disappointing formality to allow Sotheby's to take the garniture and present the vases to the same client for their successful sale.
Q. You say "many months." This e-mail is dated November 29, 2011.
A. Yes.
Q. When did you first become aware of the interest of the sheikh?
A. I believe it was in January or February of that year, 2011.
Q. Of 2011.
A. Yes, indeed.
Q. Had you communicated that interest to Mr. Rusco?
A. Yes, I had.
Q. You had told him?

A. I had told him that we had a client who was interested, and he was an Arab potentate.
Q. You told that to Mr. Rusco?
A. Yes, I had.
Q. Did you also tell that to Mr. Olins?
A. Yes, I did.
Q. And --
A. But nothing had come of his interest and we were unable to push the sale through.
Q. I'm sorry. I didn't hear what you said.
A. Nothing had, until that time, come of this interest, and we had been unable to push the sale through.
Q. So the items were delivered to Sotheby's, is that correct, the three vases?
A. Correct.
Q. And what occurred after that, after they got to Sotheby's?
A. Sotheby's photographed them, cataloged them, and published them in their sale catalog.
Q. And they were withdrawn from the sale.
A. They were.
Q. Is that because Mr. Olins objected to the sale?
A. I do not know the reason.
Q. I think you testified earlier that you had been given legal advice that the items in London were not subject to the SEC restraining order?

A. Correct.
Q. Restraining notice?
A. Correct.
Q. Was that in writing?
A. I don't remember that being in writing.
Q. You received the restraining notice in August of 2011, right?
A. Correct.
Q. When was it that you got this legal advice?
A. Early 2012.
Q. Early in 2012.
A. Correct.
Q. How early? Do you remember?
A. I don't exactly.
Q. Let me show you what has been marked as -- we will mark as Defendant's Exhibit S. This is an e-mail from you to Mr. Olins, isn't it?
A. Yes.
Q. And in the second sentence, it says, "The first document was sent to the SEC as a legal requirement describing the goods on which they placed a lean." I am assuming that should be L-I-E-N, right?
A. Correct, I believe it should.
Q. "Where the prices are your consignment prices to us as recorded in our books." Correct?

A. Yes.
Q. So at least in January of 2012, you understood that whatever is consigned to you, Mallett, is subject to the SEC lien, right?
A. Yes.
Q. Let me show you what I am marking as Defendant's Exhibit T as in "Thomas." Who is Justin Evershed-Martin?
A. He is a colleague in London.
Q. Can you take a look at that e-mail chain?
A. Yes, indeed.
Q. Do you recognize it?
A. It is an -- yes, I do.
Q. And this is after you have learned that Sotheby's -- the vases will be coming back from Sotheby's, right?
A. Correct.
Q. And this is less than a week or a little more than a week actually after the January 23 e-mail where you talk about the SEC lien?
A. Yes.
Q. And in the e-mail -- the first e-mail, which is from Mr. Evershed-Martin to you, Evershed-Martin to you, it says, Mr. Evershed-Martin says, "Will party two," which I think we have established is Glenn Randall, right?
A. Yes.
Q. "still let us sell them on his behalf? I have had an

inquiry about them, and Sotheby's are being deliberately vague, so they came to us again."

Do you know who he is referring to?

A. No, I do not.

Q. Is that the sheikh or someone else?

A. Mr. Evershed-Martin was not responsible for the sheikh, but I don't know the answer.

Q. But this does refer to the Sevres vases, correct?

A. Correct.

Q. And then you say, "Yes, we may sell them."

A. Yes.

Q. "And I believe that they may be being delivered back to us soon."

A. Correct.

Q. So that less -- about a week after you said that the vases, among other things, are subject to the SEC lien, you are now telling Mr. Evershed-Martin that, Now we can sell them.

A. Yes.

MR. DeVITA: Let me mark as Defendant's Exhibit U -- I'm sorry, it is V as in "Victor"?

THE COURT: Do we have a U?

MR. DeVITA: I didn't think we did, but Mr. Cecutti -- we do not. The last exhibit I have is T.

THE COURT: T is the last one I have written down.

MR. CECUTTI: My mistake.

MR. DeVITA: U, right?

(Pause)

BY MR. DeVITA:

Q. And this is an e-mail from you to the top -- the top of the page, the top item is an e-mail to you from Greg Rusco, correct?

A. Correct.

Q. And the initial e-mail which is on the page with the Bates number 2723 is from Mr. Olins to Mr. Rusco, isn't that right?

A. Correct.

Q. And Mr. Olins says in his e-mail, "I fully understand that the Sevres garnitures are supposed to be under the control of Mallett per the court's order. I believe that both Sotheby's and Mallett know that no sale can be completed without the written permission of both the court and the American Bank & Trust Company. You certainly have authority on my behalf to demand the garniture be returned to Mallett."

