gcl2oli1 kjc

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA,              New York, N.Y.
3
               v.                           15 Cr. 861(JMF)
4
     ROBERT OLINS,
5
                    Defendant.
6    ------------------------------x

7                                           December 21, 2016
                                            9:40 a.m.
8

9    Before:

10                     HON. JESSE M. FURMAN,

11                                          District Judge

12

13
                         APPEARANCES
14
     PREET BHARARA
15        United States Attorney for the
          Southern District of New York
16   BY:  CHRISTINE I. MAGDO
          ANDREA M. GRISWOLD
17        Assistant United States Attorneys

18
     DOAR, RIECK, KALEY & MACK
19        Attorney for Defendant
     BY:  JAMES R. DeVITA
20

21   LAW OFFICE OF ANTHONY CECUTTI
          Attorney for Defendant
22   BY:  ANTHONY CECUTTI

23

24   ALSO PRESENT:

25   HOLLY MEISTER, U.S. Attorney's Office
     VIRGINIA FAUGHNAN, U.S. Postal Service
```

gcl2oli1 kjc

1              (Hearing resumed)

2              THE COURT:  You may be seated.  Good morning.  Welcome

3     back.

4              Mr. Neville, if you want to take the stand, that would

5     be great.

6              Are you ready to proceed?

7              MR. DeVITA:  Yes, your Honor.  If I may have one

8     moment.

9              I will just inform Mr. Neville's counsel that I

10    believe I was somewhat unduly optimistic in predicting a half

11    hour to an hour.  It's more like an hour and a half.

12             THE COURT:  Okay.

13             A VOICE:  Do I get to object, your Honor?

14             THE COURT:  No.

15             Are you able to tell me at this point if Mr. Olins is

16    likely to testify?

17             MR. DeVITA:  Unlikely, your Honor.

18             THE COURT:  Unlikely?

19             MR. DeVITA:  Unlikely.

20             THE COURT:  All right.  Why don't we get started so

21    that we can get finished.

22             MR. DeVITA:  Yes, your Honor.  I am having trouble

23    locating one item.

24             (Pause)

25             MR. DeVITA:  Ah, I found it.

1    MICHAEL HENRY GARTSIDE NEVILLE, previously sworn.

2    CROSS EXAMINATION (continued)

3    BY MR. DeVITA:

4    Q.  Good morning, Mr. Neville.

5    A.  Good morning.

6           THE COURT:  Let me remind Mr. Neville that he is under

7    oath, and now you can proceed.

8           MR. DeVITA:  Thank you, your Honor.

9    BY MR. DeVITA:

10   Q.  When we left off yesterday, we were still talking about the

11   events leading to the transaction involving the Sevres globes.

12   Do you recall that?

13   A.  Sevres vases.

14   Q.  Sevres vases, yes.  We will come to the globes in a few

15   minutes.

16           Do you recall telling the government on two different

17   occasions that you had a telephone call on March 28 with

18   Mr. Olins and Mr. Rusco in which they gave you -- Mr. Rusco

19   gave you permission or told you that Mallett could have the

20   vases for $540,000.

21           Do you recall that?

22   A.  I do recall a telephone conversation.  I cannot confirm

23   whether it was both Mr. Rusco and Mr. Olins or just one of

24   those two parties.

25   Q.  But do you recall telling the government that that phone

1    call occurred on March 28, 2012, and you knew that because you

2    had an entry in your diary?

3    A.   That was the reason, yes.

4    Q.   Let me show you -- you told them both on October 15, 2015,

5    and November 9, 2015, is that right?

6    A.   I believe so, yes.

7    Q.   Let me show you the entry in your diary, which is marked as

8    Exhibit 3501-13.  I don't think you have that there with you

9    yet.

10             Do you see that?

11   A.   Yes.

12   Q.   Is that the entry you are referring to where, at the top of

13   the page, it says, "RAO/Greg call"?

14   A.   Yes.

15   Q.   And it is not next to any time frame, right?

16   A.   No.

17   Q.   So is it not correct that that was a reminder to yourself

18   to call Mr. Rusco or Mr. Olins on that date?

19   A.   It may be, yes.

20   Q.   And as we were looking at yesterday, Defendant's Exhibit X

21   was an e-mail from Sarah Sperling, but with your name as the

22   signature.

23             Oh, you have it?

24   A.   I have it.

25   Q.   Perfect.

1          That's the e-mail asking for the signed consignment

2   agreement, right?

3   A.  Correct.

4   Q.  Isn't it a fact that the call that you were going to make

5   the next day was a follow-up to try and get that signed

6   consignment agreement?

7   A.  I don't think it is a fact, no.  I wouldn't -- I don't

8   remember that precisely.

9   Q.  Let me show you what I am marking as Defendant's Exhibit

10  Y.

11          MR. DeVITA:  Today I do have the tags, your Honor, so

12  that may expedite or help matters a little bit, although I do

13  have to put them on as I go because I didn't want to have to

14  recopy everything last night.

15  A.  Thank you.

16  Q.  Now, Mr. Neville, that's an e-mail between yourself -- an

17  e-mail chain between yourself and Mr. Olins on March 28, 2012,

18  is that right?

19  A.  Yes.

20  Q.  And then it says -- it starts out with, on the 28th,

21  "Please see attached our consignment agreement, which I would

22  like to have signed by you or Greg as appropriate.  I did

23  e-mail Greg to sign a copy signed by me yesterday."

24          Do you see that?

25  A.  I do.

1   Q.  And then it says, "Unfortunately" and then Mr. Olins

2   responds, "I do not currently have access to a printer;

3   however, I do confirm that the attached consignment agreement

4   was in full force and effect throughout the term," right?

5   A.  Yes.

6   Q.  And then you ask, on March 28 -- I mean your next response

7   is at 12:34 p.m.  "Thank you very much for this.  I wonder if I

8   might have a moment any time during your brief stay in New York

9   to drop in for a quick conversation in order to clarify some of

10  the financials on your pieces before you return to Spain."

11  A.  Yes.

12  Q.  And then Mr. Olins responds, "Unfortunately I am in

13  Connecticut and I depart tomorrow.  I will call you Friday."

14  Correct?

15  A.  Correct.

16  Q.  And then you say you'll miss -- "I will miss coffee in

17  Manhattan.  I am happy to have coffee in Connecticut if it is

18  anywhere near Greenwich.  Unfortunately, I am away on Friday

19  but would love it if you had a moment either today or tomorrow

20  for a catch-up, even on the telephone."

21          And then Mr. Olins responds, "Will do tomorrow."

22  A.  Yes.

23  Q.  So does that refresh your recollection that the reason you

24  were -- you left a note for yourself to get in touch with

25  Mr. Rusco or Mr. Olins was to get the signature on the

Gcl2oli1                          Neville – Cross

1   consignment agreement?

2   A.  It may be.  I don't recollect clearly this, but it may be.

3   Q.  And it clearly shows you did not speak to Mr. Olins on

4   March 28.

5   A.  That is true.

6   Q.  And to the best of your recollection, you don't have any

7   recollection of speaking to -- now, after having gone through

8   that -- with Mr. Rusco on the 28th, do you?

9   A.  No.

10  Q.  So when you said to the government that you were certain

11  that you had spoken to them because it was in your diary, you

12  were wrong?

13  A.  No.  I was certain that I had spoke to either Mr. Olins

14  and/or Mr. Rusco late in March or early April about the

15  possibility -- about the agreement to buy the vases at

16  $540,000, but that we would have to wait for a written

17  agreement.

18  Q.  And you didn't get the written agreement?

19  A.  I did not get the written agreement, no, we did not, until

20  in later in the summer.

21  Q.  When the court approved that.

22  A.  Correct.

23  Q.  After you had already sold them.

24  A.  Correct.

25  Q.  And the sale of the vases occurred within days of that

Gcl2oli1                    Neville - Cross

1    March 28 set of e-mails, correct?

2    A.  Correct.

3    Q.  In fact, it occurred on April 3, isn't that right?

4    A.  I need to refresh myself of the actual date, but it was

5    early in April, yes.

6    Q.  Let me show you what I am marking as Defendant's Exhibit

7    Z.

8    A.  Thank you.

9    Q.  That is an internal e-mail generated at Mallett reflecting

10   the sale of the vases on April 3 at 800,000 pounds, isn't that

11   right?

12   A.  Correct.

13   Q.  And you certainly didn't tell Mr. Rusco in March, April,

14   May, or June that it had sold -- that those vases had sold for

15   800,000 pounds, right?

16   A.  No.

17   Q.  Now, let me ask you to look, if you would, at Government

18   Exhibit 105.

19        Do you have that exhibit book with you there?

20   A.  Yes, I do, sir.

21   Q.  Now, that is a series of e-mails starting with an e-mail on

22   April 11, 2012, from someone named Khalil Ishaq.  If you look

23   at the page, it has the number 2774.

24        Do you see that?

25   A.  Correct.

Gcl2oli1                         Neville - Cross

1    Q.   Who is Mr. Ishaq?

2    A.   The accountant in the finance department of Mallett in

3    London.

4    Q.   And that reflects the receipt of 844,994 pounds.

5    A.   Yes.

6    Q.   Do you know why it is 844,994 instead of 800,000 even?

7    A.   No.

8    Q.   But this does relate to the sale of the vases, isn't that

9    right?

10   A.   I believe so, yes.

11   Q.   And let me ask you to look at the next page, which is an

12   April 11 e-mail from Mr. Smyth Osbourne, who is your direct

13   superior, right?

14   A.   Yes.

15   Q.   And that's to you, and it says, "I guess we can now go into

16   bat with Olins' bank and Olins about how much we have to pay to

17   the bank and how much we keep to pay off Olins' debtor on the

18   wall lights, plus how much we need to give Glenn Randall."

19          Then it says, "Please note there will be" -- "that we

20   need to pay 40,000 pounds, five percent import duty, so there

21   will be 760,000 pounds to distribute," right?

22   A.   Correct.

23   Q.   And you respond immediately, within -- well, within a few

24   hours -- he is in London, you are in New York, right?

25   A.   Yes.

1   Q.  And then you say, "Yes, indeed.  Thanks for all of this.  I

2   am led to believe that there is a resolution agreed upon with

3   the SEC that should be signed next week.  I will wait until all

4   the air is cleared and then make a proposal."

5   A.  Yes.

6   Q.  You didn't tell your superior that you already had an

7   agreement with the bank that they would accept $540,000 as a

8   total, did you?

9   A.  Yes, I did.

10  Q.  Not in that e-mail, is it?

11  A.  No.  I telephoned them, both Mr. Smyth Osbourne and

12  Mr. Cave, to say that we had a verbal agreement of $540,000.

13  Q.  You have no record of that?

14  A.  I have no record of that telephone call, no.

15  Q.  And was that call before or after this e-mail?

16  A.  That was before this e-mail.

17  Q.  So before the e-mail -- so it was before his e-mail?

18  A.  It was before his e-mail.

19  Q.  So before his e-mail, you had already told him that you had

20  an agreement with the bank that they were going to accept

21  $540,000?

22  A.  A verbal agreement, yes.

23  Q.  And yet he said -- you had e-mail saying that he wanted you

24  to go into bat -- that's a cricket term, correct?

25  A.  Correct.

Gcl2oli1                     Neville - Cross

1    Q.  Not baseball.

2    A.  No, sir.

3    Q.  But similar.

4    A.  Yes.

5    Q.  He wanted you to go into bat to get Mr. Olins to agree on a

6    distribution, right?

7    A.  Yes.

8    Q.  Meaning he knew you didn't have an agreement with

9    Mr. Olins, right?

10   A.  We did have an agreement, but it was not in writing, and we

11   had to wait for the written agreement.  I had made that clear

12   to the London office.

13   Q.  But he is saying to you in this e-mail, Go get an

14   agreement, isn't he?

15   A.  Yes.

16   Q.  And he is saying to go get an agreement with the bank.

17   A.  Yes.

18   Q.  And you did not say in your e-mail responding to that,

19   Well, Michael, you know we already have an agreement.  I have

20   hit the ball out of the park.

21   A.  I did not say that in this e-mail, no.

22   Q.  Now, you testified that you had already had your discussion

23   with Mr. Olins about applying part of the funds to the debt on

24   the wall brackets prior to the time the court authorized the

25   sale of the vases, is that right?

1    A.  Yes.

2    Q.  Do you remember telling the government, the F.B.I. agents,

3    and these prosecutors, on May 12, 2016, quote -- let me hand to

4    you Exhibit 3501-9.

5         Do you have that up there with you?

6    A.  Sorry, sir.  Could you repeat?  35?

7    Q.  3501-9.  Do you have the 3500 material up here?

8         Here it is.  I'm sorry.  It is in this book.  Bear

9    with me a moment.

10   A.  Sir.

11   Q.  Here we are.  Okay.  And I am going to draw your attention

12   to this paragraph right there.  This is on the first page, next

13   to the last paragraph, 3501-9.

14        This is, by the way, on May 12, 2016, this is before

15   Mr. Olins pled guilty.  You were preparing for your testimony

16   at trial, right?

17   A.  Yes, sir.

18   Q.  And you said to the government, "With regards to the vases,

19   Neville called Olins after he received court approval to

20   purchase the vases for $540,000.  Neville told Olins 460,000

21   would be credited to Olins' debt from the subsequent sale of

22   the vases.  Olins did not agree to all of the 460,000 going to

23   pay down his debt.  Olins originally wanted 210 cash out of the

24   460,000.  Neville agreed to pay Olins 160,000 in cash out of

25   the 460.  Olins stated that the 160,000 was going to be used to

1    pay down a down payment or a deposit for an apartment in

2    Spain."

3            Do you recall saying that to the agents?

4    A.  Yes.

5    Q.  So you told the agents on May 16, and the government, these

6    attorneys, on May 12, 2016, that that call occurred after you

7    got court approval for the sale at 540, right?

8    A.  Yes.

9    Q.  And the court approval came on June 15, 2012, isn't that

10   right?

11   A.  I believe so.

12   Q.  And then let me show you what I am marking as Defendant's

13   Exhibit AA.  This is a June 17, 2012, e-mail.  This is from

14   Mr. Olins, even though it says "from mail," right?  Mr. Olins

15   to you?

16   A.  I believe it was.

17   Q.  So it is June 17, he says to you, "I would be most

18   appreciative if this transaction can be completed today from

19   your London office in the amounts indicated below.  The larger

20   balance should be applied to the purchase which has been

21   discussed for some time."  "The purchase" being the wall

22   brackets, right?

23   A.  Yes.

24   Q.  And this, at the time of this transmission is 23:32:16.

25   It's almost midnight, right?

1   A.  Yes.

2   Q.  So does that refresh your recollection that the

3   conversation you had with Mr. Olins, where the discussion was

4   money was going to be applied to his debt, was on June 17,

5   2012.

6   A.  It may have been.  It may have been --

7   Q.  And it -- sorry.  Had you finished your answer?

8   A.  I will leave it as it may have been, yes.

9   Q.  At that point the 210,000 is still what he is requesting,

10  and your decision only to give him 160,000 in cash was after

11  this, right?  Because the amount that's reflected in the e-mail

12  of cash is 210,000.

13  A.  Correct.

14  Q.  Now, you never told Mr. Olins that the vases had actually

15  sold for a million three, did you?

16  A.  Not before the court approval, no.

17  Q.  Well, even after court approval, didn't you tell him that

18  it had sold for a million?

19  A.  No.  I said it sold for -- we had a million to distribute

20  between the bank and him.  The bank had agreed 540, so that we

21  could give him 460.

22  Q.  Leaving Mallett 300,000?

23  A.  Correct.

24  Q.  But you told him that it sold for a million.

25  A.  I believe I would have said very clearly to him that it

1    would have been sold so that we had our commission and that we

2    had a million to distribute.

3    Q.  Let me show you what I am marking as Defendant's Exhibit

4    BB --

5    A.  Thank you.

6    Q.  -- and ask you, the top of those is an e-mail from

7    Mr. Olins to you, is that correct?  Actually, it is an e-mail

8    and a response, is that right?

9    A.  Yes.

10   Q.  And the second page -- the first one is dated November 8,

11   2013, and then the second page is an e-mail exchange, November

12   10 and then November 11, is that right?

13   A.  Yes.

14   Q.  There is a reference in there, it says -- asks you would

15   you be available to speak to, at your convenience, two

16   associates who would like to get an understanding of the real

17   values of the pieces in my collection, and you say, that's

18   fine, you will be happy to talk to them, right?

19   A.  Yes.

20   Q.  And then there is a follow-up e-mail, the second page from

21   Mr. Olins, in which he is telling you, I hope you had a nice

22   weekend.  He mentioned a person named Bhavin Shah.  Do you

23   remember that?

24   A.  I do recall that name.

25   Q.  And Mr. Shah was somebody that was interested in purchasing

1    items from the collection, right?

2    A.   Correct.

3    Q.   And the purpose of this e-mail from Mr. Olins to you is to

4    prepare you for a conversation with them, to impress them on

5    how well the items sold by you and Mallett sold, isn't that

6    right?

7    A.   I believe so.

8    Q.   And if you look at item four --

9    A.   Yes.

10   Q.   -- it says, "Christie's estimates versus what Mallett has

11   been able to net to the bank thus far."

12             Do you see that?

13   A.   I do.

14   Q.   And then it shows for the Sevres garnitures, IC --

15   A.   Yes.

16   Q.   -- 600,000 to 900,000.  That's the amount that Christie's

17   had estimated, correct?

18   A.   I believe so.

19   Q.   Versus the 1 million, which is what you had told him they

20   sold for?

21   A.   That is what we were able to net for the bank and Mr. Olins

22   combined, yes.

23   Q.   Without reference to the extra 300 million that you didn't

24   tell Mr. Olins about.

25   A.   300,000.

1    Q.  300,000.  I'm sorry.

2    A.  All of the figures that are on this note number four are, I

3    believe, figures that were net to the bank and did not include

4    Mallett's commission.

5    Q.  Well, even at a million dollars, 300,000 is a lot more than

6    20 percent, isn't it?

7    A.  We took our 20 percent from the gross figure, which was

8    1.3.  20 percent of 1.3, less, I believe, the import duty,

9    about which I am not entirely certain of the sum, would be

10   around the million-dollar mark.

11   Q.  But you didn't tell him that they had sold for a million

12   three.

13   A.  I don't remember so doing.

14   Q.  The government asked you to look at Government Exhibit 108.

15   Do you have that binder with you?

16   A.  Yes, indeed.

17   Q.  Ms. Griswold showed you that yesterday and asked if you had

18   witnessed that being signed, is that right?

19   A.  Yes, indeed.

20   Q.  And you said yes?

21   A.  Yes, I did.

22   Q.  And it is dated June 24, 2013?

23   A.  Yes.

24   Q.  2013, right?

25   A.  Correct.

1   Q.  I'm sorry, it is July 24.

2   A.  July.

3   Q.  July 24.  That's over a year after the transaction, is that

4   right?

5   A.  That is correct.

6   Q.  And isn't it a fact that you had been trying to get

7   Mr. Olins to provide some kind of documentation for this for

8   that entire year?

9   A.  The accounts department wished to have some kind of

10  documentation from Mr. Olins, and I had been asked to get it,

11  yes.

12  Q.  So the accounts department had been pressuring you, and you

13  had been pressuring Mr. Olins, is that right?

14  A.  I had asked Mr. Olins on a number of occasions, I believe,

15  yes.

16  Q.  Let me show you what we are marking as Defendant's Exhibit

17  CC.  Do you recognize that, Mr. Neville?

18  A.  No, I do not.

19  Q.  Well, if you look at the first one, it is an e-mail from

20  you to Michael --

21  A.  I have it, sorry.

22  Q.  Starting on 3155 and over to 3156.

23         That's an e-mail from you to Mr. Osbourne Smyth, is

24  that right?  I'm sorry, Smyth Osbourne.

25  A.  Yes.