That was attached to the e-mail that was sent to you by Mr. Rusco, wasn't it?

A. I believe so, yes.

Q. So it is Mr. Olins specifying that the sale cannot take place without the permission of both the court and American Bank & Trust, and it's being forwarded to you by Mr. Rusco, right?

A. Yes.

Q. Did you contradict Mr. Rusco?
A. I don't believe I did, no.
Q. Did you correct -- at this time had you gotten this advice from the lawyer that the Sevres garnitures weren't affected by the SEC restraining notice?
A. As I said earlier, I don't know exactly when we received that advice, but I did not correct Mr. Rusco, no.
Q. And you certainly didn't correct Mr. Olins, right?
A. No, I did not.

MR. DeVITA: Now we are up to V, right?

MR. CECUTTI: Yes.

BY MR. DeVITA:
Q. Let me show you what's been marked as Defendant's Exhibit V as in "Victor."

This is now February 15, at least the top e-mail is --
A. Yes.
Q. -- and it says -- let's start with the first e-mail is a reference to the efforts to get the physical custody changed from Sotheby's back to Mallett, correct?
A. Yes.
Q. And then the -- on the first page, the first e-mail at the bottom is from Richard Cave to you. "We have the garniture in Bond Street."

Now, Richard Cave is the one who was negotiating the sale of the Sevres garniture.

A. Yes.
Q. And then you say to him, "Well done. I am glad. Thanks for the news."
A. Correct.
Q. Then he sends to you an e-mail on February 15 "Robert Olins states in his e-mail of 13/2" -- which is the European way, reversing the date and the month, correct?
A. Correct.
Q. Different than us Yanks.
So that's in February. He is referring to the February 13 e-mail to Greg Rusco, "I believe that both Sotheby's and Mallett know that no sale can be completed without the written permission of both the court and American Bank & Trust Company."
You see that?
A. Yes, I do.
Q. And it continues, "Would you be able to see when the American Bank & Trust Company are likely to have this written permission for us to sell the vases? I think I could say to our client that we have secured the vases, that we have them, and that we are working on the paperwork.
Do you see that?
A. Yes, I do.
THE COURT: Counsel, I really apologize. I have to deal with a personal matter. Can you just wait 30 seconds and

I will be back on the bench?

MR. DeVITA: Yes.

THE COURT: Thank you.

(Recess)

THE COURT: Apologies, you may continue.

MR. DeVITA: Thank you, your Honor.

BY MR. DeVITA:

Q. Mr. Neville, drawing your attention to that e-mail to you from Richard Cave, did you take any action at this time to determine whether in fact Mallett was precluded from selling those Sevres vases?

A. I do not remember doing so at this precise time.

Q. But you now have received both the e-mail from -- that Mr. Rusco forwarded to you from Mr. Olins saying you have to have court and bank permission, you have Mr. Cave emphasizing that to you and essentially asking you for direction.

What did you do?

A. I don't remember exactly what we did. I understood that we waited and that is what we did.

Q. Waited for what?

A. For clarification.

(Counsel confer)

Q. I am going to ask that you take a look, the government is going to pull up Government Exhibit 103. It actually may be in the book that you have in front of you. Exhibit 103.

A. Thank you.

(Pause)

Q. This is now February 21, is that right?

A. Yes.

Q. The last of the e-mails?

A. Yes.

Q. And this is a continuation of some of the -- because it, again, refers to you have the copy of Richard Cave's e-mail to you. "We have the garniture in Bond Street;" you responding, "Well done, I'm glad, thanks for the news;" and then Richard, Mr. cave saying to you, "So far I have told the client that Mallett have them secured and that there will be some paperwork to do, etc. I don't know how long this will suffice as a delaying tactic. Simon Jones, who are moving items into Dudley House, including the pair of chairs, say they will be doing so in about a month."

A. Yes.

Q. And then you respond, "Very clever avoidance tactic. There is progress, but I will know more on Thursday morning. All the best, H."

That's from you, right?

A. Yes.

Q. Let's start with the client being referred to is the sheikh?

A. Yes.

Q. And Richard Cave is telling you that he has been able to stall the sheikh?
A. Yes.
Q. And you complimented him on his very clever avoidance tactic?
A. Correct.
Q. What is Dudley House?
A. That is the sheikh's London home.
Q. And that's where the Sevres garnitures, where they were intended to go?
A. I believe so.
Q. So this is Mr. Cave trying to light a fire under you to get the approvals, right?
A. Yes.
Q. Now, let me ask you to take a look at Government Exhibit 115. I think you saw this earlier. This is a note of your conversation on March 2 with Mr. Rusco and possibly Mr. Olins?
A. Yes.
Q. So this is roughly a week after the e-mail, maybe even a little less, because there are -- yeah, it's a week after the e-mail we just saw with Mr. cave, and you are saying to -- this quotes you as saying -- and you prepared this note yourself?
A. I dictated this to administrator.
Q. Your words? Those are your words?
A. Yes, yes.