```
 1   Q.  It says, "Please see attached, and I hope this will be
 2   sufficient.  Robert is apparently coming in this week.
 3   Sometimes even pigs fly."
 4   A.  Yes.
 5   Q.  Is that to reflect the extent to which you had been working
 6   to try and get him to sign this document?
 7   A.  I wouldn't say it was necessarily that, but Robert didn't
 8   often come in.
 9   Q.  And if you look over on page 3154, there is an e-mail from
10   Mr. Ishaq saying, All we are missing now is a 460,000 invoice
11   for the balance of the vases.
12           Do you see that?
13   A.  Yes.
14   Q.  And then you respond "hence the reference from Henry" --
15   I'm sorry, that's Mr. Smyth Osbourne responding, saying "Robert
16   is coming in this week," being Robert Olins, "to get him to
17   sign an invoice for just that, let's hope."
18   A.  Yes.
19   Q.  And that is what resulted in Exhibit 108.
20   A.  I believe so.
21   Q.  It was not a contemporaneous document where the transaction
22   occurred a year later.
23   A.  Could you rephrase that question or repeat it?
24   Q.  I said, the invoice or the letter that was signed by
25   Mr. Olins took place a year after the transaction.
```

Gcl2oli1                            Neville - Cross

1   A.  Yes, it did.

2   Q.  Now, you had testified on direct examination about a

3   transaction involving certain Swedish globes.  Do you recall

4   that?

5   A.  Yes.

6   Q.  I believe you testified that you lied to Mr. Rusco about

7   that, those globes, as well?

8   A.  Yes, I did.

9   Q.  And you lied to Mr. Olins about them, right?

10  A.  I may have done.

11  Q.  You know you did, didn't you?

12  A.  I may have done.  I don't remember, but I know I lied to

13  Mr. Rusco.

14  Q.  We looked at Government Exhibit 105 the other day.  Do you

15  have that?

16  A.  Yes, I do.

17  Q.  If you look at the second page of that, this is the same

18  series of e-mails.  It has the reference to you going into bat,

19  right?

20  A.  Yes.

21  Q.  It also has some discussion of the globes?

22  A.  Yes.

23  Q.  And it reflects in an April 11 e-mail from Mr. Ishaq --

24  that is the first page over on to the second page -- a

25  calculation reflecting an import duty for those globes, right?

1    A.   Correct.

2    Q.   And it indicates that the globes were sold for 310,000

3    euros, right?

4    A.   Yes.

5    Q.   But that the money had already been received and it was

6    258,262 pounds?

7    A.   Yes.

8    Q.   That's well over 400,000, isn't that right?

9    A.   I don't know at that present exchange rate, no.

10   Q.   In one of your -- do you have Exhibit J, Defendant's

11   Exhibit J.

12           (Pause)

13   Q.   The exhibit is on the screen, Mr. Neville, if you don't

14   have it.

15   A.   Oh, right.   Thank you.

16   Q.   Do you see that?

17   A.   Yes, I do.

18   Q.   In that, you referred to an exchange rate, dollars to

19   pounds, of $1.56 to the pound, is that right?

20   A.   I see that, yes.

21   Q.   That is sometime after this, but it is approximately the

22   same time frame, isn't it?

23   A.   I understand that, yes.

24   Q.   So at $1.56 to the pound --

25           MR. DeVITA:   Actually I also have that.   We can

1    mark -- I'm not sure if I should offer this as an exhibit, if

2    your Honor wants to take judicial notice.  I have an online

3    currency exchange rate.  Should I mark it as an exhibit?

4           THE COURT:  I don't know what you want to do with it

5    or what you would want me to take note of.

6           MR. DeVITA:  It's an exchange rate for -- an online

7    service that provides exchange rates as of a date.

8           THE COURT:  All right.  I am happy to take judicial

9    notice of it, if both parties agree that it is in fact

10   accurate.

11          MS. GRISWOLD:  We have no problem with that.

12   Mr. DeVita sent this to us before --

13          THE COURT:  Ms. Griswold, you have to use the

14   microphone.

15          MS. GRISWOLD:  Sorry, your Honor.

16   BY MR. DeVITA:

17   Q.  I have handed you a currency printout for an online service

18   which reflects that the currency, the 310 pounds that, on the

19   date reflected in the e-mail, which I believe should be on here

20   somewhere --

21          THE COURT:  March 19, 2012.

22   Q.  -- March 19, 2012, is 310 euros translates to $408,286, is

23   that right?

24   A.  Yes.

25   Q.  Now, do you still have the government exhibits there?

1   A.  Yes.

2   Q.  Could you turn to Government Exhibit 201.

3           If you turn to page 5, which is an entry in

4   Mr. Rusco's diary of June 18, 2012 --

5   A.  Yes.

6   Q.  -- it says that you called him on June 18 to let him know

7   the items Mallett would be taking to the show next week at The

8   Masterpiece, correct?

9   A.  Correct.

10  Q.  And in that conversation you told him that you were going

11  to be taking the globes.

12  A.  Yes.

13  Q.  And in fact you had already sold the globes at the

14  Maastricht fair?

15  A.  Yes.

16  Q.  And, then, if you turn to page 6, and the entry for June

17  29, 2012, it says that you reported that you had an interested

18  buyer in the globes and that the client has asked to see -- oh,

19  the client asked to see the dragons, but you told Mr. Rusco on

20  June 29 that you had an interested buyer.

21  A.  Yes.

22  Q.  And that was a lie.

23  A.  Yes.

24  Q.  Because you had already sold them.

25  A.  Yes.

Gc12oli1                        Neville - Cross

1   Q.  And then on June 5, that's on page 7, July 5, I'm sorry,

2   July 5, Mr. Rusco called you, and you confirmed the sale of the

3   globes, which had already taken place some time ago, isn't that

4   right?

5   A.  Correct.

6   Q.  Then we just saw Exhibit J saying that you had, on July

7   5 --

8           MR. DeVITA:  If we could have that up again.

9   Q.  It is on the screen, Defendant's Exhibit J.  It says, "The

10  sum of money owed to the bank will be $210,000, representing

11  $10,000 more than the agreed return, which you kindly

12  communicated before the opening of Masterpiece."

13  A.  Yes.

14  Q.  Now, isn't it a fact that, before the opening of

15  Masterpiece, you had negotiated with Mr. Rusco to reduce the

16  price that he would accept for the globes?

17  A.  I discussed it with him, yes.

18  Q.  And he agreed to take a lower return than you had discussed

19  previously.

20  A.  Correct.

21  Q.  And this negotiation took place after you had already sold

22  the globes for -- or Mallett had already sold the globes for

23  310,000 euros?

24  A.  That's correct.

25  Q.  So knowing you had sold them for far more than even the

Gcl2oli1                         Neville - Cross

1    price that existed before this negotiation, you then negotiated

2    a further discount, isn't that right?

3    A.  Yes.

4    Q.  And you did not discuss any of this with Mr. Olins, did

5    you?

6    A.  No.

7            MR. DeVITA:  I am marking an exhibit, Defendant's

8    Exhibit EE.

9            MS. GRISWOLD:  Is there a DD?

10           MR. DeVITA:  This is EE.

11           MS. GRISWOLD:  Is there a DD.

12           MR. CECUTTI:  The currency converter was DD.

13           MR. DeVITA:  Apparently we had a miscommunication,

14   because we wrote down the currency conversion as DD, even

15   though it was judicial notice.

16           THE COURT:  All right.

17   BY MR. DeVITA:

18   Q.  Let me show you EE, Mr. Neville.  And this is an e-mail at

19   the bottom of the page -- well, it starts with an e-mail from

20   Mr. Rusco to you.  This is on 7/17.

21           Do you see that?

22   A.  Yes.

23   Q.  And it is a July 6, 2012, e-mail to you.

24           It says in the third paragraph of his e-mail, "Also,

25   with regard to the Swedish globes, I received your

1   documentation just a few minutes ago by UPS delivery.  Thank

2   you for your work on the sale of this item.  I will let you

3   know when the wire transfer has been received."

4   A.  Yes.

5   Q.  And then you responded to that, isn't that right?

6   A.  I see that.

7   Q.  And in that response, in the second paragraph, you say,

8   "The money for the Swedish globes has been cleared in our

9   account today."

10  A.  Yes.

11  Q.  That was a lie, right?

12  A.  Yes.

13  Q.  And you knew it was a lie.

14  A.  Yes.

15  Q.  And you did it deliberately to deceive Mr. Rusco?

16  A.  Yes.

17  Q.  And this was part of your regular business, wasn't it, to

18  deceive your clients?

19  A.  No.  But in this instance, I did deceive Mr. Rusco, yes.

20  Q.  And then you say, "We will translate into dollars on Monday

21  and wire you from London.  You should receive it by Wednesday

22  or Thursday at the latest."

23  A.  Yes.

24  Q.  Now, of course the money didn't have to be translated

25  because the money was sitting in Mallett's bank account, wasn't

1    it?

2    A.  In Sterling, yes.

3    Q.  But it had been received, as we saw, in April.

4    A.  That is true.

5    Q.  And between April and July 6 you could easily have had

6    those funds translated, couldn't you?

7    A.  Yes, indeed.

8    Q.  Do you know when the instructions for that transfer

9    actually took place?

10   A.  No, I don't remember that.

11   Q.  Let me show you what I am marking as Defendant's Exhibit

12   FF.

13           THE COURT:  While you do that, let me ask you,

14   Mr. Neville, just that so the record is clear, I take it that

15   Mr. Olins was not involved in the sale of the globes and your

16   deception, if I can call it that, of Mr. Rusco, is that

17   correct.

18           THE WITNESS:  No, he was not.

19           THE COURT:  And why did you do this?

20           THE WITNESS:  Because I had forgotten to process a

21   sale at the original time, and I was very embarrassed when I

22   recognized that I had done so, and created this story around

23   the next subsequent exhibition at which I could sell these

24   globes.

25           THE COURT:  Okay.

Gcl2oli1                    Neville – Cross

1    BY MR. DeVITA:

2    Q.  But you didn't tell Mr. Rusco the actual price that you

3    realized.

4    A.  No.  I mistook that price.

5    Q.  I'm sorry?

6    A.  I mistook the price.

7    Q.  You mistook the price?

8    A.  Yes.  On our sales computer log from the finance department

9    in London, the sale was wrongly registered at a sale price of,

10   I believe, $290,000, and it was that sum that I took as the

11   sales price, not remembering the correct sale price of 310,000

12   euros.

13   Q.  Mr. Neville --

14   A.  Yes, yes.

15   Q.  -- between April and when the Masterpiece fair was, you

16   negotiated a price reduction.

17   A.  Just before or just during the Masterpiece fair, yes.

18   Q.  Yes.

19          And you had available to you all of the records of

20   Mallett, correct?

21   A.  Yes, I did.

22   Q.  And, so, in negotiating the reduced price, you are

23   telling us that you did not even check to see how much they

24   sold for?

25   A.  I checked the screen entry for the sale and the sale log,

Gcl2oli1                    Neville – Cross

1   and it registered $290,000.  That is the sum I took, and it was

2   wrong.  I did have access to information which would have

3   corrected me, and I did not.

4   Q.  Let me show you again or ask you to look again at

5   Defendant's Exhibit K.

6   A.  I don't believe I have it, sir.

7           THE COURT:  I think it is on the screen.

8           THE WITNESS:  Oh, I'm sorry.  Thank you.

9   Q.  Clearly that is an internal e-mail from --

10  A.  It is very clear, yes.

11  Q.  And you got a copy of that?

12  A.  No, I would not have done.  However, I did have access to

13  information which would have shown me the correct price, and I

14  did not access that information nor did I go back through my

15  e-mails to check it.

16  Q.  Well, Mr. Neville, let's go back to Government Exhibit

17  105.

18  A.  Yes.

19  Q.  And that is an e-mail to you at the top page from Michael

20  Smyth Osbourne in April of 2012.  It says, "Sorry.  You asked

21  for this last week.  Here is the level of import duty payable

22  on the globes.

23  A.  Correct.

24  Q.  So that's an e-mail to you transmitting the earlier e-mail

25  from Mr. Ishaq, right?

1   A.  Yes.

2   Q.  And the earlier e-mail from Mr. Ishaq says, "Ooops, sorry

3   about that."  And then it says, "It depends" -- and this is

4   talking about the duty, level of duty on the globes.

5   A.  Yes.

6   Q.  "It depends on whether the invoice is raised in sterling or

7   euros"?

8   A.  Yes.

9   Q.  "If it is done in euros at 310 euros, then it will be

10  15,500 euros converted to Sterling at the HMRC rate," and then

11  the next one says, "If it's done in the amount we received,

12  258,262 pounds," which we agree translated to about $408,000?

13  A.  Correct.

14  Q.  You received this e-mail.

15  A.  Yes, I did.

16  Q.  You in fact had asked for that information.

17  A.  Yes, I had.

18  Q.  And you are saying that between April 17 and the beginning

19  of Masterpiece you forgot?

20  A.  I did not go back, as I said, and check my e-mails.  I did

21  have access to this information.  I did not go back and check

22  it.

23  Q.  Not only did you have access to this information, you had

24  this e-mail telling you exactly what it was sold for, right?

25  A.  Yes, I did.

Gcl2oli1                           Neville - Cross

```
 1    Q.  And you had received it and asked for the information,
 2    right?
 3    A.  Yes, I had.
 4    Q.  And between April and the beginning of June you, forgot?
 5    A.  Yes.
 6    Q.  You had forgotten that the globes had been sold for 310,000
 7    euros?
 8    A.  Yes.  And when I went to check the screen for the sales
 9    price, the dollar price was listed at $290,000, and I took that
10    as the sales price, which was incorrect.
11    Q.  And you forgot the e-mail that you had received in April?
12    A.  Yes, sir, and I did not go back to check it.
13    Q.  Now, you understood that the letter that you sent -- or
14    that Mr. Rusco was making an application to the court for
15    approval of the prices of the items to be sold at Masterpiece,
16    right?
17    A.  Yes.
18    Q.  And he send you a copy of that, right?
19    A.  He sent me a copy of the new prices that he had agreed,
20    yes.
21    Q.  And I think we have seen that as an exhibit, didn't we?
22              You knew that he was applying to the court in order to
23    get permission for you to take the globes, which had already
24    been sold, to Masterpiece to sell, right?
25    A.  Yes, sir.
```

1   Q.  And you are saying that you forgot that they were already

2   sold for 310 euros?

3   A.  I forgot they were already sold for 310,000 euros.  I knew

4   that they had already been sold.

5   Q.  And you had no intention of inflating the receipts of

6   Mallett?

7   A.  I did not intend deliberately to inflate the receipts of

8   Mallett, no.

9        THE COURT:  At what point did you realize that there

10  was a discrepancy between the price that you reported to Rusco

11  and the price that you actually had sold them for?

12       THE WITNESS:  When I got the documents from the

13  government about this case and there was a document saying that

14  we had overinvoiced -- underinvoiced the bank.

15  BY MR. DeVITA:

16  Q.  Mr. Neville, I am going to ask you some questions about the

17  dragon candelabra.

18  A.  Indeed.

19  Q.  You knew at the time that Mr. Jaeger was going to be buying

20  them --

21  A.  Yes.

22  Q.  -- that they were going to be consigned to Mallett.

23  A.  I was told by Mr. Rusco, yes.

24  Q.  You had earlier had a transaction or possible transaction

25  for the sale -- drawing your attention, it is in 2012 and

1   sometime in May or June of 2012, you had a possible buyer, is

2   that right?

3   A.  That is correct.

4   Q.  And what was the buyer prepared to pay at that point or

5   discussing?

6   A.  I don't remember if we had finally agreed a price; however,

7   it was around the -- I don't know if it was around the

8   million-dollar mark, but the client couldn't get there.

9   Q.  But you did tell Mr. Olins and Mr. Rusco about that

10  client?

11  A.  Yes, indeed.

12  Q.  Was it the same client that ultimately wound up purchasing

13  the --

14  A.  Yes, it was.

15  Q.  Now, do you have Exhibit N there?

16  A.  I don't believe I do, sir, no.

17          MR. DeVITA:  May I have a moment?

18  Q.  I am going to hand you a copy of Defendant's Exhibit N.

19  A.  Thank you very much.

20  Q.  The sales price for the globes --

21  A.  The candelabra.

22  Q.  Sorry, the candelabra, thank you.

23          It took some time to accomplish that sale, is that

24  right?

25  A.  Yes, it did.

Gcl2oli1                            Neville - Cross

1    Q.  And it involved some friction between yourself and

2    Mr. Jaeger?

3    A.  That is true.

4    Q.  A lot of friction?

5    A.  I felt it was a lot, yes.

6    Q.  And you asked Mr. Olins to be the intermediary between you

7    and Mr. Jaeger, is that right?

8    A.  Yes, I did.

9            THE COURT:  Mr. DeVita, just so I am not confused,

10   because, with all due respect, your handwriting isn't the best

11   I have seen --

12           MR. DeVITA:  I confess, your Honor.

13           THE COURT:  Is Exhibit N the November 8 --

14           MR. DeVITA:  Yes.

15           THE COURT:  Very good.  You may proceed.

16   BY MR. DeVITA:

17   Q.  The globes were sold -- I'm sorry, the dragon candelabra

18   was sold for $800,000 cash and some property, some tables, I

19   believe it is, in return, is that correct?

20   A.  Indeed.

21   Q.  And of that $800,000, $197,000 was applied to Mr. Olins'

22   debt on the wall brackets, right?

23   A.  Correct.

24   Q.  And Mr. Jaeger was aware of that, wasn't he?

25   A.  I believed he was, yes.

1   Q.  In fact, that was discussed in front of Mr. Jaeger, wasn't

2   it?

3   A.  I believed it had been, but the actual sum of money had not

4   been disclosed, merely the idea that Mr. Olins would

5   participate in the financial sale in some way.

6             THE COURT:  Hold on.  Just to be clear and flesh that

7   out, was there a conversation in --

8             THE WITNESS:  In Mallett.

9             THE COURT:  But involving Mr. Olins and Mr. Jaeger?

10            THE WITNESS:  I believed it was, yes.

11            THE COURT:  And do you recall whether there was

12  discussion of what the portion going -- hold on one second --

13  what the portion going to Mr. Olins would go to, whether it

14  would go to the wall brackets or be given to him in cash or go

15  to the bank?

16            THE WITNESS:  It would be given to him as part of the

17  wall brackets.

18            THE COURT:  Okay.

19  BY MR. DeVITA:

20  Q.  And Mr. Jaeger had come to you to talk about the wall

21  brackets at some point?

22  A.  The wall -- I don't recall a conversation about the wall

23  brackets with Mr. Jaeger, no.

24  Q.  But you did talk about how the money was to be used.

25  A.  I believe it was discussed in front of Mr. Jaeger that it

1   would go to reducing Mr. Olins' debt with us.

2   Q.  Okay.  If you look at Exhibit N --

3   A.  Yes, indeed.

4   Q.  -- it starts with an e-mail from you -- I'm sorry, from

5   Mr. Jaeger to you asking you when -- asking you -- thanking you

6   for all your hard work.  Please wire $603,000.  Correct?  Do

7   you see that?

8   A.  I see that, yes.

9   Q.  Does that refresh your recollection that Mr. Jaeger was

10  aware of the amount being attributed to Mr. Olins?  Because he

11  knew the price was $800,000, didn't he?

12  A.  I believe he knew the price was $800,000, indeed.  Counsel,

13  if I may say, I -- we sent him an invoice for $800,000

14  originally.

15  Q.  Yes.  I will come to that.

16  A.  Sorry.

17  Q.  If you look, it says -- he sent you paperwork about where

18  to wire the $603,000?

19  A.  Indeed, that's true, yes.

20  Q.  And then on the next page, it says at the top -- his

21  November 8 e-mail to you, "Thank you.  The bill of sale for the

22  dragon candelabras will be for $603,000 for reporting purposes,

23  correct?"

24  A.  Yes.

25  Q.  And that was before the invoices were issued, right?

Gcl2oli1                    Neville - Cross

```
1    A.  It was before the final sale invoice was issued, yes.

2    Q.  And you responded to him, yes, that is correct.

3    A.  Yes.

4    Q.  Meaning that the invoice would be issued for $603,000.

5    A.  Correct.

6    Q.  And also, if I could draw your attention a little earlier

7    down the page or lower down the page, your November 8 e-mail of

8    12:04 p.m. it says, "The paperwork is coming in from London and

9    should be with us on Monday, and I will walk it up to 88th

10   Street as soon as we receive it here in the gallery."

11   A.  Yes.

12   Q.  Did you in fact walk it up to him?

13   A.  I personally didn't, but I believe -- I believe I remember

14   that our driver took it up to his apartment.

15   Q.  Okay.

16           MR. DeVITA:  I am not sure, but I believe -- I have an

17   exhibit that I believe we marked yesterday, but just for the

18   sake of clarity, your Honor, I would like to -- because I

19   didn't have copies of it at the time -- mark again a November

20   14, 2013, document that was shown to Mr. Jaeger, I believe.  I

21   will show it to your Honor.

22           (Pause)