Q. And it says, "HN tells GR that his hands are tied. He had clients interested, asking about the pieces, but is unable to trade because of the SEC restrictions."

A. Yes.

Q. So clearly you understood at this time that the SEC restraining notice precluded you from selling the Sevres garnitures?

A. Yes.

Q. Then you told him that "the publication of the vases at Sotheby's and the price that they consigned it made them unsaleable at the consignment price."

A. Yes.

Q. That was a lie.

A. Yes.

Q. But the part about the pieces being subject to the SEC restrictions was true.

A. I believed so.

MR. DeVITA: I am going to mark as Exhibit X -- a little confusing because I am using the abbreviation X for "exhibit," so it is going to be Defendant's XX?

MS. MAGDO: Was there a W?

MR. DeVITA: Oh, we are alphabetically challenged.

THE COURT: I don't know, Mr. DeVita. Your math skills earlier weren't great either.

MR. DeVITA: It's a sign of age, your Honor. That's

all I can say.

BY MR. DeVITA:

Q. This is an e-mail from Michael Smyth Osbourne is it Smyth or Smith? How is it pronounced?

A. Smith.

Q. Smyth Osbourne to Ian Hutchinson. Who are those folks?

A. Michael Smyth Osbourne is the CFO of Mallett PLC. Ian Hutchinson is the senior accountant.

Q. And this is referring to a recommendation that Mr. Smyth Osbourne is making, if you look at the last sentence, it says, "It seems sensible at this stage, however, for us to provide against his death," "his" being Mr. Olins'?

A. Correct.

Q. "As recovery looks complicated, at least in the near term. Attached is the restraining order that Mallett, Inc., received from the SEC."

Do you see that?

A. Yes.

Q. And you sent it to Mr. Smyth Osbourne, right?

A. I would have done, yes.

Q. He was your superior. You reported to him?

A. He was my superior.

Q. Just above it, it says, Mallett, Inc., who holds most of his pieces, has now been served with a restraining notice by the SEC forbidding Mallett, Inc., from selling any of his

pieces, which removes the security we had on his death."

A. Yes.

Q. So that, clearly, Mallett, Inc., is the entity that had the consignment, right?

A. Yes.

Q. So that Mallett, Inc., is restrained from selling the asset, wherever it is located, isn't that right?

A. I don't know.

Q. Well, that's certainly what Mr. Smyth Osbourne is saying, isn't he?

A. I don't know.

Q. Well, read it again.

A. I am reading it. Sorry, sir, I am reading it.

Q. Okay. Read it again.

A. "Mallett, Inc., who holds most of these pieces, has now been served with a restraining order by the SEC forbidding Mallett, Inc., from selling any of his pieces."

Q. "From selling any of his pieces," correct?

A. That is what is written.

Q. Okay. And that's what you understood at the time, isn't it?

A. I have never seen this e-mail before.

Q. I'm sorry?

A. I have not seen this e-mail before.

Q. But you knew that the consignment agreement was with

Mallett, Inc.?
A. The consignment agreement was with Mallett, Inc.
Q. In fact, you sought very shortly after this e-mail to try and get an updated, signed consignment agreement, didn't you?
A. I don't remember.
MR. DeVITA: Now we are --
A. I may have, but I don't remember the exact date.
MR. DeVITA: Now we are at X.
BY MR. DeVITA:
Q. Did you tell the government at some point that you had a conversation on March 28, 2012, with Mr. Rusco in which he authorized you to sell the vases for a return of $540,000 to the bank?
A. I believe I had a conversation late in March 2012, in which I was informed that Mallett -- all parties had agreed that Mallett could acquire the vases for $540,000. However, we would have to wait for supporting paperwork. I cannot remember if that call was with Greg Rusco or with Mr. Olins.
Q. Drawing your attention to Defendant's Exhibit X?
A. Yes.
Q. Who is Sarah Sperling?
A. She is was the -- an administrator at Mallett, Inc.
Q. And the signature at the bottom of the e-mail is -- well, not signature, but the name attached to it is Henry.
A. Yes.