23           MR. DeVITA:  I think we may not have offered this

24   entire exhibit yesterday, your Honor, I would like to offer it

25   now as a new exhibit, Exhibit FF.
```

Gcl2oli1                    Neville - Cross

1    BY MR. DeVITA:

2    Q.  Exhibit FF, the top page of the exhibit is a letter over

3    your signature, right?  There is no signature, but your

4    name --

5    A.  Yes.

6    Q.  -- on Mallett.

7            That reflects the purchase price or sale price, sale

8    price, of the candelabra, $800,000, correct?

9    A.  Indeed, it does, yes.

10   Q.  It also refers to an additional credit of $50,000 to be

11   used by Mr. Jaeger in the -- for a future purchase at Mallett,

12   correct?

13   A.  Correct.

14   Q.  And the second page of the exhibit is an actual credit note

15   for $800,000.

16   A.  Yes.

17   Q.  It is dated November 14, is that right?

18   A.  Correct.

19   Q.  Which is several days after the e-mail that we were just

20   looking at.

21   A.  Yes.

22   Q.  Which was, I think, November 8.

23           So this invoice was issued after the e-mail exchange

24   with Mr. Jaeger, isn't that right?

25   A.  I understand that.

1    Q.  Is that correct?

2    A.  Yes.  It looks correct to me.

3    Q.  Did that result in some discussion?

4    A.  It did.

5    Q.  Let me show you a document that I am marking as GG,

6    Defendant's Exhibit GG.

7            THE COURT:  While you do that, is there a reason that

8    the $50,000 store credit is not reflected in the invoice, the

9    credit note?

10           THE WITNESS:  The actual sale agreement was $80,000,

11   sir, your Honor, but the reason 50,000 is that it wasn't at

12   that moment applied and it would have been booked when he made

13   purchases subsequently, but we wouldn't have applied it on the

14   actual credit note.  We would have applied it when he came into

15   the gallery and made the purchases.

16           THE COURT:  And you had some internal record of that,

17   I assume.

18           THE WITNESS:  Yes.  The London office should have done

19   or would have done.

20           THE COURT:  Okay.

21   BY MR. DeVITA:

22   Q.  But also Mr. Jaeger's e-mail, Defendant's Exhibit N,

23   specifically asks that the bill of sale be for $603,000, thus,

24   not including the --

25   A.  Correct.

Gcl2oli1                           Neville – Cross

1   Q.  -- credit and not including the amount of money that went

2   to --

3   A.  Correct.

4   Q.  -- the debt of Mr. Olins.

5   A.  Correct.

6   Q.  I am showing you Defendant's Exhibit GG.

7   A.  Thank you.

8   Q.  It is an e-mail.  It starts out as an e-mail from Mr. Olins

9   to you saying, "I believe this bill of sale was done

10  incorrectly?" That's a reference to -- this is dated November

11  15, isn't that right?

12  A.  I see that.

13  Q.  And that is the day after the $800,000 invoice.

14  A.  I see that, yes.

15  Q.  And several days after the November 8, the week after the

16  November 8 --

17  A.  Correct.

18  Q.  -- e-mail.

19          And you say -- so is this the first that you learned

20  that there was a problem with the invoice to Mr. Jaeger?

21  A.  I believe it was, yes.

22  Q.  And then you respond -- this was on the weekend, right?

23  A.  Yes, I can see that from my subsequent e-mail.

24  Q.  Okay.  And it says that -- you respond to Mr. Olins, "If

25  Monday is all right, I am happy to talk about the possible

1    incorrectness of the invoice then."  Is that right?

2    A.  Yes.

3    Q.  So Mr. Olins is the one that told you about the incorrect

4    invoice.

5    A.  Indeed.

6    Q.  And then you arranged for the invoice to be corrected,

7    isn't that right?

8    A.  I believe I did, yes.

9            THE COURT:  And the correction here is to change it

10   from 800 to 603, is that right?

11           THE WITNESS:  I believe that is the case, your Honor,

12   yes.

13           THE COURT:  And by "correction," I mean that actually

14   is not the price that it was sold for, is that correct?

15           THE WITNESS:  Which is why I issued the invoice at

16   $800,000, correct.

17           THE COURT:  And why did you agree to change it to

18   $603,000?

19           THE WITNESS:  Because, as I understood it, your Honor,

20   that was for Mr. Jaeger's reporting purposes, so that he only

21   had a record of the monies that he actually received.

22           THE COURT:  Okay.

23   BY MR. DeVITA:

24   Q.  Showing you Exhibit HH, Mr. Neville.  Is that the corrected

25   invoice?

Gcl2oli1                    Neville - Cross

1   A.  That is the corrected invoice.

2   Q.  And is that the correct date on which the invoice was

3   issued, November 19?

4   A.  It looks like it, yes, it does.

5   Q.  And this is now the invoice to Mr. Jaeger for $603,000?

6   A.  Correct.

7   Q.  Let me hand you what's been marked as Exhibit II.

8   A.  Thank you.

9   Q.  This is a series of e-mails between Mallett and Mr. Jaeger,

10  isn't that right?

11  A.  Yes.

12  Q.  And the first one on page 3374 is from Ana Gutierrez Folch.

13  She is your assistant?

14  A.  Yes, indeed.

15  Q.  And this is on November 19 to Mr. Jaeger asking for

16  instructions on the $603,000 wire, right?

17  A.  I see that.

18  Q.  And then Mr. Jaeger responds on November 19 with

19  information?  I'm sorry, it's your wire instruction.

20  A.  Yes.

21  Q.  From redacted.  Okay.

22          In any event, that refreshes or confirms the timing

23  that we are talking about --

24  A.  Yes.

25  Q.  -- with respect to the issuance of the invoices, does it

1    not?

2    A.  It does, indeed, yes.

3    Q.  Now, I want to ask you about the transaction in which you

4    sold the candelabra.

5    A.  Yes.

6    Q.  Was there a dealer involved on the other side?

7    A.  There was a client's agent, yes.

8    Q.  By the way, let me ask you to look at Exhibit JJ, if I

9    could.

10          This is an e-mail from you to Mr. Olins, is that

11   correct?

12   A.  Yes.

13   Q.  And it refers to a delay in the receipt of the cash part of

14   this transaction, isn't that right?

15   A.  Yes.

16   Q.  And it says, "As last time with the boule chandelier, our

17   European clients have not wired the money quite as efficiently

18   as they had promised."

19          Do you see that?

20   A.  I do.

21   Q.  Was the person that was involved as the agent on the other

22   side of this transaction the same agent as was involved in your

23   sale of the boule chandelier?

24   A.  Yes, it was.

25   Q.  Who was that?

1    A.  It was a company called Gurr Johns, G-U-R-R J-O-H-N-S.

2    Q.  And was there a specific person there?

3    A.  Yes, there was.

4    Q.  What was that person's name?

5    A.  Harry Smith.

6    Q.  Harry Smith?

7    A.  Harry Smith.

8    Q.  I am going to show you what I am marking as Defendant's

9    Exhibit II.

10           THE COURT:  I think you are up to KK.

11           MR. DeVITA:  I'm sorry, KK, just a natural aversion to

12   KKs.

13           THE COURT:  As long as you don't have a third, I think

14   we are okay.

15           Mr. DeVita for our planning purposes, do you have an

16   estimate on your remaining cross?  Among other things, we have

17   only one court reporter today, so I want to be sensitive to her

18   needs.

19           MR. DeVITA:  I hope to be able to complete in a half

20   hour or 45 minutes.

21           THE COURT:  All right.  So why don't we take a break

22   in a couple of minutes, so when you reach a natural break

23   point, tell me.

24           MR. DeVITA:  That's fine.  Yes, your Honor.

25

1    Q.  This is KK.  This is an e-mail between you and Mr. Smith.

2    This is the lower one, the earlier one, November 11, 2013,

3    informing him that you sorted out the issues over the $50,000

4    with the owners of the dragon candelabra, and informing him

5    that "they have agreed to accept the credit here in the shop,

6    which at least prevents us from having to write a check,

7    although it does leave the deal feeling very skitty."

8            Do you see that?

9    A.  Yes.

10   Q.  And his response is, "That's good.  Purchase candelabra

11   $950,000, less pair of tables $150,000, balance $800,000,"

12   correct?

13   A.  Yes.

14   Q.  So that reflects the $800,000 cash and the value that he

15   put on, and you agreed on, for those tables, is that right?

16   A.  That is true.

17   Q.  Okay.

18            THE COURT:  And is this with Mr. Smith?

19            THE WITNESS:  I believe it is with Mr. Smith.

20   BY MR. DeVITA:

21   Q.  Did that valuation change, the valuation of those chairs,

22   I'm sorry, tables?

23   A.  The tables.

24            I don't know if the tables changed in value because

25   the tables were in London.  They may very well have been put in

1   at a different price by the London team.

2   Q.  Were you involved in the decision --

3   A.  No, not at all.

4   Q.  Not at all.

5   A.  I would not have been involved of the pricing of goods in

6   London, no.

7   Q.  So you had no input in the decision about how those tables

8   would be valued, is that your testimony?

9   A.  I would not -- I would not have --

10  Q.  I didn't ask you what you would have done.  I asked you

11  what you did do.

12  A.  I don't remember having any input into the valuation of the

13  tables in London.

14  Q.  Let me show you what's been marked as Defendant's Exhibit

15  LL.

16          Do you recognize that series of e-mails, Mr. Neville?

17  Take your time.

18  A.  I don't remember it, but I do see that it is me who wrote

19  them.

20  Q.  Okay.  Let's take the first e-mail.  That is from

21  Mr. Smith?

22  A.  Yes, Mr. --

23  Q.  Party three is the purchaser of the -- the representative

24  for the purchaser of the dragons, correct?

25  A.  Correct.

Gcl2oli1                        Neville - Cross

1   Q.  So it says, "Deal seems to me as follows:  Pair candelabra

2   $1,600,000, less discount 400,000, net 1,200,000."

3           Now, that's an increase from the 950,000 that we saw

4   on the earlier e-mail, right?

5   A.  Yes, indeed.

6   Q.  And it says, "Less value of tables, 400,000."  Do you see

7   that?

8   A.  Yes.

9   Q.  And that's an increase of $150,000 -- of $250,000 on the

10  value of those tables, isn't that right?

11  A.  Correct.

12  Q.  And total of 250,000 more reflected on this transaction,

13  correct?

14  A.  For the client, correct, yes.

15  Q.  And then you forward that on to Mr. Smyth Osbourne, isn't

16  that right?

17  A.  I see that, yes.

18  Q.  And it says, "So what do you think of this?  It is my

19  belief that party three" -- meaning the other Mr. Smith,

20  right?

21  A.  Yes.

22  Q.  -- "wants the total deal to be higher now so that he can

23  charge commission to his clients on both ends of the

24  transaction, the sale and the purchase, and his percentage,

25  thereby gaining more dollars, just as he achieved with the

1    chandeliers deal."

2            Do you see that?

3    A.  I do.

4    Q.  So you are suggesting to Mr. Smyth Osbourne that you help

5    the other Mr. Smith defraud his client, correct?

6    A.  No, not entirely correct.  Mr. Smith was asking us to take

7    back the two tables at the price his clients paid for them,

8    which was on their records, rather than at the price we valued

9    them previously, 150.

10   Q.  You testified just a moment ago you had no input on the

11   valuation of the --

12   A.  I don't remember having any input on the valuation that

13   London put on the tables, no.

14   Q.  But you have input right here on what the deal is going to

15   be reflected on the invoices in order to increase the dollars

16   to Mr. Smith, right?

17   A.  Yes, indeed.

18   Q.  By fooling his client as to the amount of the actual deal,

19   isn't that right?

20   A.  I don't see it that way because the client purchased the

21   tables at 400,000, and Mr. Smith wanted the client's receipt to

22   reflect their purchase price of the tables, not their

23   present-day value of the tables.

24   Q.  You have no documentation that shows what the client, his

25   client purchased those tables for, do you?

1  A.  I don't, I don't in front of me, but Mallett did.  We sold

2  the tables to the client.

3  Q.  It says that "it is my belief that party three wants the

4  total deal to be higher now so that he can charge commission to

5  his clients on both ends of the transactions."

6        That's what you said to Mr. Smyth Osbourne, right?

7  A.  It was my belief, yes.

8  Q.  "The sale and the purchase at his percentage thereby

9  gaining more dollars just as he achieved with the chandelier

10 deal."  Meaning --

11 A.  Yes.

12 Q.  -- he is getting a higher commission, right?

13 A.  Yes, yes.

14 Q.  And he is fooling his clients, right?

15 A.  That was my belief.

16 Q.  All right.

17        THE COURT:  Can you explain what the $400,000 discount

18 is reflected on page two of this?

19        THE WITNESS:  All of our list prices are negotiated.

20 Nobody comes in to an antiques dealer and pays the ticket

21 price.  Nearly always the discount is 20 or 30 percent from

22 that list price.

23        THE COURT:  So here the candelabra list price would

24 have been 1.6 million.

25        THE WITNESS:  And then we took 400,000 off.

Gcl2oli1                        Neville - Cross

1          THE COURT:  How do you square that with the prior

2    e-mail in which the purchase says purchase candelabra 950,000?

3    It increased by 650,000 over the course of a week.

4          THE WITNESS:  Well, it hasn't, if you look at the

5    tables.  The cash payment is still $800,000.  Harry Smith was

6    just trying to square the equation to get to 800,000 in cash

7    for his clients, so that his clients, it looked as if his

8    clients were getting a good deal.

9    BY MR. DeVITA:

10   Q.  Again, helping deceive his clients.

11   A.  I don't like the word "deceive" because in many ways the

12   end result is the same.  They are paying 800,000 and not -- and

13   giving us a pair of tables.

14   Q.  But they are paying a higher commission to Mr. Smith?

15   A.  They may have.  I cannot say what they did.

16   Q.  Well, that's what you said to Mr. Smyth Osbourne?

17   A.  That is what I believed.

18         THE COURT:  And certainly it allowed Mr. Smith to tell

19   his clients that, I got you a better deal.

20         THE WITNESS:  Indeed, sir.  It certainly painted a

21   better picture for Mr. Smith.

22   BY MR. DeVITA:

23   Q.  And then Mr. Smyth Osbourne says to you, "That seems fine

24   to me."

25   A.  Yes.

Gcl2oli1                    Neville - Cross

1   Q.  "We then just need to be able to justify to the auditors a

2   writedown of the tables."  "C" means "about"?

3   A.  100,000.

4   Q.  Yes.

5           So, in other words, you have got, by overvaluing those

6   tables, you then have to convince your auditors to allow you to

7   write down the value of those so you don't have inflated assets

8   on your books.

9   A.  Correct.

10  Q.  In other words, manipulating the figures.

11  A.  I don't see it as manipulating the figures, but yes, that

12  is true, we would write down the costs.

13  Q.  Deceiving your auditors?

14  A.  Not deceiving our auditors.  Reflecting the true value of

15  the tables.

16  Q.  Rather than the false value that you are putting in the

17  invoice?

18  A.  There is a difference between a purchase price and a sales

19  price, and that reflects in these figures.

20  Q.  And then you respond, "Okay.  Thank you.  I leave the

21  writedown to you all"?

22  A.  Yes.

23  Q.  Meaning you are washing your hands and let them convince

24  the auditors of this fraud, right?

25  A.  As I said, I did not have input into the figures.  London

Gcl2oli1                    Neville - Cross

1    put their stock in that.

2    Q.  But you had input into the amount that was put on the

3    invoice, didn't you?

4    A.  I did because that was the purchase price that the clients

5    had paid for the tables.

6              MR. DeVITA:  Marking Exhibit MM.

7              THE COURT:  Just a reminder to tell me when --

8              MR. DeVITA:  A few more minutes, your Honor.  I am

9    almost there at the breaking point.

10   BY MR. DeVITA:

11   Q.  Exhibit MM is an internally generated document reflecting

12   the actual invoice that was issued in connection with the sale

13   of the dragon candelabra?

14   A.  Yes.

15   Q.  And it shows that the invoice was in the amount of

16   $1,200,000?

17   A.  Yes.

18   Q.  And it shows that the value of the side tables taken in

19   trade was inflated to $400,000?

20   A.  It was $400,000, yes.

21   Q.  Well, that's inflated from the 150 that he originally said,

22   right?

23   A.  Correct.

24   Q.  When you made your agreement with the government, did they

25   ask you to tell them about every wrongful fact that you had

1    done while you were at Mallett?

2    A.  I don't remember that question.

3    Q.  Well, did they tell you it was important that you tell them

4    about everything you have done?

5    A.  They told me it was important to tell the truth, yes.

6    Q.  And not to hold anything back.

7    A.  I hope I haven't.

8    Q.  They told you it was important not to hold anything back,

9    correct?

10   A.  I don't remember that exact question, sir.

11   Q.  Well, they asked you a lot about the transaction on the

12   dragon candelabra, didn't they?

13   A.  Yes, they did.

14   Q.  Did you tell them about manipulating the estimate or the

15   value of those tables in order to get a bigger commission for

16   Harry Smith?

17   A.  I told them about the writedown on the value of the tables.

18   Q.  But you told them that was written down because of

19   bookkeeping?

20   A.  I told them it was written down because the value we took

21   them back at was the purchase price by the client and we had to

22   write them down to the value that was present day, yes.

23   Q.  But before you wrote them down, you inflated the value to

24   help Mr. Smith, right?

25   A.  The value that was on the papers at 400,000 was the

Gcl2oli1                          Neville – Cross

1    purchase price by the client.

2    Q.  Mr. Neville, you didn't understand my question.

3    A.  Sorry.

4    Q.  When the original proposal was made, Mr. Smith said to you,

5    Value the tables at $150,000, right?

6    A.  Correct, yes.

7    Q.  He then asked you to increase the value of the tables to

8    $400,000?

9    A.  Correct.

10   Q.  You believed that it was in order to inflate his

11   commission, right?

12   A.  I believed it was, yes.

13   Q.  And you did that.  You and Mr. Smyth Osbourne agreed to

14   inflate the value of those tables.

15   A.  To take the tables back at their purchase price, yes.

16   Q.  Inflate the value.

17   A.  To take the tables back at their purchase price.

18   Q.  You don't like the word "inflate."

19   A.  I don't see it that way, sir.

20   Q.  You don't see it that way.

21   A.  No.

22   Q.  Did you mention this to these prosecutors when they were

23   asking you about what wrong things you did in connection with

24   these transactions?

25   A.  I did, yes.

1    Q.  You did mention that?

2    A.  I said to the prosecutors -- I believe, I am saying, to the

3    prosecutors, that we took the tables back at their purchase

4    price and had to write them down and that was our commission.

5    Q.  That's what you said with respect to the chandelier

6    transaction?

7    A.  It is the same client with the same goods in part exchange,

8    yes.  Or similar, sorry, similar goods in part exchange.

9    Q.  Did you tell them that you believed you were helping

10   Mr. Smith inflate his commission to his client?

11   A.  I did not.

12           MR. DeVITA:  Okay.  Your Honor, this is a good time to

13   break.

14           THE COURT:  All right.  I would very much like to get

15   this all in today, so let's keep the break relatively short,

16   five or so minutes.  And we will pick up there, and obviously

17   the sooner we can bring this all to a close --

18           MR. DeVITA:  I will do the best as I can, your Honor.

19           THE COURT:  The adage if you had more time you would

20   make it shorter didn't prove to be true.

21           MR. DeVITA:  I didn't seem to carry through, your

22   Honor, but I think it will be quicker.

23           THE COURT:  See you in five minutes.

24           (Recess)

25           THE COURT:  Mr. Neville, you remain under oath.

1              THE WITNESS:  Yes.

2              THE COURT:  Mr. DeVita, you may proceed.

3              MR. DeVITA:  Thank you, your Honor.

4    BY MR. DeVITA:

5    Q.  Mr. Neville, you were telling us, I think that the same

6    person, Mr. Harry Smith is it --

7    A.  Correct.

8    Q.  And what was the name of the firm?

9    A.  Gurr Johns.

10   Q.  -- also was involved in the purchase or your sale of the

11   boule chandelier, is that right?

12   A.  Yes.

13   Q.  Let me show you what's been marked as Defendant's Exhibit

14   NN.  This is a series of e-mails between yourself and Mr. Olins

15   relating to the sale of that chandelier, isn't that right?

16   A.  Yes.

17   Q.  And in the e-mail, the first e-mail from Mr. Olins,

18   December 14, 2010, it says, "I just spoke to Greg Rusco.  The

19   question arose as to the value of the items that are proposed

20   to be taken back by Mallett in the transaction."

21              Do you see that?

22   A.  I do.

23   Q.  And then you respond, "We are taking back a pair of

24   chandeliers from the client at $200,000, which represents our

25   commission on the sale of your chandelier."

Gcl2oli1                              Neville - Cross

1    A.  Yes.

2    Q.  So you are also asking Mr. Olins to accept a net of

3    $1,350,000, right?

4    A.  Yes.

5    Q.  And that the chandeliers that you are taking back would

6    represent only 15 percent commission to Mallett.

7    A.  Approximately, yes.

8    Q.  That's what you are saying in this e-mail?

9    A.  Yes.

10   Q.  Now, let me ask you to look at Exhibit D, which was

11   admitted in evidence yesterday.

12   A.  Thank you.

13   Q.  If you turn to the second page, it refers to party three.

14   That's Mr. Smith.  That's the same person that we have been

15   talking about, who also purchased the candelabras, the

16   dragons.

17   A.  Yes.

18   Q.  So this is an invoice issued by Mallett on or about -- it's

19   dated January 20, 2011, right?

20   A.  It is not an invoice.  It is an internal document, yes.

21   Q.  But it's an internal -- the second page is the invoice?

22   A.  Correct.

23   Q.  Okay.  So that reflects the invoice for a total of

24   $2,700,000, right?

25   A.  Correct.

1   Q.  Let me show you OO.  This is an invoice for the same

2   transaction, isn't that right?

3   A.  Correct.

4   Q.  And this is the invoice that went to the purchaser?

5   A.  Correct.

6   Q.  And it reflects, again, the price of 2,700,000?

7   A.  Yes.

8   Q.  And it says, "Payment will be received as $1,450,000 cash"?

9   A.  Yes.

10  Q.  You had told Mr. Olins in your e-mail that there was only

11  $1,350,000 cash, isn't that right?

12  A.  Correct.

13  Q.  So that was a lie.

14  A.  It doesn't take into account the import duty that we had to

15  pay on the chandelier.

16  Q.  You told Mr. Olins that the cash was only $1,350,000,

17  right?

18  A.  To be paid to the bank, yes, because we had to pay an

19  import duty on the chandelier to get it into Europe.

20  Q.  It wasn't being sold into Britain, was it?

21  A.  This was being sold into Europe, yes.

22  Q.  Not Britain.

23  A.  Not England, no.

24  Q.  And you testified -- so the balance of the -- the

25  difference between the 1,450,000 and the 2,700,000 represents

1    the valuation of the --

2    A.   The purchase price for the chandeliers, I believe.

3    Q.   For the chandeliers.  That was the value that was being