Q. Did you instruct her to send this e-mail?
A. I would have done, yes.
Q. And this is March 27, 2012, correct?
A. Correct.
Q. And you are asking Mr. Rusco to sign a -- to sign the consignment agreement from October 2010?
A. Correct.
Q. And in that -- you signed it.
A. I did.
Q. And in that consignment agreement, it says that the vases are consigned for $725,000 return. That means 725,000 to the bank?
A. Correct.
Q. And it says, "Net proceeds to cosigner $3,373,000 unless otherwise agreed by cosigner."
A. Consignor.
Q. Consignor. I'm sorry.
A. Yes, indeed, yes.
Q. If you had an agreement in late March to buy them for $540,000, why are you sending Greg Rusco a consignment agreement that says they are going to have a return to the bank of $725,000?
A. Because our auditors needed to have paperwork to prove that we had these pieces for the previous year, calendar year, for 2011, because the consignment ended the 30th of September,

2011, and this consignment agreement itself had never been signed.

Q. But wouldn't you update to reflect -- if you are asking for written permission to sell or to purchase for $540,000, wouldn't you update the amount of the consignment to reflect the new agreement?

A. I don't believe I would have done. I may have done, but I don't believe I would have done, because this was an historic document that was being asked for by the London Finance Department in order to clarify the paperwork.

Q. So you would submit to the accounting department for the auditors a misleading document, is that what you are saying?

A. No. This document refers to the previous year. It does not refer to the present time. It refers to the time from 2000 -- October 2010 through 30 September 2011.

THE COURT: Mr. DeVita, let's stop there for the day.

MR. DeVITA: That's fine.

THE COURT: Any estimate on how much longer you have on cross?

MR. DeVITA: Well, your Honor, since I will have overnight, it is the old story about I didn't have enough time to write a short letter. I might have time to, unlike the usual practice of lengthening because of additional time, I may be able to shorten it, and I would predict within half an hour to an hour.

THE COURT: All right. And do you anticipate having defense witnesses.

MR. DeVITA: The only remaining decision, your Honor, is whether Mr. Olins is going to testify. There will not be any other defense witnesses.

THE COURT: Can we resume at 9:30 tomorrow?

MR. DeVITA: That's fine with me.

MS. GRISWOLD: Good for the government.

THE COURT: Okay.

So, Mr. Neville, you are excused. Because you are on cross-examination, you are not permitted to communicate with the representatives of the government overnight, so you should be back here a few minutes before 9:30, ready to go. We will resume your testimony at that time.

THE WITNESS: Yes. Thank you, your Honor.

THE COURT: Have had a good evening. You may step down.

MR. DeVITA: Thank you, your Honor.

THE COURT: Counsel, do we need to discuss anything? I was excusing the witness so we could talk, but if there is nothing to talk about.

MR. DeVITA: Well, unless you wanted to talk about scheduling.

THE COURT: I think we have just discussed that.

MR. DeVITA: I meant what happens next.

THE COURT: I think we are resuming at 9:30.

MR. DeVITA: Yes. I meant after the completion of the testimony, does your Honor still intend to proceed with the sentencing?

THE COURT: I think you should be prepared for that possibility and I would certainly hope that I would, because it will be fresh in my mind and I will have the opportunity now to reflect on what I have heard, while keeping an open mind, because I haven't heard everything. I may change my mind tomorrow.

MR. DeVITA: I just want to be prepared, your Honor.

THE COURT: You should certainly be prepared for the likelihood, certainly the possibility, if not the likelihood, that we will proceed directly to sentencing. But some of it will also depend on timing. I do have other matters scheduled later in the day tomorrow. So depending how long things go, I may or may not have time to do it. So we will play it by ear, take it one step at a time.

I will tell you that I will not be here from Thursday through January 4. So if it doesn't happen tomorrow, we will have to talk about when it will happen.

MR. DeVITA: All right.

THE COURT: All right?

MR. DeVITA: Thank you, your Honor.

THE COURT: Have a good evening. I will see you

tomorrow.

\- - -

INDEX OF EXAMINATION

Examination of: Page

GREGORY WESTFALL RUSCO

Direct By Ms. Magdo . . . . . . . . . . . . . . . . 9

Cross By Mr. DeVita . . . . . . . . . . . . . . . .38

Redirect By Ms. Magdo . . . . . . . . . . . . . . .95

Recross By Mr. DeVita . . . . . . . . . . . . . . .96

Redirect By Ms. Magdo . . . . . . . . . . . . . . .97

BRUCE W. JAEGER

Direct By Ms. Magdo . . . . . . . . . . . . . . . .98

Cross By Mr. DeVita . . . . . . . . . . . . . . . 127

Redirect By Ms. Magdo . . . . . . . . . . . . . . 159

MICHAEL HENRY GARTSIDE NEVILLE

Direct By Ms. Griswold . . . . . . . . . . . . . 162

Cross By Mr. DeVita . . . . . . . . . . . . . . . 216

GOVERNMENT EXHIBITS

Exhibit No. Received

3 and 102 . . . . . . . . . . . . . . . . . . . . .20