4    placed on the chandeliers that were being taken back, is that

5    right?

6    A.   I believe so, yes.

7    Q.   So it wasn't $200,000, it was considerably more, whatever

8    the --

9    A.   Yes, it was considerably more --

10   Q.   -- a million two hundred and fifty thousand more, isn't

11   that right?

12   A.   It's a million two hundred and fifty thousand, yes.

13   Q.   And then they were subsequently written down?

14   A.   Yes, indeed.

15   Q.   But is the reason for, as you indicated in your earlier

16   e-mail to Mr. Smyth Osbourne, the reason for valuing those

17   tables at that $1,250,000 --

18   A.   The chandeliers, yes.

19   Q.   The chandeliers.

20           -- amount was to help Mr. Smith defraud his client,

21   right?

22   A.   I was not involved in these negotiations.  It was Mr. Smyth

23   Osbourne who was involved with these earlier negotiations with

24   Mr. Smith.

25   Q.   But you were aware of it, right?

Gcl2oli1                    Neville - Cross

1    A.  I was aware of them only subsequently.

2    Q.  Okay. but you knew that they were a lot -- worth more than

3    $200,000, which is what you told Mr. --

4    A.  I knew they had been invoiced for a lot more than $200,000.

5    Q.  And you knew they were worth more, right?

6    A.  I did not think so.  Giltwood chandeliers were very

7    difficult to sell and still are today.

8    Q.  These giltwood chandeliers were sold, weren't they?

9    A.  Yes, I believe they were.

10   Q.  Do you know for how much?

11   A.  I don't remember now.

12        MR. DeVITA:  Marking Defendant's Exhibit PP.

13   Q.  Are those the same chandeliers that were part of the

14   trade?

15   A.  Yes, indeed.

16   Q.  And they sold for 350,000 pounds, right?

17   A.  I see that, yes.

18   Q.  That's a good deal more than $200,000, isn't it?

19   A.  Yes, it is.

20   Q.  And do you know as of the date they were sold, which is

21   April of 2014, what the exchange rate would be?

22   A.  No, I don't.

23        MR. DeVITA:  I have another converter, your Honor?

24        THE COURT:  All right.  Why don't we do it as an

25   exhibit since we did last time.  QQ.

1           MR. DeVITA:  So QQ.

2    Q.  That converter reflects that 350,000 pounds on that date

3    translated, converted to $587,853.  Do you see that?

4    A.  I do see that, yes.

5    Q.  So that's a good deal more than the $200,000 that you

6    represented to Mr. Olins was being received back in trade,

7    isn't it?

8    A.  Yes, it is.

9    Q.  Now, it was the chandelier transaction that essentially

10   precipitated Mr. Olins' request for the wall brackets, isn't

11   that right?

12   A.  Sorry, I didn't catch that, sir.

13   Q.  Let me start by this.  Let me show you Defendant's Exhibit

14   RR.  Actually, I'm sorry, I am going to hold off on RR.  I will

15   come back to that.

16           (Pause)

17           MR. DeVITA:  Bear with me a minute, your Honor.

18           (Pause)

19           THE COURT:  Are you almost there?

20           MR. DeVITA:  I am looking, your Honor, if I could have

21   just another moment.

22           (Pause)

23           MR. DeVITA:  Your Honor, this is Exhibit B to my

24   November 29, 2016, submission.  It is a March 14, 2012, e-mail.

25   This is an e-mail from Mr. Smyth Osbourne to Mr. Hutchison and

 1    to others, if I can approach the witness, your Honor.

 2                THE COURT:  You may.  Are you marking this as a new

 3    exhibit for hearing purposes or just showing him this?

 4                MR. DeVITA:  Just showing it to him, your Honor, and I

 5    can admit it if it is necessary.

 6    Q.  But there is a reference in this e-mail that says, "We

 7    have" -- talking about Mr. Olins -- "following the sale of one

 8    of his pieces at the end of 2010 for more than $1 million, he

 9    agreed to purchase a set of wall lights which we had on

10    consignment from someone else for $695,000."

11                Do you see that?

12    A.  I do see that, yes.

13    Q.  Okay.

14                So the purchase that's referring to is -- I'm sorry.

15    The sale that that's referring to is the sale of the

16    chandeliers that we just were looking at, isn't that right, at

17    the end of 2010?

18    A.  Yes.

19    Q.  So it was the sale of the chandelier that led to the

20    purchase of the wall brackets essentially, isn't that right?

21    A.  I did not see it as that, no, sir.  I understand that

22    Mr. Smyth Osbourne wrote that, but that was not my perception.

23    Q.  They were more or less contemporaneous in time?

24    A.  They were contemporaneous in time, yes.

25    Q.  With respect to the sale of the wall brackets, your

1    conversations with -- prior to the beginning of March with

2    Mr. Olins, he had expressed an interest for a long time on

3    those wall brackets, isn't that right?

4    A.  That is correct.

5    Q.  And you knew that he had owned them at one point, didn't

6    you?

7    A.  I didn't know that he had actually owned them.  I knew that

8    he was in the process of trying to acquire them.  I didn't know

9    that they were actually his.

10   Q.  But he was very familiar with them.

11   A.  He was very familiar with them.

12        THE COURT:  There has been testimony about wall

13   brackets and wall lights.  Are they the same?

14        THE WITNESS:  No, they are different, your Honor.

15   However, the wording in quite often confused.

16        MR. DeVITA:  Your Honor, these are wall brackets, just

17   to distinguish what we are talking about, these are the subject

18   of the debt that Mr. Olins incurred on the books.

19        THE COURT:  Since you are not testifying, let me ask

20   Mr. Neville.

21        MR. DeVITA:  Oh, I'm sorry.

22        THE COURT:  Were there wall brackets and wall lights?

23        THE WITNESS:  There were, your Honor.  Mr. Olins owned

24   two wall lights, which we sold to a client here in New York.

25   Mr. Olins purchased from us four carved giltwood wall brackets

Gcl2oli1                        Neville – Cross

1    which were part of his debt to Mallett.

2          THE COURT:  But in this e-mail that Mr. DeVita just

3    showed you from Mr. Smyth Osbourne -- and I understand that you

4    didn't write this e-mail -- but do you understand him to be

5    referring to, when he says "the purchase," "that Mr. Olins

6    agreed to purchase the set of wall lights which we had on

7    consignment from someone else for $695,000," that's actually

8    referencing the wall brackets?

9          THE WITNESS:  Correct, your Honor.

10         THE COURT:  Thank you.

11   BY MR. DeVITA:

12   Q.  And the wall lights had been sold prior to this?

13   A.  Correct, sir.

14   Q.  Let me show you Exhibit RR.  These are minutes from a sales

15   meeting on March 1, 2011, is that right?

16   A.  Yes.

17   Q.  And you were present at that meeting?

18   A.  I was on the telephone for that meeting, yes.

19   Q.  You are listed as participating in the meeting.

20   A.  Yes, that's correct.

21   Q.  Some of the participants were in person, some of them were

22   by telephone, is that right?

23   A.  That is right, sir.

24   Q.  And there was a discussion of -- MSO, what does that stand

25   for?

Gcl2oli1                      Neville – Cross

1   A.  Michael Smyth Osbourne.

2   Q.  And "the figures" refers to the sales figures for the

3   month?

4   A.  Yes.

5   Q.  For the period?

6          And it says that "these figures do not include the

7   sale of the set of brackets from" and this is now

8   Mr. Degardiola I think you testified?

9   A.  Yes.

10  Q.  "to Robert Olins, since we do not have a payment schedule

11  for them yet."

12         So there was no payment schedule agreed upon at this

13  point.

14  A.  No.

15  Q.  It says, "the principal of the sale is confirmed, though

16  payment schedule is not, GHS."  That's who?

17  A.  That's Mr. Hutchison Smith.

18  Q.  The chairman of the firm?

19  A.  The chief executive of the firm.

20  Q.  Chief executive of the firm.

21         "Notes that he would like to include this sale in

22  March.  This is a $695,000 sale for $195,000 profit."

23         Are you familiar with the term "revenue recognition,"

24  the accounting term?

25  A.  I have heard it, but I am not an accountant.

1   Q.  But you understand that, by including this sale and that

2   profit in the records or in the accounting of Mallett, Mallett

3   is putting that into its profit?

4   A.  Yes.

5   Q.  Was there pressure at this time to, shall we say, boost the

6   profits of Mallett?

7   A.  There was always pressure to be as profitable as possible.

8   Q.  And to appear as profitable as possible.

9   A.  If you say so, yes.

10  Q.  Well, my question to you is, did any accountant say that it

11  was a good accounting practice to recognize this sale and that

12  profit without even having a payment plan?

13  A.  Our finance director, Michael Smyth Osbourne, did not

14  question.

15  Q.  Did not question.

16  A.  Did not question.

17  Q.  He just did what he was told.

18  A.  I don't believe that is the case.  He did not do as he was

19  told, no.

20  Q.  Well, he was told to put this on the books as a sale and

21  recognize the profit, right?

22  A.  He was asked to, yes.

23  Q.  He was asked to.

24  A.  I questioned the use of "told" to Michael Smyth Osbourne.

25  Q.  And in fact, an invoice was issued reflecting that as a

1   sale by Mallett, right?

2   A.  Yes.

3           MR. DeVITA:  Marking as Exhibit SS?

4           THE COURT:  That one is unfortunate already.

5           MR. DeVITA:  Very unfortunate.  Unfortunately that's

6   how the alphabet works.

7           THE COURT:  All right.

8           MR. DeVITA:  I think this is part -- or part of this

9   exhibit was previously marked, your Honor.  This is the --

10  marked as a Government Exhibit.

11  BY MR. DeVITA:

12  Q.  This internal document -- this entire document relates to

13  the sale -- recorded sale of those brackets, right?

14  A.  Yes.

15  Q.  And the invoice that's addressed to Mr. Olins indicates a

16  sale at $695,000, right?

17  A.  Correct.

18  Q.  This is an internal document.  That was not sent to

19  Mr. Olins, was it?

20  A.  I believe the invoice was given to Mr. Olins, yes.

21  Q.  By whom?

22  A.  I don't remember, but I do believe he would have had a

23  copy, a top copy of that invoice.

24  Q.  You believe he would have?

25  A.  Yes.

1    Q.  You don't remember?

2    A.  I don't remember now.

3    Q.  You didn't give it to him?

4    A.  I don't believe I gave it to him, no.

5    Q.  But this particular set of documents are internal documents

6    issued by Mallett for its records, right?

7    A.  Yes, indeed.

8    Q.  Okay.

9         Did there come a time when Mallett became concerned

10   about the accounting for that transaction?

11   A.  Yes.

12   Q.  And do you recall participating in a meeting where that was

13   discussed, how to address that was discussed?

14   A.  There were a number of discussions between London and

15   myself concerning Mr. Olins' payment of this invoice.

16        MR. DeVITA:  I'm not sure if we have seen this

17   document before, but I am going to mark it as Exhibit TT.

18   A.  Thank you.

19   Q.  Exhibit TT is a copy of the minutes of a meeting of the

20   board of directors of Mallett, is that right?

21   A.  Yes.

22   Q.  And you were a member of the board of directors, right?

23   A.  Yes.

24   Q.  And a great deal is redacted, but drawing your attention

25   down to the categories of financials and then it says, "It was

1    agreed that the debtor of $695,000 owed by Robert Olins for the

2    purchase of a set of wall brackets in 2010 should be provided

3    against."

4            Do you see that?

5    A.  I do see that.

6    Q.  So that meant that, in accounting terms, a bad debt reserve

7    was established?

8    A.  The sale was written off in the 2011 accounts.

9    Q.  My question to you is whether the -- what was agreed here

10   was the creation of a bad debt reserve on the accounts of

11   Mallett with respect to that debt.

12   A.  I can't answer that accurately as I am not part of the

13   accounting team at Mallett.

14   Q.  But you --

15   A.  My understanding of this was that, in the public company

16   accounts for 2011, this transaction was canceled.

17   Q.  Well, when you say "canceled," it says "provided against."

18   That means it is being made into a bad debt reserve.  You

19   understood that as a member of the board of directors voting on

20   this action, right?

21   A.  I did not understand the wording "bad debt reserve."  The

22   sale was canceled and therefore the figures for 2011 did not

23   reflect the sale of $695,000.

24   Q.  And that reduced the profit?

25   A.  For 2011 it reduced the profit.

Gcl2oli1                          Neville - Cross

1    Q.  Okay.

2           Well, wasn't that a current entry to reflect current

3    profits, the reserve?  It was reserved against, is that your

4    understanding of what was being accomplished?

5    A.  I regret I don't understand the principle "reserved

6    against," no, sir.  It is not an accounting term I have come

7    across.

8    Q.  Okay.  But it also mentions, by the way, on the second

9    page, this is, again, the March 28 board of directors, "The

10   unpaid SEC fine has led the SEC to applying their own lien

11   against" -- "over these assets and serving Mallett, Inc., with

12   a restraining order in August 2011, prohibiting Mallett, Inc.,

13   from selling any of those items it holds on consignment from

14   Robert Olins."

15          Do you see that?

16   A.  I do.

17   Q.  And this was approximately a week before you actually --

18   Mallett actually did sell the vases?

19   A.  Indeed.

20   Q.  And this is the board of directors recognizing that the SEC

21   restraint prevents Mallett from selling any of the items held

22   on consignment from Robert Olins?

23   A.  May I draw your attention to the fact that it only says

24   Mallett, Inc., in this particular instance?

25   Q.  Well, who had the vases on consignment?

1   A.  The vases were in London, on the London premises.

2   Q.  No.  My question to you was, what company had the

3   consignment of the vases?

4   A.  Mallett, Inc.

5   Q.  And this says Mallett, Inc., is prohibited from selling any

6   of the items it holds on consignment.

7   A.  Correct.

8   Q.  But it sold them anyway?

9   A.  Mallett, Inc., did not sell the vases, Mallett Antiques

10  London sold the vases.

11  Q.  What is the relationship between Mallett, Inc., and Mallett

12  London?

13  A.  Mallett, Inc., and Mallett London are two separate trading

14  companies.  They have a common owner in Mallett PLC.

15  Q.  So Mallett PLC owns both.

16  A.  Correct.

17  Q.  So, in your view, it was okay for Mallett London to sell

18  the vases even though Mallett, Inc., had them on consignment?

19  A.  That was not my view.  That was the legal advice that we

20  had been given.

21  Q.  I am going to show you what's been marked as Defendant's

22  Exhibit UU, not to be confused with W, UU.

23       Mr. Neville, this is a copy of the minutes of a board

24  meeting of Mallett Public Limited Company, PLC --

25  A.  Yes.

1  Q.  -- which is the parent company?

2  A.  Yes.

3  Q.  And it says that, "GHS reported that June trading data

4  showed" blank blank "including a 192 pound writeback of part of

5  the Olins' bad debt provision following the repayment by Olins

6  of part of his debt."

7        Do you see that?

8  A.  I do.

9  Q.  So do you understand that the sale had not been canceled,

10 that a bad debt reserve had been set up on the books, and this

11 resulted in a reduction of that bad debt reserve, that is, this

12 relates to the credit Mallett applied against that debt

13 resulting from the sale of the vases, right?

14 A.  I see that.

15 Q.  You understand that, correct?

16 A.  No, I don't understand it, in truth.

17 Q.  Do you know whether this resulted, this 192 pound writeback

18 resulted in an increase of the profits?

19 A.  It resulted in the increase of the profits for 2012, yes.

20 Q.  Let me draw your attention to the next page.  There is a

21 reference there to something called Project Adam.

22 A.  Yes.

23 Q.  What was Project Adam?

24        (Pause)

25 Q.  Let me ask a different question.

1   A.  Do ask a different question, please, yes.

2   Q.  Was Mallett in the process of trying to sell itself at this

3   time?

4   A.  Yes, we were.

5   Q.  And was that what Project Adam was?

6   A.  May well have been.  I don't remember.

7   Q.  So that it was important at this time for Mallett to

8   increase its profits in order to help the sale of the company,

9   isn't that right?

10  A.  No more important than any other year to show profits for

11  our shareholders, I wouldn't have thought.

12  Q.  Well, wasn't it important, to make Mallett an attractive

13  purchase, to have Mallett's profits increased?

14  A.  It was always important to try and increase the company's

15  profits.

16  Q.  And isn't that part of the reason why pressure was put on

17  Mr. Olins for part of the receipts from the sale of the vases

18  to be applied against his debt, because the debt, the bad debt

19  was reducing profits?

20  A.  The bad debt did not reduce any profits in 2012.  The bad

21  debt was written off in the public company's accounts in 2011.

22  Q.  Mr. Olins --

23  A.  Neville.

24  Q.  I'm sorry.

25          Mr. Neville, it says that "GHS reported that June

1    trading to date showed" something "including 192,000 pound

2    writeback, a part of Olins' bad debt provision."  That means it

3    increased, that writeback increased the profits for 2012,

4    right?

5    A.  It increased the profits for 2012, yes.

6    Q.  At the time when Mallett was trying to sell itself, right?

7    A.  Yes.

8           MR. DeVITA:  Your Honor, I am drawing to a close, you

9    will be happy to hear.

10          THE COURT:  I am happy to hear that.

11   BY MR. DeVITA:

12   Q.  Now, yesterday you were testifying on direct examination

13   about Mr. Olins -- I think you have told the government that

14   Mr. Olins was purchasing an apartment in Spain?

15   A.  That was my understanding.

16   Q.  Well, isn't it a fact that he was trying to rent an

17   apartment in Spain that you were helping with?

18   A.  I believed he was living in a rented apartment, and he was

19   looking to purchase an apartment.

20   Q.  Let me show you what is marked as Defendant's Exhibit WW.

21          Now, you had mentioned that some person that Mallett

22   used for its property was helping with Mr. Olins trying to set

23   up his apartment in Spain, right?

24   A.  Correct, yes.

25   Q.  And that's a reference -- that's what's referred to in the

1    first e-mail on the page ending 4078.  Do you see that?

2    A.   4078.

3    Q.   That's the second page of the exhibit.

4    A.   I am watching it, yes, it is.

5    Q.   That is an effort by the person that you had referred him

6    to to try enlist your aid in getting Mr. Neville to pay a fee

7    of 150 -- I'm sorry, 1500 euros -- or at least 500 euros in

8    connection with that apartment, isn't that right?

9    A.   I see that, yes.

10   Q.   And then you forwarded that on to Mr. Neville?

11   A.   Olins.

12   Q.   Mr. Olins, right?

13   A.   Yes, I did.

14   Q.   Then Mr. Olins responded to you on -- the date of it, it

15   says, 1/11, but I believe that is a reversal.  The month comes

16   second.  Is that right?

17   A.   It would appear so, yes.

18   Q.   So it is -- he is reporting to you that he is still delayed

19   with "my move to the apartment at Plaza del Cordone because of

20   continuing disagreements with the landlady," correct?

21   A.   I see that.

22   Q.   And this is the apartment that you had referred someone to

23   help him with, right?

24   A.   It appears so, yes.

25   Q.   And it says, "The landlady has refused to put in a buzzer

Gcl2oli1                        Neville - Cross

1   security system, and I have refused to move in without one.  I

2   even offered recently to pay for the system and get reimbursed

3   from the next rent payment."

4           Do you see that?

5   A.  I do see that.

6   Q.  Does that refresh your recollection that he was planning to

7   rent an apartment in Spain?

8   A.  He had expressed to me a wish to acquire an apartment in

9   Spain and that he was living in a rented apartment, and I now

10  see that the Plaza del Cordone apartment was going to be for

11  rent.

12  Q.  And you know he never moved into the rental apartment,

13  isn't that right?

14  A.  I don't know, but it looks like it from this e-mail.

15  Q.  Well, you knew he never moved to Spain, right?

16  A.  That is correct.

17          MR. DeVITA:  We are up to X, right?

18          MR. CECUTTI:  Yes.

19          MR. DeVITA:  I am going to mark as Exhibit XX a series

20  of e-mails between you and Mr. Olins.

21  Q.  You are aware, are you not, Mr. Neville, that one of the

22  reasons why Mr. Olins didn't move to Spain is because of health

23  problems that his mother suffered, isn't that right?

24  A.  I believe that could be the case, yes, indeed.

25          Thank you.

321

Gcl2oli1                    Neville - Cross

1    Q.  And the first e-mail, dated December 20, this is shortly

2    after your e-mail exchange that we just saw, right?  It is

3    about a month later?  Talking about the problems with the

4    apartment?

5    A.  I see that.

6    Q.  Okay.

7             It says, "My mother is back in the hospital with

8    pneumonia.  Unless there is a dramatic improvement today, I

9    will not be able to get to New York tomorrow."

10            Do you see that?

11   A.  Yes, I do.

12   Q.  And then, shortly after that, he sent you a letter, an

13   e-mail, that says, "The past two weeks have been hell here.

14   First the ruptured colon leading" -- this is talking about his

15   mother, isn't that right?

16   A.  I believe it is, yes, indeed.

17   Q.  "First the ruptured colon leading to sepsis and a

18   colostomy, then double pneumonia with a blood clot in her lung,

19   then internal bleeding caused by the heparin to treat the blood

20   test.  When the heparin was stopped, she had a stroke.  Then

21   the brilliant doctors decided to put her on a drug called

22   Haldol, an antipsychotic, this to keep an 82-year-old woman

23   quiet.  The Haldol almost killed her.  It put her in a

24   vegetative state for five days.  I demanded that she be taken

25   off that drug and got kickback from the medical team.  Three

Gcl2oli1

1    days after being off this terrible drug, she came back to life

2    today.  All is well for the moment except for serious kidney

3    issues.  She is eating for the first time in two weeks.  Two

4    weeks being on a feeding tube.  Bottom line, don't get old" --

5    I second that -- "in the alternative, don't get sick."

6            This is by way of explanation for his not being able

7    to meet with you, right?

8    A.  Yes.

9    Q.  And also you understand that that is why he never moved to

10   Spain, right?

11   A.  I do understand that now, yes.

12           MR. DeVITA:  No further questions, your Honor.

13           THE COURT:  All right.  I have a few questions before

14   redirect.

15           First, in this same e-mail, just looking at it, it

16   continues that "I haven't done anything about business or other

17   issues," and then, in parentheses, it says "brackets."

18           What was that a reference to, as you understand it?

19           THE WITNESS:  I don't know, sir, your Honor.  I don't

20   know.

21           THE COURT:  All right.

22           Second, sticking to "brackets," just to clarify, when,

23   in your view, was the sale of the brackets to Mr. Olins?  And

24   by "sale," I mean the agreement.

25           THE WITNESS:  In -- two or three weeks before the

Gcl2oli1

```
 1   invoice, sir.  Two or three weeks before the invoice, so that

 2   would have been in February 2011.

 3             THE COURT:  So earlier you saw that e-mail from

 4   Mr. Smyth Osbourne in which he talked about the transaction

 5   involving the chandelier in 2010.

 6             THE WITNESS:  Correct.

 7             THE COURT:  And when was that transaction?

 8             THE WITNESS:  That was in late 2010, December 2010.

 9             THE COURT:  Switching gears to the candelabra, the

10   $50,000 credit, store credit that was given to Mr. Jaeger, was

11   that always to be part of the sale price, always to be part of

12   the deal from the beginning, or was that a product of some

13   additional negotiation?

14             THE WITNESS:  That was a product of additional

15   negotiation when I was not able to obtain the full 950,000 in

16   cash as agreed.

17             THE COURT:  Can you tell me how that came about, in

18   other words, who you negotiated that with.

19             THE WITNESS:  With Mr. Olins.

20             THE COURT:  So not with Mr. Jaeger.

21             THE WITNESS:  No, your Honor.

22             THE COURT:  And over what period of time was that.

23             THE WITNESS:  A few days, I believe, on the telephone.

24             THE COURT:  And did you have any interaction with

25   Mr. Jaeger about the purchase price before the sale or was it
```

  1    all through Mr. Olins?

  2              THE WITNESS:  It was all through Mr. Olins.

  3              THE COURT:  And did you have any interactions with

  4    Mr. Jaeger after the sale?

  5              THE WITNESS:  Yes, your Honor.

  6              THE COURT:  Can you tell me about that?

  7              THE WITNESS:  Mr. Jaeger came in to the gallery on a

  8    number of occasions, once or maybe twice, with his wife, in

  9    order to select works for -- to purchase on the $50,000 credit.

 10              THE COURT:  And what was your exchange with reference

 11    to the candelabra?

 12              THE WITNESS:  I don't remember any exchange of the

 13    candelabra.  It was all pleasantries about the photographs that

 14    he wished to give to his wife.

 15              THE COURT:  Gotcha.

 16              All right?  Redirect.

 17              MS. GRISWOLD:  Yes, briefly.  Thank you.

 18    REDIRECT EXAMINATION

 19    BY MS. GRISWOLD:

 20    Q.  Mr. Neville, you testified that by February of 2012 you

 21    knew that, with respect to the vases, Mallett had a client who

 22    was interested in paying significantly more than the Sotheby's

 23    estimate of 500 or 550,000?

 24    A.  Yes.

 25    Q.  And that you communicated that information to Mr. Olins

Gcl2oli1                     Neville - Redirect

1    around that time?

2    A.  Yes.

3              MS. GRISWOLD:  I would ask Ms. Meister to please pull

4    up -- I guess you can't pull it up.

5    Q.  Do you have Defense Exhibit AA in front of you?  It is the

6    June 17, 2012, e-mail.

7    A.  Yes, I do.

8    Q.  You recall that Mr. DeVita asked you a number of questions

9    about your communications with Mr. Olins after the court

10   approved the sale of the vases in June of 2012.

11             Do you recall those questions?

12   A.  I recall being questioned about that, yes.

13   Q.  In this e-mail, Defense Exhibit AA, Mr. Olins says to you,

14   "I would be most appreciative if this transaction can be

15   completed today from your London office in the amount indicated

16   below," that is, the 210,000 in cash that he initially asked

17   you for; and then it says, "The larger balance should be

18   applied to the purchase which has been discussed for some

19   time."

20             Do you see that?

21   A.  I do.

22   Q.  What did you understand that to mean when you received that

23   on June 17 of 2012?

24   A.  I understood it to mean the wall brackets.

25   Q.  What, the credit to the wall brackets?

1    A.  The credit to the wall brackets, yes.

2    Q.  And the part about "it had been discussed for some time,"

3    was that a reference to the fact that you had had discussions

4    about the credit to the wall brackets?

5             MR. DeVITA:  Objection, your Honor.  This is leading.

6             THE COURT:  Sustained.

7    BY MS. GRISWOLD:

8    Q.  When was the approval from the court obtained for the sale

9    of the vases?

10   A.  In June 2012.

11   Q.  Mr. Neville, the credits to the wall brackets that Mallett

12   made for Mr. Olins following the sale of the vases, was there

13   ever any discussion about that credit being for any work that

14   Mr. Olins had done in helping Mallett find buyers for his

15   pieces?

16   A.  No, I don't think so, no.

17   Q.  Do you recall Mr. DeVita asked you a series of questions

18   surrounding the globes?

19   A.  Yes.

20   Q.  And you admit that you intended to and did lie to Mr. Rusco

21   about the timing of the sale of the globes, correct?

22   A.  Correct.

23   Q.  And that you also lied to him about the sale price.

24   A.  I misquoted him the sales price, yes.

25   Q.  To be clear, you told him the sale price was $210,000,

1     correct?

2     A.  After all deductions, yes.

3     Q.  And at that time, it was your testimony that you believed

4     it to in fact be $290,000 at the time?

5     A.  Correct.

6     Q.  So even believing that it was $290,000, you still misled

7     Mr. Rusco purposefully by $80,000, is that correct?

8     A.  No.  $290,000 less our commission, less the import duty,

9     and less the registration costs came to $210,000, which is the

10    sum we returned to the bank.

11    Q.  You were asked a number of questions about the boule

12    chandelier, the wall lights, vases, the candelabra, and the

13    globes.

14    A.  Yes.

15    Q.  Did you personally obtain commission or money of any kind

16    from these transactions?

17    A.  No.

18              MS. GRISWOLD:  No further questions.

19              MR. DeVITA:  One.

20              THE COURT:  Let me ask a question which may prompt

21    additional questions or inform re-recross.

22              To the extent that you didn't obtain anything

23    personally on the candelabra or vase transactions, tell me why

24    you engaged in these transactions and participated in what you

25    understood at the time to be some degree of fraud.

Gcl2oli1

1        THE WITNESS:  Because, your Honor, I was furthering

2   our business and benefiting our clients.

3        THE COURT:  And when you say your clients, who were

4   you benefiting?

5        THE WITNESS:  I was benefiting Mr. Olins and I was

6   benefiting the clients purchasing the goods.

7        THE COURT:  Okay.  Any follow-up on redirect before?

8        MS. GRISWOLD:  No, your Honor.

9        THE COURT:  Mr. DeVita.

10  RECROSS EXAMINATION

11  BY MR. DeVITA:

12  Q.  Mr. Neville, you were a shareholder of Mallett, right?

13  A.  I had 10,000 shares, a little bit more with my -- I had

14  6,000 pounds worth of shares, yes.

15  Q.  And to the extent Mallett was marketing itself, you stood

16  to profit by the sale of your shares?

17  A.  Yes, I did.  Yes, I did.

18  Q.  So that increasing the profits of Mallett benefited you

19  financially, didn't it?

20  A.  Yes.

21       MR. DeVITA:  No further questions.

22       THE COURT:  All right.

23       THE WITNESS:  Your Honor, could I just qualify that?

24  I had 6,000 pounds of shares in my own name.  I did have

25  additional shares from the company when it was sold, as a

1   director of company.

2              THE COURT:  Meaning the 4,000?

3              THE WITNESS:  No, I had 6,000 pounds worth of shares

4   which I had actually purchased, and I had I think a total of

5   about 20 or 30,000 pounds worth of shares as director's

6   remuneration when I was working in London.

7              THE COURT:  Okay.  All right.  Can we excuse

8   Mr. Neville.

9              MR. DeVITA:  Yes, your Honor.  Nothing further.

10              THE COURT:  All right.  You may step down,

11   Mr. Neville.  Thank you.

12              THE WITNESS:  Thank you, your Honor.

13              (Witness excused)

14              THE COURT:  Ms. Griswold or Ms. Magdo, next witness.

15              MS. GRISWOLD:  The government calls paralegal Holly

16   Meister.

17              MR. DeVITA:  Your Honor, I think my copy of the

18   government exhibits is on the witness stand.  May I retrieve

19   it?

20              THE COURT:  Yes, please.

21    HOLLY MEISTER,

22        called as a witness by the government,

23        having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25   BY MS. GRISWOLD:

1   Q.  Ms. Meister, are you a paralegal at the U.S. Attorney's

2   office?

3   A.  Yes, I am.

4   Q.  How long have you been with the office?

5   A.  One year and four months.

6   Q.  In connection with your testimony today, were you asked to

7   review any materials?

8   A.  Yes.

9   Q.  Generally what types of materials?

10  A.  Bank records, wire transfer records, as well as phone

11  records.

12          MS. GRISWOLD:  Let me ask Ms. Pyun to pull up

13  Government Exhibit 107, please.  Ms. Pyun, excuse me.

14  Q.  Do you see that?

15  A.  Yes.

16  Q.  Are you familiar with this?

17  A.  Yes, I am.

18  Q.  What is Government Exhibit 107?

19  A.  This is a wire transfer record showing a payment from

20  Mallett to an entity called Northern Wychwood for $160,000.  It

21  was made on June 21, 2012.

22  Q.  And do you understand this to be a screen shot from a

23  Mallett system?

24  A.  Yes.

25          MS. GRISWOLD:  Ms. Pyun, pull up Government Exhibit

Gcl2oli1                    Meister - Direct

1    405, please.

2    Q.  Do you recognize Government Exhibit 405?

3    A.  Yes.

4    Q.  This is one of the exhibits that you were asked to look at

5    in preparation for your testimony?

6    A.  Correct.

7    Q.  And what is Government Exhibit 405?

8    A.  These are Barclays Bank records for Spirit Bear Ltd.

9    Q.  Who produced this document to the government?

10   A.  The defendant.

11   Q.  Is 405 the entire set of bank records for this account or

12   just a subset?

13   A.  Just a subset.

14   Q.  And what is the date range for the subset?

15   A.  June 2012.

16   Q.  I will ask you to please look at Government Exhibits 400,

17   401, 402, and 404, and if it's easier to just look in your

18   binder.

19          Are these also bank records that you were asked to

20   look at in preparation for your testimony today?

21   A.  Yes.

22   Q.  And this series, 400, 401, 402, and 404, are they all from

23   the same account?

24   A.  Yes.

25   Q.  And what account is that?

 1   A.  This is a TD Bank account for Spirit Bear Ltd. located in

 2   the U.S.

 3   Q.  I will show you Government Exhibit 600, which is a

 4   three-page Power Point document.  Are you familiar with this

 5   document?

 6   A.  Yes.

 7   Q.  Did you help put it together?

 8   A.  Yes.

 9   Q.  And what documents did you use to put this chart together?

10   A.  I used Exhibits 400 through 405.

11   Q.  At a high level, what does this chart show?

12   A.  At a high level, this document shows how the $160,000 we

13   saw in Government Exhibit 107 was used.

14   Q.  Let's start with the first slide.

15          Can you describe what's depicted in the first slide of

16   Government Exhibit 600.

17   A.  Yes.  In the first slide, we see $160,000 being transferred

18   from Mallett, the art and antiques dealer, to Northern

19   Wychwood; and then, from there, we see $159,980 being

20   transferred to Spirit Bear Isle of Man Barclays account.

21          MS. GRISWOLD:  Ms. Pyun, could you highlight for us on

22   Government Exhibit 405 that wire transfer.

23   Q.  Ms. Meister, can you identify the incoming $160,000 wire

24   transfer.  I'm sorry, $159,980.

25   A.  Yes, it is at the bottom of the page.

Gcl2oli1                          Meister - Direct

1   Q.  By the way, do you know why it is not for the full

2   $160,000?

3   A.  I believe that it may have been due to a fee on the full

4   160.

5   Q.  Going back to Government Exhibit 600, there is a map on the

6   first side.  What is that map of?

7   A.  This map depicts the Isle of Man, which is located off the

8   coast of the United Kingdom, and where the Barclays Spirit Bear

9   account was located.

10          MS. GRISWOLD:  Let's move to the second slide on

11  Government Exhibit 600, please.

12  Q.  What does this slide depict?

13  A.  This slide depicts how the $159,980 was spent in the

14  Barclays account.

15  Q.  What did you do to determine -- to categorize these buckets

16  depicted on this slide?

17  A.  I added up the different amounts that were used in the

18  different buckets you see on the slide.

19  Q.  So let's start with the first bucket, 35,331.73 in legal

20  fees.  There are a number of names below that.  How did you

21  identify those firms as -- or those entities as law firms?

22  A.  I researched them on the Internet.

23  Q.  And for each of those firms, is there an entry in

24  Government Exhibit 405?

25  A.  Yes.

Gcl2oli1                         Meister - Direct

1   Q.  And you added those up to get that amount?

2   A.  Yes.

3   Q.  Moving to the second bucket on this slide, this says

4   interior decorator $5,000?

5   A.  Yes.

6   Q.  Can you explain that one?

7   A.  This I was able to determine, after participating in a

8   short phone call with Janice Silverstone, along with AUSAs

9   Griswold and Magdo, who confirmed that she worked as Mr. Olins'

10  interior decorator.  Additionally, I reviewed Ms. Silverstone's

11  FBI302.

12  Q.  And that is marked as 3504-1?

13  A.  Correct.

14  Q.  It says Silverbrook Farm.  Is that because the -- pulling

15  up Government Exhibit 405 -- the wire transfer actually goes to

16  Silverbrook Farm?

17  A.  Correct.

18          (Pause)

19          MS. GRISWOLD:  Thank you.  We can go back to

20  Government Exhibit 600, please.

21  Q.  The third bucket on Government Exhibit 600 says "Other

22  Payments."

23          Can you describe what you did, what goes into this

24  bucket of 44,769.88?

25  A.  Yes.  The Bering Connect and Maria Luisa, I believe, are

1   business entities in Spain based on my research.

2   Q.  So are there wire transfers to those entities listed in

3   that bucket, Bering Connect and Maria Luisa on Government

4   Exhibit 405?

5   A.  Yes.

6           MS. GRISWOLD:  I ask Ms. Pyun to please pull up

7   Government Exhibit 406.

8   Q.  Are you familiar with this exhibit, Ms. Meister?

9   A.  Yes.

10  Q.  What is this exhibit?

11  A.  This is a letter from Jay Palmer, the president of Spirit

12  Bear, to Spirit Bear's accountant, essentially depicting how

13  the $160,000 was used.

14  Q.  And for the Bering Connect and the other transfer that you

15  identified that you believed went to entities in Spain, are

16  those reflected on this exhibit?

17  A.  Yes, they are.

18  Q.  And how are they categorized in the letter to Mr. Palmer to

19  the accountant for Spirit Bear?

20  A.  The first to Maria Luisa was categorized as rent, and

21  Bering Connect was categorized as storage.

22  Q.  If we could go back to Government Exhibit 600, slide two,

23  the final bucket reflects a $60,000 wire transfer.

24  A.  Correct.

25  Q.  Can you explain what this one is?

1  A.  This shows a $60,000 wire transfer to Jay Palmer who, as I

2  said, is the president of Spirit Bear.

3  Q.  And is that to an account in Mr. Palmer's name?

4  A.  It is into an account in Spirit Bear's name.

5  Q.  Spirit Bear U.S. Ltd. or Spirit Bear Isle of Man?

6  A.  Spirit Bear U.S. limited.

7  Q.  If you turn to the next slide, please, the Government

8  Exhibit 600.

9        And by the way, for that analysis that you did, what

10  was the time period under which all of those payments were

11  made?

12  A.  June to July 2012.  Specifically June 26 to July 26, 2012.

13  Q.  With respect to the Spirit Bear Barclays account, was it

14  June 25 and June 26 of 2012?

15  A.  Yes.

16  Q.  So a two-day time period.

17  A.  Correct.

18  Q.  Turning to the third slide, what does this slide reflect?

19  A.  This slide reflects how the $60,000 wire transfer we just

20  saw was used in the TD Bank account.

21  Q.  And, again, for the TD Bank account, did you just analyze

22  the time period, a narrow subset time period?

23  A.  Yes.

24  Q.  And what time period did you look at for the TD Bank

25  account?

Gcl2oli1                          Meister - Direct

1   A.  June 26 to July 26, 2012.

2   Q.  Between June 26 and July 26, 2012, based on your analysis,

3   were there any other incoming payments into this TD Bank

4   account besides the $60,000?

5   A.  Yes, there were.

6   Q.  How many?

7   A.  Two.

8   Q.  Can you is describe those two?

9   A.  The first was from an entity called Spain Select which is

10  similar to an Air B & B, as I determined from my research; and

11  that was, I believe, on June 26, 2012.  And the second was from

12  a Laurel Brown for $50,000 on July 9.

13  Q.  How much was the Spain Select transaction?

14  A.  I think it was approximately 1,000.

15          MS. GRISWOLD:  I would asks Ms. Pyun to please pull up

16  page 321 of Government Exhibit 400 and highlight the Spain

17  Select transaction.

18  Q.  How much was the incoming wire transfer from Spain Select?

19  A.  It was 1,186.19.

20  Q.  And based on your review of the TD Bank account records,

21  were you able to determine what the purpose of that incoming

22  wire transfer was?

23  A.  Yes.

24  Q.  What was it?

25  A.  It was a repay of a security deposit to the benefit of

1    Mr. Olins.

2    Q.  And then you said that there was one other incoming wire

3    transfer of about $50,000?

4    A.  Correct.

5    Q.  And based on your analysis of the records, were you able to

6    determine what happened with that money, the $50,000?

7    A.  Shortly after the wire came into the account, $50,000 was

8    used on an HPEV stock purchase.

9    Q.  So putting aside the $50,000 from Laurel Brown, that came

10   in and then was used to purchase stock, and the Spain Select,

11   the only other money that came into the account during your

12   review period was the $60,000 from the Isle of Man.

13   A.  That's correct.

14          MS. GRISWOLD:  I ask to turn back to Government

15   Exhibit 600, please.

16   Q.  Ms. Meister, can you please walk us through your analysis

17   of the $60,000, that is, how you categorized each of these

18   buckets and the amounts that go into each bucket.

19   A.  Yes.

20          So, in the first bucket you see a category for ATM

21   withdrawals, so there we see many withdrawals occurring in

22   Connecticut, specifically Hartford; California; and Washington,

23   D.C.  I was able to determine those by looking at the

24   statements, seeing the lines that indicate ATM withdrawals, and

25   then adding them up.

1    Q.   To more than $6,000?

2    A.   Correct.

3    Q.   Okay.

4              And the next bucket?

5    A.   The next bucket, where it says "debit and other purchases,"

6    primarily those were spent on hotels, airfare, travel expenses

7    related to Expedia, Kayak, U.S. Air, and those also added up to

8    more than $11,000.

9    Q.   And the final bucket labeled "furnishings," that's

10   $21,631.10?

11   A.   Yes.

12   Q.   What went into this bucket?

13   A.   There were two payments which I noticed on two checks, one

14   to Stark and one to J. Robert Scott, which added up to the

15   amount you see, $21,631.10.

16   Q.   Turning to Government Exhibit 401, are these the checks

17   that you were just referring to to Stark and J. Robert Scott?

18   A.   I believe they are on -- yeah.

19             MS. GRISWOLD:  Ms. Pyun, if you can highlight the one

20   to Stark, please.

21   A.   Yes.

22   Q.   This is a check for 4,533.60?

23   A.   Correct.

24   Q.   Do you know what Stark is?

25   A.   Stark is a luxury manufacturer of rugs and fabrics.

Gcl2oli1                        Meister - Direct

1    Q.  And also furniture?

2    A.  And furniture.

3    Q.  And how do you know this?

4    A.  I visited the Stark location in New York.

5    Q.  When did you do that?

6    A.  About a week ago.

7    Q.  And the memo line on this check, are you able to see what

8    the payment was for?

9    A.  I am able to clearly read the first line to say "two

10   slipper chairs 50 percent" and then the second one I believe

11   says "16" -- I'm not completely sure what that says, the word,

12   but it says "100 percent" and then the bottom says "21

13   Lucretta" --

14   Q.  That's fine.  Thank you.

15              Based on your visit to Stark, did you determine

16   whether that's a store that's available to the general public

17   or you have to have a professional decorator to visit it?

18   A.  You have to have a professional decorator to visit it.

19              MS. GRISWOLD:  And, Ms. Pyun, if you could please pull

20   up the second check to J. Robert Scott.

21   Q.  This one is in the amount of $17,097.50?

22   A.  Correct.

23   Q.  And do you know what J. Robert Scott is?

24   A.  J. Robert Scott is a luxury furniture manufacturer.

25   Q.  How do you know that?

Gcl2oli1                    Meister - Direct

1    A.  I visited the location in New York.

2    Q.  Last week?

3    A.  Yes.

4    Q.  And, again, is this a store that's available to the general

5    public or do you need a decorator to be with you?

6    A.  You need a decorator to be with you.

7    Q.  And the memo line, does the memo line provide information

8    as to what this payment was for?

9    A.  Yes.  It says, "two wave ottomans 50 percent;" something

10   "skin," I believe, "100 percent; two Wallace II chairs, 50

11   percent;" and then the last one, I'm not certain, but "50

12   percent."

13   Q.  And, finally, on Government Exhibit 401 on the first page,

14   there is a check for I believe $2,138?

15   A.  Yes.

16   Q.  Do you know who the individual that this check was made out

17   to is?

18   A.  Harriet Carpenos.

19   Q.  Do you know who that is?

20   A.  That is Robert Olins' mother.

21   Q.  I am going to show you what is marked as Government Exhibit

22   801.

23            MS. GRISWOLD:  May I approach with --

24            THE COURT:  Your witness already did.

25            MS. GRISWOLD:  She is doing double duty.

1   Q.   What is Government Exhibit 801?

2   A.   801 shows Harriet Carpenos's land line records.

3   Q.   For what time period?

4   A.   February 2012.

5   Q.   Were you asked to do anything with these records in

6   preparation for your testimony today?

7   A.   Yes.

8   Q.   What were you asked to do?

9   A.   I was asked to review them and I assisted in making a chart

10   to analyze them.

11   Q.   And is that chart Government Exhibit 801 -- I'm sorry,

12   800?

13   A.   Yes.

14          MS. GRISWOLD:  If we could pull that up, please.

15   Q.   Specifically what were you asked to look for in Government

16   Exhibit 800?

17   A.   Specifically I was asked to --

18          MR. DeVITA:  Objection.

19   A.   -- look at the calls between Mr. Robert Olins and Greg

20   Rusco and as between Mallett and Mr. Olins.

21   Q.   And with respect to -- you said these are numbers for

22   Mr. Rusco or AB&T and Mallett.  How did you know that?  Looking

23   at the first line of Government Exhibit 800, it says

24   "918-481-3816, Greg Rusco."  How did you know that is the

25   number for him?

1    A.  I researched AB&T and saw that there their main line phone

2    number is 918-481-3800, so I was able to deduce this appears to

3    be Gregory Rusco's personal line at the company.

4    Q.  And what about the number listed there for Mallett

5    212-249-8783?

6    A.  I researched Mallett, and this is the phone number that

7    comes up for the business listing.

8            THE COURT:  Ms. Griswold, do you or your witness have

9    a copy of Government Exhibit 800 for me?

10           MS. GRISWOLD:  Oh, yes, your Honor.

11           THE COURT:  Thank you.

12   Q.  Can you describe what you did?

13   A.  Yes.  So I looked at the phone records and saw where calls

14   between these numbers and Mr. Olins occurred, and then I was

15   able to indicate the time of the calls and then the duration of

16   the calls.  So that is what you see on this chart.

17   Q.  And the last call that you had identified in February, what

18   date was that?

19   A.  The last call was on February 23, 2012, at 10:51 a.m.

20           MS. GRISWOLD:  If we could please go to Government

21   Exhibit 700.

22   Q.  Ms. Meister, are you familiar with this exhibit?

23   A.  Yes.

24   Q.  What is depicted in this exhibit?

25   A.  This exhibit shows booked travel for Mr. Robert Olins from

1  the time period October 2010 to January 2016.

2  Q.  Did Mr. Olins have a trip after February -- what's his

3  first trip after February 23 of 2012?

4          MR. DeVITA:  Your Honor, I am going to ask for some

5  *voir dire* on this.

6          THE COURT:  Given that it's a hearing, why don't you

7  just wait until your opportunity for cross.

8          Go ahead.

9          MR. DeVITA:  My point is, your Honor, there are clear

10  errors on this.  This is a summary of information I believe I

11  requested from the government relating to Homeland Security

12  records.  These are not the original records.

13          THE COURT:  Mr. DeVita, I understand you have a point

14  to make, but I am telling you to wait until cross to make it.

15          So, Ms. Griswold, you may proceed.

16          MS. GRISWOLD:  Thank you, your Honor.

17  BY MS. GRISWOLD:

18  Q.  So, first, can you identify if there was any booked travel

19  after February 23, 2012?

20  A.  Yes.

21  Q.  What did you identify?

22  A.  There was a trip from New York to Madrid, Spain -- I'm

23  sorry -- yes, that's it, yes.

24  Q.  And on what date was that trip?

25  A.  That was on February 24, 2012.

1    Q.  And the final column of this chart has a column that says,

2    "Reported or confirmed"?

3    A.  Yes.

4    Q.  And what is your understanding of what that means based on

5    your communications with the agent in this case?

6    A.  I understand that "reported" means the travel was booked

7    and that "confirmed" means that Mr. Olins was actually on the

8    flight.

9    Q.  So if it's confirmed, you know he was on the flight;

10   reported, you don't know?

11   A.  Yes.

12            MS. GRISWOLD:  No further questions.

13            THE COURT:  All right.  Now is your chance.

14            MR. DeVITA:  All right.

15   CROSS EXAMINATION

16   BY MR. DeVITA:

17   Q.  Just a few other questions before we get to the chart.

18            Ms. Meister, when you spoke to Ms. Silverstone, did

19   she tell you that work for which she was being paid had been

20   performed long before the payment?

21   A.  I don't recall.

22   Q.  You don't recall one way or the other?

23   A.  I don't recall one way or the other.

24   Q.  Do you remember whether she was asked?

25   A.  I don't recall.

Gcl2oli1                    Meister - Cross

1   Q.  I think you testified that the Stark and Scott companies

2   were companies that accept orders from decorators, right?

3   A.  That's correct.

4   Q.  And Ms. Silverstone was a decorator?

5   A.  To my knowledge, yes.

6   Q.  So if she ordered materials and they didn't get paid for,

7   she would be responsible for them, right?

8   A.  I'm not sure.

9   Q.  Do you know how old Ms. Silverstone is?

10  A.  I don't know how old.

11  Q.  She is elderly?  You know she ill and couldn't appear

12  today, right?

13  A.  I am aware.

14  Q.  You know that she has had health issues for a number of

15  years?

16  A.  I didn't know how long the health issues were.

17  Q.  But of the amounts that you identified, Stark and Scott,

18  were items that apparently Ms. Silverstone ordered?

19  A.  Apparently, yes.

20  Q.  And you know that Mr. Olins never occupied the apartment in

21  Spain, right?

22  A.  I'm -- to my knowledge, yes.

23  Q.  You identified debit card withdrawals.  Are you familiar

24  with the name Sandy Harrison?

25  A.  I have heard it.

1   Q.  She is someone that has been affiliated with Spirit Bear

2   over the years?

3   A.  I'm not sure what she is affiliated with, but I have heard

4   the name.

5   Q.  And you know that she lives in California, right?

6   A.  I did not know that.

7   Q.  With respect to the chart that's Government Exhibit 700,

8   there is an indication of travel from Jamaica to Miami with no

9   departure to get to Jamaica in the first place, right?  This

10  is -- covers the entire period from December -- from October

11  2010 to January 2016?

12  A.  To my knowledge, yes.

13  Q.  And that was what was requested from Homeland Security,

14  right.

15  A.  To my knowledge that appears to be so.

16  Q.  So the Jamaica it just has an "R."  That could just be a

17  complete error, right?

18  A.  Possibly.

19  Q.  There would be some indication of someone going to Jamaica

20  before they could return from Jamaica, right?

21          MS. GRISWOLD:  Objection, your Honor.  Lack of

22  foundation as to Ms. Meister's knowledge on this.

23          THE COURT:  I think we can all assume in order to take

24  a flight from Jamaica one would have to go to Jamaica.

25          MR. DeVITA:  Okay.

Gcl2oli1

1          THE COURT:  So go on.

2    BY MR. DeVITA:

3    Q.  So you don't know of your own knowledge how much of the

4    other entries are accurate or inaccurate, right?

5    A.  I don't.

6    Q.  But, at least according to this schedule, in the period

7    between May 13, 2012 and June 13, 2012, it appears that

8    Mr. Olins was in Spain because he has a departure from New York

9    to Madrid on the 13th and a return from Madrid to New York on

10   June 13, right?

11   A.  It appears that way.

12   Q.  It also reflects that on March 28, that was one that was

13   just "R," so that means it wasn't confirmed, right?

14   A.  It means it was reported.

15   Q.  Reported.  Okay.

16          MR. DeVITA:  No further questions, your Honor.

17          THE COURT:  All right.  Thank you.  Can we let

18   Ms. Meister step down?

19          MS. GRISWOLD:  Yes, your Honor.

20          THE COURT:  All right.  You may step down.

21          (Witness excused)

22          THE COURT:  Is that the conclusion of --

23          MS. GRISWOLD:  The government has no more witnesses.

24          MR. DeVITA:  The defense rests.

25          THE COURT:  All right.  So let's talk about how we are

Gcl2oli1

1   going to proceed from here.

2          Here is my problem.  Much as I really did want to get

3   everything done today, I have a court meeting in 20 minutes and

4   then I have proceedings most of the afternoon until about 4:15.

5          I am happy to entertain some argument or discussion

6   now with respect to the significance of the testimony that I

7   have heard, and then we can reconvene at 4:15 and basically

8   pursue or finish the sentencing proceeding.  That would be my

9   vote; and, at the end of the day, my vote is probably the only

10  one that matters.

11         Is that okay with everybody here?

12         MS. GRISWOLD:  Yes, the government with like to move

13  forward.

14         MR. DeVITA:  Yes, your Honor.

15         THE COURT:  All right.  Very good.

16         So why don't we take advantage of the time that we do

17  have, the next 15 minutes or so, and at least have a brief

18  discussion concerning the matters that I have heard over the

19  last day and a half.  That doesn't give you a whole lot of time

20  to speak about it, and you will have an opportunity during

21  sentencing to talk about --

22         MR. DeVITA:  Your Honor, I apologize.  I neglected --

23  I have one more exhibit -- actually you can take judicial

24  notice of this, there was a reference to an earlier SEC

25  monetary judgment, and I have a copy of that printed off of

Gcl2oli1

1    Pacer, and I think it is relevant, if I can hand it up to your

2    Honor, give a copy to the government.

3           THE COURT:  Sure.

4           MR. DeVITA:  If you recall, during Mr. Rusco's

5    testimony, there was discussion of the monetary judgment and

6    payments that were made on the basis of -- made on the basis of

7    advances by AB&T.

8           And specifically, your Honor, if you look at the third

9    page, there is a payment schedule, the total amount is I think

10   $180,000, and it gives $45,000 within 30 days of the judgment,

11   another 45,000 within 180 days, and a third 45,000 payment

12   within 270 days of the judgment.  And the testimony was that

13   Mr. Olins had asked the bank to allow him to take some of the

14   proceeds from the sales or to advance those amounts well within

15   those limits.

16          THE COURT:  All right.  Thank you.

17          I'm not quite sure what the best way to do this is,

18   other than essentially to give you five to eight minutes each

19   to make what case you want from the evidence and testimony that

20   we have heard over the last day and a half.

21          For what it's worth, I think I have a fairly good

22   sense of the record, given that I had read everything before

23   the hearing and obviously have sat and listened carefully over

24   the last day and a half.  But why don't you highlight what you

25   think are the most important things in the time that you have;

Gcl2oli1

1    and, then, during sentencing later, you will have an

2    opportunity to address the 3553 factors.

3            In that regard, I would ask you to refrain from

4    commenting on what I would describe as the sort of financial

5    condition desperation evidence until later, since I think that

6    is more 3553 issue, and I understand there are some disputes

7    there, but focus on the candelabra issues, the vases, the wall

8    brackets, as a focus in the next few minutes.

9            So with that, Ms. Griswold or Ms. Magdo, do you want

10   to take the lead?

11           MS. GRISWOLD:  Yes, your Honor.  May I use the podium?

12           THE COURT:  You may.

13           MS. GRISWOLD:  Thank you.

14           The government, as you know, we asked for this *Fatico*

15   hearing.  It wasn't something that we expected to do, given the

16   plea agreement here.  But I will cut to the chase, since I only

17   have five to eight minutes here.  I want to get into three

18   factual areas.

19           We believe that the evidence introduced at this *Fatico*

20   has only reinforced the fact that Mr. Olins made material

21   factual misrepresentations in his sentencing submission that

22   need to be corrected and that were corrected at this hearing.

23           Let me start, first, with the candelabra.  Mr. Olins

24   argued that the dragon candelabra conduct didn't involve any

25   criminal conduct on his part; that he never had any intention

Gcl2oli1

of deceiving Mr. Rusco regarding the candelabra; and that it
was long after Mr. Jaeger purchased the candelabra that Olins
had the opportunity to earn some kind of commission from a
resale, and that is in his sentencing submission at page 12 the
first full paragraph.

He asserts that in April/May of 2013, Mr. Olins and
Mr. Jaeger for the first time negotiated a commission, and he
also asserts that Mr. Olins advised Mr. Jaeger to negotiate the
sale for 800,000 plus a $50,000 credit to Mallett.  The
evidence from this hearing flatly contradicts these claims.

Before Mr. Jaeger purchased the dragon candelabra from
the receiver, he and Mr. Olins had agreed that Mr. Olins would
share in the proceeds of the resale if it was successful above
a certain price.  So how did we learn this and know this from
the hearing?  For one, Jaeger said this agreement existed.  He
testified credibly that Olins told him that the receiver had
assigned a value of $432,000 to the dragon candelabra and that
Olins was required to make that up.  Jaeger had no reason to
lie about that.

Jaeger also testified that there was never any
discussion about paying Olins' commission for the deal.  Plus
Jaeger's testimony is corroborated by a few different pieces of
documentary evidence we looked at during this hearing,
including Jaeger's handwritten notes, which is Government
Exhibit 303, as well as the fact that Olins was ultimately paid

Gcl2oli1

1    $197,000, not 200,000, not an amount related to the ultimate

2    resale price of 1.2 million or the even the $800,000 in cash,

3    but 197, the exact difference between 432 and 235.  That alone

4    is striking.

5          In Jaeger's words, the whole premise of why Jaeger

6    agreed to give Olins anything was because Olins had told him

7    about this purported reserve price.  And we know that Rusco

8    testified at this hearing that there was no 432 reserve price

9    at the time that the candelabra transaction went through.  The

10   commission excuse is a cover story.

11         And the other reason you know, Olins admitted that in

12   June 2012 he took 160,000 in cash and a 300,000 credit for the

13   wall brackets from the sale of the vases.  He claims that the

14   $160,000 was lucky.  He wasn't in on a fraud with Mr. Neville

15   before the court approved the sale.  He got it after the fact.

16   He won the lottery.

17         Well, if that were the case, then I guess he got lucky

18   again with respect to the candelabra.  And, again, he had

19   nothing to do beforehand with negotiating the resale; but,

20   again, after, he all of a sudden gets a big upside.  It is

21   simply not credible.  The only person who got nothing out of

22   the candelabra deal was Mr. Neville.

23         So let me now turn to the vases, if I have time to

24   move on to the vases.

25         THE COURT:  You may.

1          MS. GRISWOLD:  Olins argues again that he won a large

2     up side on the vases only after the fact of the court approving

3     the vases being sold for $540,000 in June of 2012.  Again, in

4     his sentencing submission, he says, "Mr. Olins contacted

5     Neville about obtaining some funds relating to the sale of the

6     vases after that approval."  That's page 11 of his October 14

7     submission.

8          Of course, what this statement is leaving out is that

9     Olins knew that there were extra funds to be obtained, that

10    there would be more money to split up than the 540 obtained by

11    the receiver plus a commission to Mallett of 10 to 20 percent.

12    There would have been nothing to talk about in terms of

13    obtaining some of the funds if there weren't extra funds to be

14    obtained.  Prior to June 2012, Olins did know that, because

15    prior to June, Neville told Olins he had a buyer willing to pay

16    significantly more than that amount.  And when Olins heard

17    that, he said he wanted a cut.  And then Olins helped get Rusco

18    to approve the transaction.

19         Now, Mr. Neville is not a perfect witness, and that is

20    not news to the government.  The government, as you know, did

21    not believe Mr. Neville when he proffered.  He tried to say

22    that there was no plan to deceive the receiver and he lied

23    because he was trying to stay out of trouble.  And he was

24    required to plead guilty to false statements for this.  Neville

25    has accepted responsibility, and he will have his day at

Gcl2oli1

1    sentencing, which is not today.

2           But the question is not whether Mr. Neville is a

3    perfect witness.  The question is whether we believe his

4    testimony that he and Olins had an agreement to cut Olins in

5    before Judge Cote approved Mallett to purchase the vases for

6    540,000 in June 2012.

7           Well, take a look at Government Exhibit 106.  This is

8    the e-mail showing that before the receiver approved the sale

9    of the vases at 160, Olins had his lawyer putting pressure on

10   Greg Rusco and the bank to allow the sale of the vases to go

11   through.  Sure, Mr. Olins wants the pieces to sell, but why

12   push so hard for a sale at 540,000, a price below both of the

13   consignment prices we saw Olins had previously agreed to in

14   Government Exhibits 110 and 111.

15          This e-mail also shows you the communication between

16   Olins and Neville in the critical time period before the

17   receiver approved the sale.  The defendant wants you to believe

18   that he had not agreed with Neville to receive a portion of the

19   upside.  But if Neville were the mastermind of the fraud, then

20   why would Mallett have cut in Olins at all.  Why would Mallett

21   even tell Olins that they had a buyer who paid more?  Take a

22   look at Government Exhibit 105, please.  That's another e-mail

23   that tells you that Neville is telling the truth about the fact

24   that he had an agreement with Olins prior to June of 2012.

25   This is the April 2012 internal Mallett e-mail in which Neville

Gcl2oli1

1    is discussing figuring out how much money needs to apply to

2    Olins' debt on the wall brackets.  If there was no agreement

3    with Olins as of April of 2012 to be cut in, why would Mallett

4    be sharing any of this money with him?  They wouldn't.

5           In addition, Defendant Exhibit AA the June 17, 2000,

6    e-mail that was sent from Mr. Olins to Mr. Neville just three

7    days after Judge Cote approved the vases transaction, has a

8    very telling line.  It says, "Please send me the $210,000 in

9    cash and then apply the rest to my wall bracket account as we

10   have discussed for some time."  It makes no sense that the

11   first conversation they would have had about Mr. Olins getting

12   a cut of those proceeds would have been within those last

13   couple of days and yet in that e-mail he says "as we have

14   discussed for some time."

15          And you don't even need Neville at all to conclude

16   that Mr. Olins committed fraud and obstructed justice

17   repeatedly in transactions completely unrelated to Neville.  As

18   we know from the testimony of Mr. Rusco yesterday, Mr. Olins,

19   with absolutely zero involvement of Mr. Neville, defrauded AB&T

20   of over $3 million.  He lied to Mr. Rusco about two of the

21   items that were collateral for the AB&T loan -- a carpet and a

22   chair -- that had either been refunded or sold.  And not subtle

23   lies, bald-faced lies that millions of dollars in proceeds that

24   should have gone to the bank was somehow held up and had not

25   been received.

Gcl2oli1

1          And it was Mr. Rusco who discovered this deception in

2     the summer of 2012.  He would likely never have discovered this

3     fraud if the receiver had not been appointed.  That $3 million

4     that Mr. Olins used for himself which should have gone to AB&T

5     would have nearly paid off the disgorgement judgment.  And if

6     you add in the $695,000 that Mr. Olins received from the sale

7     of the vases and the dragon candelabra, it would have easily

8     covered the disgorgement judgment.

9          THE COURT:  Why don't you bring things to a close.

10          MR. DeVITA:  I can stop there.  I will turn to the

11     other points later.

12          THE COURT:  Thank you.

13          Mr. DeVita.

14          MR. DeVITA:  Your Honor, I would like to address the

15     vases first.

16          Mr. Neville told the government in a May 12, 2016,

17     302 -- it is 3501-9 -- with regards to the vases, "Neville

18     called Olins after he received court approval to purchase the

19     vases for $540,000.  Neville told Olins that $460,000 would be

20     credited to Olins' debt from the subsequent sale of the vases."

21          THE COURT:  Can I ask you a question, just to cut to

22     the chase?  Why does that make any sense unless there was --

23     why would Mr. Neville, upon getting $460,000 more than he was

24     reporting, share that information with Mr. Olins let alone

25     agree to give him any of it unless Mr. Olins was in on it in

Gcl2oli1

advance?  It just doesn't make a whole lot of sense to me.

MR. DeVITA:  Well, because, your Honor, Neville and
Mallett are now exposed since March on the wall brackets to the
tune of $695,000.  They have to cover that.  So they devise --
it is clear from the April e-mail that there is no agreement.
Otherwise there is no need for Mr. Neville to go to bat with
Mr. Olins to get him to agree to any part of dividing the
profit from the sale of the vases.  So Mr. Neville claims they
are already in agreement, but he is being told by his boss go
to Mr. Olins, go to the bank and get them to agree to allow us
to keep some of the money to cover the exposure on the wall
brackets.

Nevertheless, he doesn't do it until after he has got
permission for the sale, because he knows he is not supposed to
sell it.  He knows -- notwithstanding -- your Honor,
Mr. Neville has no credibility.  The idea that he believed it
was okay to sell these things that were subject to the SEC lien
makes no sense, and it is contradicted by his contemporaneous
statements.  So that he knows that he can't even explain that
he has already sold these because he is going to get in
trouble.  He has got an e-mail in February from Mr. Olins
saying, You can't sell without the bank and the SEC's
permission.  Mr. Olins said that to Mr. Rusco, Mr. Rusco
forwarded it to Mallett, Mr. Neville.

So the answer is that they decide they have to cover

Gcl2oli1

their exposure on the brackets.  They want some part of this

profit to do that.  Neville says, Go work it out with Mr. Olins

and the bank, and he doesn't.  He waits until after there is

approval for the sale, calls Olins and says:  This is what we

are doing.  So he has to tell him at this point there is a huge

profit that wasn't revealed to the bank.

        And then what happens?  Not defending this, this is

what he has pled guilty to, Mr. Olins asks for some of that in

cash because he is broke.  He asks for some of that in cash.

Originally he asked for $210,000.  They give him $160,000.

That's what he has pled guilty to, taking that $160,000 and

having it wired to Isle of Man.

        The e-mail that Ms. Griswold just referred to talks

about the purchase we have been talking about for some time,

the purchase -- and Mr. Neville said this, one of the few

honest things that he said, that was referring to the purchase

of the wall brackets that they had been talking about for some

time.  And now there is money available to pay for some of

that.  Neville wants it all.  Olins, to his regret, agrees to

allow them to keep that 460,000 or the 300,000 as long as he

gets a piece of it.  That's what happened.

        Mr. Neville has no credibility.  He has defrauded

Mr. Olins repeatedly.  He misled the bank repeatedly.  He

participated in at least two instances in the sale of items

from this estate where he held helped another agent defraud his

Gcl2oli1

1   client.  He is here scrambling to save himself, your Honor.

2   And until it became clear after Mr. Neville -- after Mr. Olins'

3   plea, Mr. Neville told the government that it was June after he

4   got permission -- received approval from the court that he

5   called and told him he was going to take some of the money.

6   So, your Honor, that corroborates Mr. Olins on when that took

7   place.

8            THE COURT:  All right.  Why don't you turn to the

9   candelabra.

10           MR. DeVITA:  The candelabra, your Honor, I think

11  that -- I suggest to your Honor that Mr. Jaeger has credibility

12  issues as well.  And he has a grudge, not a rational grudge,

13  but a grudge against Mr. Olins.

14           When Mr. Olins, as Mr. Jaeger was forced to admit, has

15  made millions of dollars over the years, he didn't make enough

16  for him.  So he has -- they had litigation that was very

17  bitter, as he had testified.  I think that there may have been

18  some understanding prior to the sale, but it was not a formal

19  agreement.  When it didn't sell for $950,000, Mr. Jaeger says,

20  The deal is off.  The deal came back later.  Maybe there was a

21  confusion as to where the final agreement was.  But it was when

22  Mr. Neville and Mr. Jaeger couldn't get along that Mr. Olins

23  became the intermediary.  It was Mr. Olins that, as Mr. Neville

24  even admitted, negotiated the additional $50,000 of the store

25  credit to make the dragon sale go through.

1          I would submit to you that whatever informal
2     understanding may have existed was then off the table when the
3     dragons didn't sell and that it was only after Mr. Olins got
4     involved to facilitate the sale that there really was an
5     agreement on his -- some part of his debt being reduced.
6     Because, again, it is the benefit of that money is going to
7     Mallett.  He never saw a penny of it.  He never got the wall
8     brackets, never got a penny of that money that was credited on
9     the dragons.  It was the exposure of Mallett that drove what
10    they were doing.  And now Mallett needed to reduce the exposure
11    on its books, and therefore it was putting pressure on to get
12    the debt reduced.
13         THE COURT:  But it was credited to, in essence, an
14    account at Mallett, albeit an unconventional and strange one,
15    since he didn't take possession of these brackets, correct?
16         MR. DeVITA:  He never got them.
17         THE COURT:  I understand that.  But he came closer and
18    closer as he paid it down through these transactions, correct?
19         MR. DeVITA:  And was unable to fund it, your Honor.
20         THE COURT:  And how do you explain the $197,000
21    figure?
22         MR. DeVITA:  It is clearly the difference between what
23    they thought it was selling for to the bank and when it
24    didn't -- that sale did not take place in May of 2012, it was
25    supposed to sell for 500 -- I think 432, the sale ultimately

1    was 235 and the 197 is the difference between the two.  It is

2    debt that would have -- had the sale taken place in June as

3    Neville was hoping to bring about, it would have reduced his

4    debt to the bank by that much more, $197,000 more than the

5    reduction that resulted from the sale to Jaeger.  So he lost

6    197,000 that would have been paid down to the bank between June

7    and November of 2012.

8           A year later -- remember, your Honor, the bank sold it

9    free and clear of any encumbrance or any lien, sold it to

10   Mr. Jaeger.  The only theory on which Mr. Neville -- of course

11   he never received the money, but the only theory on which he

12   had an obligation is that any money that came into his hand he

13   was obligated to turn over to the bank.  That's not, as I

14   understand it, the way that this judgment worked.  To say that

15   he can't afford to pay his rent or any of that is just not a

16   fair way of interpreting the obligations on these loans.

17          So, again, what I am suggesting is that Mallett,

18   again, was exposed to the seller from whom it took the brackets

19   and needed to cover them and also was in the process of selling

20   itself.  It was putting pressure to cover the bad debt reserve

21   and increase its profits in order to sell itself.

22          THE COURT:  I have to go to a court meeting.  I do

23   want the government to respond to the excerpt in the proffer

24   302 that Mr. DeVita referred to, that is to say, Mr. Neville's

25   reporting that he called Mr. Olins after the sale was approved

Gcl2oli1

by the court.

I will give you another opportunity to expand a little bit on this later hopefully, depending a little bit on time. Here is what I will tell you.  I have a proceeding that starts at 3:45 that I don't know precisely how long it will take; so why don't you come at 4:00, and if it ends by 4, we will start immediately thereafter.  If it ends a little later, you may have to wait a little bit, but hopefully we will start as early as we can.  All right?

MR. DeVITA:  Your Honor, can we try and reassemble -- can we stay in the courtroom to try and gather up the mess that I have made here?

THE COURT:  You do have to clean up the mess you have made there because I have other matters here this afternoon.

MR. DeVITA:  Okay.

THE COURT:  You will have to apologize to Ms. Smallman, and she can discuss the particulars with you, but why don't you take a few minutes and straighten up.  As far as I am concerned, if you want to leave some thing in the courtroom until this afternoon --

MR. DeVITA:  No, I understand that, your Honor.  I am just concerned about trying to get some order out of this chaos.

THE COURT:  Understood.  All right.  I will see you at 4:00.  Thank you.

Gcl2oli2

1          (Recess)

2          THE COURT:  All right, welcome back, counsel.  Let's

3  get started with the rest of the sentencing.

4          Before I go further, though, I was given a stipulation

5  and order that, as I understand it, extends the deadline that

6  was otherwise today.  Given the hour and the date, I thought I

7  might just take care of that in the first instance.

8          Any objection to my signing this?  It pertains to any

9  petition by Mallett with respect to the forfeiture in this

10  case.

11          MS. MAGDO:  Your Honor, it is on consent between the

12  government and a third party or the potential third party.  The

13  defendant is no longer a party to the forfeiture proceeding

14  because he has already relinquished all right, title, and

15  interest that he may have had in the subject property.

16          MR. DeVITA:  Yes, your Honor.  That doesn't affect my

17  client.

18          THE COURT:  All right.  So I will sign that

19  stipulation and order.  I don't know if it will be docketed

20  today or tomorrow, but it is signed and dated as of now.  In

21  that regard, the deadline is extended.

22          MS. MAGDO:  Thank you, your Honor.

23          THE COURT:  And I will give it to my deputy who can

24  make a copy.  I think I understood that counsel for the third

25  party is here.  If he wants a copy, that's fine, or she.

Gcl2oli2

1          With that, let's proceed to sentencing.

2          Let me confirm a few things.  First, number one, I

3    want to make sure that any crime victims have been notified of

4    their rights under the Crime Victims Rights Act.  I suppose I

5    should have asked that before the hearing as well, but I want

6    to make sure that that is in fact the case.

7          MS. GRISWOLD:  Yes, your Honor, and I believe the

8    court received a copy.  There was a victim impact letter from

9    Panhandle Realty.

10         THE COURT:  I did.  Which brings me to the next point,

11   which is the matters that I have reviewed in preparation for

12   today's proceeding.

13         I have reviewed the presentence report dated September

14   1, 2016.  I have also received and reviewed a number of other

15   submissions: the defendant's submission dated October 14, 2016,

16   and the attachments to that submission, including letters and

17   an affidavit from various friends and business associates of

18   the defendant; a letter from the defendant's doctor; and a

19   letter from the defendant himself; the loan review document

20   from AB&T that was also entered into evidence at the hearing;

21   and I have reviewed the videotape statement of the defendant's

22   mother.

23         I have received the government's letter of October 19,

24   2016 and the defendant's letter of October 20, 2016.  Those

25   were in reference as to whether a hearing should be held.

Gcl2oli2

          I have received the government's more formal

submission filed on October 28, 2016, and the attachments to

that submission, including one invoice from Mallett, the

transcript of Mr. Olins' deposition in the SEC action, as well

as a complaint and one decision in the Northern District of

California case.

          I have received the defendant's reply letter of

November 29, 2016, as well as the attachments to that

submission, many of which were also entered into evidence at

the hearing, as well as the letter that counsel just referred

to from Panhandle Realty dated September 16, 2016, and the

attachments to that submission, namely, other letters, all of

which were transmitted under cover letter from the U.S.

Attorney's office dated November 23.

          Have the parties received unredacted versions of each

of the foregoing submissions?

          I should also say obviously I have considered the

evidence presented at the hearing over the last day and a half,

both the testimony and the evidence that has been offered.

          MS. GRISWOLD:  Yes, your Honor, we have received all

of that.

          MR. CECUTTI:  Yes, your Honor, we have.

          THE COURT:  Are there any additional submissions that

I should have received?

          MS. GRISWOLD:  Not from the government.

Gcl2oli2

1          MR. CECUTTI:  No, your Honor.

2          THE COURT:  The defendant's submission of October 14,

3     I think, is the only one that was submitted with proposed

4     redactions.  Those redactions are approved.  Given the nature

5     of -- give me one second.

6          (Pause)

7          THE COURT:  I apologize.  Again, I think the October

8     14 submission is the only one with proposed redactions, and

9     those are approved.  I will file the unredacted version of that

10    submission under seal, which will be available to counsel in

11    the event of an appeal without further application to me.

12          The only other submission that I think is not on the

13    docket is the so-called victim impact letter.  I am inclined to

14    think that it probably should be.  I think the letters attached

15    to that letter were submitted to Judge Cote and are public on

16    another docket already.  I'm not sure there is anything private

17    in those letters per se.  I am also open to the possibility

18    that they should be redacted.  I don't think there is any

19    personal information on there.  I think it is all company

20    information.

21          But, Ms. Griswold, do you have a view on that?

22          MS. GRISWOLD:  We agree with the court.  We reviewed

23    them, and I don't see anything in there that would require

24    redaction.

25          THE COURT:  So why don't you docket those in the next

Gcl2oli2

1   day or two, please, so that they are part of the public record

2   as well.

3          Normally I would turn to the presentence report but

4   here there are objections and my rulings on those objections

5   obviously relates to my reactions to the evidence presented at

6   the hearing over the last day and a half, so let's finish up

7   our discussions from earlier, and then I will tell you where I

8   stand with respect to those issues.

9          I did mention that I would give the government the

10  opportunity to respond and wanted the government to respond in

11  particular to the argument concern Mr. Neville's proffer

12  statement and the statement in the 302 indicating that he had

13  called Mr. Olins after the court approved the sale of the vases

14  to propose dividing the overage, I think is the way he

15  described it.

16         But, Ms. Griswold or Ms. Magdo, do you want to

17  respond?

18         MS. GRISWOLD:  Yes, your Honor.  Thank you.

19         Your Honor, we do want to address the court's question

20  regarding the reference, I think it was in 3501-9, to

21  Mr. Neville calling Mr. Olins after the court approved the sale

22  of vases.

23         It is true that Neville called Olins in June 2012,

24  after the court approved the vase transaction.  Once Neville

25  had confirmation of the court approval for $540,000, he reached

369

Gcl2oli2

 1    out to Mr. Olins to discuss the specific.

 2           But the fact of this conversation in June 2012 does

 3    not undermine the fact that Olins had requested and in fact

 4    Mr. Neville had agreed before June 2012 that Olins would get a

 5    cut of the difference between the 540,000 price paid to the

 6    receiver and the higher price offered by the sheikh.

 7           And I wanted to point your Honor's attention to some

 8    of the other statements by Mr. Neville in the 3500, because

 9    Mr. Neville has always been consistent about the fact that

10    Olins asked to be cut in on the deal before June of 2012.  And

11    3501-9, that is one of the last proffer sessions that the

12    government had with Mr. Neville, and we believe that if you

13    read everything together, he is finishing the story in terms of

14    the chronology of the last -- when the 160 discussion happens,

15    that is, the June 2012 phone call is after he receives word

16    that the court has approved the transaction and takes the step

17    of then calling Mr. Olins to discuss how it is going to be

18    broken up.

19           So, in particular 3501-2, that is an MOI from

20    Mr. Neville's first proffer with the government, the vases are

21    discussed at page 6, and at page 6, Mr. Neville states very

22    clearly that, by April 2012, Olins had asked to be cut in.

23           And 3501-5 are notes from an in-depth proffer in which

24    the vases were covered at length.  And, again, here, at page 2

25    of 6, Mr. Neville states that, by April 2012, he says by when

1   Mallett received money on the vases, which we know was April

2   2012, that Olins had asked to be cut in.

3          And that's also what Mr. Neville testified to in this

4   court.  This testimony began at about page 180 of yesterday's

5   transcript, and Mr. Neville stated that, well before June of

6   2012, he and Mr. Olins had an agreement that Mr. Olins would be

7   part of the deal.  And he testified, at page 197 of yesterday's

8   transcript, that after the court approved the sale, he did the

9   next logical thing, he called Mr. Olins to iron out the

10  details.

11         Now, if Mr. Neville had been shown 3501-9, which he

12  was not, he would have acknowledged that, yes, he called

13  Mr. Olins.  But we expect he also would have testified, if

14  asked, Is that the first time that you discussed with Mr. Olins

15  the possibility or the overage concept, he would have said,

16  Absolutely not, and that that is borne out by the rest of his

17  testimony before your Honor as well as the other proffers that

18  he had with the government before the proffer statements

19  created in 3501-9.

20         THE COURT:  All right.  Thank you.

21         MS. GRISWOLD:  Do you want me to continue in terms of

22  the factual points that we had wanted to make coming out of the

23  hearing or --

24         THE COURT:  I thought I did that earlier.

25         MS. GRISWOLD:  Well, your Honor, we had hoped to also

Gcl2oli2

1    address the wall brackets.  In our view, there had been some

2    factual assertions by Mr. Olins in his submission about the

3    candelabra, about the vases, and also about the wall brackets.

4            But if your Honor feels that it has enough factual

5    information, I certainly don't need to belabor us any more than

6    we have.

7            THE COURT:  I think it's too late for all that.  Hang

8    on one quick second.

9            (Pause)

10           THE COURT:  You don't need to belabor it.  In a case

11   where, putting aside the acceptance of responsibility credit,

12   there is actually no dispute about the guidelines calculation,

13   I think we have spent an inordinate amount of time to fill me

14   in on the background, relevant background here.

15           Let me tell you my views with respect to the matters

16   that were in dispute, which, again, it is a peculiar situation

17   in the sense that I am not sure formal findings need to be made

18   because there aren't really any issues, again, other than the

19   possibility of the acceptance points being in play that I need

20   to make, that is to say, no specific findings.

21           Having said that, I will say that, here, I am sort of

22   working a little bit off of the government's submission of

23   October 28 that identified four issues in dispute that I think

24   were thoroughly addressed in the hearing, and I will say, as a

25   bottom line, that I largely agree with the government's view of

1    the evidence.

2         In my view, I would think that the evidence amply

3    supports the government's theory that Mr. Olins was aware of

4    and involved in the effort to obtain a surplus or overage with

5    respect to the sale of the vases, that he was well aware of it,

6    and partially responsible for it in advance of that sale, and

7    that there was a prearrangement for him to get a portion of

8    that overage going in to the transaction.  I think that that is

9    supported not only by Mr. Neville's testimony, which I do

10   credit, and that is probably in and of itself sufficient, but

11   that testimony is corroborated by the other evidence, some of

12   which was cited by Ms. Griswold earlier, including the e-mail

13   referencing the fact that attributing a portion of that amount

14   to the wall brackets had been discussed for some time,  and

15   that's Defense Exhibit AA, Government Exhibit 105, the April 17

16   e-mail, in which there is discussion of what portion of the

17   excess would be attributed to Mr. Olins and his account, if you

18   will; and, at the end of the day, it just is consistent with

19   what I think common sense suggests.  I find it far-fetched to

20   believe that Mr. Neville single-handedly arranged for a sale

21   above the 540,000 mark and then shared that fact with Mr. Olins

22   and essentially volunteered to give him that money when he

23   wouldn't necessarily have even known about it.  I think much

24   more likely and consistent with the other evidence that I will

25   discuss in a moment is that Mr. Olins was very much involved in

Gcl2oli2

all of that, and it was his effort to obtain money for his own

purposes and also to satisfy the debt that he owed for the wall

brackets.

So all of that is to say that I do agree with the

government's view on that issue.

Second, and similarly, I agree with the government's

view on the candelabra issue.  I am less sure of all of the

particulars here.  That is to say, I think the timing and

specifics of each aspect of the transaction are a little bit

unclear, and the witnesses were not entirely in agreement,

which I don't think is surprising, given how long ago these

events took place and the like; but, the bottom line is, I

agree with the government's view that Mr. Olins saw an

opportunity in advance of the sale to pay down his debt on the

wall brackets or obtain money for his own purposes, that he

essentially arranged for Mr. Jaeger to buy the candelabra at a

relatively low price, understanding and hoping that he would be

able to sell it at a higher price through the consignment to

Mallett, and that he would then benefit from that.

I think whether all of that was precisely scheduled

out at the time is a little bit unclear.  I think, obviously,

there were some aspirations here in terms of whether they would

be able to arrange a sale since Mallett had not succeeded in

selling the candelabra for some time on its own, but I

certainly think that he had reason to know that there would be

a purchaser at a higher price, that there would be some
surplus, that he saw this as an opportunity to give an
advantage to Mr. Jaeger, for whatever reason, either friendship
or whatever debt he owed him, and to benefit himself.

I find it hard to believe, again, just as a matter of
common sense, that Mr. Jaeger would agree to give him what
would otherwise be a fairly random number, $197,000, unless
Mr. Olins told him the story that Mr. Jaeger testified that he
told him, namely, that he had to pay the difference between the
$432,000 figure and the 235,000 purchase price.  And I credit
Mr. Jaeger's testimony on that score, too.  I certainly agree
with Mr. DeVita that Mr. Jaeger obviously has some history of
some anger or disagreement toward the defendant; but, the
bottom line is, I believed his testimony on that score, which
is further corroborated by his contemporaneous notes and,
again, common sense and the pattern of conduct that I am
describing here.

Third is the wall brackets.  Here, I largely adopt the
government's view of things, but I'm not inclined to believe or
think that the defendant had some sort of sinister plan to use
the wall brackets as an alternative bank account that would not
be visible to or known by the SEC.  I think, instead, it is
quite clear that the defendant wanted the wall brackets; that
he coveted them for some amount of time; and when they were
available and back on the market, if you will, that he seized

Gcl2oli2

the opportunity to try and obtain them, albeit by essentially,
I mean, he didn't have the funds at the time, but he agreed to
purchase them for the $695,000 figure that he agreed to
purchase them or 675, I can't remember, all of which is to say,
I don't think -- I think it was a confluence of circumstances
where he saw an opportunity to get something that he had long
coveted, and that also enabled him to engage in these
transactions in a nontransparent way that would make it less
likely that the SEC, or anyone else for that matter, any
creditors, would be aware of the money that he was obtaining
from them.

        I further find that that -- that the defendant in his
sentencing submission made the claim that he had agreed to
purchase the wall brackets prior to the disgorgement order.  As
far as I can tell, there is no evidence to support that claim
whatsoever.

        I think Mr. Neville's testimony -- which I do
credit -- and the records that I have seen all indicate that
that transaction occurred in March of 2011, after the
disgorgement order was entered; and, furthermore, the
defendant's submission states that he was not able to proceed
with the purchase because of the disgorgement order.  I do not
credit that either.  I think it is quite clear that he did
continue to pursue the wall brackets.  I think ultimately that
was not successful, because he was not able ultimately to pay

off the debt largely because I think it came to an end with

this case, but I think his intention and actions were to pay

down that debt in the hopes of ultimately getting the wall

brackets.

The Spirit Bear piece of the story, I'm not sure what

to say about it, but I think, consistent with what I see as a

larger pattern of deception here, I think it is quite clear

that at some point Mr. Olins either thought that these being in

his name would be a problem or saw an opportunity to use this

asset as collateral with respect to the transaction that

Mr. Jaeger testified about and therefore saw that it was or

felt that it was in his interest to transfer the invoice to

Spirit Bear.  But I think it is quite clear that even that was

really a formalism and that the reality of the matter is that

he had an interest in the wall brackets and that they would

have been personal property if he had ever obtained them.

Finally, the last category, the financial conditions

sort of desperation category, if I can call it that.  There, my

view falls somewhere in between the two parties, which is to

say that I do credit the defendant's account to some extent of

his financial condition, which is to say that I don't think

that he was living high on the hog or really living a lavish

life, and he clearly was struggling to sort of maintain his

lifestyle, to satisfy debts, to pay off lawyers, and clearly in

not particularly desirable and one might even say dire straits.

1          That being said, I think the government has presented

2     a pretty compelling case that some of the money that he

3     obtained through the conduct that is at issue here was used for

4     his own purposes to finance an apartment in Spain and to do

5     things that clearly should not have been done, given the debts

6     that he owed to the bank and to the SEC and the orders that the

7     court had entered in this case.  I will leave it at that.

8          So there is no question that he used it for his own

9     selfish purposes.  He used it to maintain a certain lifestyle.

10    At the end of the day, I don't think that that lifestyle was

11    perhaps as high flying as it once was or as the defendant might

12    have wanted it to be, but I think there is no question in my

13    mind that he did this to advantage himself in some respects.

14         So that sort of tells you my views of the evidence.

15    In light of that, let's turn to the presentence report.

16         I don't know who is handling sentencing at the back

17    table.

18         MR. DeVITA:  Mr. Cecutti.

19         THE COURT:  Okay.  Mr. Cecutti, have you reviewed the

20    presentence report?

21         MR. CECUTTI:  Yes, I have, your Honor.

22         THE COURT:  Have you discussed it with Mr. Olins?

23         MR. CECUTTI:  Yes.

24         THE COURT:  Putting aside the sentencing guidelines

25    for a moment, do you have any objections to the factual

 1    recitations set forth in the report in light of the, well, I

 2    will call them findings, but the findings that I just

 3    articulated?

 4            MR. CECUTTI:  No, your Honor.

 5            The only thing I will point out is, and I believe the

 6    government and us are in agreement on this, is probation

 7    believed that a two-point enhancement for obstruction under

 8    3C1.1 was applicable.

 9            THE COURT:  Let me hold off because I haven't turned

10    to the guidelines yet.  I am just asking about the factual

11    recitation.

12            MR. CECUTTI:  No, no.

13            THE COURT:  Mr. Olins have you reviewed the

14    presentence report?

15            THE DEFENDANT:  Yes, your Honor.

16            THE COURT:  And have you discussed it with Mr. DeVita

17    and Mr. Cecutti?

18            THE DEFENDANT:  Yes, I have.

19            THE COURT:  And have you had enough time to discuss

20    the presentence report with them and to discuss anything that

21    you would want to raise in connection with your sentencing

22    today?

23            THE DEFENDANT:  Yes, I have.

24            THE COURT:  All right.

25            Ms. Magdo or Ms. Griswold, have you reviewed the

Gcl2oli2

presentence report?

MS. GRISWOLD:  Yes, your Honor.

THE COURT:  Again, putting aside the guidelines for a moment, any objections to the factual recitation?

MS. GRISWOLD:  No.

THE COURT:  Hearing no objections, again, I understand that that is, in light of my findings, not necessarily what the defendant's view of the evidence is, but hearing no objections, I will adopt the factual recitations set forth in the report, which will be made part of the record and kept under seal.  If an appeal is taken, a presentence report as well will be available to counsel without further application to me.

Now I will turn to the guidelines.  As counsel know, I am no longer bound by the guidelines, but I am required to accurately calculate the guidelines and consider the applicable guidelines range in imposing sentence.

In this case, there was a plea agreement in which the parties stipulated to a particular calculation of the sentencing guidelines.  Here the presentence report reaches a slightly different calculation based on its views of how the offenses or whether the offenses should be grouped and therefore whether an obstruction of justice enhancement should apply.

I guess my question -- I will start with the government -- is, given application note 8 to 3C1.1 and

Gcl2oli2

1   application note 3 to 2J1.2 of the guidelines which, as I

2   understand it, is what probation based its views on, why

3   probation is not correct here?

4           MS. MAGDO:  Your Honor, with respect to the grouping,

5   we gave a lot of thought to this before we entered into the

6   plea agreement, whether the two offenses should be grouped or

7   not.  We couldn't find a lot of precedent or case law on this,

8   and our position was ultimately, the harm of the two offenses

9   is distinct enough that the statutes punishing money laundering

10  and the statutes against obstruction of justice are really

11  aiming to criminalize two distinct types of harm, one being a

12  harm in, well, the administration of justice and functioning of

13  the court system and money laundering being a more diffuse harm

14  to society, and so we do abide by the, we do stand by the terms

15  of the plea agreement where we did count them as separate

16  groups.

17          THE COURT:  And I guess what I don't necessarily buy

18  about that is, here, the money laundering was in aid of the

19  obstruction, that is to say, that the gravamen of the

20  obstruction was that the defendant concealed assets, money from

21  the court, and the way he did that was by engaging in money

22  laundering.  So isn't there a sufficient nexus between the two

23  that they should be grouped?

24          MS. MAGDO:  There could be, but with money laundering,

25  you have that problem of a potential merger issue where the act

Gcl2oli2

1    that is the money laundering also is the act that is the SUA.

2    So, here, the two acts, we are careful to distinguish the two.

3    The promotion is -- the money laundering is the sending of the

4    money from the account in New York to the Isle of Man.  That's

5    the international money laundering, and it is in order to

6    promote the obstruction, which is what occurred -- what the

7    defendant did in the California court and in the New York court

8    by giving false deposition testimony, by filing false

9    affidavits, and by making it more difficult for the court and

10   for the SEC to find the assets that he had.

11        So I think we were a little bit cautious because of

12   the potential merger problem.  And, in this case, your Honor is

13   right, the two do seem very closely related, but I think we

14   still saw the harms that these types of offenses criminalize as

15   distinct enough that we felt that they should not be grouped.

16        THE COURT:  While you are up, do you want to address

17   the question of acceptance of responsibility credit?  Is it

18   your view, in light of the hearing and the findings that I

19   articulated, that the defendant should not get the three points

20   for acceptance of responsibility?

21        MS. MAGDO:  Well, your Honor, that the court's factual

22   findings seem to be almost entirely in line with the

23   government's factual allegations that were in the complaint, in

24   the indictment, in our sentencing submissions, and that the

25   defendant has denied at pretty much every turn, at the stage of

1    sentencing submissions and basically for the last two days, the

2    defendant has not only -- well, first of all, the defendant

3    could have remained silent with respect to, say, the dragon

4    candelabra transaction. He did not. He could have just denied

5    it. But he went even further than that. He came up with an

6    alternative narrative of what happened that I think your Honor

7    agrees had no basis in evidence and, after taking us through

8    two days of testimony, still has no basis in evidence. We

9    think that this type of behavior, post-plea behavior is

10   inconsistent with someone who has truly demonstrated acceptance

11   of responsibility. So, yes, your Honor, we would move to deny

12   the three acceptance points in this case.

13            THE COURT: All right. Mr. Cecutti.

14            MR. CECUTTI: Your Honor, we believe that the three

15   points should be granted to Mr. Olins. Mr. Olins has accepted

16   responsibility.

17            He pled guilty back in, I believe, June. He pled

18   guilty to the charges that are in the plea agreement.

19            He, as part of our submission, provided a letter

20   indicating that he accepts responsibility. That's what we

21   anticipate him saying today. His best recollection was what we

22   submitted in terms of the events in question.

23            At the end of the day, he doesn't deny the fact that

24   he received proceeds and disbursed them in a way that was

25   criminal and that he committed crimes. He doesn't deny that.

Gcl2oli2

1    And, for that reason, he should be receiving the three points

2    for acceptance of responsibility.  He doesn't deny the charges

3    that he pled guilty to and therefore should receive those

4    points.

5              THE COURT:  And do you wish to address the grouping

6    issue?

7              MR. CECUTTI:  We share the same view as the

8    government, your Honor.  We think that the harms are

9    sufficiently distinct whereby the two-point enhancement for

10   obstruction should not apply.

11             THE COURT:  I think the grouping question is a close

12   one, and in the absence of the parties' agreement I might be

13   inclined to have viewed it the other way.  But I think it is

14   close and, in light of that, I will honor the parties'

15   agreement and therefore adopt your agreement and proposed

16   calculation with respect to the guidelines.

17             I am not, however, going to give the defendant credit

18   for acceptance of responsibility.  I think that while he has

19   technically accepted responsibility in the sense that he pled

20   guilty to the two counts for which he is being sentenced, I

21   think the reason that we had the hearing in these slightly

22   unusual circumstances is that the view he took of the evidence

23   really minimized his culpability to the absolute minimum that

24   would satisfy the elements of those statutes and basically

25   described himself as sort of an almost innocent beneficiary of

Gcl2oli2

criminal conduct by Mr. Neville. I think he, in doing so, has

flat out just not accepted responsibility for what I see as a

pattern of deception and lies and fraud.

          Given that, I think this is one of those rare

situations where, notwithstanding the plea, acceptance of

responsibility credit is not warranted, and I therefore will

not include the three-point credit for acceptance of

responsibility. The third point obviously is no longer

available, because it is available only on a government motion

and the government is no longer making that motion.

          Now, in light of that, if I am not mistaken, between

the parties' agreement and that modification to it, I, using

the November 2016 edition of the guidelines, I think, if I am

not mistaken, find that the offense level is a 23, criminal

history category is a I, the guidelines range is 46 to 57

months, and the fine range is $20,000 to $500,000.

          Are the parties in agreement that that is consistent

with what I just said?

          MS. GRISWOLD: Yes, your Honor.

          MR. CECUTTI: Your Honor, may I just confer with the

government.

          THE COURT: Yes.

          (Counsel confer)

          MR. CECUTTI: Yes, that's correct, your Honor.

          THE COURT: So I will adopt that calculation, then.

Gcl2oli2

```
 1              In the plea agreement, the parties each agreed not to

 2     seek a departure from the stipulated sentencing guidelines

 3     range, admittedly, a different one than the one I just found,

 4     but is that correct?

 5              MS. GRISWOLD:  Yes, your Honor, although we believe

 6     that there is a carveout for the acceptance, so we are at this

 7     point intending to seek a sentence within the new guidelines

 8     range.

 9              THE COURT:  Understood.

10              My question is, does anyone think there is a basis for

11     a departure within guidelines system and as distinct from what

12     has come to be known as a variance here?

13              MR. CECUTTI:  No, your Honor.

14              MS. GRISWOLD:  No, your Honor.

15              THE COURT:  I agree.  That is to say, that there are

16     no bases within the guidelines system that would warrant a

17     departure.

18              Having set up all of that, and recognizing that I have

19     read and reviewed a lot of material in this case and sat

20     through a day and a half of a hearing and you do not need to

21     repeat what you have stated in your submissions, I will give

22     the parties an opportunity to be heard.

23              I will start with the government.

24              MS. GRISWOLD:  Your Honor, we don't have much more to

25     say.  We believe that deterring this defendant from repeating
```

Gcl2oli2

1    this pattern and deterring other would-be defendants from

2    hiding assets from the government when they don't want to

3    comply with a civil judgment, but most importantly promoting

4    respect for the law and for the courts are all significant,

5    important ends of justice in this case that support a sentence

6    within the guidelines range of 46 to 57 months.

7           THE COURT:  Can I ask you just a couple of specific

8    questions?

9           MS. GRISWOLD:  Sure.

10          THE COURT:  First, I'm not inclined to -- well, I

11   guess the question is, what weight, if any, I should give the

12   purported victim impact statement.  I don't know if they are,

13   specifically speaking, a victim of the crimes to which

14   Mr. Olins has pleaded guilty.  But the letter references or

15   speculates that there were other fraudulent transactions.

16          Do you believe there is any basis to that?  Have you

17   investigated that?  What weight, if any, do to you think I

18   should put on it?

19          MS. GRISWOLD:  We have not investigated it.  Our view,

20   in reviewing the letter, is that the conduct that Panhandle

21   Realty is driving at is really the conduct that has been before

22   the court in terms of the transactions that Judge Cote

23   considered and that the court is familiar with in this case.

24   We don't have any information to suggest that there are other

25   instances of fraud, and so we think that the conduct that's

Gcl2oli2

1     articulated in that victim impact letter is already before the

2     court.

3              THE COURT:  All right.  Second question, in his

4     submission, the defendant or defense counsel indicated that the

5     BOP doesn't allow diazepam, the medication that the defendant

6     receives.  Is that true to your knowledge, and do you know if

7     there is a substitute that is available or do you know anything

8     about that?

9              MS. GRISWOLD:  May I consult for a moment.

10             THE COURT:  Yes.

11             (Counsel confer)

12             MS. GRISWOLD:  Your Honor, we do not know the answer.

13    We can certainly find out expeditiously.

14             THE COURT:  All right.

15             And, lastly, your views on restitution.  I feel like

16    at some point in this process I saw a proposed restitution

17    order, but I no longer know where it is or when I got it.  I

18    recall that the proposed restitution was in the amount of

19    $657,000.

20             MS. GRISWOLD:  Yes, payable to the receiver.  We can

21    resubmit that after.  We have it in electronic format.

22             THE COURT:  I think my deputy just located it.  And I

23    take it the 657, that is the 460,000 attributable to the vase

24    transaction and the 197 attributable to the candelabra?

25             MS. GRISWOLD:  That's correct.

Gcl2oli2

1          THE COURT:  Okay, Mr. Cecutti, do you wish to be

2     heard?

3          MR. CECUTTI:  Your Honor, pursuant to the plea

4     agreement, we cannot ask for a sentence below the guidelines.

5     That's clear.  That's what we agreed to.

6          However, the plea agreement obviously doesn't

7     foreclose your Honor from considering all of the factors under

8     3553(a) to determine what is the appropriate sentence not for,

9     in our view, this defendant, but a person, Robert Olins, and to

10    impose a sentence that is sufficient and not greater than

11    necessary to achieve the purposes of sentencing in this case

12    for Mr. Olins based upon the offenses that he has committed.

13         Now, Mr. Olins recently turned 60 years old, a week

14    ago today; and, at his core, he is a good person.  This is

15    somebody who is sacrificial; who has lived his life to trying

16    to and helping other people; developed close relationships and

17    friendships with others, and tries to help and serve them to

18    the best of his ability, which we believe is reflected in the

19    numerous letters that we have provided as part of our

20    submission.

21         The other important consideration for your Honor is

22    that Mr. Olins is a dedicated son to his elderly mother.  I

23    have had the opportunity to visit with Ms. Carpenos; and, from

24    what I observed, they have a very close relationship, a very

25    tight one.  But this is something more than just a mother/son

Gcl2oli2

relationship.  Mr. Olins is her sole caregiver, and she is able
to remain at home because of Mr. Olins' care while she is
receiving treatments for cancer.

          THE COURT:  Can I interrupt and just ask you a
question on that score?  I noticed in the submissions, or it
might have been in the presentence report, that Mr. Olins'
sister lives in West Hartford as well.

          MR. CECUTTI:  She does.

          THE COURT:  What, if any, role does she play with
respect to her mother and why would she not be available?

          MR. CECUTTI:  It's obviously a fair question, your
Honor.  She is simply not available.  She does live in the West
Hartford area.  She has numerous other responsibilities, and
since -- well, prior to 2012, but especially when Mr. Olins'
mother became very sick, an e-mail that your Honor heard
earlier today, Mr. Olins became his mother's sole caregiver,
and he has been doing that since 2012.  He takes her to places,
he helps prepare meals, he cares for her, brings her to social
events, and the bottom line here is that, but for his care, she
wouldn't be able to live at home.  And that's an important
consideration obviously today at sentencing.

          Now, in terms of the nature of the offense, I don't
intend to speak at length about this.  We have spent a day and
a half and more discussing the nature of the offense and
Mr. Olins' conduct.  But I wanted to raise a few things that I

think are important for your Honor's consideration.

I think what's important is, in 2011/2012, the picture here is that Mr. Olins has a loan with AB&T, he has an SEC disgorgement judgment, he is caring for his mom, not nearly as intensely as he has been doing for the past four years or so, but he is caring for her, he is going through financial struggles, as your Honor has acknowledged, and he is also dealing with his own medical conditions, and that is the picture that we find ourselves in, he finds himself in at the time that he committed these offenses.

He had no intention, it's our respectful view, he had no intention from the outset to deceive anybody.  In fact, I think the testimony from Mr. Rusco supports that.  In fact, Mr. Olins, he began -- he was paying back the loan to AB&T, he was working closely with Mr. Rusco to help pay back that loan. There was testimony from Mr. Rusco that Mr. Olins had introduced many potential purchasers both before and after the receivership.  Mr. Olins was encouraging higher prices in an effort to try and help pay back that loan.  And ultimately, when the receivership order had been signed, it became more difficult for the sales of the antiques to occur and for those sales to occur at good prices or high prices, fair prices.

And as a result, but nonetheless, Mr. Olins was still actively working with Mr. Rusco to try and pay down the loan and, as of -- actually, as of a few months ago, in fact, the

Gcl2oli2

principal on the AB&T loan is zero.  And I think that's an

important point, because I think it reflects positively on

Mr. Olins, that this is somebody who wasn't trying to negate

responsibility.  He was trying to make a good faith effort to

repay back AB&T.

　　　　　With respect --

　　　　　THE COURT:  What is the balance on the loan?  I know

you have artfully said the principal is zero, and there was

some testimony that even the interest due at the time of the

receivership order, that that has been paid off, but what is

the current balance?

　　　　　MR. CECUTTI:  In terms of interest, I don't have that

exact figure; but, from my understanding, the order of priority

is the AB&T principal, which is now zero, followed by the SEC

disgorgement judgment, followed by -- and I think this is up to

Judge Cote, in terms of the interest on the AB&T loan.  So the

AB&T principal has been completely paid off, and that's been in

large part due to Mr. Olins' efforts.

　　　　　In terms of the SEC disgorgement judgment, your Honor

heard testimony, I believe, from Mr. Rusco that there were

efforts made by Mr. Olins and Mr. Rusco to try and settle,

resolve that SEC matter in an amount of I believe 1 to $1.5

million, and ultimately the SEC rejected that.  But that's an

attempt by Mr. Olins and Mr. Rusco to try and resolve that

issue as well.

Gcl2oli2

1              Your Honor may recall also that there were efforts by

2       both AB&T and Mr. Olins to try and make payments to the SEC,

3       which did occur in June of 2010, and before the disgorgement

4       order in February of 2011.  There were payments made to the

5       SEC, and those were efforts made by Mr. Olins.

6              The other thing that your Honor may recall is, I know

7       there are multiple exhibit numbers or letters, but Exhibit B to

8       our defense submission was a loan review report from April of

9       2011, which indicated that the repayment was going well, in

10      essence, and that's another indication that Mr. Olins was

11      making a good-faith effort to try and be responsible and pay

12      down the loan.

13             THE COURT:  Let me ask you, how do you square that

14      with the testimony of Mr. Rusco?  I think it was with respect

15      to the two items on the asset list that, unbeknownst to him,

16      were no longer in Mr. Olins' possession, the armchair and the

17      carpet or the rug.

18             MR. CECUTTI:  I believe the carpet ultimately --

19             (Pause)

20             MR. CECUTTI:  I believe that the carpet was ultimately

21      used to purchase a chandelier, which ultimately became a

22      receivership asset, and I do recall Mr. Rusco indicating that

23      Mr. Olins was embarrassed and apologetic about that as well.

24             But ultimately those weren't the only two items.

25      There were many items, and there was a high loan amount that

1    needed to be paid down and there was a high disgorgement

2    judgment that also needed to be paid, and Mr. Olins was making

3    a big effort to try and make that happen.  And I think there

4    are many e-mails that were submitted that reflect those efforts

5    and the fact that Mr. Rusco was willing to enter an agreement

6    with the SEC, was encouraging the SEC to enter into a

7    resolution with Mr. Olins also reflects that.

8            Mr. Olins' efforts to try and repay down the loan with

9    AB&T and the SEC and the financial state that he was in is also

10   reflected in the fact that he couldn't finance an appeal, and

11   that was something that Mr. DeVita had elicited from Mr. Rusco.

12   And I think that is important because it captures the financial

13   condition of Mr. Olins during that time period.  He was

14   receiving, I think, more than competent legal advice from many

15   prestigious white collar criminal defense law firms indicating

16   that he had a meritorious appeal, and he simply couldn't

17   finance it.  And, again, I think that that gives a picture to

18   the court of what Mr. Olins' financial conditions was during

19   that time period.

20           And your Honor has acknowledged, has indicated that

21   certainly Mr. Olins was struggling during this time period.  He

22   wasn't leading a lavish lifestyle.  I think what's also

23   important here and, again, we are not here today to excuse

24   conduct or defend Mr. Olins' actions, but I think it is worth

25   noting that the appointment of a receiver was driven by the

Gcl2oli2

1    SEC.  That wasn't something that Mr. Olins was encouraging.  It

2    wasn't something that Mr. Rusco or AB&T was encouraging,

3    either.  And as a result of the appointment of a receiver, in

4    our view, it stunted the ability for both AB&T and the SEC to

5    be paid.

6              THE COURT:  I hear your point.  I read that in your

7    submission.  That may even be right.  But it is water under the

8    bridge at this point.  It was an issue for Judge Cote to

9    consider.  She did what she did, and Mr. Olins was required to

10   live with that and we are here because he didn't.  I don't find

11   that a particularly compelling argument for mitigation here, so

12   move to the next point.

13             MR. CECUTTI:  The next point is, I think, what also --

14   and, again, we are just trying to provide context.  I think

15   what is also important here are the misrepresentations made by

16   Mr. Neville related to various items in Mr. Olins' collection

17   and how that contributed to the exacerbation of Mr. Olins'

18   negative financial conditions and also slowed the repayment

19   back to AB&T and really limited his ability to repay back the

20   SEC, and I think that is -- had it not been for those actions,

21   I think we would be in a different story with respect to AB&T

22   and with respect to the SEC.

23             Ultimately, your Honor, I think a question is what did

24   Mr. Olins receive amongst all of this, and I think it is clear

25   what he didn't receive.  He didn't receive the wall brackets.

Gcl2oli2

There is no apartment in Spain.  It was a pipe dream.  It was

something that he was exploring, something that he wanted, but

never materialized or came close to materializing.  And there

is nothing to indicate that he was living a lavish lifestyle or

had the ability to do so.

       Turning to the history and characteristics of

Mr. Olins, we had submitted, again, a number of letters

describing who he is.  And I think that Judge Rakoff has a

significant quote that we quoted in our submission from *United*

*States v. Adelson* and I think it is worth repeating.  It says,

"If ever a man is to receive credit for the good he has done

and his immediate misconduct assessed in the context of his

overall life hitherto, it should be at the moment of his

sentencing, when his very future hangs in the balance."

       This elementary principle of weighing the good with

the bad was plainly part of what Congress had in mind when it

directed courts to consider as a necessary sentencing factor

the history and characteristics of the defendant.

       We submit that the letters that were part of our

submission reveal a tremendous amount of good in Mr. Olins that

your Honor should credit, and I will highlight a few of the

comments.

       One letter from Mr. Lawrence Madison, who is the

former chairman of the board at Spatia Light --

       THE COURT:  I am going to cut you off only because it

Gcl2oli2

1    is after 5:00.  I have read all these submissions.  I have read

2    every one of the letters.  I got it.

3          If there is something that is not in your submission,

4    why don't you focus on that.

5          MR. CECUTTI:  That's fine.

6          THE COURT:  Just given the time, I would rather you

7    not go over things that I have already reviewed, because I

8    assure you that I have taken them into consideration.

9          MR. CECUTTI:  That's fine.

10          So, again, your Honor, we ask that all of the things

11    that the writers did submit your Honor take into consideration.

12          This is a man who is generous.  He is sacrificial.  He

13    has relationships with people who have stood by him for

14    decades.  In fact, many of those people were here today and

15    some of them are still here today, and they took time out of

16    their lives, their responsibilities, to be here yesterday all

17    day and to be here today because this is their friend, Robert

18    Olins.  And Robert Olins is somebody who has given to them, has

19    sacrificed for them, has served them, has been with them during

20    the darkest times of their lives.

21          I will point out one individual, and his name is Kenny

22    Schneider.  And Kenny Schneider is a lawyer, and Kenny

23    Schneider clerked for a criminal court judge in this city.  He

24    worked for Proskauer.  He advocated for clients.  And he is now

25    going through some of the darkest times in his life and, as he

Gcl2oli2

wrote in his letter, the only man that is standing next to him

is Robert Olins, and I think that speaks volumes about who

Robert Olins is as a person.  He is more than the offenses that

he pled guilty to and is convicted of and will be sentenced on.

        I wanted to turn briefly to the purposes of

sentencing, and I am not going to remind the court about the

purposes, but the government made mention of the fact that

Mr. Olins needs to be deterred.  I will say this:  Mr. Olins,

since his arrest in this case, and in fact since the SEC

litigation began in 2007, has gone through a tremendous amount

in his life and, in fact, in many ways has been punished.  He

experiences daily stress and anxiety and the worsening of his

medical conditions.  He has lost close friends, professional

contacts, and business associates.  He has experienced deep

shame and embarrassment.

        At the end of the day, your Honor, he is a man who is

60 years old who has nothing.  He is the sole caregiver of his

elderly mother who has cancer.  He doesn't have any bank

accounts.  He doesn't have a car.  He doesn't have any

significant material possessions.  He has nothing.  And the

only thing left that he has right now is his own self-respect

and dignity.  Everything has been taken away from him.  And he

very much wants to be able to repay the money that is owed, to

repay back his debts.  That's his desire.  That's what he wants

to do.  And the only thing left this afternoon is his own

Gcl2oli2

1    self-respect and dignity.  That's it.

2            THE COURT:  All right.  Why don't you begin to finish

3    up, please.

4            MR. CECUTTI:  One of the express purposes of

5    sentencing is to provide needed medical care in the most

6    effective manner, and your Honor raised a question with

7    Ms. Griswold concerning whether Mr. Olins can receive

8    appropriate medication in a BOP facility.

9            Now, I have done some of the research.  I have

10   contacted the BOP by phone.  I have read information online.

11   They do not provide diazepam.  Diazepam is a medication

12   commonly known as Valium that is prescribed to people who

13   suffer from extreme claustrophobia, and that's what Mr. Olins

14   suffers from, and we provided medical documentation verifying

15   that.  Mr. Olins is being treated by three different doctors

16   and is prescribed a regimen of medication, and the information

17   I received from the BOP is that diazepam is not a drug that

18   they give to inmates.

19           Percocet is another medication Mr. Olins receives,

20   which I do not believe the BOP gives to inmates either.  Now, I

21   haven't had an express discussion about that medication, but

22   the nature of that medication would suggest to me that they

23   would not provide that to inmates, much like the reasons for

24   why they don't provide diazepam or Valium.  But he has serious

25   medical conditions.  I'm not going to belabor the point with

1    his mother.  She also has serious medical conditions.  I think

2    those factors should obviously be considered by your Honor in

3    imposing an appropriate sentence.

4              So, at the end of the day, your Honor, we simply ask,

5    because we can't ask for a sentence below the guidelines, your

6    Honor to take into consideration everything that we submitted

7    as part of our written submissions and impose a sentence that

8    is sufficient and not greater than necessary for this

9    individual in this case.

10             THE COURT:  And one last question.  Any objection to

11   the proposed order of restitution in light of my findings?

12             MR. CECUTTI:  No, your Honor.

13             THE COURT:  All right.  Thank you.

14             Mr. Olins, is there anything that you wish to say

15   before I sentence you.

16             THE DEFENDANT:  I just would like to say that I felt

17   like I took responsibility for what I pled guilty for.  It has

18   been an awful X number of years, awful.  It's embarrassing.

19             And with respect to my sister, in taking care of my

20   mother, she has a troubled child and she has a full-time job,

21   and she can't take my mother to doctors appointments or prepare

22   her meals or -- I mean, she just can't do it.  She is a good

23   daughter, but she is not capable of doing it.

24             And I am embarrassed by, at the age of 60, being in

25   the position I am in.  I never thought in a million years that

Gcl2oli2

1    I would be in this position.

2            I apologize to you and I apologize to my mother for

3    putting her and in perhaps a terrible position, but I have

4    never -- not "but," but I have never been in a situation like

5    this and just certainly never thought I would be.

6            THE COURT:  All right.  Thank you.

7            Counsel, is there any reason why sentence should not

8    be imposed at this time?

9            MS. GRISWOLD:  No, your Honor.

10           MR. CECUTTI:  No, your Honor.

11           THE COURT:  In imposing sentence, I am required to

12   consider the factors set forth in Title 18 United States Code §

13   3553(a).  In the interests of time I don't think I will recite

14   them, but suffice it to say that I have considered all of them,

15   Subsections 1 through 7, if I remember correctly, including the

16   guidelines range, which I have found, for the reasons I stated

17   earlier, to be 46 to 57 months in prison.  Ultimately I am

18   required to impose a sentence that is sufficient but no greater

19   than necessary to comply with the purposes of sentencing that I

20   mentioned a moment ago.

21           Sentencing is, as I have said before, I think

22   indisputably the hardest part of any judge's job and part of it

23   is to find the right balance between punishing someone for

24   their conduct and recognizing, as Judge Rakoff did in the quote

25   that Mr. Cecutti read, the totality of a person's being.

Gcl2oli2

1          In this case I have no question that a jail sentence

2      is warranted.  I do think that the pattern of deception and

3      misconduct that I described earlier is one that warrants

4      punishment; that it is needed to reflect the seriousness of the

5      offense; it is needed because of what I see as a pattern of

6      conduct on Mr. Olins' part of thinking that he can get away

7      with things and not comply with the lawful orders of the court

8      and essentially try to continue living his life and keep the

9      balls in the air, some of which were not particularly good

10     ones, in a way that would ultimately redound to his advantage.

11         I also am troubled by what I see as the denial of his

12     responsibility and what I think is a clear effort to shift

13     blame to Mr. Neville.  Mr. Neville is no angel.  He has pled

14     guilty to serious crimes of his own and has other warts, if you

15     will, on his past and his day will come.  But, the bottom line

16     is, I don't think that he was single-handedly responsible for

17     the deception and fraud in the way that Mr. Olins suggested in

18     his sentencing submission and tried to suggest in the last day

19     and a half.  For those reasons, I certainly think a jail

20     sentence is warranted.

21         Having said that, given the totality of the

22     circumstances, I am not going to impose a guidelines sentence.

23     I think that the defendant's medical condition, his role with

24     respect to his mother -- and by that I mean just the degree to

25     which he has gone above and beyond a son's responsibilities in

Gcl2oli2

the last few years of being her sole caregiver, not as much the

fact that she needs to continue having his care.  It pains me

to send someone to prison in those circumstances, but

ultimately I think Mr. Olins had to understand when he did

these things that he was jeopardizing her in that way, and I am

hoping that alternative arrangements can and will be made for

her either with Mr. Olins' sister or otherwise.

          Third are the letters that counsel submitted.  I would

highlight two.  One is Mr. Schneider's, and Mr. Schneider's

presence here speaks volumes as well.  Second is the letter

from Mr. Terhune.  Both of those I thought were quite notable

in indicating a degree of empathy and generosity to those in

Mr. Olins' life and suggested somebody who is not

single-handedly selfish or craven in the way that his conduct

here might otherwise have suggested, but suggested that he is

someone who looks out for others, even though he doesn't

necessarily need to, and others who are down on their luck.

          Lastly, I would cite the fact that he has paid down

the principal on the AB&T loan.  Obviously, again, that doesn't

necessarily reflect the full amount owed to AB&T, let alone the

SEC judgment, but I do think that that is a reflection of his

efforts to make good on his debts and put this behind him.

          And then, finally, I would say what I have learned

over the last day and a half of this hearing is that this is a

world in which I think lots of people are playing fast and

1    loose with things, and I think it's quite clear, between the

2    use of the store credit and the valuations of items that are

3    exchanged in these transactions that, quite frankly, people are

4    cutting corners all over the place.  I'm not suggesting that

5    that excuses Mr. Olins' conduct, but I do think, apropos of

6    what Mr. Cecutti said, it needs to be viewed in context.  I

7    think the evidence has indicated that the troubling world in

8    which people are manipulating and can sort of manipulate the

9    details of transactions to suit their purposes and advantage

10   particular parties to transactions and the like and it is sort

11   of in that context that Mr. Olins engaged in the pattern of

12   conduct that I have found troubling.  Again, that by no means

13   excuses it, but it does put it in context.

14          For all those reasons, while I do think that a

15   sentence of jail time is necessary here, for the reasons I

16   said, I do not think that a guidelines sentence is warranted.

17   Indeed, I am inclined to vary below even what the guidelines

18   calculation was in the parties' agreement before the acceptance

19   of responsibility credit was taken out of the picture.

20          So, with that, I will state the sentence that I intend

21   to impose and would ask you, Mr. Olins, to please rise.

22          Mr. Olins, it is the judgment of this court that you

23   are remanded to the custody of the Bureau of Prisons for a

24   period of 24 months -- that is two years -- on each count,

25   Counts One and Five, I believe, to be served concurrently, to

Gcl2oli2

1    be followed by a period of two years of supervised release.

2              During your term of supervised release, you will be

3    subject to the following mandatory conditions:

4              First, you shall not commit another federal, state, or

5    local crime;

6              Second, you shall not illegally possess a controlled

7    substance;

8              Third, you shall not possess a firearm or destructive

9    device;

10             Fourth, you shall refrain from any unlawful use of a

11   controlled substance and submit to one drug test within 15 days

12   of your release on supervised release and at least two periodic

13   drug tests thereafter as determined by probation; and,

14             Fifth, you shall cooperate in the collection of DNA as

15   directed by probation.

16             In addition, these standard conditions of supervised

17   release shall apply, and you must also meet the following

18   special conditions:

19             First, you shall submit your person, residence, place

20   of business, vehicle, or any property or electronic device

21   under your control to a search on the basis that the probation

22   officer has a reasonable belief that contraband or evidence of

23   a violation of the terms of supervised release may be found.

24   That search must be conducted at a reasonable time and in a

25   reasonable manner.  Failure to submit to a search may be

Gcl2oli2

1    grounds for revocation.  And you shall advise any other

2    residents that the premises may be subject to search pursuant

3    to that condition.

4            You shall provide the probation officer with access to

5    any requested financial information unless you have satisfied

6    your financial obligations which I will mention in a moment.

7            You shall not incur any new credit charges or open

8    additional lines of credit without the approval of the

9    probation officer unless you have satisfied your financial

10   obligations.

11           You are to report to the nearest probation office

12   within 72 hours of your release from custody and you are to be

13   supervised in the district of your residence.

14           I am not going to impose a fine because I do not

15   believe that you have the ability to pay a fine, particularly

16   in light of the restitution order and other debts that you owe.

17           On the subject of restitution, it is further the

18   judgment of this court that you pay restitution in the amount

19   of $657,000, specifically, you will make restitution, in

20   accordance with Title 18 United States Code § 3663(a), payable

21   to the Clerk of the United States District Court for

22   disbursement to AB&T.  Information concerning the bank is set

23   forth in the order that I will sign.  The requirement of

24   interest under Section 3664 will be waived in light of your

25   financial circumstances as set forth in the report.

Gcl2oli2

 1         If you are engaged in a BOP non-UNICOR work program,

 2    you shall pay $25 per quarter toward the criminal financial

 3    penalties.  If you participate in BOP's UNICOR program as a

 4    grade one through four, however, you shall pay 50 percent of

 5    your monthly UNICOR earnings toward the criminal financial

 6    penalties consistent with BOP regulations at 28 CFR Section

 7    545.11.  Excuse.  Me that's not applicable here.  There is only

 8    one victim.

 9         The restitution shall be paid in monthly installments

10    of 15 percent of gross monthly income over a period of

11    supervision to commence 30 days after your release from

12    custody, and you shall notify the court and the probation

13    department of any material change in your economic

14    circumstances that might affect your ability to pay

15    restitution.

16         I am also imposing the mandatory special assessment of

17    $100 per count for a total of $200, which shall be due and

18    payable immediately; and, consistent with the consent

19    preliminary order of forfeiture that I signed and entered on

20    June 14 in connection with your plea, you are ordered to

21    forfeit to the United States $160,000 in United States currency

22    and the specific property referenced in that order, namely, all

23    right, title and interest in the wall brackets that we have

24    heard so much about.

25         Has does either counsel know of any legal reason why

1    the sentence should not be imposed as stated?

2              MS. GRISWOLD:  No, your Honor.

3              MR. CECUTTI:  No, your Honor.

4              MR. DeVITA:  No, your Honor.

5              THE COURT:  Sentence as stated is imposed.  I find

6    that the sentence is sufficient but no greater than necessary

7    to satisfy the sentencing purposes set forth in Section

8    3553(a)(2), including the need to promote respect for the law,

9    to provide just punishment for the offense, to afford adequate

10   deterrence, hopefully that's not necessary as to Mr. Olins, but

11   as to him and certainly as to others, and to protect the public

12   from further crimes of the defendant of which I hope there will

13   be none.

14             Is there any objection to allowing the defendant to

15   voluntarily surrender?

16             MS. GRISWOLD:  No objection.

17             THE COURT:  Is there a request with respect to

18   surrender date?  I don't know if the circumstances with respect

19   to Mr. Olins' mother warrant --

20             MR. DeVITA:  Your Honor, Mr. Olins is required to

21   appear in California in court on January 30 and 31 in

22   connection with the disgorgement proceeding out there.

23   Sometime after that would be -- and that should give the Bureau

24   of Prisons adequate time to make a designation.  We would ask

25   that your Honor recommend a designation somewhere close to his

Gcl2oli2

1   home in Connecticut.

2               THE COURT:  Very good.  I will certainly do that.  I

3   will recommend to the Bureau of Prisons that he be designated

4   to facility as close to West Hartford as possible to facilitate

5   the maintenance of ties with his family and in the hopes that

6   his mother might be able to visit him in custody.

7               I will order the defendant to surrender for service at

8   the institution designated by the Bureau of Prisons before 2

9   p.m. on February 17 or as notified by the probation or Pretrial

10  Services Department.

11              Mr. Olins you should understand that your conditions

12  of release will continue up until the time that you are to

13  surrender to begin your sentence.  If you fail to report for

14  your sentence, you may be charged with another offense and

15  subject to punishment above and beyond the punishment that you

16  have received today.

17              Do you understand that?

18              THE DEFENDANT:  I do.

19              MR. DeVITA:  Your Honor, I'm not sure about the bail

20  limits of Mr. Olins' release, but I assume he has the court's

21  permission to travel to California to appear in court in

22  connection with the SEC case.

23              THE COURT:  Any objection, Ms. Griswold?

24              MS. GRISWOLD:  No objection.  The current travel

25  restrictions are Southern and Eastern District of New York and

Gcl2oli2

1   District of Connecticut.  But if he is making an application

2   right now to be able to go to California at the end of January

3   for the SEC proceeding, we don't have an objection.

4           THE COURT:  I will grant that application as long as

5   Mr. Olins advises his, I am assuming Pretrial Services is still

6   in the picture at this point, but whether Pretrial Services or

7   probation, he should provide the details with respect to his

8   travel to them and then he may go to attend that proceeding.

9           I think there are several open counts to be dismissed,

10  is that correct, Ms. Griswold?

11          MS. GRISWOLD:  Yes, your Honor, Counts Two, Three, and

12  Four.  The government would move at this time that they be

13  dismissed.

14          THE COURT:  They are so dismissed.

15          Mr. Olins to the extent that you have not given up

16  your right to appeal through your guilty plea and the plea

17  agreement that you entered into in connection with your plea,

18  you have the right to appeal.  Any notice of appeal must be

19  filed within 14 days of entry of the judgment of conviction;

20  and if you cannot afford to pay the costs of an appeal, you may

21  apply for leave to appeal *in forma pauperis*.

22          Is there anything further from the government?

23          MS. GRISWOLD:  No, your Honor.

24          THE COURT:  From the defense?

25          MR. CECUTTI:  No, your Honor.

Gcl2oli2

1                    MR. DeVITA:  No, your Honor.

2                    THE COURT:  Let me say, first of all, this has been an

3        unusual last two days in the sense of the amount of time that

4        we devoted to a case where there was no dispute about the

5        guidelines, but I obviously felt that it was important for my

6        understanding of what the defendant's conduct was and wasn't

7        and whether he accepted responsibility.

8                    I do want to thank counsel I thought, even if it went

9        a little longer than I would have liked, both sides did a

10       really terrific job during the hearing, and it was certainly

11       helpful to me in exercising my discretion.

12                   Mr. Olins, I want to say to you that I imagine that

13       you and your family and friends would have liked to avoid the

14       sentence that I imposed altogether, but for the reasons that I

15       stated, I felt that I could not do that.  I hope that you have

16       gotten the message and understand that the kind of conduct that

17       landed you here is not acceptable and that you put it behind

18       you; that when you do get out, I hope that your mother is able

19       to greet you at that time and that you are able to care for her

20       and be a part of her life in a way that you don't have to come

21       back here ever again.

22                   I guess the bottom line is, I wish you and your family

23       the best of luck and wish everybody happy holidays and we are

24       adjourned.  Thank you.

25                   COUNSEL:  Thank you, your Honor.
                                        -  -  -